# IN  THE  UNITED  STATES  DISTRICT  COURT
## FOR  THE  SOUTHERN  DISTRICT  OF  OHIO
### EASTERN  DIVISION  AT  COLUMBUS

GERALD HAND,                                   :

                          Plaintiff,                                   Case No. 2:07-cv-846

                -vs-                                     District Judge Sandra A. Beckwith
                                                            Magistrate Judge Michael R. Merz

MARC HOUK, Warden

                Defendant.                     :

## REPORT AND RECOMMENDATIONS

This is a habeas corpus action brought by Petitioner Gerald Hand pursuant to 28 U.S.C. § 2254 and seeking relief from both his conviction for aggravated murder with death specifications and his resulting death sentence.

Mr. Hand is represented in this proceeding by appointed counsel who did not represent him in any direct appeal proceedings.[1]

**Statement of Facts**

The Supreme Court of Ohio described the facts and circumstances leading to Mr. Hand's indictment, trial, convictions, and adjudged sentence of death as follows:

> On March 24, 1976, Hand notified police that he found the strangled body of his wife, 28-year-old Donna Hand, in the basement of their Columbus home.

---

[1] The Court notes that present counsel represented Mr. Hand in his attempt to exhaust claims contained in Section XI (A-C) of his habeas Petition which attempt he made after he filed his Petition.  See, *infra.*

On September 9, 1979, while Hand was out of town, family members found the strangled body of Hand's second wife, 21-year-old Lori Hand, in the basement of the same home. The murders of Donna and Lori Hand remained unsolved for more than 20 years.

Sometime before January 15, 2002, Hand hired Walter "Lonnie" Welch, a longtime friend, to kill his wife, 58-year-old Jill Hand. On the evening of January 15, Hand shot and killed Jill at their Delaware County home and then shot and killed Welch when he arrived there. Subsequent investigation showed that Hand had previously hired Welch to kill Donna and Lori Hand.

Hand was convicted of the aggravated murders of Jill and Welch and sentenced to death. The evidence established that Hand's marriage to Jill had soured, Hand had accumulated more than $200,000 in credit card debt, and Hand stood to collect more than $1,000,000 in life insurance and other benefits on Jill's death. Before his death, Welch had told various friends and family members that Hand hired him to kill Jill and that Hand had previously hired him to kill Donna and Lori. Hand admitted that he had shot Welch, and forensic evidence established that Hand's claim that he acted in self-defense on the night of the murders was unsupported by the evidence. Forensic evidence established that Welch was shot in the back at close range. Hand also admitted to a cellmate that he had shot Jill and Welch.

### State's Case

**Murder of Donna Hand.** On the evening of March 24, 1976, Hand notified police that his wife had been murdered at their home on South Eureka Avenue in the Hilltop section of Columbus. According to Hand, he returned home after being out with his brother but was unable to open his front door because it was double latched from the inside. Hand entered the house through a side door and found Donna's body.

The police found Donna's fully clothed body at the bottom of the basement stairway. She had a bag over her head and it was tied with a spark-plug wire. The police found no sign of forced entry. Drawers in the upstairs bedroom had been removed and turned over, but the room did not appear to have been ransacked. Moreover, no property was missing from the house.

Dr. Robert Zipf, then a Franklin County Deputy Coroner, examined

Donna's body at the scene and found blood around the head where the body was lying. However, no blood spatters or other bloodstains were found on the stairs, which indicated that Donna had not hit her head falling down the steps.

During the autopsy, Dr. Zipf found "three chop wounds to the back of [Donna's] head" that were caused by "some type of blunt object, maybe a very thin pipe or a dull hatchet." However, Dr. Zipf determined that Donna had died from strangulation caused by the spark-plug wire around her neck.

During the fall of 1975, Donna told Connie Debord, her sister, that she planned to divorce Hand and move back to their parents' home. Donna felt that "everything was over" and "feared for her life." About two weeks before she was killed, Donna told Evelyn Latimer, another sister, that she was going to file for divorce.

Hand received $67,386 in life insurance following Donna's death. Hand also filed a claim for reparations after Donna's death and received $50,000 from the Ohio Victims of Crime Compensation Division of the Court of Claims.

During 1975 or 1976, Teresa Fountain overheard Welch talking to Isaac Bell, Fountain's boyfriend, about "knocking his boss's wife off to get some insurance money." Sometime after Donna's murder, Welch told Fountain, "I hope you didn't hear anything and * * * you keep your mouth shut, * * * you didn't hear anything."

**Murder of Lori Hand**. Hand married Lori Willis on June 18, 1977, and Welch was the best man at the wedding. Hand and Lori lived in the home on South Eureka Avenue in which Donna had been murdered.

By June 1979, Hand's marriage to Lori was falling apart. Lori told her friend, Teresa Sizemore, that she was unhappy with her marriage and was making plans to file for a divorce. Sizemore also saw Lori and Hand interact, but she "didn't see any warmth there because [Lori] wasn't happy."

Around 8:30 a.m. on September 9, 1979, Hand and his baby, Robby, left home so that Lori could clean the house for a bridal shower planned for that afternoon. Steven Willis, Lori's brother, picked up Hand at his house. The three of them then spent the next few hours visiting a flea market, a car show, and Old Man's Cave in Hocking

3

Hills. They also went go-cart racing.

Around 9:30 a.m., Lois Willis, Lori's mother, arrived at Hand's home to help Lori prepare for the bridal shower. After Lois knocked and did not get an answer, she left and returned about an hour and half later. Upon returning, Lois noticed that the front door was ajar and entered the house. Alarmed, she called Hand's family, who found Lori's body in the basement.

Police discovered Lori's body on the basement floor with a plastic sheet wrapped around her head. Lori's pants were unfastened with the zipper down, and her blouse was pulled up against her breast line. Bloodstains and blood spatters were found on the wall near Lori's body, and a spent lead projectile was found near her body. Lori had been shot twice in the head, but neither gunshot killed her. Dr. Patrick Fardal, a Franklin County Deputy Coroner, determined that strangulation was the cause of death. Lori's vehicle had been stolen from Hand's garage. Police recovered her vehicle about three blocks from the Hand home.

Police found the first and second floor levels of the house in disarray, with drawers and other items of property dumped on the floor. Nevertheless, the house did not appear to have been burglarized, because there were no signs of forced entry and the rooms were only partially ransacked. Investigators also seized a cash box containing credit card slips, currency, and a .38 caliber handgun from the trunk of Hand's car parked in the garage.

After he learned of Lori's death, Hand returned home. Hand told police that he had been out of the house with Steve and his young son when Lori was murdered. Hand said that "everyone, including * * * his brothers and help at the shop would have known" that he was going to be gone from the house that morning.

Hand told police that he was very possessive of Lori. He admitted having sexual problems with Lori because he "wanted sex at least once a night and she didn't want to do that." When asked about insurance, Hand said that he had in the past year doubled its value and that it should pay off both of his mortgages. Hand received $126,687.90 from five separate life insurance policies after Lori's death.

On September 10, 1979, the police recovered a pair of gloves near where Lori's vehicle was found. The fingers of the gloves were

4

bloody, and the gloves had been turned inside out. Human bloodstains were found on the gloves, and debris from inside the gloves was preserved.

On October 9, 1979, the police reinterviewed Hand. Hand provided the names of Welch and others who worked for him and said that he did not trust any of them. He told police that everyone, including all of his neighbors, was aware that he had received $50,000 after his first wife's murder. Hand also said that his wife was not planning to separate from or divorce him and that they were "extremely in love with each other."

During the fall of 1979, Welch went to the home of Pete Adams, Welch's first cousin, and told Adams that he had "killed Donna and Lori Hand" and had done it for Bob Hand. Adams did not notify police about this conversation until after Welch's death in 2002.

During 1979 and 1980, Betty Evans, Welch's sister, observed that Welch had a "wad of money," cars, and a girlfriend who wore a mink jacket, a diamond necklace, and rings. Around the same time, Welch told Evans that if she "knew anything, not to say anything because him and Bob had a pact and if anything got out, they were going to kill each other's mother."

In the 1980s and 1990s, Welch intermittently worked as a mechanic at Hand's radiator shop in Columbus. Hand also provided Welch with extra money on a frequent basis and gave him cars and a washer and dryer. In the late 1980s, Welch started using crack cocaine and spent a lot of money on it.

Sometime after Lori's death, Hand met and married Glenna Castle. They were married for seven to eight years and then divorced.

**Hand's marriage to Jill and his financial problems**. In October 1992, Hand married Jill Randolph, a widow, and moved into Jill's home on Walnut Avenue in Galena, Delaware County. Jill was employed at the Bureau of Motor Vehicles in Columbus and was financially secure. Hand was the beneficiary of Jill's state retirement and deferred-compensation accounts in the event of her death, and he was the primary beneficiary under her will.

By 2000, Hand's radiator shop had failed, and he was deeply in debt. During the 1990s and early 2000, Hand obtained thousands of dollars by making credit card charges payable to Hand's Hilltop Radiator. By

5

January 2002, Hand had amassed more than $218,000 in credit card debt.

At some point, Jill found out about the extent of Hand's debt. During 2000, she learned that Hand had charged more than $24,000 on a credit card in her name. Jill was upset and told her daughter, Lori Gonzalez, that "[s]he was going to have Bob pay off that amount that he had charged up with the sale from his business."

In October 2000, Hand sold his radiator shop and the adjoining buildings. In May 2001, Hand started working as a security guard in Columbus and earned $9.50 an hour. Despite his enormous debt, Hand continued to pay on several credit cards to maintain life insurance coverage on his wife, including payments in December 2001 and January 2002.

Hand and Jill grew increasingly unhappy with one another. During 2001, Hand told William Bowe, a friend of Hand's, that he was "quite tired of her." Abel Gonzalez, Jill's son-in-law, lived at the Hand home from April to June 2001. Abel said that Hand and Jill's marriage was "on the down slope. * * * There was no warmth there. * * * It seemed everything Bob would do would antagonize Jill, and she made it real clear that she was upset."

**Plans to murder Jill Hand**. In July or August 2001, Welch asked Shannon Welch, his older brother, if he had a pistol or could get one. Welch also asked, "Do you know what I do for extra money?" He continued, "Well, I killed Bob's first wife and * * * I got to kill the present wife and I'll have a lot of money after that." Welch said he was going to be well off enough to retire and talked about buying an apartment complex. Thereafter, Welch asked Shannon about a pistol "maybe once a week, sometimes twice a week."

Between December 21, 2001, and January 3, 2002, Welch was in jail for various motor vehicle violations. During that time, Welch told his cellmate, David Jordan Jr., that he planned to "take somebody out for this guy named Bob" and mentioned that he had "put in work for him before." Welch said he needed a driver because his eyes were "messed up." He asked Jordan if he wanted the job and offered to pay him between $5,000 and $6,000. Welch said this job was supposed to happen in January, and he gave Jordan his phone number.

During December 2001, Shannon asked Hand whether he could provide bond money to get Welch out of jail. Hand said, "Well, I

6

can't have no contact with Lonnie * * * because we got business" and refused to give him any money.

On January 14, 2002, Welch told Tezona McKinney, the daughter of Welch's common-law wife, that he was going to buy a car for her mother. Welch said he "was going to get the money the next day" and would buy the car "because [he] didn't buy her anything for Christmas because [he] was in jail."

Around 5:00 p.m. on January 15, 2002, Welch attended a family gathering at Evans's home in Columbus to celebrate Evans's birthday. Welch told Shannon that he had to "be ready * * * to see Bob because [he] might be taking care of * * * business tonight." Before leaving, Welch told Evans that he "was going to pick up some money and he'd be right back."

**Murder of Jill and Welch**. Around 6:45 p.m. on January 15, 2002, Hand arrived home from work. At 7:15 p.m., Hand made a 911 call to report that his wife had been shot by an intruder. Hand also reported that he had shot the intruder.

Police found Welch's body lying face down on Hand's neighbor's driveway. Inside Hand's house, Jill's body was found lying between the living room and the kitchen. Hand told police that he had shot the intruder but did not know his identity. He also gave police two .38-caliber revolvers that he used to shoot him. On the way to the hospital, Hand saw the intruder's vehicle and told Mark Schlauder, a paramedic, that "it could have belonged to somebody that worked for" Hand.

Around 8:00 p.m. on January 15, Detective Dan Otto of the Delaware County Sheriff's Office interviewed Hand at the hospital. Hand said that after arriving home, he had dinner with Jill and then went to the bathroom. Upon exiting, Hand heard Jill scream, "Gerald," heard two gunshots, and saw a man in a red and black flannel shirt at the end of the hallway. Hand then retrieved two .38 caliber revolvers from the master bedroom. Hand started down the hallway firing both guns at the intruder, but had trouble shooting because the guns were "misfiring" and "missing every other round." Hand followed the intruder out the front door and continued firing at him as he ran toward his car, and then the intruder fell on the neighbor's driveway.

During the interview, Hand repeated that he did not recognize the gunman, but recognized Welch's car in the driveway. Hand said he

"didn't know [Welch] that well; that he did odd jobs around the shop; that he was a thief; that he was a cocaine addict; that he * * * [came] in to the shop area from time to time." Hand also said that it had been a year since he had had any contact with Welch, and Welch had no reason to be at his home that night.

Investigators found no sign of forced entry at Hand's residence. Blood spatters were found inside the front door and on the front-door stoop. The top of the storm door was shattered, and particles of glass extended 13 feet into the front yard. All the glass fragments were found on top of the blood spatters. Police also found a black jacket on the front stoop, a spent bullet and glass fragments on top of the jacket, and a tooth outside the front door.

According to Agent Gary Wilgus, a crime-scene investigator, the blood spatters indicated that the victim was bleeding and "blood was dropping from his body" as he was moving away from the house. A bloody trail led onto the sidewalk and through the front yard and ended where Welch was lying in the driveway. Welch was wearing cloth gloves, and a knit hat with two eyeholes and a mouth hole was next to his head. Police also found a .32-caliber revolver on the front lawn.

Inside the house, police found glass fragments and bloodstains extending two to three feet from the front door and another tooth just inside the front door. Jill's body was 12 feet from the front door, her legs pointed towards the front door, and she was wearing a nightgown. Jill had been shot in the middle of her forehead. A second bullet deflected off the floor and was found on the carpet next to Jill's head.

Investigators found a bullet in the living room ceiling, and a second bullet was found in the living room window frame. While investigators could not determine the exact trajectory of the two bullets, they determined that they most likely originated from gunshots in the hallway area. No evidence of gunplay was found elsewhere in the house.

On January 17, 2002, Detective Otto reinterviewed Hand, and Hand provided a different version of events. Hand stated that after his wife was shot, he retrieved two guns from the master bedroom, went into the hallway, and saw Welch "coming down the hallway towards the master bedroom at him." Hand and Welch then began firing at each other in the hallway and were within four feet of each other during

the gun battle. Hand repeated that he chased Welch outside the house but "couldn't get his guns to fire; that he was missing every other round and * * * they weren't firing." When asked about the .32-caliber revolver in the front yard, Hand stated that he did not know who owned it.

During the second interview, Hand said, "I was misquoted on the first interview at the hospital" about not knowing Welch. Hand said that he had known Welch, a former employee, for over 20 years. However, Hand continued to give the impression that they were not close. When asked about a wedding photo showing Welch as his best man, Hand said he "couldn't find anybody else to stand in as [his] best man." Hand repeated that "the only thing he saw" on the night of the murder was an unknown person in "red and black flannel," and he had "no clue who this unknown person was." Hand also said that "Jill had never met Lonnie; Lonnie's never been to Walnut Avenue; he had no idea why he was there."

In discussing his financial situation, Hand said he sold his radiator shop in October 2000 and received $300,000, and later received $33,000 from the sale of his share of the business and its inventory, and $140,000 from somewhere else. Hand said he "always needed money, but if he needed money, he could get some; that he had money." Hand also told police that he was "hiding the money and that he was considering filing bankruptcy; that that was against Jill's wishes." Later, Hand said that he "wasn't going to file for the bankruptcy * * * and they were going to work it out." When asked if he had any offices, Hand said that his office was in a bedroom in the house. However, Hand failed to disclose that he kept business records at another location.

On January 19, 2002, the police seized several boxes containing Hand's business and personal records from the storage area above a hardware store near Hand's former radiator shop. These records included credit cards, credit-card-and life-insurance-account information, payment receipts, a list of credit card debt prepared by Jill, and other information about Hand's finances.

Heather Zollman, a firearms expert, testified that the .32-caliber revolver found in the front yard was loaded with two fired and three unfired .32-caliber Smith and Wesson ("S & W") Remington-Peters cartridges. Bullet fragments removed from Jill's skull were consistent with being an S & W .32-caliber bullet. In testing the .32-caliber revolver, Zollman found that "on more than 50 percent of [her]

testing, the firearm misfired" as a result of "a malfunction of the firearm." The stippling pattern shown in Jill's autopsy photographs indicated that "the muzzle to target distance was greater than six inches, and less than two feet."

Zollman tested the two .38-caliber revolvers and found that they were both in proper working order, and neither weapon showed any tendency to misfire. A bullet removed from Welch's right forearm was "consistent with the .38 caliber." Zollman also concluded that the bullet and fragments recovered from Welch's mouth and his lower back had rifling class characteristics corresponding with the S & W .38-caliber revolver. Further, gunshot residue around the bullet hole on the back of Welch's shirt revealed a muzzle-to-target distance greater than two feet from the garment but less than five feet.

Jennifer Duvall, a DNA expert, conducted DNA testing of bloodstains found on the shirt Hand was wearing on the night of the murders. Five of the bloodstains were consistent with the DNA profile of Welch. The odds that DNA from the shirt was from someone other than Welch was "one in more than seventy-nine trillion in the Caucasian population; one in more than forty-four trillion in the African-American population, and one in approximately forty-three trillion in the Hispanic population."

Michele Yezzo, a forensic scientist, examined bloodstain patterns on Hand's shirt. There were more than 75 blood spatters of varying sizes on the shirt. Yezzo concluded that the shirt was "exposed to an impact" that "primarily registered on the front of the garment." Yezzo also examined glass fragments collected from Hand's residence and "found tiny fragments of clear glass" on Hand's shirt, trousers, tee-shirt, and pair of socks that he was wearing on the night of the murders. However, she found no glass fragments on Welch's boots. Yezzo conducted a fiber analysis of the bullet from Welch's mouth, but found "no fibers suitable for comparison."

Ted Manasian, a forensic scientist, found particles of lead and barium on both gloves that Welch was wearing, and these are "highly indicative of gunshot residue." Manasian could not determine how the gunshot residue got on the glove, just that it was there. Thus, Welch could have fired the gun, or was in the proximity of the gun when it was discharged, or handled an item that had gunshot residue on it.

Detective Otto testified that $1,006,645.27 in life insurance and state-

benefit accounts were in effect at the time of Jill's death. This amount included $113,700 in Jill's Ohio Public Employees Retirement System account and $42,345.29 accumulated in the Ohio Public Employees Deferred Compensation program.

Dr. Keith Norton, a forensic pathologist in the Franklin County Coroner's office, conducted the autopsy of Jill and Welch. He concluded that Jill died from a single gunshot wound to the head. Dr. Norton found that Welch had been shot five times: in his mouth, left upper chest, left forearm, right shoulder, and lower back. The gunshot wound to Welch's lower back went into the spinal cord and would have paralyzed his legs. However, the gunshot wound to the chest was the cause of death.

According to Kenneth Grimes Jr., Hand's former cellmate in the Delaware County Jail, Hand told him that he "killed his wife and the man he was involved with." Hand said he hired a man and they had "been doing business together for years." Hand said he "hired the man to kill his wife and, in turn, the deal went sour. He wanted more money, so he killed two birds with one stone. He got both and didn't have to pay anything." Hand said he had agreed to pay $25,000 to have his wife killed, and the man "wanted it doubled." Hand said he was going to claim self-defense. He also said the evidence against him was "circumstantial and there were many witnesses that didn't have * * * any actual, proof."

**Attempted jail escape.** Hand was incarcerated in the Delaware County jail beginning on August 8, 2002. On November 26, 2002, correction officers discovered an escape attempt in Hand's cell block.

An attempt had been made to cut through the lock on the rear emergency exit of the cell block and through a cell bar. Officers searching Michael Beverly's cell found two saw blades. Police also seized some torn-up tee-shirt material and a pencil with a tee-shirt tied around it from Hand's belongings in his neighboring cell.

Michael Beverly and Wedderspoon, another inmate, came up with the idea for the escape. Beverly said that he obtained two hacksaw blades and began cutting through the rear-exit lock and one cell bar. Dennis Boster, another inmate, was the lookout, and once in a while Hand would relay messages to Beverly that a guard was coming. Hand also advised Beverly on how to cut through the metal bar.

According to Grimes, Beverly and Hand discussed escaping through

11

the front of their cell block. The plan was that while Hand distracted the guards and nurses by requesting his medication, Beverly would apprehend a guard, and they would escape through the front door. Grimes also identified Hand as a lookout.

### Defense Case

Sally Underwood, Hand's sister, was a bartender in the Columbus Hilltop area from 1992 until 1994. During that time, Welch frequently came into the bar selling televisions, stereos, and other electronic equipment. When asked where he obtained this property, Welch said that he "had just stolen it from a house down the street." Underwood could tell that Welch was "on something" when he entered the bar.

According to Terry Neal, another inmate in Hand's cell block, Hand was not involved in the escape attempt. Dennis Boster, who was convicted of escape, also testified that Hand was not involved in the escape attempt and never served as a lookout.

Hand testified in his own behalf. He said, "I did not kill my wife or have anything to do with the planning of killing my wife, either." Hand also denied conspiring with Welch or anyone else to kill Donna or Lori. Hand did not remember "too much" about the day Donna was killed.

When Hand married Lori, Welch was the best man at the wedding because his brother backed out at the last minute. Hand said that he had a great sexual relationship with Lori before his son, Robert, was born, but thereafter, they started having sexual problems. However, his business was going well, and his financial condition was "great."

During his marriage to Lori, Hand took over his father's radiator shop, purchased the underlying property, and bought some extra lots. Welch worked part-time at the radiator shop and was paid under the table. Around this time, Hand embarked on a credit card scheme. He used personal credit cards, charged them to his business, and used this money to finance his business and purchase real estate.

The wedding shower at his home on September 9, 1979, had been planned weeks in advance. When he learned that Lori had been killed, Hand "didn't believe it at first" and then went "hysterical." Hand later told police that he suspected that his brother, "Jimbo," had killed Lori because they were not "getting along that good and he had

12

the keys to [Hand's] house."

Shortly before Hand and Jill were married in 1992, he moved into her Delaware County home. After they had been married for a couple of years, Jill found out about Hand's credit card scheme. Hand said, "She didn't like it; * * * She just didn't want no part of it." She also learned about Hand's debt, which at one point, was close to a million dollars. Jill was also aware that Hand had life insurance on her through his credit cards.

In 2000, Jill learned that Hand used her credit card to pay for repairs to one of Hand's properties. Jill was upset and wanted a "total refinance of everything." Hand then "started selling everything * * * and then paying the credit cards and the mortgages and everything down." In 2001, Hand sold his radiator shop. By May 2001, Hand had sold all his properties, had paid thousands of dollars on his credit card debt, and had gone to work as a security guard.

According to Hand, he arrived home from work around 6:45 p.m. on January 15, 2002. Hand was coming out of the bathroom when he heard Jill shout, "Gerald, Gerald." He then heard a couple of shots and saw a man dressed in red flannel. Hand retrieved two guns from the bedroom dresser, and as he came out of the bedroom, he saw the intruder coming down the hallway. Hand started "firing, and * * * assumed [the intruder] was firing." However, Hand thought his guns were "misfiring because [the intruder] wasn't going down." Hand said he chased the intruder out the front door and continued firing at him until the intruder fell on the driveway. He then returned to the house and called 911.

Hand did not know how many shots he fired. He retrieved the guns and started firing, later explaining, "I wanted to protect myself * * * and shoot him, the son-of-a-bitch that shot my wife." Hand did not recognize the intruder, but recognized Welch's car in the driveway. He had no idea why Welch had come to his house that night.

Hand denied telling Grimes that Welch was already in the house when he came home from work, denied telling him that Welch wanted to renegotiate his fee, and denied telling him that he killed his wife and then killed Welch. As for the escape, Hand said that he tried to stay away from Beverly as much as possible. Beverly asked Hand if he wanted to join in the escape, and Hand told him "no, and just get away." Hand also claimed that he did not aid Beverly in any way. Finally, he said that the string found in his cell was used for hanging

13

a bag with food items to keep out the ants.

*State v. Hand,* 107 Ohio St.3d 378, 378-89 (2006).

## State Court Proceedings

On or about August 9, 2002, in Case 02CR-I-08-366, Mr. Hand was indicted by the Grand Jury of Delaware County, Ohio, for the following: one count of Aggravated Murder (Count One of the Indictment), in violation of O.R.C. § 2903.01(A) for the death of Jill J. Hand; one count of Aggravated Murder (Count Two of the Indictment), in violation of O.R.C. § 2903.01(A) for the death of Walter M. "Lonnie" Welch; and two counts of Conspiracy to Commit Aggravated Murder (Counts Three and Four of the Indictment), with the listed accomplice being Walter M. "Lonnie" Welch and the intended victim being Jill J. Hand, a violation of O.R.C. § 2923.01(A)(1) . Appendix to Return of Writ, Vol.1 at 55-59 (hereinafter "App.").  All four counts of the indictment carried a specification for using a firearm during the course of the indicted crime. *Id.*

Additionally, Counts One and Two of the Indictment contained a capital specification for committing Aggravated Murder during a course of conduct of killing or attempting to kill two or more people. Count Two of the Indictment, involving the murder of Mr. Welch, also contained capital specifications for the following: that the Aggravated Murder was committed for the purpose of escaping detection, apprehension, trial or punishment for another crime committed by the offender, being complicity to commit the murder of Donna Hand (Specification Two); that the Aggravated Murder was committed for the purpose of escaping detection, apprehension, trial or punishment for another crime committed by the offender, being complicity to commit the murder of Lori L. Hand (Specification Three); that the Aggravated Murder was committed for the purpose of escaping detection, apprehension, trial, or punishment for another crime committed by the

offender, being complicity to commit the murder of Jill J. Hand (Specification Four); that the victim,

Mr. Welch, was a witness to an offense, being the murder of Donna A. Hand, and was purposely

killed to prevent the victim's testimony in any criminal proceeding (Specification Five); that the

victim, Mr. Welch, was a witness to an offense, being the murder of Lori L. Hand, and was

purposely killed to prevent the victim's testimony in any criminal proceeding and that the

aggravated murder was not committed during the commission of the offense for which the victim

was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely

killed in retaliation for the victim's testimony in any criminal proceeding (Specification Six). *Id.*

On August 14, 2002, Mr. Hand entered a plea of not guilty to the Indictment. App.

Vol. 1 at 65-66. The court appointed Terry Sherman as lead counsel and Richard Cline as co-

counsel. *Id.* at 69-70. Both attorneys were certified to be appointed to capital cases pursuant to Rule

20 of the Ohio Supreme Court Rules of Superintendence. *Id.*

On December 6, 2002, in Case 02CR-I-12-643, the Grand Jury of Delaware County,

Ohio, indicted Mr. Hand for one count of Escape, in violation of O.R.C. §2921.34(A)(1). App. Vol.

4 at 17-18. Mr. Hand pled not guilty to that charge on December 12, 2002. *Id.* at 37-38. On January

10, 2003, in Case 03CR-I-01-014, the Grand Jury for Delaware County, Ohio indicted Mr. Hand

for one count of Conspiracy to Commit Aggravated Murder, in violation of O.R.C. §2923.01(A)(2).

App. Vol. 5 at 17-18. This conspiracy charge was similar to the two original charges contained in

Counts Four and Five of the August 9, 2002, Indictment but expanded the time frame of the

Indictment to include the eight-plus month period prior to Jill Hand's death. *Id.* Mr. Hand pled not

guilty on January 21, 2003. *Id.* at 28-29. All three cases were consolidated for trial. *Id.* at 44-45.

Jury selection began on May 1, 2003, and continued through May 6, 2003. Trial

Transcript, Vols. 3 through 6 (hereinafter "Trial Tr.")[2].  After the court's preliminary instructions and a jury view on May 7, 2003, the jury began hearing testimony in the guilt phase of Mr. Hand's trial on May 8, 2003.  Trial Tr. Vols. 7 and 8.  On May 30, 2003, the jury found Mr. Hand guilty of the charges in the Indictment including all of the specifications.  App. Vol. 3 at 183-203; *see also,* Trial Tr. Vol.  20 at 3815-3818.

The mitigation phase of Mr. Hand's trial began on June 4, 2003, and on that same date, the jury determined that the aggravating factors outweighed the mitigating factors and recommended that the court sentence Mr. Hand to death.  App. Vol. 3 at 208-15; *see also,* Trial Tr. Vol. 21 at 3926-3945.  On June 4, 2003, in open court, the court accepted the jury's recommendation and sentenced Mr. Hand to death for Counts One and Two of the Indictment.  App. Vol. 3 at 216-19; *see also,* Tr. Vol. 22 at 3945-3954.  On June 5, 2003, the court filed its Judgment Entry of Sentence in which it sentenced Mr. Hand to death for Counts One and Two of the Indictment. App. Vol. 3 at 216-219.  The court did not impose a sentence for Counts Three and Four of the Indictment, the accompanying counts of Conspiracy to Commit Aggravated Murder.  *Id.*  The court also sentenced Mr. Hand to three years incarceration for the one count of Escape to be served consecutive to Counts One and Two of the Indictment, as well as to a three-year term of incarceration for the two firearms specifications which the court ordered to run concurrent with each other but consecutive to the other charges for which Mr. Hand was convicted.  *Id.*  On June 16, 2003, the court filed its Opinion and Judgment Entry Pursuant to R.C. 2929.03(F).  *Id.* at 221-34.

---

[2]

Each state court trial transcript which Respondent filed in this action reflect two volume numbers; one  which is the volume number as filed in this Court and one which is the volume number in the state court.  For example, Respondent filed the trial court's Trial Transcript Vol. I as Trial Transcript Volume 3 in this habeas action.  (Doc.  27).  This Court's citations to the Trial Transcript Volume number are to the volume numbers as filed in this Court.

Mr. Hand filed a notice of appeal to the Supreme Court of Ohio on July 30, 2003.

App. Vol. 6 at 6-8.   In support of his appeal, Mr. Hand raised the following Propositions of Law:

### PROPOSITION OF LAW NO. 1
Where the State fails to prove by clear and convincing evidence that a witness is unavailable due to a criminal defendant's wrongdoing, and the proposed evidence does not meet standards of reliability, it is constitutional error to admit this evidence against the defendant.

### PROPOSITION OF LAW NO. 2
The introduction and admission of prejudicial and improper character and other acts evidence and the failure of the trial court to properly limit the use of the other acts evidence denied Gerald Hand his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the United States Constitution, Amends. V, VI, VIII and XIV; Ohio Const. Art. I, §§ 10 and 16.

### PROPOSITION OF LAW NO. 3
It is prejudicial error for a trial court to join the unrelated charge of escape with charges of aggravated murder and conspiracy in violation of O.R.C. § 2941.04, thus prejudicing Appellant in violation of his constitutional protections.

### PROPOSITION OF LAW NO. 4
Where the State has failed to present any evidence that a criminal defendant planned to break his detention, a conviction on the charge of escape is constitutionally infirm due to the insufficiency of the evidence to prove each element of the offense.

### PROPOSITION OF LAW NO. 5
When the State proceeds on a theory that the defendant is the principal offender of an aggravated murder, it is error for the trial court to instruct the jury on complicity. U.S. Const. VI, XIV.

### PROPOSITION OF LAW NO. 6
The trial court's failure to give the required narrowing construction to a "course-of-conduct" specification in a capital case creates a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner in violation of the United States Constitution. U.S. Const. Amends. VIII & XIV.

### PROPOSITION OF LAW NO. 7
Where trial counsel's performance at voir dire and in the trial phase

17

in a capital case falls below professional standards for reasonableness, counsel has rendered ineffective assistance, thereby prejudicing the defendant in violation of his constitutional rights.

## PROPOSITION OF LAW NO. 8
Where trial counsel put on a very brief and skeletal presentation at the penalty phase, fail to argue residual doubt and fail to make any closing argument to the jury, counsel's performance is substandard and a capital defendant is prejudiced thereby.  U.S. Const. amends. VI, VIII and XIV.

## PROPOSITION OF LAW NO. 9
The capital defendant's right against cruel and unusual punishment and his right to due process are violated when the legal issue of relevance is left to the jury regarding sentencing considerations. U.S. Const. amends. VIII, XIV.

## PROPOSITION OF LAW NO. 10
A capital defendant's right against cruel and unusual punishment under the Eighth and Fourteenth Amendments is denied when the sentencer is precluded from considering residual doubt of guilt as a mitigating factor.  The preclusion of residual doubt from a capital sentencing proceeding and the trial court's refusal to instruct the jury to consider it also violate the Defendant's due process right to rebuttal under the Fourteenth Amendment.  The preclusion of residual doubt may also infringe a capital defendant's right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments. U.S. Const. Amends. VI, VII, XIV; Ohio const. Art. I, §§ 9, 10, 16.

## PROPOSITION OF LAW NO. 11
Gerald Hand's death sentence must be vacated by this Court as inappropriate because the evidence in mitigation was not outweighed by the aggravating circumstances.

## PROPOSITION OF LAW NO. 12
A capital defendant's right to due process is violated when the State is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.  U.S. Const. amend. XIV; Ohio Const. Art. I, § 16.

## PROPOSITION OF LAW NO. 13
Ohio's death penalty law is unconstitutional.  Ohio Rev. Code Ann.

18

§§ 2903.01, 2929.02, 2929.021, 2929.22, 2929.023, 2929.04, and 2929.05 do not meet the prescribed constitutional requirements and are unconstitutional on their face and as applied to Gerald Hand. U.S. Const. amends. V, VI, VIII, [a]nd XVI; Ohio Const, Art. I, §§ 2, 9, 10, [a]nd 16.  Further, Ohio's death penalty statute violated the United States' obligations under international law.

App. Vol. 6 at 245-386.

On January 18, 2006, the Ohio Supreme Court affirmed Mr. Hand's conviction and sentence.  *State v. Hand,* 107 Ohio St.3d 378 (2006); *see also,* App. Vol. 8 at 316-77.  Mr. Hand filed a Motion for Reconsideration with the Ohio Supreme Court on January 30, 2006, which the court denied on April 29, 2006.  App. Vol. 9 at 1-10.

On April 18, 2006, Mr. Hand, who was represented by new counsel, sought to reopen his direct appeal by filing an Application for Reopening Pursuant to OhioS.Ct. Prac. R. XI, Section 6 in which he raised the following claims:

**PROPOSITION OF LAW I**
Appellate counsel was ineffective for failing to raise the claim that appellant Hand's conviction was against the manifest weight of the evidence because the state failed to prove the underlying aggravating circumstances and specifications of Count 2, specifications 2-6, beyond a reasonable doubt.  The conviction was, therefore contrary to this Court's holding in *State v. Odraye Jones*, 91 Ohio St. 3d 335, 744 N.E.2d 1163 (2001).

**PROPOSITION OF LAW II**
Appellate counsel was ineffective for failing to motion the court to supplement their brief to include relevant and previously unavailable juror bias issues.

**PROPOSITION OF LAW III**
Appellate counsel was ineffective for failing to raise the issue that the trial court committed error by failing to conduct a constitutionally adequate inquiry to determine bias of jurors due to pre-trial publicity.

App. Vol. 9 at 28-39.  The Supreme Court of Ohio denied Mr. Hand's Application for Reopening

on August 2, 2009.  *State v. Hand*, 110 Ohio St.3d 1435 (table) (2006); *see also*, App. Vol. 9 at 43.

On June 27, 2006, Mr. Hand filed a petition for a writ of certiorari with the United States Supreme

Court, App. Vol. 9 at 45, which the Court denied.  *Hand v. Ohio,* 549 U.S. 957 (2006).

      On September 24, 2007, after he had filed his Petition for Writ of Habeas Corpus in

this Court, Mr. Hand filed with the Ohio Supreme Court a Motion to Reopen Appeal on the Basis

of Ineffective Assistance of Appellate Counsel.  App. Vol. 9 at 47-61.  Mr. Hand raised the

following claims which he alleged should have been raised in his direct appeal:

> **A.** The death penalty specifications relating to the murder of Hand's
> first wife were barred by the doctrine of collateral estoppel.

> **B.** The trial court erred in denying Hand's motion to dismiss the
> specifications regarding the murder of Hand's first two wives on
> Evid.R. 404(B) grounds.

> **C.** Trial counsel provided ineffective assistance in failing to object
> to privileged testimony regarding Hand's bankruptcy attorney.

*Id.*  On December 12, 2007, the Ohio Supreme Court denied Mr. Hand's Motion to Reopen on the

procedural ground that Mr. Hand had failed to comply with the 90-day filing deadline of that court's

S.Ct.Prac.R. XI(6)(A).  *Id.* at 207.

      On December 24, 2004, Mr. Hand filed his Petition for Post Conviction Relief in the

Delaware County Court of Common Pleas.  App. Vol. 10 at 77-111.  In his Petition, Mr. Hand raised

the following grounds for relief:

> **<u>Ground for Relief No. 1</u>**
> Petitioner's conviction and sentence are void or voidable because the
> trail court failed to conduct a constitutionally adequate inquiry to
> determine juror bias due to pre-trial publicity.  The court's error
> violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth,
> Ninth and Fourteenth Amendments of the United States Constitution
> and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio
> Constitution.

**Ground for Relief No. 2**
Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel when trial counsel failed to adequately question prospective jurors with regards to their awareness of pre-trial publicity. The failure to act by defense counsel violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 3**
Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel when defense counsel failed to make a motion for a change of venue. The failure to act by defense counsel violate Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

**Ground for Relief No. 4**
Petitioner's conviction and sentence are void or voidable because his trial counsel failed to present compelling expert psychological evidence in his defense during the penalty phase of his capital trial. This inaction violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I. Sections 2, 5, 9, 10, 16 and 20 of the Ohio Constitution.

**Ground for Relief No. 5**
Petitioner's conviction and sentence are void or voidable because his trial counsel failed to reasonably investigate and present compelling evidence, through family and friends, to mitigate the sentence of death. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution.

**Ground for Relief No. 6**
Petitioner's conviction and sentence are void or voidable because his trial counsel failed to reasonably investigate and present compelling evidence that was vital mitigation after Petitioner testified poorly during his trial and was convicted of aggravated murder. Therefore, Petitioner's rights were denied under the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and

21

Sections 2, 5, 9, 10, 16, and 20 of Article I of the Ohio Constitution.

**Ground for Relief No. 7**
Petitioner's conviction and sentence are void or voidable because a juror failed to follow this court's instruction regarding the weighing process necessary to determine Petitioner's death sentence.  As a result, Petitioner was denied his right to due process, and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

**Ground for Relief No. 8**
Petitioner's conviction and sentence are void or voidable because his trial counsel failed to present compelling evidence about his third wife during the penalty phase of his capital trial.  As a result, Petitioner was denied his right to effective assistance of counsel, due process, and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

**Ground for Relief No. 9**
Petitioner's conviction and sentence are void or voidable because the death penalty as administered by lethal injection in the state of Ohio violates his constitutional rights to protection from cruel and unusual punishment and to due process of law.  U.S. Const. amends. VIII, IX, XIV; Sections 1,2 , 5, 9, 10, 16, and 20, Article I of the Ohio Constitution; *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998) (five justices holding that the Due Process Clause protects the "life" interest at issue in capital cases).

**Ground for Relief No. 10**
Petitioner's conviction and sentence are void or voidable because, assuming *arguendo* that none of the grounds for relief in his post-conviction petition individually warrant the relief sought from this court, the cumulative effects of the errors and omissions presented in the petition's foregoing paragraphs have been prejudicial and have denied Petitioner his rights secured by the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution, and Article I, Sections 1, 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

*Id.*

On February 9, 2005, Mr. Hand filed an amendment to include the following Grounds

22

for Relief:

> **Ground for Relief No. 11**
> Petitioner's conviction and sentence are void or voidable because he was denied the effective assistance of counsel when trial counsel failed to act upon and utilize Petitioner's timely report of an escape attempt at the Delaware County Jail.  The failure to act by defense counsel violated Petitioner's rights as guaranteed by the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments of the United States Constitution and Article I, Sections 2, 5, 9, 10, 16, and 20 of the Ohio Constitution.

> **Ground for Relief No. 12**
> Petitioner's conviction and sentence are void or voidable because the State withheld material evidence–investigation in 2001 by the Columbus Police Department of the murders of Petitioner's first two wives–in violation of his rights to due process and a fair trial as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

App. Vol. 11 at 8-14.

On May 27, 2005, the Delaware County Court of Common Pleas granted the state's Motion to Dismiss and dismissed Mr. Hand's petition for post-conviction relief.  *Id.* at 158-65.

Mr. Hand filed a notice of appeal of the Delaware County Common Pleas Court's decision on June 23, 2006.  App. Vol.12 at 12-13.  In that appeal, Mr. Hand raised the following assignments of error:

> **Assignment of Error No. I**
> The trial court erred by dismissing appellant's post-conviction petition where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.

> **Assignment of Error No. II**
> Ohio's post-conviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

> **Assignment of Error No. III**

23

Considered together, the cumulative errors set forth in Appellant's substantive grounds for relief merit reversal or remand for a proper post-conviction process.

*Id.* at 80-128.

On April 21, 2006, the Ohio Fifth District Court of Appeals affirmed the judgment of the trial court. *State v. Hand,* No. 05CAA060040, 2006 WL 1063758 (Ct. App. Delaware Cnty. Apr. 21, 2006);  App. Vol. 12 at 360-74.

Mr. Hand filed a notice of appeal to the Supreme Court of Ohio on June 5, 2006. App. Vol.13 at 3-5.  In his Memorandum in Support of Jurisdiction, Mr. Hand raised the following propositions of law:

> **Proposition of Law No. 1**
> The Court of Appeals erroneously upheld the trial court's determination that all but appellant's seventh post-conviction claim was barred by the doctrine of *res judicata*, thereby violating appellant's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 2, 9, 10, 16, and 20 of the Ohio Constitution.
>
> **Proposition of Law No. 2**
> The Court of Appeals erred when it determined that there was insufficient evidence presented in support of the Seventh Ground for Relief to grant relief or discovery and an evidentiary hearing.
>
> **Proposition of Law No. 3**
> The Court of Appeals erred by dismissing appellant's post-conviction petition , where he presented sufficient operative facts and supporting exhibits to merit an evidentiary hearing and discovery.
>
> **Proposition of Law No. 4**
> Ohio's post-conviction procedures neither afford an adequate corrective process nor comply with due process and equal protection under the Fourteenth Amendment.

*Id.* at 29-74.

The Supreme Court of Ohio declined to accept Mr. Hand's appeal.  *State v. Hand,*

24

110 Ohio St.3d 1468 (2006). Mr. Hand then filed for certiorari to the United States Supreme Court

(App. Vol. 13 at 96) which was denied on February 20, 2007. *Hand v. Ohio,* 549 U.S. 1217 (2007).

**Proceedings in this Court**

On March 1, 2007, Mr. Hand filed a Motion for Leave to Proceed in Forma Pauperis,

Notice of Intention to File Habeas Corpus Petition, and a Motion for Appointment of Counsel for

Habeas Corpus. (Doc. 1). This Court granted Mr. Hand's Motion for Leave to Proceed in Forma

Pauperis and for Appointment of Counsel. (Doc. 2). On August 22, 2007, Mr. Hand filed his

Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus in which he raised the following

claims:

### GROUNDS FOR HABEAS RELIEF

**I. The admission of unreliable hearsay evidence, absent clear and convincing evidence that Hand was at fault for the declarant's unavailability at trial, violated Hand's right to due process.**

**II. The introduction of prejudicial character and other acts evidence, and the failure of the trial court to appropriately limit the evidence, violated Hand's right to due process, a fair trial, and a reliable determination of his guilt and sentence.**

**III. The State failed to disclose material exculpatory evidence to the defense at trial in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), and Hand's Fifth and Fourteenth Amendment rights.**

**IV. Hand was denied the effective assistance of counsel during the guilt phase of his trial in violation of his Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendment rights.**

**A. The failure to object to testimony from Hand's bankruptcy attorney that was protected by the attorney-client privilege;**

**B. The failure to adequately question prospective jurors**

regarding their awareness of pretrial publicity;

C. The failure to make a motion for change of venue;

D.  The failure to act upon and utilize Hand's report of an escape attempt at the Delaware County jail;

E.  The failure to exclude prospective jurors who were biased against the defense;

F.  The failure to object to the admissibility of co-conspirator statements;

G.  The failure to object to other bad acts evidence and argument;

H.  The failure to present evidence of self-defense at the hearsay hearings;

I.  The failure to call Phillip Anthony as a defense witness;

J.  The failure to request jury instructions;

K.  The cumulative impact of defense counsel's errors.

V.  Hand was denied the effective assistance of counsel at the sentencing phase of his trial in violation of his Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendment rights.

A.  The failure to present expert psychological testimony in mitigation;

B.  The failure to investigate and present mitigation through family and friends regarding Hand's abysmal childhood and dysfunctional family background;

C.  The failure to present pharmacological and lay witness testimony to explain Hand's demeanor during his guilt-phase testimony;

D.  The failure to present testimony regarding Hand's third wife;

E.  The failure to investigate and present an ineffective

[sic] mitigation strategy, coupled with the failure to give a penalty phase closing argument;

F. The failure to object to the admission of all guilt phase evidence;

G. Cumulative error of ineffectiveness in mitigation.

VI. The trial court's failure to conduct an adequate colloquy to determine whether prospective jurors were biased from their exposure to pretrial publicity violated Hand's Fifth, Sixth, Ninth, and Fourteenth Amendment rights.

VII. The joinder of an unrelated escape charge with Hand's aggravated murder trial violated Hand's rights to due process and a fair trial.

VIII. Hand was convicted of escape absent sufficient evidence of his guilt in violation of the Fifth and Fourteenth Amendments.

IX. The trial court improperly instructed the jury in violation of Hand's Sixth and Fourteenth Amendment rights.

A. Hand's Sixth and Fourteenth Amendment rights were violated when the trial court instructed the jury on complicity despite the State's theory that Hand was the principal offender.

B. The trial court failed to give the appropriate narrowing construction to the course of conduct specification.

C. The trial court failed to appropriately instruct the jury on the relevance of the guilt phase exhibits at sentencing.

D. The trial court failed to appropriately instruct the jury as to the definition of reasonable doubt.

X. The jury's failure to properly conduct the weighing process before imposing the death penalty violated Hand's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.

XI. Hand was deprived of the effective assistance of counsel on direct appeal in violation of his Sixth and Fourteenth

27

Amendment rights.

A. The failure to preserve the collateral estoppel argument;

B. The failure to raise an ineffective assistance of counsel challenge to the fact that trial counsel did not object to the testimony of Hand's bankruptcy attorney on the grounds of attorney-client privilege;

C. The failure to challenge the trial court's ruling denying Hand's motion to dismiss the specifications relating to the murder of Hand's first two wives;

D. The failure to challenge the sufficiency of the evidence as to the aggravating circumstances and specifications of count two, specifications two through six;

E. The failure to amend the brief to include juror bias issues;

F. The failure to allege that the trial court's inquiry into potential juror bias resulting from extensive pretrial publicity was constitutionally defective.

XII. The Ohio death penalty statutes are facially unconstitutional.

XIII. The exclusion of residual doubt as a mitigating factor violated Hand's right against cruel and unusual punishment and rights to due process and a fair trial.

XIV. Ohio's use of the lethal injection procedure to administer executions constitutes cruel and unusual punishment in violation of Hand's Eighth, Ninth, and Fourteenth Amendment rights.

XV. The cumulative errors at Hand's trial, sentencing, and on direct appeal command issuance of a writ of habeas corpus.

(Doc. 11).

Mr. Hand admitted that he had failed to exhaust the claims contained in Ground XI

Subsections A-C and alleged that "exhaustion in state court would be futile." *Id.* at 54. However,

28

Mr. Hand advised the Court that he would file a motion to stay and abey the case pending his attempt to exhaust those issues in state court.  *Id.*  Indeed, on August 23, 2007, Mr. Hand filed a Motion to Hold Petition for Writ of Habeas Corpus in Abeyance Pending Exhaustion of Appellate Ineffectiveness Issues.  (Doc. 12).

      The Court granted Mr. Hand's motion to the extent that it would hold in abeyance those issues which Mr. Hand was attempting to exhaust in the state courts but that it would not hold in abeyance proceeding on the remaining issues.  (Doc. No. 18.)   As noted above, Mr. Hand filed a motion to reopen his appeal on the basis of ineffective assistance of appellate counsel which the Ohio Supreme Court denied on the procedural ground that he had failed to comply with the 90-day filing deadline of that court's S.Ct.Prac.R. XI(6)(A).

      On May 23, 2008, Mr. Hand filed a Motion for Discovery as to his Third, Fourth, Fifth, and Eleventh Grounds for Relief. (Doc. 33).  This Court summarized Mr. Hand's Motion as follows:

> Petitioner seeks discovery related to Claims III, IV, V, and XI in his Petition.  The discovery sought is outlined below:
>
> In Claim III, Petitioner alleges the prosecution withheld exculpatory material from him at the time of trial in violation of his rights under *Brady v. Maryland,* 373 U.S. 83 (1963).  Specifically, he alleges the Columbus Police conducted an investigation in 2001 into the deaths of his first two wives but did not disclose the content of that investigation to him.  He alleges that the investigation may have uncovered exculpatory evidence because the investigation began several months prior to the deaths of Jill Hand and Lonnie Welch, the victims in the case in suit.  Petitioner theorizes that suspects other than Petitioner and Mr. Welch must have been targets or potential targets of the investigation because "[t]he Columbus police had no suspicion of a Welch/Hand conspiracy until after Welch's January 15, 2002, death."  (Motion, Doc. No. 33, at 4).
>
>     1.  The right to issue a subpoena duces tecum to the A&E

Cable Network for all documents, interviews, video and audio tapes, and reporter's notes regarding the 2001 investigation of the deaths of Hand's first two wives created in connection with "The Black Widower" program that aired on July 14, 2004;

2. Conduct a deposition of Detective Graul of the Columbus Police Department's Unsolved Case Review Team related to his 2001 investigation into the Deaths of Donna Hand and Lori Hand;

3. Conduct a deposition of Detective Dan Otto of the Delaware County Sheriff's Department related to the information and documents he received from Detective Graul and the Unsolved Case Review Team regarding the deaths of Donna Hand and Lori Hand; and

4. Conduct depositions of Mr. Hand's trial counsel, Terry K. Sherman and Richard Cline, to document what, if anything they knew about the 2001 investigation before trial.

*Id.* at 5-6.

In his fourth and fifth Claims for relief, Petitioner asserts he received ineffective assistance of trial counsel in several respects. To develop those claims, he desires to depose his trial counsel, Terry K. Sherman and Richard A. Cline, and his mitigation specialist Debra Gorrell. *Id.* at 8.

Finally, in his eleventh Claim for Relief, Petitioner asserts he received ineffective assistance of appellate counsel. To provide evidence in that regard he, seeks to depose Stephen A. Ferrell, Pamela J. Prude-Smithers, and Wendi Dotson who represented him on direct appeal, and Susan M. Roche and Veronica N. Bennu, who represented him in state post-conviction proceedings.

(Doc. 41 at 2-3).

This Court ultimately granted in part and denied in part Mr. Hand's Motion stating:

Petitioner's theory as to what would be disclosed by examining the files of the Columbus Police Unsolved Crimes Team is somewhat vague, but Brady violation claims often are: a petitioner doesn't

know what he doesn't know.  In this case the Petitioner has provided more than mere speculation by showing from investigation already done that the Columbus Police had "reopened" investigations into the deaths of Petitioner's first two wives before the deaths of the victims in this case.  Therefore, Petitioner may depose Detective Graul and Petitioner's trial attorneys regarding that investigation.  A deposition of Detective Dan Otto is denied in the basis that Dr. Graul can readily testify on what he gave Detective Otto.  Should Detective Graul have a memory lapse on this point, the Court will reconsider.

Petitioner is also denied leave to depose the A&E Cable Network. *Brady* applies to information in the possession of the State, not the media.  Here, again, if Detective Graul has a memory lapse on what he gave A&E, the Court will reconsider, but only to the extent of A&E's governmental sources.

Petitioner may also depose his trial attorneys and mitigation specialist on his claim of ineffectiveness of trial counsel. ...

Petitioner may also depose his appellate counsel, Mr. Ferrell, Ms. Prude-Smithers, and Ms. Dotson.  The Court does not understand what Petitioner expects to discover by deposing his post-conviction counsel. ... Petitioner is denied permission to depose Susan M. Roche and Veronica N. Bennu [state post-conviction counsel]. ...

Petitioner's Motion for funds for a pharmacological expert is granted on the following conditions:
...
2.  The Court has not ruled that any evidence derived from such an expert would be admissible at any evidentiary hearing in this case...

3.  The Court has also not ruled on Respondent's assertion that the Claim for Relief to which this Motion relates is procedurally defaulted.

*Id.* at 4-6.

On June 11, 2009, Mr. Hand filed the Affidavit of Eljorn Don Nelson, PharmD. and the depositions of Terry Sherman,  Richard Cline, Debra Gorrell Wehrle, Stephen Ferrell, Pamela Prude-Smithers, and Wendi Overmeyer.  (Doc. 55, 56, 57, 58, 59, 60, 61).  Also on June 11, 2009, Mr. Hand filed a Motion to Expand the Record or in the Alternative for an Evidentiary Hearing.

(Doc. 62). On September 3, 2009, the Court granted Mr. Hand's Motion to Expand the Record to include the seven tendered items insofar as the Court considered those items in support of Mr. Hand's alternative Motion for Evidentiary Hearing. (Doc. 69). In addition, the Court granted the Motion for evidentiary hearing and in doing so noted:

> Petitioner seeks to present evidence on Grounds IV, V, and XI which allege ineffective assistance of trial counsel in both the guilt and penalty phases of the trial and on direct appeal. ...
>
> ... Petitioner states he wishes to present testimony as to three sub-claims of ineffective assistance of trial counsel at the guilt phase, specifically
>
>> his attorney's failure to, *inter alia,* 1) question and excuse jurors who were ultimately seated on the jury but expressed predetermined notions of guilt or other reservations in their questionnaires (Petition, pp. 22-23, 25), 2) act upon Hand's report of an escape attempt at the Delaware County Jail (*Id.*, pp. 24-25), and 3) present evidence of self-defense at preliminary hearing to determine the admissibility of voluminous unreliable hearsay statements (*Id.*, pp. 27-28).
>
> ...
>
> The Court concludes that the intended testimony is potentially relevant to and may be helpful in deciding claims in the Petition which on their face3 state claims of constitutional violations. ...
>
> As to the claims of ineffective assistance of trial counsel at the mitigation phase and ineffective assistance of appellate counsel, Petitioner desires to present the testimony of his trial and appellate attorneys, his mitigation specialist, and Dr. Nelson. ... As with ineffective assistance of trial counsel at the guilt phase, the intended testimony may be helpful in deciding what is, on its face, a valid constitutional claim ... .

*Id.* at 6-7. The Court also determined that testimony from Dr. Nelson would be helpful in determining whether it was ultimately ineffective assistance of trial counsel to fail to seek access to pharmacological advice as to medications Mr. Hand was taking at the time of trial and sentencing.

32

*Id.* at 8.

On February 11 and 12, 2010, the Court heard testimony from Stephen Ferrell, Eljorn Don Nelson, Richard Cline, Debra Gorrell Wehrle, and Terry Sherman. (Doc. 81, 82, 87, 88). The parties have filed post-hearing briefs, (Doc. 90, 92, 94), and the case became ripe for decision.

**Standard of Review**

**I. Antiterrorism and Effective Death Penalty Act of 1996**

The Antiterrorism and Effective Death Penalty Act of 1996, Pub.L.No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA") applies to all habeas cases filed after April 24, 1996. *Herbert v. Billy,* 160 F.3d 1131 (6th Cir. 1998), *citing, Lindh v. Murphy,* 521 U.S. 320 (1997). Since Mr. Hand filed his Petition well after the AEDPA's effective date, the amendments to 28 U.S.C. § 2254 embodied in the AEDPA are applicable to his Petition.

Title 28 U.S.C. § 2254, as amended by the AEDPA, provides:

...
(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

   (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

   (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254.

The AEDPA also provides that a factual finding by a state court is presumed to be

correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e).   In addition, pursuant to the AEDPA, before a writ may issue on a claim that was evaluated by the state courts, the federal court must conclude that the state court's adjudication of a question of law or mixed question of law and fact was "contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).

A state court's decision is contrary to the Supreme Court's clearly-established precedent if: (1) the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law; or (2) the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Williams v. Taylor,* 529 U.S. 362, 405-06 (2000).   A state court's decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal rule [from Supreme Court cases] but unreasonably applies it to the facts of the particular state prisoner's case", "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply[,] or [if the state court] unreasonably refuses to extend that principle to a new context where it should apply." *Williams,* 529 U.S. at 407-08.  For a federal court to find a state court's application of Supreme Court precedent unreasonable, the state court's decision must have been more than incorrect or erroneous; it must have been "objectively unreasonable." *Wiggins v. Smith,* 539 U.S. 510, 520-21 (2003); *Williams,* 529 U.S. at 407, 409.  An *unreasonable* application of federal law is different from an *incorrect* application of federal law.  *Id.* at 410 (emphasis in original).   In sum, Section 2254(d)(1) places a new constraint on the power of a federal court to grant a state prisoner's

34

application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. *Id.* at 412 (Justice O'Connor, concurring).

A state court decision is not "contrary to" Supreme Court law simply because it does not specifically cite Supreme Court cases. *Early v. Packer,* 537 U.S. 3 (2002). Indeed, "contrary to" does not even require awareness of Supreme Court cases, so long as neither the reasoning nor the result of the state-court decision contradicts them. *Id.* at 8. The AEDPA prohibits the overturning of state decisions simply because the federal court believes that the state courts incorrectly denied the petitioner relief:

> By mistakenly making the "contrary to" determination and then proceeding to a simple "error" inquiry, the Ninth Circuit evaded Section 2244(d)'s requirement that decisions which are not "contrary to" clearly established Supreme Court law can be subjected to habeas relief only if they are not merely erroneous, but "an unreasonable application" of clearly established federal law, or based on "an unreasonable determination of the facts".

*Id.* at 11.

For the purposes of the AEDPA, the court reviews the last state court decision on the merits. *Howard v. Bouchard,* 405 F.3d 459, 469 (6th Cir. 2005), *cert. denied,* 546 U.S. 1100 (2006).

The AEDPA standard of review applies only to "any claim that was adjudicated on the merits in State court proceedings." *Danner v. Motley,* 448 F.3d 372, 376 (6th Cir. 2006). A state court's failure to articulate reasons to support its decision is not grounds for reversal under the AEDPA. *Williams v. Anderson,* 460 F.3d 789, 796 (6th Cir. 2006), *citing, Harris v. Stovall,* 212 F.3d 940 (6th Cir. 2000), *cert. denied,* 432 U.S. 947 (2001). Where the state court fails to adjudicate a claim on the merits, the habeas court conducts an independent review of a petitioner's claims. *Williams*, *supra.* That independent review, however, is not a full, *de novo* review of the claims, but

remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA.  *Williams, supra.*

## II.  Procedural Default

The standard for evaluating a procedural default defense is as follows:

> In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an adequate and independent state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause of the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also, Simpson v. Jones,* 238 F.3d 399, 406 (6th Cir. 2000).  That is, a petitioner may not raise on federal habeas a federal constitutional right he could not raise in state court because of procedural default. *Wainwright v. Sykes*, 433 U.S. 72 (1977); *Engle v. Isaac*, 456 U.S. 107 (1982).   Absent cause and prejudice, a federal habeas petitioner who fails to comply with a state's rules of procedure waives his right to federal habeas corpus review. *Boyle v. Million*, 201 F. 3d 711, 716 (6th Cir. 2000); *Murray v. Carrier*, 477 U.S. 478 (1986);  *Engle v. Isaac*, 456 U.S. 107 (1982);  *Wainwright,*  433 U.S. at 87.

The Sixth Circuit Court of Appeals requires a four-part analysis when determining whether a habeas claim is barred  by procedural default.  *Reynolds v. Berry*, 146 F. 3d 345, 347-48 (6th Cir. 1998), *citing Maupin v. Smith*, 785 F. 2d 135, 138 (6th Cir. 1986); *accord Lott v. Coyle*, 261 F. 3d 594 (6th Cir. 2001), *cert. denied,* 534 U.S. 1147 (2002).

> First the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule.
>  . . .
> Second, the court must decide whether the state courts actually enforced the state procedural sanction, citing *County Court of Ulster*

*County v. Allen*, 442 U.S. 140, 149, 99 S.Ct. 2213, 60 L.Ed.2d 777 (1979).

Third, the court must decide whether the state procedural forfeiture is an "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim.

Once the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate under *Sykes* that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Maupin,* 785 F. 2d at 138.

# Analysis

## <u>GROUND I</u>

### The admission of unreliable hearsay evidence, absent clear and convincing evidence that Hand was at fault for the declarant's unavailability at trial, violated Hand's right to due process.

In his First Ground for Relief, Mr. Hand alleges that the state violated his due process rights when the trial court admitted into evidence certain statements which Lonnie Welch made to various individuals. Mr. Hand's position is that the admission into evidence of testimony from Pete Adams, Betty Evans, Teresa Fountain, Anna Hughes, David Jordan, Barbara McKinney, Tezona McKinney, and Shannon Welch violated his due process rights as well as his rights under the Sixth Amendment's Confrontation Clause.

Mr. Hand raised this claim on direct appeal to the Ohio Supreme Court which addressed it as follows:

> ***Admissibility of Welch's statements.*** In proposition of law I, Hand argues that the trial court erred in admitting Welch's statements about his complicity with Hand to murder Hand's wives. Hand argues that the testimony was not admissible under Evid.R. 804(B)(6), forfeiture

37

by wrongdoing, or any other hearsay exception. Additionally, Hand argues that such evidence violated his Sixth Amendment right "to be confronted with the witnesses against him." Sixth Amendment to the United States Constitution.

Over defense objection, the trial court admitted Welch's statements to various witnesses describing Welch's complicity with Hand in the murders of Donna, Lori, and Jill. First, Pete Adams, Welch's cousin, testified that a week or two after Lori's murder in the fall of 1979, Welch came to his home and told him that he "killed Donna and Lori Hand" and "did it for Bob."

Second, Shannon Welch, Welch's brother, testified that during July or August 2001, Welch asked Shannon "if [he] had a pistol or if [he] could get one." Welch then asked, "Do you know what I do for extra money?" Welch continued, "Well, I killed Bob's first wife and * * * I got to kill the present wife and I'll have a lot of money after that." About a week and a half before Jill's and Welch's murders, Welch told Shannon that he "might get to take care of his business with Bob tonight." On January 15, Welch told Shannon, "Well, I got to go take a shower and change clothes and be ready to go to see Bob because I might be taking care of my business tonight."

Third, Barbara McKinney, described in the record as Welch's common-law wife, testified that Welch told her that he had visited Hand's home in Delaware and "Bob showed him the house." When Welch was in jail between December 2001 and January 2002, Welch directed Barbara on the phone, "Call my friend and see if he'll pay my bond to get me out of jail." Welch identified his friend as Bob Hand and said, "[D]on't say his name on the phone any more."

Fourth, Tezona McKinney, Barbara's daughter, testified that on January 14, 2002, the day before the murders, Welch told her, "Well, if I get this little money * * * tomorrow, I want to buy your mother this car because I didn't buy her anything for Christmas." Welch then pointed out the car to Tezona and said, "I want your mother to have that car. And if I can, I'm going to try to make sure I get it for her, if I get this money." On another occasion, Welch told Tezona that "Bob Hand killed his first two wives."

Fifth, Betty Evans, Lonnie Welch's sister, testified that around 1979 or 1980, Welch told her that if she "knew anything, not to say anything because him and Bob had a pact and if anything got out, they were going to kill each other's mother." On the evening of the

38

murders, Welch told Evans that "he was going to pick up some money and he'd be right back; that he was sorry he didn't have anything for [her] birthday; that when he comes back, he'll take care of it."

Sixth, Teresa Fountain, Shannon Welch's ex-girlfriend, testified that during 1975 or 1976, she overheard Lonnie Welch "talking to [her boyfriend] Isaac all about insurance money and knocking his boss's wife off to get some insurance money." Later, Welch told Fountain, "I hope you didn't hear anything and * * * you keep your mouth shut, * * * you didn't hear anything."

Seventh, Anna Hughes, a friend of Lonnie Welch, testified that although Welch often missed work, he was not fired from his job working for Hand. On one occasion, Welch said to her, "I didn't go to work * * * [but] I got it like that." Sometime around 1998, Welch mentioned to Hughes that he was "going out to Bob's." He added, "I've got to get me a hit and I ain't got no money."

Finally, David Jordan Jr., Welch's Franklin County Jail cellmate, testified that during December 2001, Welch said that he was "going to take somebody out for this guy named Bob" and added, "I've put in work for him before." Welch offered Jordan between five and six thousand dollars to be his driver. Welch also said the murder would "happen sometime in January" and gave Jordan his phone number.

**Admissibility under Evid.R. 804(B)(6).** Under Evid.R. 804(B)(6), a statement offered against a party is not excluded by the hearsay rule "if the unavailability of the witness is due to the wrongdoing of the party for the purpose of preventing the witness from attending or testifying." Evid.R. 804(B)(6) was adopted in 2001 and is patterned on Fed.R.Evid. 804(b)(6), which was adopted in 1997. Staff Notes (2001), Evid.R. 804(B)(6). To be admissible under Evid.R. 804(B)(6), the "offering party must show (1) that the party engaged in wrongdoing that resulted in the witness's unavailability, and (2) that one purpose was to cause the witness to be unavailable at trial." Id.; see, also, *United States v. Houlihan* (C.A.1, 1996), 92 F.3d 1271, 1280.

Before admitting Welch's statements under Evid.R. 804(B)(6), the trial court conducted an evidentiary hearing outside the jury's presence. Welch's cousins, Pete Adams and Phillip Anthony Jr., testified that Welch told them that he had killed Donna and Lori for Hand. Anthony also testified that shortly before Jill's murder, Welch

39

told him that he needed a gun because Hand wanted him to murder his present wife. n1 The trial court also considered the testimony of Hand's cellmate, Kenneth Grimes, that Hand had admitted killing Welch to eliminate him as a possible witness.

> n1 Anthony was not called as a prosecution witness during the state's case-in-chief.

Based on evidence at the trial and at the evidentiary hearings, the trial court found, "The state has shown, by a *preponderance of the evidence* under Rule 804, that, number one, the witness, accomplice, victim, Lonnie Welch's death was caused by the defendant, and it's obviously by virtue of that to cause his unavailability." (Emphasis added.) The trial court then ruled that Welch's statements were admissible. After conducting further evidentiary hearings with other witnesses, the trial court admitted the remainder of Welch's statements.

Hand alleges several reasons why the trial court erred in admitting Welch's statements under Evid.R. 804(B)(6). First, Hand argues that the trial court should have used the clear-and-convincing standard of proof, rather than a preponderance-of-the-evidence standard, in proving the predicate facts. However, the majority of United States Courts of Appeals applying the federal rule have followed the preponderance-of-the-evidence standard in ruling on preliminary determinations of admissibility under Fed.R.Evid. 804(b)(6). See *Cotto v. Herbert* (C.A.2, 2003)*,* 331 F.3d 217, 235; *United States v. Scott* (C.A.7, 2002), 284 F.3d 758, 762; *United States v. Cherry* (C.A.10, 2000), 217 F.3d 811, 820; *United States v. Zlatogur* (C.A.11, 2001), 271 F.3d 1025, 1028; see, also, *Steele v. Taylor* (C.A.6, 1982), 684 F.2d 1193, 1202 (preponderance standard in making preliminary findings in waiver-by-misconduct cases); *State v. Boyes, Licking* App. Nos. 2003CA0050 and 2003CA0051, 2004 Ohio 3528, 2004 WL 1486333, P54-56 (applying the preponderance standard in determining whether the foundational requirements for *Evid.R. 804(B)(6)* were met). Thus, the trial court properly applied the preponderance-of-the-evidence standard in ruling on admissibility.

Second, Hand argues that the trial court erred in admitting Welch's statements without first considering Hand's affirmative defense of self-defense. However, Hand failed to offer any evidence of self-defense during the evidentiary hearing, although the defense had the opportunity to do so. Thus, the trial court made the appropriate ruling

based on the evidence before the court.

Third, Hand contends that Welch's statements were not admissible under Evid.R. 804(B)(6), because the state failed to show that Hand's purpose in killing Welch was to make him unavailable as a witness. Hand argues that when Welch was killed, there were no pending charges and no evidence that Welch intended to testify against him at trial. We reject this argument.

Evid.R. 804(B)(6) "extends to potential witnesses." Staff Notes (2001), Evid.R. 804(B)(6); *United States v. Houlihan,* 92 F.3d at 1279 (rule applies with "equal force if a defendant intentionally silences a *potential* witness." (Emphasis sic.) Thus, the absence of pending charges against Hand at the time he killed Welch did not preclude the admissibility of Welch's statements. Moreover, the state need not establish that Hand's sole motivation was to eliminate Welch as a potential witness; it needed to show only that Hand "was motivated *in part* by a desire to silence the witness." (Emphasis sic.) *Id.* at 1279; *United States v. Dhinsa* (C.A.2, 2001), 243 F.3d 635, 654. Hand's admissions to Grimes clearly established that one of Hand's purposes was to eliminate Welch as a potential witness.

Finally, Hand argues that the trial court erred in admitting Welch's statements because they were not reliable. Hand claims that the witnesses were not credible because they were Welch's friends, family members, and a cellmate. Moreover, Hand contends that Welch's friends and family members were angry at him for killing Welch.

Following the evidentiary hearings and before admitting Welch's statements under Evid.R. 804(B)(6), the trial court found that each witness was credible. The decision whether to admit these hearsay statements was within the trial court's discretion. See *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus (the admission of relevant evidence rests within the sound discretion of the trial court); cf. *State v. Landrum* (1990), 53 Ohio St.3d 107, 114, 559 N.E.2d 710 ("The determination of whether corroborating circumstances are sufficient to admit statements against penal interest, as a hearsay exception, generally rests within the discretion of the trial court").

No evidence supports Hand's allegations that Welch's friends and family members were not telling the truth, and their bias could have been explored on cross-examination. Indeed, courts generally hold

41

that "where a declarant makes a statement to someone with whom he has a close personal relationship, such as a spouse, child, or friend, * * * that * * * relationship is a corroborating circumstance *supporting* the statement's trustworthiness." (Emphasis sic.) *State v. Yarbrough,* 95 Ohio St.3d 227, 2002 Ohio 2126, 767 N.E.2d 216, P53; see, also, *United States v. Tocco* (C.A.6, 2000), 200 F.3d 401, 416 (declarant's statements to his son in confidence considered trustworthy); *Latine v. Mann* (C.A.2, 1994), 25 F.3d 1162, 1166-1167 (reasoning that statements made to a perceived ally rather than to a police officer during an interrogation are trustworthy). Moreover, the testimony of Welch's friends and family members was corroborated by Jordan, Welch's cellmate, and Grimes, who testified that Hand admitted hiring Welch to kill Jill.

Based on the foregoing, we find that the trial court did not abuse its discretion in admitting Welch's statements under *Evid.R.* 804(B)(6).

**Admissibility under other evidentiary rules.** We further find that Welch's statements were admissible as statements against interest (Evid.R. 804(B)(3), as a statement of intent (Evid.R. 803(3)), and as a co-conspirator's statement (Evid.R. 801(D)(2)(e)).

First, Evid.R. 804(B)(3) provides a hearsay exception where the declarant is unavailable as a witness. This rule states: "(3) *Statement against interest.* A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Welch's statements admitting his involvement in murdering Hand's wives qualified for admissibility under Evid.R. 804(B)(3). Welch's statements to Adams, Shannon, and Jordan implicating Hand in the murders were also admissible. n2 *State v. Madrigal* (2000), 87 Ohio St.3d 378, 2000 Ohio 448, 721 N.E.2d 52, paragraphs one and three of the syllabus (out-of-court statements made by an accomplice that incriminate the defendant may be admitted as evidence if the statement contains adequate indicia of reliability); see, also, *State v. Issa* (2001), 93 Ohio St.3d 49, 60, 2001 Ohio 1290, 752 N.E.2d 904; *Lilly v. Virginia* (1999), 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117, fn. 5. As in *Issa,* Welch's statements were voluntarily made to family and friends. Moreover, in his statements, Welch did

42

not attempt to shift blame from himself, because he admitted his role as the shooter in multiple killings. *Issa,* 93 Ohio St.3d at 61, 752 N.E.2d 904. Thus, the circumstances surrounding Welch's statements did render Welch particularly worthy of belief. See id.

> n2 Tezona McKinney's testimony, "Welch told me that Bob Hand killed his first two wives," is not a statement against Welch's interest and is therefore not admissible under Evid.R. 804(B)(3).

Second, Evid.R. 803(3) creates a hearsay-rule exception for "[a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed."

Under Evid.R. 803(3), statements of current intent to take future actions are admissible for the inference that the intended act was performed. See *Yarbrough,* 95 Ohio St.3d 227, 2002 Ohio 2126, 767 N.E.2d 216, P33; *Sage,* 31 Ohio St.3d at 182-183, 31 OBR 375, 510 N.E.2d 343; see, generally, *Mut. Life Ins. Co. of New York v. Hillmon* (1892), 145 U.S. 285, 295, 12 S.Ct. 909, 36 L.Ed. 706. Not all of Welch's statements were admissible under this rule. However, Welch's statement to Shannon, "I got to kill the present wife and I'll have a lot of money after that," was admissible under Evid.R. 803(3) to prove that Welch later acted in conformity with that intention. Welch's statement to Shannon, "I got to * * * be ready to go to see Bob because I might be taking care of my business tonight," was also admissible as evidence of his intention. Similarly, Welch's statement to Evans on the night of the murders that "he was going to pick up some money and he'd be right back" was admissible to help show that Welch intended to meet with Hand and collect money from him for shooting Jill. Finally, Welch's statement to Jordan that he intended to "take somebody out for * * * Bob" and planned to do so "sometime in January" was admissible to help prove that Welch later went to Hand's home to carry out this plan.

Third, Evid.R. 801(D)(2)(e) provides: "A statement is not hearsay if * * * the statement is offered against a party and is * * * a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." Statements of coconspirators are not admissible under Evid.R. 801(D)(2)(e) until the proponent of the statement has made a prima facie showing of the existence of the conspiracy by independent

43

proof. *State v. Carter* (1995), 72 Ohio St.3d 545, 1995 Ohio 104, 651 N.E.2d 965, paragraph three of the syllabus. However, explicit findings of a conspiracy's existence need not be made on the record. *State v. Robb* (2000), 88 Ohio St.3d 59, 70, 2000 Ohio 275, 723 N.E.2d 1019.

Welch's statements to Shannon and Jordan were admissible under Evid.R. 801(D)(2)(e) . Hand's statements to his cellmate, Grimes, provided independent proof of the conspiracy's existence. See *State v. Duerr* (1982), 8 Ohio App.3d 396, 400, 8 OBR 511, 457 N.E.2d 834 (defendant's own statements can provide "independent proof" of the conspiracy). Hand called Welch a business partner and said he had hired Welch to kill his wife.

The facts show that by July 2001, Hand and Welch had entered into a conspiracy to murder Jill. During that period of time, Welch began asking Shannon whether he had a pistol so that Welch could kill Hand's wife. Welch's ongoing requests for a pistol and his conversations with Shannon about murdering Jill were within the scope of the conspiracy. Further, Welch's December 2000 and January 2001 jailhouse conversations with Jordan about the murder were also within the scope of the conspiracy.

**Right to Confrontation.** Hand contends that the admission of Welch's statements under Evid.R. 804(B)(6) violated his Sixth Amendment right to confrontation. In making this argument, Hand relies upon the Supreme Court's recent decision in *Crawford v. Washington* (2004), 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. However, we reject Hand's claims.

In *Crawford,* the Supreme Court held that it is a violation of the Confrontation Clause to admit "testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (overruling *Ohio v. Roberts* (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597, which held that statements from an unavailable witness may be admissible without violating the Confrontation Clause if the statements had been found to be reliable).

However, *Crawford* explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability. *Id.* at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177 ("the rule of forfeiture by

44

wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability"). See, also, *Reynolds v. United States* (1879), 98 U.S. 145, 158, 25 L.Ed. 244 (if a witness is unavailable because of the defendant's own misconduct, "he is in no condition to assert that his constitutional rights have been violated").

The trial court's preliminary determination that Welch's statements were admissible included a finding that Hand killed Welch to eliminate him as a potential witness. Indeed, Hand admitted to Grimes that he killed Welch to achieve that purpose (i.e., prevent him from being a witness against him). Thus, Hand forfeited his right to confront Welch because his own misconduct caused Welch's unavailability. See *United States v. Garcia-Meza* (C.A.6, 2005), 403 F.3d 364, 369-370 (defendant forfeited his right to confront his wife because his wrongdoing -- i.e., his murder of her -- was responsible for her unavailability).

Finally, the admission of Welch's statements on the basis of Evid.R. 804(B)(3), Evid.R. 803(3), or Evid.R. 801(D)(2)(e) would not violate Hand's Sixth Amendment right to confront witnesses, because he killed Welch and thereby made him unavailable to testify. Such waiver by misconduct is consistent with *Crawford*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. Indeed, *Crawford's* affirmation of the "essentially equitable grounds" for the rule of forfeiture shows that the rule's applicability does not hinge on the evidentiary basis for the testimony's admissibility. *Id.* at 62, 124 S.Ct. 1354, 158 L.Ed.2d 177. See *Garcia-Meza,* 403 F.3d at 370-371; *United States v. Thompson* (C.A.7, 2002), 286 F.3d 950, 963, citing *United States v. Cherry* (C.A.10, 2000), 217 F.3d 811, 820 (applying waiver-by-misconduct rule to co-conspirator).

Based on the foregoing, we overrule proposition of law I.

*Hand*, 107 Ohio St.3d at 389-96.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right is incorporated against the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 406 (1965).

The Sixth Circuit recently addressed the issue of the Confrontation Clause is *Miller v. Stovall,* 608 F.3d 913 (6th Cir. 2010), and the court noted:

> For over twenty years, courts analyzed confrontation challenges using *Ohio v. Roberts,* 448 U.S. 56 (1980), under which hearsay statements were admissible so long as they bore sufficient "indicia of reliability," that is, if they fell into a "firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Id.* at 66. In *Crawford v. Washington,* 541 U.S. 36 (1994), the Supreme Court revised its understanding of the confrontation right. ... The Court held that if a hearsay statement is testimonial, it can be admitted against a criminal defendant only if the declarant is unavailable for trial and the defendant had a prior opportunity to cross-examine the declarant. *Id* at 59. Although the Court left unanswered whether *Roberts* still governs nontestimonial hearsay, *id.* at 68, it later held that the Confrontation Clause did not apply at all to such statements, abrogating *Roberts* in full, *see Davis v. Washington,* 547 U.S. 813, 821 (2006).

608 F.3d at 918.

There is no dispute that Mr. Welch was not available to testify at trial nor is it disputed that Mr. Hand never had the opportunity to cross-examine Mr. Welch. Rather, the first question is whether the various statements Mr. Welch made to the persons who testified at Mr. Hand's trial were "testimonial" in nature thereby implicating the Confrontation Clause.

> In *Crawford*, the Supreme Court declined to "spell out a comprehensive definition of 'testimonial.' " 541 U.S. at 68. It began at the extremes, noting that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51. It then listed three "formulations" of th[e] core class of testimonial statements," drawn from court filings and pervious cases:

>> [(1)] "*ex parte* in-court testimony or its functional equivalent–that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," Brief for Petitioner 23; [(2)] "extrajudicial statements ... contained

46

in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions," *White v. Illinois*, 502 U.S. 346, 365 (1992) (Thomas, J., joined by Scalia, J., concurring in part and concurring in judgment); [(3)] "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Brief for National Association of Criminal Defense Lawyers et al. at *Amici Curiae* 3.

*Id.* at 51-52. The Court noted that "all share a common nucleus." *Id.* at 52. It also declared that testimony at a preliminary hearing, grand jury proceeding, or former trial and statements in police interrogations are testimonial under any definition, *id.* at 52, 68, and that business records and statements in furtherance of a conspiracy are not testimonial "by their nature," *id.* at 56.

In *Davis v. Washington,* 547 U.S. 813 (2006), the Court delivered a refined definition of "testimonial," but only for a subset of cases involving police interrogation. ... The Court explicitly cautioned that it did not mean "to imply, however, that statements made in the absence of any interrogation are necessarily nontestimonial," because the Framers did not intend "to exempt from cross-examination volunteered testimony or answers to open-ended questions." *Id.* at 822 n.1. In its most recent case on the Confrontation Clause, the Court appeared to discuss the three formulations as more than merely possible definitions. *See Melendez-Diaz v. Massachusetts,* 129 S.Ct. 2527, 2531 (2009))(stating that in listing the three formulations, *Crawford* "described the class of testimonial statements covered by the Confrontation Clause"); *id.* at 2532 (in holding that drug-analysis certificates are testimonial, noting that "[o]ur description of [the core class of testimonial statements] mentions affidavits twice").

The Sixth Circuit had adopted a standard for applying the Supreme Court's ruling in *Crawford*. In *United States v. Cromer,* 389 F.3f 662 (6th Cir. 2004), this court offered the following guidance for determining whether a statement in testimonial:

> The proper inquiry, then, is whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.

47

> *Id.* at 675; *see also United States v. Hinton,* 423F.3d 355, 359-60 (3rd Cir. 2005) (adopting the *Cromer* standard).  Applying this standard, we held that a confidential informant's statements to a police officer, relating the name identification and physical description of the defendant, were testimonial.  *Id.* at 677-79.  This court has consistently applied the *Cromer* standard.  *See, e.g., United States v. Mooneyham,* 473 F.3d 280, 286-87 (6th Cir. 2007) (co-conspirator's statements to undercover police officer were not testimonial because he would not have believed they would be used a trial); *United States v. Johnson,* 440 F.3d 832, 843 (6th Cir. 2006) (statement to twenty-five year acquaintance was not testimonial when declarant had no reason to suspect acquaintance's cooperation with law enforcement); *United States v. Barry-Scott,* 251 F. App'x. 983, 989-90 (6th Cir. 2007) (unpublished opinion) (confidential informant's statements to police officer were testimonial).

*Miller,* 608 F.3d at 923-24.

 The Supreme Court has refined *Crawford* with respect to the "wrongdoing of a party" exception to the hearsay rule vis-a-vis the Confrontation Clause.  In *Giles v. California,* ___ U.S. ___, 128 S.Ct. 2678, 2682 (2008), the Court held that the Confrontation Clause does not contain an exception "permit[ting] the use of a witnesses's unconfronted testimony if a judge finds ... that the defendant committed a wrongful act that rendered the witness unavailable to testify at trial."  The Court reasoned that under the common law, "the exception applied only when the defendant engaged in conduct *designed* to prevent the witness from testifying."  *Id.* at 2683 (emphasis in original).

 Mr. Hand's  First Ground for Relief fails for two reasons.  First, under *Crawford*, the statements about which Mr. Hands complains do not raise Confrontation Clause issues because they were nontestimonial.  Second, even if the statements were testimonial, the *Crawford/Giles* exception applies because, as the Ohio court found, Mr. Hand engaged in conduct that was *designed* to prevent Mr. Welch from testifying.

48

Each of the witnesses who testified as to Mr. Welch's statements were either his relative, friend, or acquaintance. The witnesses and their relationships to Mr. Welch were: (1) Pete Adams, his cousin (Trial Tr. Vol. 14 at 2217; 2385)[3]; (2) Shannon Welch, his brother (Trial Tr. Vol. 15 at 2518; 2640); (3) Barbara McKinney, his common law wife[4] (*Id.* at 2479; 2692); (4) Tezona McKinney, Barbara's daughter (*Id.* at 2254; 2745); (5) Betty Evans, his sister (*Id.* at 2600; 2769); (6) Teresa Fountain, Shannon's former girlfriend (*Id.* at 2576; Trial Tr. 18 at 3112); (7) Anna Hughes, a friend (Trial Tr. Vol. 16 at 2801; 2869); and (8) David Jordan, Jr., his Franklin County Jail cellmate (*Id.* at 2817; 2904-05). These were not formal statements made to government officials. Mr. Welch did not make them in the course of a police interrogation, at a preliminary hearing, during grand jury proceedings, or at a previous trial. Rather, Mr. Welch made the statements to his relatives, friends, and acquaintances. There is absolutely nothing that would indicate that Mr. Welch made the statements with the intention of bearing testimony against Mr. Hand. Nor is there any indication that Mr. Welch would have anticipated that the statements would be used against Mr. Hand in the prosecution of any crime. Additionally, there is nothing to indicate that Mr. Welch had any reason to suspect that the individuals to whom he made the various statements were, or would be, cooperating with law enforcement personnel in the investigation of any crimes. Rather, Mr. Welch made the statements to people whom he most likely trusted and in whom he confided.

Because the statements about which Mr. Hand complains are not testimonial in

---

[3] Each of these eight witnesses testified twice; once in the Ohio Evid.R. 804(B)(6) hearing outside the presence of the jury and once in the jury's presence.

[4] The Court notes that Ohio has adopted a statute that prohibits common law marriages although there is a grandfather clause for those common law marriages that were valid on the statute's effective date of October 10, 1991. *See* Ohio Revised Code Sec. 3105.12.

nature, there are no Sixth Amendment confrontation rights implicated in their admission into evidence.  Nevertheless, even assuming that the statements are testimonial, Mr. Hand forfeited any Sixth Amendment confrontation rights because, as noted, he engaged in conduct that was designed to prevent Mr. Welch from testifying.

        Testimony at the hearsay hearing as well as at Mr. Hand's trial  indicated that Mr. Hand killed Mr. Welch to eliminate him as a potential witness as to the killings of Mr. Hand's first and second wives as well as his wife Jill.  Indeed,  Kenneth Grimes, Mr. Hand's  former cellmate in the Delaware County jail testified that Mr Hand told him that he killed Mr. Welch to achieve that purpose (*i.e.*, prevent him from being a witness against him).   Mr. Grimes testified at the hearsay hearing that Mr. Hand "wasn't satisfied with his wife, he thought she was being permiscuous [sic]" and that "he was going to have her knocked off", and that his description of what happened to his wife changed over time in that it went from self-defense to "him doing the actual crime."  Trial Tr. Vol. 14 at 2246-47.  Mr. Grimes testified further that Mr. Hand told him that the man who supposedly killed his wife was a business partner, that "he was hired to do that job", that the job didn't turn out as it was supposed to, and that the other man was renegotiating and therefore "Mr. Hand took care of them both." *Id.* at 2247.  Mr. Grimes also testified at the hearing that Mr. Hand told him he had "[taken] care of both of them; he shot the man and his wife...." *Id.* at 2248.  Mr. Grimes testified that Mr. Hand told him that "anybody who messed with him would disappear." *Id.* at 2251.  In the presence of the jury, Mr. Grimes gave similar testimony.  According to Mr. Grimes, Mr. Hand told him that he "killed his wife and the man he [sic] was involved with."  Trial Tr. Vol. 16 at 3025.  Mr. Hand also told Mr. Grimes that he had hired a man, with whom he had "been doing business ... for years", to kill his wife, that the deal went sour because he wanted more money, and

so he killed two birds with one stone and didn't have to pay anything. *Id.*

Although *Giles* was not decided until more than two years after the Ohio Supreme Court affirmed Mr. Hand's convictions and sentences and arguably would not apply to Mr. Hand's current Petition, *see, Teague v. Lane,* 489 U.S. 288, 301 (1989), the Ohio Supreme Court's conclusion that that trial court properly determined that Mr. Hand killed Mr. Welch to eliminate him as a potential witness certainly satisfies the heightened *Crawford* standard as announced in *Giles*. Moreover, the simple fact that Mr. Hand killed Mr. Welch without considering his motive for doing so satisfies the pre-*Giles* standard of *Crawford*. In other words, Mr. Hand forfeited his Sixth Amendment confrontation right under both tests.

In his direct appeal to the Ohio Supreme Court, Mr. Hand claimed that the statements as offered from Mr. Welch's family and friends, did not meet due process requirements of reliability. Mr. Hand argues that the Ohio Supreme Court failed to address his due process argument. However, contrary to Mr. Hand's argument, the Ohio Supreme Court did address his due process claim by finding that the statements were indeed reliable, that the trial court properly admitted the statements at issue, and that their admissions were not violations of Mr. Hand's Sixth Amendment confrontation rights. While the Ohio Supreme Court may not have specifically used the term "due process", a review of its decision reveals that it considered the overall constitutional implications of the admission of the testimony.

For the same reasons that this Court discussed with respect to the statements at issue being nontestimonial, the Court concludes that the Ohio Supreme Court's properly determined that the statements were reliable and therefore their admission did not violate Mr. Hand's due process rights. Specifically, Mr. Welch made the statements to his relatives, friends, and acquaintances,

51

individuals with whom he had close, personal relationships. Further, there is no evidence which indicates that any of the witnesses were not telling the truth. Indeed, any alleged bias could have been brought out on cross-examination.

In addressing Mr. Hand's allegations of violations of his Sixth Amendment Confrontation Clause and due process rights, the Ohio Supreme Court's findings and decision are not contrary to nor an unreasonable application of, clearly established federal law. Therefore Mr. Hand's Ground I should be rejected.

## GROUND II

**The introduction of prejudicial character and other acts evidence, and the failure of the trial court to appropriately limit the evidence, violated Hand's right to due process, a fair trial, and a reliable determination of his guilt and sentence.**

Mr. Hand argues in Ground II that the trial court erred by admitting certain allegedly prejudicial character and other acts evidence. Mr. Hand also argues that assuming that the trial court properly admitted the evidence, it erred by failing to give a limiting instruction to the jury that the evidence could not be used to demonstrate his guilt, but only to illustrate his motive in the crime. Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it saying:

> ***Other evidentiary issues.*** In proposition of law II, Hand argues that the prosecutor's closing argument improperly mentioned evidence of Hand's fraudulent business practices and improperly presented "other acts" evidence. Hand also argues that the trial court failed to provide the jury with adequate limiting instructions. However, except where mentioned, the defense failed to object and waived all but plain error. See *State v. Wade* (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph one of the syllabus; *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.
>
> **1. Mentioning fraudulent business practices during closing argument.** Allen Peterson, Hand's accountant, prepared the corporate income tax returns for Hand's radiator business and testified that the

business suffered financial losses for a number of years before going out of business.

The defense objected to evidence of Hand's tax returns as irrelevant and moved to strike Peterson's entire testimony. In overruling the defense objection, the trial court provided the jury with the following limiting instruction: "Exhibits that were admitted, being the tax returns from yesterday, those are admitted solely for showing a motive. They are not to be construed * * * in any other way, for any other purpose, such as how record keeping may have taken place, strictly on that sole issue."

Hand testified in his own behalf and stated that he paid Welch and Adams "cash under the table" to avoid paying withholding taxes and to avoid a paper trail. Hand also admitted that he had not filed a personal federal income tax return for at least 15 years.

During the closing argument, the prosecutor reviewed evidence of Hand's business practices and made the following argument:

"And did you catch his statement * * * about he and his father like to save on their taxes by paying employees under the table in cash? We all know that tax avoidance is common in this country, but what he calls saving on taxes is actually fraud. The fact that he so breezily engaged in that kind of behavior * * * *tells us much about his respect for the law and his willingness to lie and deceive.* This wasn't just a rinky-dink, every once in a while practice, that the defendant engaged in during the slow season of his business. Exhibit 275, prepared by Detective Otto, indicates that the defendant billed more than one hundred thousand dollars fraudulently to his own business on his own credit cards. *This was fraud on a massive scale, and it exemplifies the way in which this man operates.*" (Emphasis added.)

Hand concedes that evidence of his financial situation was proper to prove motive. However, Hand contends that the prosecutor improperly argued that his illegal business practices showed that he did not hesitate to violate the law in general.

The prosecution is entitled to significant latitude in its closing remarks. The prosecutor may comment on "'what the evidence has shown and what reasonable inferences may be drawn therefrom.'" *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773. As to defense witnesses, including the defendant, the prosecutor may comment upon their testimony and suggest the conclusions to be drawn therefrom. The prosecutor may state that

"the evidence supports the conclusion that the defendant is not telling the truth, is scheming, or has ulterior motives for not telling the truth." See *State v. Finkes* (Mar. 28, 2002), Franklin App. No. 01AP-310, 2002 Ohio 1439, P45, 51, 2002 WL 464998, *9; *State v. Draughn* (1992), 76 Ohio App.3d 664, 670, 602 N.E.2d 790.

Hand's credibility was at issue because he testified in his own defense. The prosecutor's characterization of Hand's behavior as fraud and his argument that Hand's illegal business practices showed his "willingness to lie and deceive" represented fair comment on Hand's credibility. However, the argument that Hand committed "fraud on a massive scale, and it exemplifies the way in which this man operates" represented an overly broad comment on Hand's character. Nevertheless, we find no plain error in view of the overwhelming evidence of Hand's guilt. Cf. *State v. Rahman* (1986), 23 Ohio St.3d 146, 154-155, 23 OBR 315, 492 N.E.2d 401.

**Reaction to wives' deaths.** Hand contends that testimony about his reaction to news about Lori's and Jill's murder was improper "other acts" evidence. Sam Womeldorf, a now retired Columbus homicide detective, was involved in the murder investigations of Donna and Lori. Womeldorf described Hand's demeanor after Hand was notified of Lori's death:

> "A: In dealing with Bobby on the * * * death of his first wife, I noticed that Bobby carried on; he was not exactly honest with me * * * in particular things. * * * And I noticed that when Bobby came this time, he was very similar to the first time, he carried on, and * * * stomping and * * * demanding to go in the house and the same thing he did on the other one. And you would think he was crying, however, * * * --

> "Mr. Sherman: I'm going to object. This is all opinion.

> "The Court: Overruled.

> "* * *

> "A: I noticed he wasn't crying; there were no tears."

Evid.R. 701, which governs opinion testimony by lay witnesses, provides: "If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of his testimony or the determination of a fact in issue."

54

Womeldorf's testimony satisfied both requirements of Evid.R. 701. Womeldorf personally observed Hand's demeanor, and the lack of grief was relevant in showing Hand's strange reaction after learning that Lori had been killed. See *State v. Griffin,* Hamilton App. No. C-020084, 2003 Ohio 3196, 2003 WL 21414664, P37-38 (testimony that defendant "began to cry and sob, but there were no tears" admissible as lay opinion); cf. *State v. Stojetz* (1999), 84 Ohio St.3d 452, 463, 1999 Ohio 464, 705 N.E.2d 329 (testimony that witness appeared "scared" and "not able to think" admissible as lay opinion). We find that the trial court did not abuse its discretion in admitting this testimony. See *Sage,* 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

Hand also claims that Abel Gonzalez, Hand's son-in-law, improperly testified that Hand failed to show remorse following Jill's death. Two to three weeks after Jill's death, Abel talked to Hand about Jill's estate. During his testimony, Abel was asked about Hand's demeanor:

> "Q: What was his demeanor when you had this conversation with him?
>
> "A: It was just a matter of fact. It was more like just a business conversation, let's say.
>
> "Q: Did he ever say he missed Jill?
>
> "A: No.
>
> "Q: Did he act sad about what had happened?
>
> "A: I can't say he was sad; no."

Hand's emotional reaction two to three weeks after Jill's death was of questionable relevance. However, we find that Gonzalez's testimony did not constitute outcome-determinative plain error in view of the compelling evidence of Hand's guilt.

**3. Sex-related testimony.** At trial, Womeldorf testified that Hand told him: "[Lori] was cold and he was a horny old man. * * * [He] wanted sex at least once a night and she didn't want to do that." Hand argues that this testimony was improperly admitted.

The admission of Hand's statement about his sexual relations with Lori was a matter of relevancy. Evid.R. 401 provides: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action

more probable or less probable than it would be without the evidence." We find that testimony about Hand's frequent desire for sex and his wife's lack of that interest was relevant as a possible motive for Lori's murder.

Hand also argues that testimony that he was infatuated with Barbara McKinney's daughter was improper other-acts evidence. Barbara's testimony included the following questioning:

> "Q: Did you ever see Lonnie Welch and Bob Hand get together when you lived at the home on King Edward Avenue?
>
> "A: Bob Hand used to come to our house and pick Lonnie up frequently. And he also had an infatuation, I guess, for my youngest daughter."

Barbara's nonresponsive remark was harmless, and her testimony was not repeated. Given the overwhelming evidence of Hand's guilt, we find that this isolated remark did not result in outcome-determinative plain error.

**4. Interest in "true crime" stories.** Hand also claims that testimony that he read "true crime" stories was improperly admitted. William Bowe, a childhood friend of Hand, testified, "When we [were] younger," Hand liked to read about "the perfect crime and stuff like that."

Hand's childhood interest in crime stories was only marginally relevant in showing that Hand may have used information about police work to manipulate the crime scene at his Delaware home. However, we find that the testimony did not result in outcome-determinative plain error.

**5. Forcing his father out of business and Hand's obsession with money.** Hand contends that the state improperly introduced evidence that he forced his father out of his radiator business and was obsessed with money. Bowe worked for ten years at Hand's radiator shop. During his testimony, Bowe explained why he left the shop:

> "Q: And you said you worked there about ten years, until 1980, I gather?
>
> "A: Yeah; * * * he bought the building --

"Q: You mean --

"A: Bob.

"Q: Okay; the defendant.

"A: He kicked his dad out of there.

"Q: What do you mean?

"A: Well, I don't know. They had an argument or something, and the next thing I know, he's smashing the windows out of the shop and said you got three days to move out of here.

"Q: Who is he saying that to?

"A: To his dad.

"Q: I see.

"A: So we did move, and I went with his dad."

This evidence established that Hand took over the radiator business and then hired Welch to work for him. Testimony that Hand fired his father and gave him three days to leave the shop was of highly questionable relevance. But we find that the evidence did not result in outcome-determinative plain error.

Hand also argues that testimony that he was obsessed with money was improperly introduced. Here, Bowe testified:

"Q: * * * Do you have any knowledge about the defendant's views toward money, finances?

"A: No; everybody knows Bob, and that's been his big thing in life is how much money he can get in his pocket. He's a money person.

"Q: And why do you say that?

"A: Ever since we was kids, * * * his quest in life is money."

We find that Bowe's opinion testimony was admissible under Evid.R. 701 because it was based upon his lifelong relationship with Hand, and Bowe's opinion helped to explain Hand's financial motives.

**6. Limiting instructions.** Hand argues that the trial court erred by not providing limiting instructions on the admissibility of "other acts" evidence. As discussed earlier, the trial court provided the jury with limiting instructions on the consideration of Hand's tax returns.

57

However, the defense did not request any further limiting instructions at the end of the guilt-phase evidence. Hand's failure to request such instructions waived all but plain error. In any event, nothing suggests that the jury used other-acts evidence to convict Hand on the theory that he was a bad person. Thus, we find that the trial court's failure to give further limiting instructions did not constitute plain error. See *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 1993 Ohio 171, 620 N.E.2d 50.

Based on the foregoing, proposition of law II is overruled.

*Hand,* 107 Ohio St.3d at 396-401.

Federal habeas corpus is available only to correct federal constitutional violations. 28 U.S.C. § 2254(a); *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Smith v. Phillips*, 455 U.S. 209 (1982); *Barclay v. Florida,* 463 U.S. 939 (1983).  "[I]t is not the province of a federal habeas court to reexamine state court determinations on state law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62 (1991).

A federal constitutional claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation, including presenting both the legal and factual basis of the claim.  *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik*, 986 F.2d 1506 (6th Cir.) *cert. denied*, 509 U.S. 907 (1993), *overruled in part on other grounds, Thompson v. Keohane*, 516 U.S. 99 (1995); *Riggins v. McMackin,* 935 F.2d 790 (6th Cir. 1991). The claim must be fairly presented at every stage of the state appellate process. *Wagner v. Smith,* 581 F.3d 410, 418 (6th Cir. 2009).  Merely using talismanic constitutional phrases like "fair trial" or "due process of law" does not constitute raising a federal constitutional issue.  *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006);  *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987); *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,*

531 U.S. 958 (2001), *citing Petrucelli v. Coombe*, 735 F.2d 684, 688-89 (2d Cir. 1984).  "A lawyer need not develop a constitutional argument at length, but he must make one; the words 'due process' are not an argument." *Riggins v. McGinnis*, 50 F.3d 492, 494 (7th Cir.), *cert. denied sub. nom., Riggins v. Washington,* 515 U.S. 1163 (1995).

Mr. Hand argues that the Ohio Supreme Court failed to address his other acts evidence claim under federal constitutional law and that this Court should therefore address the claim *de novo* rather than under the AEDPA standard.

It is true that the Ohio Supreme Court did not analyze this claim under federal constitutional law.  However, when Mr. Hand raised this issue on direct appeal to the Ohio Supreme Court, he raised it as a question of state law with only cursory mentions of due process and the United States Constitution.  App. Vol. 6 at 279-85.  Specifically, Mr. Hand argued that, "[t]he improper admission of 'other acts' evidence in the present case destroyed the presumption of innocence that should have been accorded to Hand and denied him his right to a fair trial in violation of the Due Process Clause of the Fourteenth Amendment."   Mr. Hand did not raise any constitutional arguments and he cited to one federal case, *Chapman v. California,* 386 U.S. 18, 26 (1967), for the proposition that, "[t]he State cannot demonstrate that the admission of this evidence and consideration of their improper argument were harmless beyond a reasonable doubt."  App. Vol. 6 at 284.  Aside from *Chapman,* the fourteen cases Mr. Hand cited on direct appeal are Ohio cases which address the appropriateness of prior acts evidence under Ohio statute and rules of evidence.  Mr. Hand's arguments on direct appeal focused solely on the trial court's alleged errors of state law in admitting the other acts evidence and with respect to its limiting jury instruction.  In other words, Mr. Hand failed to "federalize" his claim on the issue of other acts evidence.

Mr. Hand's presentation to the Ohio Supreme Court of his claim with respect to other acts evidence was inadequate to put that court on notice of a federal claim. Therefore, this claim is not cognizable in federal habeas corpus because it deals with a matter of state law and Ground II should be dismissed.

## GROUND III

**The State failed to disclose material exculpatory evidence to the defense at trial in violation of *Brady v. Maryland,* 373 U.S. 83 (1963), and Hand's Fifth and Fourteenth Amendment rights.**

In his Ground III, Mr. Hand argues that the state failed to disclose exculpatory evidence in violation of *Brady v. Maryland,* 373 U.S. 83 (1963). Mr. Hand's position is that the state failed to turn over Colombus Police Department files which contained information about the 2001 investigation into the deaths of his first two wives. The Respondent argues that this claim is procedurally defaulted. Mr. Hand argues in response that this claim is not procedurally defaulted because he supported the claim with evidence outside the record and therefore the post-conviction court improperly determined that he should have brought the claim on direct appeal. Mr. Hand concludes that the state court erred by determining the claim was barred by *res judicata.*

As noted above, Mr. Hand raised this claim as his Ground for Relief No. 12 in his post-conviction petition and the trial court rejected the claim on the basis of *res judicata* as well as on the basis that the claim was not supported by the record stating:

> Here, the Defendant's arguments are not supported by the material on the record regarding discovery matters. First, the case was reopened as a matter of routine. Second, the Columbus Police Department did turn over the files in response to defense counsel's discovery requests. The Defendant had access to any information the State could use in the trial including any alternative theories that could lead to a different outcome. Therefore, this information was readily available and was not withheld from the Defendant. Even if the

60

information were not made available to the Defendant, this issue should have been raised on appeal.  Since the Defendant did not raise it on appeal, he is now barred from raising it under the doctrine of res judicata.  The Court denies the twelfth claim for relief.

App. Vol. 11 at 164-65.

In support of his *Brady* claim, Mr. Hand submitted to the post-conviction court a transcript or video of a July 14, 2004, episode of *American Justice* titled *The Black Widower* which the A & E cable network aired.[5]  Mr. Hand's position is that it was not until that television program was brought to his attention that he knew or had reason to know that the investigation into the deaths of his first two wives had been opened and therefore he could not have raised his *Brady* claim on direct appeal.

It is generally true that "a federal habeas court sitting in review of a state-court judgment should not second guess a state court's decision concerning matters of state law." *Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir.2001). However, when the record reveals that the state's reliance upon its own procedural rule is misplaced, federal courts are "reluctant to conclude categorically that federal habeas review of the purportedly defaulted claim is precluded." *Id.*

While it is true that, generally, a *Brady* claim is properly brought on direct appeal, in view of the facts of this case, it was not possible for Mr. Hand to do so.  As this Court haa noted, Mr. Hand filed his direct appeal on July 30, 2003.  The evidence upon which Mr. Hand based his post-conviction *Brady* claim did not come into existence until July 14, 2004. In addition, the evidence was outside the record.

After carefully reviewing Mr. Hand's post-conviction petition, this Court concludes

---

[5] It is not clear from the record before this Court whether Mr. Hand submitted a transcript or a video of the program.  *See* App. Vol. 11 at 12.  However, for purposes of this discussion, the form of the evidence Mr. Hand submitted does not matter.

that the Delaware County Common Pleas Court's reliance on the doctrine of *res judicata* was misplaced as was the reliance of the court of appeals. *See State v. Hand,* 2006 Ohio 2028, 2006 Ohio App. LEXIS 1855 (Ohio App. 5th Dist. Apr. 21, 2006). Therefore, Ohio's procedural rule of *res judicata* is not applicable to Mr. Hand's *Brady* claim and his claim in not procedurally defaulted.

Because the Ohio state courts did not adjudicate Mr. Hand's *Brady* claim on the merits, there is no state court decision to which this Court can defer pursuant to 18 U.S.C. § 2254(d). When there are no results, let alone reasoning, to which a federal habeas court can defer, any attempt to determine whether the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law would be futile. *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), *cert. denied,* 540 U.S. 1158 (2004). Therefore, if the state court does not rule on a federal claim before it, federal review of that claim is *de novo*, rather than deferential. *Hawkins v. Coyle*, 547 F.3d 540, 546 (6th Cir. 2008), *cert. denied,* ___ U.S. ___,130 S.Ct. 553 (2009) (citations omitted); *see also, See, Nields v. Bradshaw,* 482 F.3d 442, 449-50 (6th Cir. 2007), *cert. denied sub nom., Nields v. Hudson*, 552 U.S. 1118 (2008), *citing, Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006).

The State has a duty to produce exculpatory evidence in a criminal case. If the State withholds evidence and it is material, the conviction must be reversed. *Brady, supra*. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Impeachment evidence as well as exculpatory evidence falls within the rule. *Id.*

62

"There are three essential components of a true *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 282 (1999).

As noted above, this Court granted leave for Mr. Hand to engage in discovery on several issues including his *Brady* claim. (Doc. 41). Specifically, the Court granted Mr. Hand leave to depose Det. Graul of the Columbus Police Department with respect to the *Brady* claim.

As noted above, on June 11, 2009, Mr. Hand filed the following depositions: Terry Sherman and Richard Cline, his trial counsel; Debra Gorrell Wehrle, the mitigation specialist in his case; and Stephen Ferrell, Pamela J. Prude-Smithers, and Wendi Dotson Overmeyer, his direct appeal counsel. (Doc. 56, 57, 58, 59, 60, 61). Mr. Hand never filed a deposition of Det. Graul or any other member of the Columbus Police Department who was associated with the unsolved crimes team or who was involved in the reopening of the investigation of the deaths of Mr. Hand's first two wives. In addition, none of the witnesses who testified at the February, 2010, evidentiary hearing in this Court offered testimony on the issue which is the subject of Mr. Hand's *Brady* claim.

While this Court has given Mr. Hand every opportunity to learn what he didn't know with respect to his *Brady* claim, he has failed to provide this Court with any facts to support his claim. In spite of his previous assurances to the Court that his "description of the exculpatory evidence and the prejudicial effect of its nondisclosure [would] become more specific through the discovery process", (Petitioner's Reply, Doc. 32 at 26; PAGEID#: 532), Mr. Hand has not described the allegedly exculpatory evidence nor has he explained the prejudicial effect of its nondisclosure. In addition, Mr. Hand either did not depose Det. Graul or he chose not to file his deposition with this

Court.  Further, a review of the deposition transcripts which Mr. Hand did file reveals that Mr. Hand

did not examine any of the  witnesses  about facts related to his *Brady* claim. (Doc. 56, 57, 58, 59,

60, 61).  The same is true of the witnesses who testified during the evidentiary hearing before this

Court.  (Doc. 87, 88).

This Court concludes that Mr. Hand has simply failed to support his *Brady* claim.

Therefore, his Ground III should be rejected.

### Ground IV

**Hand was denied the effective assistance of counsel during the
guilt phase of his trial in violation of his Fifth, Sixth, Eighth,
Ninth, and Fourteenth Amendment rights.**

In Ground IV, Mr. Hand alleges that his trial counsel were constitutionally ineffective

for several reasons.

The right to counsel guaranteed by the Sixth Amendment is the right to the effective

assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, (1970) (citations omitted).

"The Supreme Court set forth the test for ineffective assistance of counsel in *Strickland v.

Washington*, 466 U.S. 668 ... (1984)".  *Eley v. Bagley,* 604 F.3d 958, 968 (2010).

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence has
> two components.  First, the defendant must show that the counsel's
> performance was deficient.  This requires showing that counsel was
> not functioning as the "counsel" guaranteed the defendant by the
> Sixth Amendment.   Second, the defendant must show that the
> deficient performance prejudiced the defense. This requires showing
> that counsel's errors were so serious as to deprive the defendant of a
> fair trial, a trial whose result is reliable.  Unless a defendant makes
> both showings, it cannot be said that the conviction or death sentence
> resulted from a breakdown in the adversary process that renders the
> result unreliable.

*Strickland,* 466 U.S. at 687.  In other words, "[t]o establish ineffective assistance, a defendant 'must

show both deficient performance and prejudice.' " *Berghuis v. Thompkins,* ___ U.S. ___, ___, 130

S.Ct. 2250, 2255 (2010), *quoting, Knowles v. Mirzayance,* 556 U.S. ___, ___, 129 S. Ct. 1411, 1413

(2009).

        With respect to the first prong of the *Strickland* test, the Supreme Court has

commanded:

> Judicial scrutiny of counsel's performance must be highly
> deferential.... A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of hindsight,
> to reconstruct the circumstances of counsel's challenged conduct, and
> to evaluate the conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the evaluation, a court
> must indulge a strong presumption that counsel's conduct falls within
> a wide range of reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be considered sound trial
> strategy."

*Strickland,* 466 U.S at 689, *quoting, Michel v. State of Louisiana,* 350 U.S. 91, 101 (1955).

        As to the second prong, the Supreme Court said:

> The defendant must show that there is a reasonable probability that,
> but for counsel's unprofessional errors, the result of the proceeding
> would have been different. A reasonable probability is a probability
> sufficient to overcome confidence in the outcome.

*Strickland,* 466 U.S. at 694; *see also*, *Darden v. Wainwright,* 477 U.S. 168 (1986); *Wong v. Money,*

142 F.3d 313, 319 (6th Cir. 1998).

### Subclaim A

### The failure to object to testimony from Hand's bankruptcy attorney that was protected by the attorney-client privilege

        In his first Subclaim of Ground IV, Mr. Hand claims that his trial counsel were

ineffective for failing to object to testimony from his bankruptcy attorney that was protected by the

attorney-client privilege.

The Respondent argues first that this claim is procedurally barred. Mr. Hand essentially acknowledges the default, but argues that he is able to establish cause and prejudice to excuse the default. Mr. Hand's position is that he was represented by attorneys from the same office, *i.e.,* the Ohio Public Defender, on appeal and in post-conviction and the similarity of the defense and appellate teams can serve as good cause for failing to raise an ineffective assistance of counsel claim.

When a defendant is represented by different counsel at trial and on direct appeal, the vehicle for raising an ineffective assistance of trial counsel claim is direct appeal. *See, Hicks v. Collins,* 384 F.3d 204, 211 (6th Cir.), *cert. denied,* 544 U.S. 1037 (2994). Mr. Hand first raised this ineffective assistance of counsel claim in his Application for Reopening that he filed with the Ohio Supreme Court on September 27, 2008, App. Vol. 9 at 55-56, which that court denied on the basis that he had failed to comply with the ninety-day filing deadline in S.Ct.Prac.R. XI(6)(A). *Id.* at 207.

Ohio law provides that an appellant must raise his claims on appeal at the first opportunity to do so. *See, Jacobs v. Mohr,* 265 F.3d 407, 417 (2001); *see also*, *State v. Broom,* 40 Ohio St.3d 277, 288-89 (1988), *cert. denied,* 490 U.S. 1075 (1989) (noting that in Ohio, the failure to present a claim to either the state court of appeals or to the Ohio Supreme Court constitutes a waiver of the claim). This Court must assume that Ohio courts would follow their own procedural rules and bar this claim on the basis of *res judicata. See*, *Simpson v. Sparkman,* 94 F.3d 199, 203 (6th Cir. 1996)(applying the presumption that the state court "would not have ignored its own procedural rules and could have enforced the procedural bar"). The assertion of *res judicata* to bar claims not raised at the earliest opportunity is an adequate and independent ground upon which Ohio

may rely to foreclose habeas review. *Jacobs,* 265 F.3d at 417.  Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default. *Carter v. Mitchell,* 443 F.3d 517, 538 (6th Cir. 2006), *cert. denied,* 549 U.S. 1127 (2007).

      The first three prongs of *Maupin's* test are satisfied.  First, Mr. Hand failed to comply with Ohio's procedural rule of raising an effective assistance of trial counsel claim on direct appeal when represented by different counsel at trial and on direct appeal.  Second, the state courts would have enforced those rules if they had been given the opportunity to do so.  Third, the waiver doctrine and *res judicata* constitute an adequate and independent state ground upon which the state courts would foreclose review of the issue in Subclaim A.

      With respect to the fourth *Maupin* prong, the Court is not persuaded by Mr. Hand's argument that he has established cause for the default of this claim.  The fact that Mr. Hand was represented by counsel from the same office on direct appeal and during post-conviction is irrelevant.  That is because, as noted, when the defendant was represented by different counsel at trial and on direct appeal,  the vehicle for raising an ineffective assistance of trial counsel claim is direct appeal.  Therefore, Mr. Hand has not established cause for the default and the fourth *Maupin* prong is satisfied.

      The claim of ineffective assistance of trial counsel that Mr. Hand has raised in Subclaim A of Ground IV is procedurally defaulted.

### Subclaim B

### The failure to adequately question prospective jurors regarding their awareness of pretrial publicity

In Subclaim B of Ground IV, Mr. Hand argues that his trial counsel were

67

constitutionally ineffective for failing to question potential jurors about their awareness of pretrial publicity.  Mr. Hand alleges that two of the individuals, Alma Ray and Charlene Finamore, who served on the jury that convicted him were exposed to pre-trial publicity which made them unable to serve impartially and that counsel were ineffective for failing to more closely question Ms. Ray and Ms. Finamore as to the publicity.

Respondent argues first that this claim is procedurally defaulted.  Mr. Hand's position is that the claim is not procedurally defaulted because the state courts relied on evidence outside the record and therefore those courts erred in concluding that the claim was barred by *res judicata*.

Mr. Hand presented this claim to the Delaware County Common Pleas Court in his second ground for relief in his post-conviction petition.  App. Vol.10 at 88-90.  That court determined that Mr. Hand's second ground for relief was barred by *res judicata* because his claim that counsel was constitutionally ineffective because of they failed to question the jurors about pretrial publicity was based on the record and therefore should have been raised on direct appeal. *Id.,* Vol. 11 at 160-61.   The court of appeals agreed saying:

> Appellant claims the trial court erred in finding the doctrine of res judicata barred the consideration of claims one, two, three, four, five, six, eight, eleven, and twelve in his petition for post-conviction relief. We disagree.
> ...
> Appellant's second, third, fourth, fifth, sixth, eighth and eleventh grounds for relief assert ineffective assistance of appellant's trial counsel.
>
> The Sixth Amendment right to effective counsel should be raised on appeal and cannot be re-litigated in a post-conviction petition if the basis for raising the issue of ineffective counsel is drawn from the record. *State v. Lentz* (1994), 70 Ohio St. 3d 527.  In *State v. Jackson* (1980), 64 Ohio St. 2d 107, syllabus, the Supreme Court of Ohio held the following:

In a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness.

Broad assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction petitions. General conclusory allegations to the effect that a defendant has been denied effective assistance of counsel are inadequate as a matter of law to impose an evidentiary hearing. See *Rivera v. United States* (C.A.9, 1963). 318 F.2d 606.

Because appellant's claims are based upon ineffective assistance of counsel, we will use the following standard set out in *State v. Bradley* (1989), 42 Ohio St.3d 136, paragraphs two and three of the syllabus, certiorari denied (1990), 497 U.S. 1011. Appellant must establish the following:

2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (*State v. Lytle* [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 621; *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.)

3. To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.

A review of appellant's direct appeal indicates that he specifically raised numerous claims of ineffective assistance, including: ineffective assistance of counsel during voir dire; failure to call witnesses during both the guilt and mitigation phases of trial; failure to investigate, prepare and present evidence during both phases; and failure to form a reasonable trial strategy. However, appellant asserts, without evidence gathered outside the record, there was insufficient evidence available in the record to assert the claims at issue on direct appeal. We disagree.

69

> In the second and third claims, appellant asserts counsel was ineffective for failing to question members of the venire who demonstrated knowledge of pre-trial publicity, and failing to use all of the peremptory challenges necessary to make a valid claim a change of venue should be granted.
>
> We find that the claims presented were cognizable and capable of review on direct appeal. Appellant does not offer any new evidence outside the record precluding the application of res judicata. We note the record on direct appeal was supplemented with the jury questionnaires which appellant asserts merit review under post conviction relief herein.

*Hand,* 2006 WL 1063758 at *3-5; App. Vol. 12 at 366-68.

Ohio's doctrine of *res judicata* provides, in relevant part, that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment. *Williams v. Bagley,* 380 F.3d 932, 967 (6th Cir. 2004), *cert. denied sub nom., Williams v. Bradshaw,* 544 U.S. 1003 (2005), *citing, State v. Perry,* 10 Ohio St.2d 175 (1967). With respect to a procedural default analysis, Ohio's doctrine of *res judicata*, is an adequate and independent state procedural ground. *Williams, citing, Monzo v. Edwards,* 281 F.3d 568, 577 (6th Cir. 2002). Further, the Sixth Circuit has rejected claims that Ohio has failed to apply the doctrine of *res judicata* consistently. *Williams, citing, Greer v. Mitchell*, 264 F.3d 663, 673 (6th Cir. 2001), *cert. denied,* 535 U.S. 940 (2002). In other words, as noted above, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default. *Carter,* 443 F.3d at 538.

The first and second prongs of the *Maupin* test have been satisfied with respect to this claim. First, as the court of appeals noted, *supra,* in Ohio, whether trial counsel were constitutionally ineffective for failing to question potential jurors about their awareness of pretrial

publicity can be determined by reviewing the voir dire transcript. Second, when Mr. Hand attempted to raise this issue in his post-conviction proceedings, Ohio courts specifically relied on *res judicata* in rejecting his claim. As noted, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default.

As to the third *Maupin* prong, Mr. Hand argued, for the first time, in his post-hearing briefing in this Court that even if this claim is procedurally defaulted, he can establish cause for the default. Specifically, Mr. Hand argues that his appellate counsel were ineffective for failing to amend his direct appeal to include this claim. Ineffective assistance of appellate counsel may constitute cause for a procedural default, *Murray v. Carrier*, 477 U.S. 478 (1986), unless that claim is also procedurally defaulted. *Edwards v. Carpenter*, 529 U.S. 446, 450-51 (2000).

This claim is intertwined with Mr. Hand's ineffective assistance of appellate counsel claim contained in Ground XI Subclaims E and F, *infra*. In those Subclaims, Mr. Hand argues that his appellate counsel were ineffective for failing to move to amend his appellate brief to raise issues of juror bias. As noted in the discussion of that claim, although Respondent argues that it is procedurally defaulted, this Court concludes that it is not. Accordingly, the Court will address the merits of the juror bias issues because whether Mr. Hand's appellate counsel were ineffective for not amending his brief to include those issues resolves the question of whether the present claim (Subclaim B of Ground IV) is procedurally barred.

"[T]he requirement that every defendant in a criminal case receive a fair trial by a panel of impartial, indifferent jurors ... is a basic requirement of due process." *United States v. Rigsby*, 45 F.3d 120, 122 (6th Cir.), *cert. denied,* 514 U.S. 1134 (1995) (internal quotation marks and citation omitted).

71

In *Irvin v. Dowd*, 366 U.S. 717 (1961)*, superseded on other grounds by statute as stated in Moffat v. Gilmore*, 113 F.3d 698 (7th Cir. 1997), the United States Supreme Court expounded on the right to a jury untainted by pretrial publicity as follows:

> [T]he right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. *In re Oliver*, 333 U.S. 257 [(1948)]. . . .
>
> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.
>
> This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court. *Spies v. People of State of Illinois*, 123 U.S. 131 (1887); *Holt v. United States*, 218 U.S. 245 (1910); *Reynolds v. United States*, [98 U.S. 145 (1878)].

*Irvin*, 366 U.S. at 722-23.

As an initial matter, this Court notes that the jury selection process for Mr. Hand's trial took several days. *See,* Trial Tr. Vols. 3, 4, 5, 6. The prospective jurors were divided into groups of between six and nine individuals and the court and counsel questioned each group separately. *See,* Trial Tr. Vol. 1 at 3-4. After an initial round of challenges for cause, the court asked the remaining members of the group to return to the courtroom for additional *voir dire*. *See, Id.*

During its questioning of the group of prospective jurors to which Ms. Ray and Ms.

Finamore were assigned, the court asked the prospective jurors, "Is there anything that you may have read, heard or seen that caused you to form an opinion as to the defendant's guilt or innocence that you could not put aside?" to which all of the prospective jurors answered in the negative.  Trial Tr. Vol. 4 at 306.  The Court then asked, "Any of you?", and again all of the prospective jurors answered in the negative.  *Id.*  The Court continued by asking, "So are you all able to put aside anything you saw, heard or read in the media and decide this case strictly on evidence that's presented within the walls of this courtroom?".  *Id.*  All of the prospective jurors answered in the affirmative.  *Id.*  The court then asked, "Anybody have any concerns about that?", and the prospective jurors answered in the negative.  *Id.*  Finally, the court said, "No, all right.  I'm sure none of you want to reach a significant and important decision in your lives based on something you might have seen in the news; is that fair?" and the prospective jurors all answered in the affirmative. *Id.* at 306-07.

> The following dialogue took place between Mr. Hand's counsel and Ms. Ray:
>
> **Mr. Cline:** We talked briefly about an adage, and I believe it's a biblical adage, an eye for an eye.  How many people have heard that?
> ...
> I think everybody on the jury has heard that.  Ms. Ray, what does that mean to you?
>
> **Ms. Ray:** Well, supposedly, if somebody does something to you, you're to do it back.
>
> **Mr. Cline:** Okay.  And I take it from your response that that's not a belief that you personally hold?
>
> **Ms. Ray:** No.  I believe in the New Testament and not the Old.
>
> **Mr. Cline:** All right, ... .
> ...
>
> **Mr. Cline:** Is there anyone on the panel who has life insurance on

their own life?
...

**Ms. Ray:** Yes.

...

**Mr. Cline:** Ms. Ray, I think you were one.  Is that similar — did you get it [life insurance] through work or—

**Ms. Ray:** Now that I don't have any family to take care of I do need to have burial expenses.
...
And they keep getting higher and higher.

**Mr. Cline:** ... Is that something you bought yourself, or is that something you got through an employment or some association?

**Ms. Ray:** No, I bought it.

**Mr. Cline:** You had to buy it?

**Ms. Ray:** Yes.

...

*Id.* at 322-23; 350-51.

Ms. Ray completed a juror questionnaire prior to trial.  App. Vol. 10 at 205-16.  In response to questions on her juror questionnaire, Ms. Ray reported that she had seen one news article in the April 30, 2003, Delaware Gazette and in answer to the question, "What impression did it leave in your mind?", Ms. Ray responded "wondering".  *Id.* at 213.   Ms. Ray also indicated on her questionnaire that: (1) based on her exposure to pre-trial publicity, she did not know whether Mr. Hand was guilty and that she had no opinion either way; (2) she would be able to put any and all information she obtained by way of media coverage out of her mind and base her decision solely on the evidence presented in the courtroom and the instructions of law given to her by the court; and (3) that if selected as a juror, she would not have any difficulty following the court's instructions not

74

to read, listen, or watch any accounts of the case reported by the media.  *Id.* at 213-14.  With respect to the death penalty, Ms. Ray reported that she believed in it and thought that is was appropriate in some murder cases but inappropriate in most murder cases.  *Id.* at 215.

During voir dire, Mr. Hand's counsel and Ms. Finamore had the following exchange:

**Mr. Cline:** Ms. Finamore, how about you; do you subscribe to an eye for an eye philosophy?

**Ms. Finamore:**  To a certain extent, but, again, you hear about turning the other cheek also.  I don't necessarily think that if someone kills a person, their life should be taken.  I don't think it's an automatic death penalty.

**Mr. Cline:** Okay.  What about a circumstance where the state proved that the defendant had taken more than one person's life; have they crossed the line at that point, or are you still willing to listen to the rest of the evidence?

**Ms. Finamore:** Are you talking in regards to the penalty, the death penalty?

**Mr. Cline:** Yes.

**Ms. Finamore:** It would depend on the evidence and the circumstances.  It would not be an automatic.
...

**Mr. Cline:** ... If during the course of three different marriages, each wife was murdered, is there anyone who believes that the husband is probably guilty?  That's all you know.  Anyone believe that?
...
Ms. [Finamore], no?
...

**Ms. Finamore:** If I heard that, I would lean toward that because I've always heard that the first—

**Mr. Cline:** That's a natural reaction; isn't it?

**Ms. Finamore:** uh-huh.

75

**Mr. Cline:** ... If the state proves to you that three wives were murdered, but they don't prove anything else, would you convict that person?

**Ms. Finamore:** If they were murdered but not murdered by him?

**Mr. Cline:** Exactly. You understand the question correctly. That's right, all they prove is that these three women were murdered.

**Ms. Finamore:** Okay, and what am I deciding?

**Mr. Cline:** The guilt or innocence of the husband.

**Ms. Finamore:** But they didn't prove that he did it, just that they were murdered?

**Mr. Cline:** Right. You couldn't find him guilty, could you?

**Ms. Finamore:** No.
...

**Mr. Cline:** ... Is there anyone here who had either heard or read about post-traumatic stress disorder?

**Ms. Finamore:** Heard of it.
...

**Mr. Cline:** Miss Finamore, you've heard — I was you nodding your head. I did hear you say yes.
...

**Ms. Finamore:** It's just if someone suffers a very traumatic event in their life, they could be plagued with either physical or mental problems afterward, recurring.
...

**Mr. Cline:** ... Some people feel that it's unfair to bring that kind of evidence into the courtroom. Would you be offended if that kind of evidence was presented to you?
...
Would you judge it with the same rules and the same requirements of proof that you would any other evidence?
...

76

**Ms. Finamore:** Yes.

Trial Tr. at 322-23, 343-45.

Ms. Finamore also completed a juror questionnaire prior to trial.  App. Vol. 10 at 217-28.  In response to questions on that form, Ms. Finamore reported that she had been exposed to pre-trial publicity two to three times and that the exposure was by way of articles in the Columbus Dispatch or reports on the television news about the investigation and Mr. Hand's arrest.  *Id.* at 225. Ms. Finamore also reported that the media exposure left her with the impression that Mr. Hand was probably involved.  *Id.*  In addition, Ms. Finamore reported that based on her exposure to media reports, she thought that Mr. Hand was guilty.  *Id.*  Ms. Finamore reported further that: (1) she would be able to put any and all such information out of her mind and base her decisions solely on the evidence presented in the courtroom and the instructions of law given by the court; (2) she would be able to put any and all information she obtained by way of media coverage out of her mind and base her decision solely on the evidence presented in the courtroom and the instructions of law given to her by the court; and (3) that if selected as a juror, she would not have any difficulty following the court's instructions not to read, listen, or watch any accounts of the case reported by the media. *Id.* at 225-26.  With respect to her views about the death penalty, Ms. Finamore reported that while she believed in it in certain instances, she thought that life in prison was a greater punishment and that she thought it was appropriate in some murder cases, but inappropriate in most murder cases. *Id.* at 227.

After carefully reviewing the voir dire as to both Ms. Ray and Ms. Finamore as well as their responses to the questions on each juror's respective questionnaire, this Court concludes that Mr. Hand's counsel were not ineffective for failing to question either Ms. Ray or Ms. Finamore with

77

respect to pre-trial publicity.

First, with respect to Ms. Ray, the answers she provided on the juror questionnaire clearly indicate that she was exposed to pre-trial publicity.  However, her exposure was, at most, minimal.  As noted, Ms. Ray reported that she had seen one newspaper article and that the article simply left her "wondering".  Further, even in view of that minimal exposure, Ms. Ray did not know whether Mr. Hand was guilty and that she would be able to put any and all information she obtained by way of media coverage out of her mind and base her decision solely on the evidence.  Further, Ms. Ray's answers to the court's questions during voir dire again made it clear that she would base any decision on the evidence presented in the courtroom, would follow the law as the court gave it, and that she would not base a decision on what she had learned by way of the media.

Several of the answers which Ms. Ray gave on the juror questionnaire as well as during voir dire indicate that, arguably, she may have been a favorable juror for Mr. Hand.  For example, Ms. Ray testified that she did not subscribe to the "an eye for an eye" adage.  Ms. Ray also testified that she herself had bought her own life insurance indicating that she understands the need for that insurance and suggesting that the mere existence of such a policy is not in and of itself suspect.  Finally, with respect to the death penalty, Ms. Ray reported on her juror questionnaire that she thought that is was appropriate in some murder cases but inappropriate in most murder cases.

Turning to Ms. Finamore, the Court notes that initially her responses on her juror questionnaire appear somewhat problematic.  Specifically, after reporting that she had been exposed to pre-trial publicity, Ms. Finamore reported that as a result of that exposure she thought Mr. Hand was guilty.  However, Ms. Finamore's responses to other questions on the form as well as her testimony during voir dire indicate that in spite of her initial impression about Mr. Hand's guilt, she

78

was rehabilitated as a juror.  Specifically, and similar to Ms. Ray, Ms. Finamore's answers to other questions on the juror questionnaire as well as her voir dire testimony made it clear that she was able to put aside her initial impression and base her decision on only the evidence presented in the courtroom and that she would apply the law as the court gave it to the jury and that she would not have any difficulty following the court's instructions not to read, listen, or watch any accounts of the case reported by the media.

Again similar to Ms. Ray, Ms. Finamore was arguably a juror favorable to Mr. Hand with respect to her views about the death penalty.  As noted above, Ms. Finamore reported that although she believed in the death penalty in certain instances, she thought that life in prison was a greater punishment and that she thought it was appropriate in some murder cases, but inappropriate in most murder cases.

When Mr. Hand attempted to raise this issue before the post-conviction court, he submitted numerous examples of the pre-trial publicity about his case.  App. Vol. 10 at 113-204.  First, the Court notes that some of the articles which Mr. Hand submitted were printed after the jury selection in his case had started.  The articles are from different sources but primarily The Delaware Gazette and The Columbus Dispatch.  The articles essentially follow the discovery and investigation of the crimes as well as Mr. Hand's arrest.  Indeed, over time, the articles became somewhat repetitious as to what they reported.  Nevertheless, while there are numerous media reports, it is clear that neither Ms. Ray nor Ms. Finamore were so poisoned by pre-trial media reports that they should not have served on the jury.

At this juncture, this Court notes that is not persuaded by Mr. Hand's argument that this claim is not procedurally defaulted on the basis that the state court relied on evidence outside

79

the record.  While it is true that the post-conviction court of appeals referred to the jury questionnaires attached to Mr. Hand's direct appeal brief, the court did so "in passing".  In other words, the court simply acknowledged that Mr. Hand had submitted those documents during his direct appeal.  The court did not use those documents for the purpose of addressing the substance of Mr. Hand's claim.  This Court also notes that while the state court of appeals cited *Strickland*, as well as other ineffective assistance of counsel authorities, it stopped short of addressing the merits of Mr. Hand's ineffective assistance of counsel claim.

This Court concludes that Mr. Hand has not satisfied the "cause and prejudice" standard of *Maupin*.   Even if Mr. Hand had established cause for the default, he has not satisfied the prejudice prong of the *Maupin* test because the claim is without merit.  Accordingly, this Court concludes that Subclaim B of Ground IV is procedurally defaulted and, in the alternative, is without merit.

.             **Subclaim C**

**The failure to move for a change of venue**

Mr. Hand argues in Subclaim C of Ground IV that his trial counsel were ineffective for failing to file a motion for a change in venue.  Mr. Hand also claims that his counsel were ineffective because they failed to exercise all of the allotted peremptory challenges particularly with respect to jurors who had obvious, in-depth knowledge of the publicity surrounding his case.  Respondent argues that this claim is procedurally defaulted.  Mr. Hand does not challenge the Respondent's position.  However, Mr. Hand argued, for the first time in his post-hearing briefing that that his appellate counsel were ineffective for failing to raise the claim on direct appeal thereby establishing cause for the default.

A petitioner may avoid procedural default only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case. See [*Wainwright v.*] *Sykes*, 433 U.S. [72, ] 87... [1977]. A showing of cause requires more than the mere proffer of an excuse. Rather, "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Habeas petitioners cannot rely on conclusory assertions of cause and prejudice to overcome procedural default; they must present affirmative evidence or argument as to the precise cause and prejudice produced. *See Tinsley v. Million*, 399 F.3d 796, 806 (6th Cir.), *certi. denied,* 546 U.S. 1044 (2005) (citing *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 452 (6th Cir.2003) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at a developed argumentation, are deemed waived.") (quotation marks omitted)). *Lundgren v. Mitchell*, 440 F.3d 754, 763-64 (6th Cir. 2006).

Mr. Hand offers only a conclusory assertion that his appellate counsels' ineffectiveness is cause for his default of this claim. Indeed, he has not offered any affirmative evidence or argument as to his appellate counsel's ineffectiveness with respect to this claim. Most notably, Mr. Hand has not raised appellate counsel's ineffectiveness for failure to amend his direct appeal brief to include a claim of trial counsel's failure to move for a change of venue in his present Petition.

In addition, Mr. Hand did not raise a claim of ineffectiveness of appellate counsel for failing to raise trial counsel's ineffectiveness for failing to move for a change of venue claim on

either of his applications to reopen his direct appeal.  App. Vol. 9 at 28-39; *Id.* at 47-61.

Accordingly, Mr. Hand's underlying ineffectiveness of appellate counsel claim is itself defaulted.

Therefore, that claim of ineffective assistance of appellate counsel cannot serve as cause for default

of his claim of ineffective assistance of trial counsel with respect to the change of venue. *Carpenter,*

*supra.*

### Subclaim D

**The failure to act upon and utilize Hand's report
of an escape attempt at the Delaware County jail**

Mr. Hand argues in Subclaim D that he was denied the effective assistance of trial

counsel because counsel failed to provide to the jail authorities information Mr. Hand gave counsel

related to the planning of an escape attempt by other inmates.  Mr. Hand's position seems to be that

if counsel had provided that information to the jail authorities, it would have established that he did

not participate in the attempt and he would not have been charged with attempted escape.  Mr. Hand

suggests that as a result, the trial court would not have instructed the jurors that they could consider

his participation in the attempted escape as showing consciousness of guilt and his conviction for

attempted escape would not have undermined his primary mitigation argument that he would adapt

to prison life.

Respondent argues that this claim is procedurally barred.

Mr. Hand raised this claim for the first time in his post-conviction petition as his

eleventh ground for relief.  App. Vol. 11 at 8-14.  The trial court determined that the claim was

barred by *res judicata* because it was based on the trial record and therefore should have been raised

on direct appeal.  *Id.* at 160-61.  The court of appeals agreed:

We further find the trial court did not err in dismissing appellant's

82

> eleventh ground for relief relative to statements he made to counsel about the attempted escape of other inmates. The record clearly demonstrates appellant himself testified at trial as to his statements to counsel; therefore, appellant's claim does not provide new evidence outside the record and the Supreme Court could have considered the argument on direct appeal.

*Hand,* 2006 WL 1063758; App. Vol. 12 at 369-70.

The trial transcript reveals that Mr. Hand indeed testified about the escape plans and that he told his counsel that inmates were planning an escape.  Trial Tr. Vol. 26 at 3496-99.

As noted above, Ohio's doctrine of *res judicata* has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default. *Carter,* 443 F.3d at 538 The first and second prongs of the *Maupin* test have been satisfied with respect to this Subclaim. First, as the court of appeals determined, Mr. Hand's allegation about his trial counsel and the information he gave than about a planned escape could be determined by reviewing the trial transcript.  Second, when Mr. Hand attempted to raise this issue in his post-conviction proceedings, Ohio courts specifically relied on *res judicata* in rejecting his claim.  As noted, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default.  The third prong of *Maupin* is satisfied because Mr. Hand has not shown that there was cause or prejudice with respect to the default.

This Court concludes that Subclaim D of Ground IV is procedurally defaulted.

### Subclaim E

#### The failure to exclude prospective jurors who were biased against the defense

In Subclaim F of Ground IV, Mr. Hand argues that his trial counsel were constitutionally ineffective for failure to adequately question a prospective juror who served on the

jury regarding her professional relationship with the victim, Jill Hand, as well as the impact of her own daughter's death on her ability to serve.  Mr. Hand did not identify this juror in his Petition, but identified her as Juror Lombardo in his Reply.  Mr. Hand first argues that in addressing this claim, the Ohio Supreme Court did not cite *Strickland* or any other United States Supreme Court case therefore this Court is not bound by the standards of § 2254(d) and should review his claim *de novo*. Mr. Hand then argues that Juror Lombardo was biased because her husband had previously worked with Jill Hand, because she had witnessed workplace violence, and because she lost a daughter and therefore was the mother of a victim.  Mr. Hand concludes that his trial counsel were ineffective for not thoroughly questioning Ms. Lombardo on those issues and for failing to ultimately eliminate her from the jury.

Mr. Hand raised this issue in the Ohio Supreme Court which rejected it as follows:

**Voir dire of Juror Lombardo.**  Hand claims that his counsel were ineffective for failing to explore the bias of Juror Lombardo, a seated juror, and strike her from the jury. However, " 'the conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked.'" [*State v.*] Cornwell,[1999] 86 Ohio St.3d [560,]... 568, 715 N.E.2d 1144, quoting *State v. Evans* (1992), 63 Ohio St.3d 231, 247, 586 N.E.2d 1042. Moreover, "counsel is in the best position to determine whether any potential juror should be questioned and to what extent." *State v. Murphy* (2001), 91 Ohio St.3d 516, 539, 2001 Ohio 112, 747 N.E.2d 765.

Hand contends that his counsel failed to explore Juror Lombardo's bias after she disclosed that her husband had worked with Jill Hand. Juror Lombardo stated that her husband, an investigator with the Ohio Attorney General, "had worked with [Jill] on and off for about 12 years. She was with DMV [Division of Motor Vehicles] and * * * he had an investigation regarding the DMV." Thereafter, Juror Lombardo was asked whether she would be able to fairly consider the testimony of witnesses who worked with the Attorney General's Office. Juror Lombardo stated that she would "listen to their testimony separate from [her] husband's work, absolutely." Juror Lombardo also assured counsel that "it would not be difficult at all"

to separate what happens at trial from her husband. Thus, counsel did question Juror Lombardo about her bias, and her responses indicated that her husband's job would not influence her performance as a juror.

Hand also argues that his counsel were deficient by failing to inquire further about the death of Juror Lombardo's daughter. This segment of voir dire occurred as follows:

> Mr. Cline: In the course of listening to whatever comments were made, how did you feel about what you were hearing?
>
> Ms. Lombardo: Well, I lost a daughter in the past and I pretty much went through a lot of stuff. I felt very sad, but I really didn't pursue it. I just really have a yearning to know more about it. Of course, I had feelings about it, sadness. I would still need to know more about what happened.
>
> Mr. Cline: On your questionnaire, the question was asked if you had started to form any opinions and I think you marked, "Not sure." Then your next comment was, "Mr. Hand is entitled to a fair and just trial."
>
> Ms. Lombardo: He absolutely is.

Hand argues that Ms. Lombardo's response about her daughter's death raised issues of potential bias that his counsel was obligated to pursue. However, Hand's claim of potential bias is speculative. Juror Lombardo had earlier assured the court that she could decide the case solely upon the evidence and agreed to set aside her personal beliefs and follow the law in deciding the case. Moreover, the follow-up question eliciting Juror Lombardo's reaffirmation that Hand was entitled to a fair trial diminished the likelihood that her daughter's death was a potential source of bias. Given these circumstances, we find that trial counsel's decision not to question Juror Lombardo any further about the loss of her daughter, a very personal issue, was a proper exercise of discretionary judgment. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 490, 2000 Ohio 465, 721 N.E.2d 995.

Finally, Hand argues that his counsel were deficient in failing to challenge Juror Lombardo for bias after she disclosed that she had witnessed workplace violence. About 30 years earlier, Juror Lombardo had seen her boss confront an intruder where she worked. She later learned that her boss had shot the man. Juror Lombardo was

a witness in the subsequent murder trial, and her testimony supported the jury's decision that her boss had acted in self-defense. During a follow-up question, the trial counsel asked Juror Lombardo, "Do you believe that a person who has been put in danger, or his life is threatened should have the right to defend himself or herself?" Juror Lombardo answered, "Yes."

Here, Juror Lombardo's views about self-defense were favorable to the defense because Hand claimed that he killed Welch in self-defense. Thus, we reject Hand's claim that his counsel was ineffective by failing to challenge Juror Lombardo for cause or peremptorily because of her prior experience with workplace violence. See *State v. Vrabel,* 99 Ohio St.3d 184, 2003 Ohio 3193, 790 N.E.2d 303, P54-56.

*Hand,* 107 Ohio St.3d at 407-08.

First, as this Court noted above, a state court need not specifically cite Supreme Court cases so long as neither its reasoning nor its result contradicts them. *Early,* 537 U.S. at 8. Therefore, this Court is not persuaded by Mr. Hand's argument that the Court should address this claim *de novo* on the basis the Ohio Supreme Court did not specifically cite to any United States Supreme Court cases in addressing this claim.

As noted above, that every defendant in a criminal case receive a fair trial by a panel of impartial, indifferent jurors is a basic requirement of due process. *Rigsby,* 45 F.3d at 122. The ultimate question is whether a juror swore that he or she could set aside any opinion that he might hold and decide the case on the evidence and whether that juror's protestation of impartiality should have been believed. *Patton v. Yount,* 467 U.S. 1025, 1036 (1984). "The question of whether a trial court has seated a fair and impartial jury is a factual one, involving an assessment of credibility." *Gall v. Parker,* 231 F.3d 265, 308 (6th Cir. 2000), *cert. denied,* 533 U.S. 941 (2001), *superseded by statute on other grounds as stated in Bowling v. Parker,* 344 F.3d 487, 501 n. 3 (6th Cir.2003), *cert. denied sub nom., Bowling v. Haeberlin*, 543 U.S. 842 (2004), *citing, Patton,* 467 U.S. at 1038. On

habeas review, the inquiry is "whether there is fair support in the record for the state courts' conclusion that the jurors [ ] would be impartial." *Gall, supra, citing, Patton, supra.* A trial court's finding of impartiality is a factual determination entitled to 28 U.S.C. 2254(e)'s presumption of correctness. *Dennis v. Mitchell,* 354 F.3d 511, 520 (6th Cir. 2003), *cert. denied,* 541 U.S. 1068 (2004).

During voir dire, the following dialogue took place between Mr. Hand's trial counsel, and Ms. Lombardo:

**Mr. Cline:** Ms. Lombardo ...

**Ms. Lombardo:** Yes.

**Mr. Cline:** When we talk about the publicity in this case, I found it interesting that you noted that there was some publicity, yes, you heard some people talking about it, maybe; does that sound right?

**Mr. Lombardo:** Yes.

**Mr. Cline:** Tell me how you felt when you heard those people talking about this case? At that point, of course, you did not know that you would be here and asked to bare your soul in front of all these people, but tell me how you felt?

**Ms. Lombardo:** I don't know if it makes a difference in the jury selection or not but the way I heard about the case was my husband had worked with Mrs. Hand. We were at function with his company, his staff and that's where I heard about it. My husband was acquainted with Mrs. Hand.

**Mr. Cline:** Did your husband know Mrs. Hand personally or only in a brief, working—

**Ms. Lombardo:** Well, he had worked with her on and off for about 12 years. She was with DMV and he was with the attorney general's office. And he had an investigation regarding the DMV. That's how I heard about the case.
...

87

**Mr. Cline:** During the course of listening to whatever comments were made, how did you feel about what you were hearing?

**Ms. Lombardo:** Well, I lost a daughter in the past and I pretty much went through a lot of stuff. I felt very sad, but I really didn't pursue it. I just really have a yearning to know more about it. Of course, I had feelings about it, sadness. I would still need to know more about what happened.

**Mr. Cline:** On your questionnaire, the question was asked if you had started to form any opinions and I think you marked, "not sure." then your next comment was, "Mr. Hand is entitled to a fair and just trial."

**Ms. Lombardo:** He absolutely is.

**Mr. Cline:** Do you think that this process that we're going through today helps ensure that?

**Ms. Lombardo:** Yes, I do.

**Mr. Cline:** I'm going to ask you to consider the possibility that there's been proof beyond a reasonable doubt of a premeditated murder and a specification, at least one, that the judge will explain to you. And there's no reasonable doubt at all that the murder was premeditated, planned in advance, and now we are over here. How important is it to you that the murder was premeditated?

**Ms. Lombardo:** It's very important. That has a lot to do with my thinking on that.
...
That's very important to me, whether it will be proven it's premeditated or not or whether...

**Mr. Cline:** Whether what?

**Ms. Lombardo:** Whether he would maybe do it again. Those things would be important to me.

**Mr. Cline:** If we ever got past this barrier on a premeditated murder charge, then you must at that point have decided that the murder was, in fact, premeditated; right?

**Ms. Lombardo:** Yes.

88

**Mr. Cline:** Logically, if the charge says premeditated murder and we're over here, you've already concluded, haven't you, beyond a reasonable doubt, that it was premeditated; correct?

**Ms. Lombardo:** Yes.

**Mr. Cline:** And you've also concluded that whatever single or multiple specifications are proven beyond a reasonable doubt; right?

**Ms. Lombardo:** Yes.

**Mr. Cline:** So now we're over here and we know it's premeditated and we know that there's a specification, but the law says that not every premeditated murder results in the death penalty. Because if it did, this arrow would go straight over there. But the arrow stops and we have this whole gray section two [sic]. Are your feelings about premeditated murder—let me ask it differently. Knowing that the law says that not every premeditated murder results in the death penalty, how does that make you feel about the law?

**Mr. Lombardo:** I'm OK with it.

**Mr. Cline:** You're OK with that concept?

**Ms. Lombardo:** Yes.

**Mr. Cline:** And do you feel that you would be able to apply that concept and consider this individual case on its merits?

**Ms. Lombardo:** Yes.

**Mr. Cline:** Can I hold you to that?

**Ms. Lombardo:** Yes.
...

Trial Tr. Vol. 5 at 696-701.

As voir dire continued, the trial court inquired of the panel, including Ms. Lombardo, as follows: (1) whether anyone was "possessed of the state of mind evincing ill-will or bias either against the State of Ohio or this Defendant so that it would be impossible for [ ] you to be fair and

89

impartial", to which the prospective jurors answered in the negative;  *Id.* at 706; (2)  if anyone was

"possessed of the state of mind evincing favoritism or bias towards either the State of Ohio or this

Defendant", to which the prospective jurors again answered in the negative;  *Id.*; (3) if there was

"any reason whatsoever ... that would render it impossible for you to be a fair and impartial juror

in this case", to which the panel again answered in the negative;  *Id.* at 707-08; (4) if members of

the panel "all agree[d] to follow the law as I explain it to you, as opposed to the law as what you

think it is or what you think it ought to be" to which the panel members answered in the affirmative;

*Id.* at 708.

        Mr. Yost, the prosecutor in Mr. Hand's case, engaged in the following dialogue with

Ms. Lombardo during voir dire:

> **Mr. Yost:** Miss Lombardo, I noticed on your jury questionnaire, you were a witness when you were 18, I guess?
>
> **Ms. Lombardo:** A time ago.
>
> **Mr. Yost:** ... What happened there?
>
> **Ms. Lombardo:** I was employed by an auto-body shop and a person came into the auto-body shop to see my boss who was back in the garage part working on some automobiles. He was, obviously to me, very drunk and angry and I could see that he was carrying a gun. And he kind of pushed by me and went back into the garage area where my boss was working.  And I heard shouting and gunshots. And I ran out.  My father worked downtown.  I ran out from where it was happening to my father's office and later found out that my boss had shot the man who had come in where I was working.  So I had to testify as to his condition.  I mean, it was just the three of us there that day.  His condition, his temperament, whether or not he was carrying a gun, that sort of thing.
>
> **Mr. Yost:** It must have been a very unsettling event for a young person.
>
> **Ms. Lombardo:** I think my mother had a harder time with it than I

did.  It just felt like I was there for a reason.

**Mr. Yost:** Was there anything about that experience that would make it difficult for you to serve as a juror in this case:

**Ms. Lombardo:** Not really, no.
...

**Mr. Yost:** ... Life insurance, anybody have life insurance policies?
                            ...
How many do you have, Miss Lombardo?

**Ms. Lombardo:** I have one on myself, my two children and my husband.

**Mr. Yost:** Is that one policy, two policies?

**Ms. Lombardo:** Separate policies.

**Mr. Yost:** But one each?

**Ms. Lombardo:** Yes.

*Id.* at 711-12; 718-19.

Mr. Cline again inquired of Ms. Lombardo and they engaged in the following

dialogue:

**Mr. Cline:** ... What does it mean to you when I say give the defendant the presumption of innocence?

**Ms. Lombardo:** He's innocent until the fact that he's proved not.

**Mr. Cline:** Okay.  So a person, who is the defendant, is innocent until the facts are proven beyond a reasonable doubt?

**Ms. Lombardo:** Correct.
...

**Mr. Cline:** These people are making the accusation in this case. They are accusing Mr. Hand.  Isn't it fair that we ask them to prove it?

91

**Ms. Lombardo:** Yes.

...

**Mr. Cline:** ... Ms. Lombardo, you described a pretty harrowing event that happened to you a few years ago; right?

**Ms. Lombardo**: A lot longer than a few years ago.  It's really difficult for me to remember it that well.

**Mr. Cline:** To remember it?

**Ms. Lombardo:** Yes.

**Mr. Cline:** Because it's been a while?

**Ms. Lombardo:** Yeah, but, you know, it's part of the questionnaire.

**Mr. Cline:** Okay, If I understood your explanation correctly, your boss actually ended up shooting the person who you observed and the reason you were in court was to help explain the circumstances that surrounded the shooting by your boss of this other person?

**Ms. Lombardo:** Yes.

**Mr. Cline:** I want to make sure I got that right.  I was a little confused.  Did I get it right?

**Ms. Lombardo:** I was testifying on behalf of the person who shot. I was testifying on his behalf.

**Mr. Cline:** Do you believe that a person who has been put in danger, or his life is threatened should have the right to defend himself or herself?

**Ms. Lombardo:** Yes.

**Mr. Cline:** Is that sort of what you were dealing with in that circumstance years ago?

**Ms. Lombardo:** Yes, it was considered self-defense, is the way the verdict was.

*Id.* at 723; 725; 726-27.

Contrary to Mr. Hand's argument, Ms. Lombardo did not give any indication that she was prejudiced against him or that she should not have served on the jury for any other reason.

First, although Ms. Lombardo indicated that her husband was acquainted with Jill Hand and had contact with her in a professional setting on and off for about twelve years, that is the extent of her familiarity with Mrs. Hand. Ms. Lombardo herself had never met Jill Hand, did not have any contact with her whatsoever, did not know her, had never interacted with her, and certainly did not have any kind of ongoing relationship with her. Her husband's relationship with Mrs. Hand was, at most, professional and superficial.

Second, while Ms. Lombardo testified that she had "lost a daughter", there is no indication what caused that loss. Mr. Hand suggests that Ms. Lombardo's daughter's death was attributable to a crime and therefore, as the relative of a victim of a crime, Ms. Lombardo should have been excluded from the jury. However, there is nothing in the record to support that suggestion. Ms. Lombardo's daughter could very well have died as the result of a devastating illness as of a crime.

Third, while it is true that several years ago, Ms. Lombardo was the witness to a shooting incident at her then-place of employment, her responses to counsel's questions revealed that she testified on behalf of her employer who had apparently been charged criminally with shooting another individual. Ms. Lombardo explained that her employer had acted in self-defense and that the verdict in the case reflected the self-defense theory. Mr. Hand's version of the events which resulted in Jill Hand's and Lonnie Welch's deaths essentially involved an allegation of self-defense. If anything, it would be to Mr. Hand's benefit to have Ms. Lombardo, an individual who understands and accepts the defense of self-defense on his jury.

93

Lastly, and perhaps most importantly, Ms. Lombardo testified that she: (1) believed that Mr. Hand was entitled to a fair and just trial; (2) knew that the law provided that not every premeditated murder required the imposition of the death penalty, that she was "O.K." with that; (3) understood that each individual case should be considered on its merits and she could do that; (4) did not have any ill-will or bias either against or in favor of either the State of Ohio or Mr. Hand; (5) knew of no reason why she could not be a fair and impartial juror; (6) would follow the law as the judge gave it to the jury; (7) believed that a person was innocent until proven guilty; and (8) believed that it was fair that the state should be required to prove the allegations it had made against Mr. Hand.   There is simply nothing in the record to indicate that Ms. Lombardo was not impartial, had pre-conceived opinions about the case, was acquainted with any of the individuals involved in the case the including Jill Hand, could not follow the court's instructions, had any opinions about the law which would cause her to ignore the court's instructions, or that she did not accept the theory of self-defense.  In other words, there was no reason that Ms. Lombardo could not serve as a fair and impartial juror in Mr. Hand's case.  Because there was no reason why Ms. Lombardo should not have been seated as a juror, Mr. Hand's counsel were not ineffective for failing to challenge her for cause or to exercise a peremptory challenge to remove her from the jury.

The claims contained in Mr. Hand's Subclaim E of Ground IV are without merit. Therefore, the Ohio Supreme Court's  finding with respect to the issue raised in Subclaim E of Ground IV is not contrary to  nor an unreasonable application of, clearly established federal law.

### Subclaim F

### The failure to object to the admissibility of co-conspirator's statements

In Subclaim F, Mr. Hand argues that his trial counsel were ineffective for failing to

94

object to the admissibility of Lonnie Welch's statements to various individuals.  Mr. Hand raised

this claim on direct appeal and the Ohio Supreme Court rejected it as follows:

> **Failure to object to Welch's statements under Evid.R.
> 801(D)(2)(e).** Hand argues that his counsel were deficient by failing
> to argue that Welch's statements to friends and family members were
> not admissible as statements of a co-conspirator until the prosecutor
> had made a prima facie case showing the existence of the conspiracy
> by independent proof. However, as we discussed in proposition of
> law I, Welch's statements were properly admissible under Evid.R.
> 804(B)(6). Thus, Hand suffered no prejudice.

*Hand,* 107 Ohio St.3d at 410.

When the claim underlying an ineffective assistance of trial counsel claim fails, a

petitioner cannot show prejudice and his claim of ineffective assistance of trial counsel based on that

claim also fails.  *See, Goff v. Bagley,* 601 F.3d 445, 482 (6th Cir. 2010).

This Court has already considered and rejected the claim underlying Mr. Hand's

ineffective assistance of counsel claim as presented in this Subclaim.  Specifically, in addressing Mr.

Hand's Ground I, *supra*, this Court concluded that the trial court did not err in admitting into

evidence various statements that Lonnie Welch made to several individuals.  Since the Court has

rejected the underlying claim, Mr. Hand cannot establish prejudice and his claim of ineffective

assistance of trial counsel based in Subclaim F must fail.  Accordingly, the Ohio Supreme Court's

finding with respect to the issue raised in Subclaim F of Ground IV is not contrary to  nor an

unreasonable application of, clearly established federal law.

### Subclaim G

### The failure to object to other bad acts evidence and argument

In Subclaim G of Ground IV, Mr. Hand alleges that his trial counsel were ineffective

for failing to object to the admission of certain bad acts evidence.

Mr. Hand raised this issue on direct appeal and the Ohio Supreme Court wrote:

> **Failure to object to other-acts evidence and argument.** Hand also argues that his counsel were deficient by failing to object to testimony about Hand's reaction to Jill's death, that Hand forced his father out of business, that Hand was obsessed with money, that he enjoyed reading true-crime stories, and that he was infatuated with Barbara McKinney's [***187] daughter. Further, Hand argues that his counsel were deficient by failing to object to the prosecutor's argument that his illegal business practices showed his propensity to commit the charged offenses. However, as we discussed in proposition of law II, Hand was not prejudiced by counsel's failure to object to any of this testimony or the prosecutor's argument.

*Hand,* 107 Ohio St.3d at 410.

As with the claim Mr. Hand raised in Subclaim F, *supra,* of Ground IV, this Court has considered and rejected the claim underlying this claim of ineffective assistance of counsel. That is, in Ground II, *supra*, the Court determined that it was not error for the trial court to admit into evidence character and other acts evidence.  Again, since the Court has rejected the underlying claim, Mr. Hand cannot establish prejudice and his claim of ineffective assistance of trial counsel as he has raised in Subclaim G must fail.  *Goff, supra.*  Therefore, the Ohio Supreme Court's finding with respect to the issue raised in Subclaim G of Ground IV is not contrary to, nor an unreasonable application of, clearly established federal law.

### Subclaim H

### The failure to present evidence of self-defense at the hearsay hearing

In this Subclaim, Mr. Hand argues that his counsel were ineffective for failing to present evidence of self-defense at the hearsay hearing**.** Mr. Hand's position is that counsel should have presented his testimony on the issue of self-defense to show that he was not responsible for Lonnie Welch's unavailability to testify at trial.  Mr. Hand argues that if it had been established that

he was not the cause of Mr. Welch's unavailability at trial, then the trial court would not have

admitted testimony about the statements Mr. Welch made to several individuals.

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it

as follows:

> Hand contends that his counsel were deficient in failing to present
> evidence of self-defense during the evidentiary hearings on the
> admissibility of Welch's statements under Evid.R. 804(B)(6). Hand
> argues that such evidence was necessary to show that Welch's
> unavailability was not due to Hand's misconduct.
>
> During the evidentiary hearing, Grimes testified that when Hand first
> discussed the murders, Hand said that he was "going to plead self-
> defense." Subsequently, Hand's story changed, and he admitted to
> "offing them both * * * [because] anybody that messed with him
> would disappear." Thus, it is highly speculative whether the defense
> presentation of additional evidence of self-defense would have made
> any difference in the trial court's ruling on the admissibility of
> Welch's statements.
>
> Moreover, it is almost certain that Hand would have had to testify to
> raise the issue of self-defense during the evidentiary hearing. The
> record does not show whether Hand or his counsel made the decision
> to forgo Hand's testimony during the evidentiary hearing. However,
> if Hand made the decision, he has no grounds to attack his counsel's
> effectiveness.  If it was counsel's decision, then counsel made a
> tactical decision that should not be second-guessed. Indeed, trial
> counsel could have reasonably decided not to put Hand on the stand
> so that the prosecutor could not cross-examine Hand and learn details
> of his defense. Thus, we find that trial counsel made a legitimate
> tactical decision in not presenting additional evidence of self-defense
> during the evidentiary hearing. *State v. Bradley,* 42 Ohio St.3d at 144,
> 538 N.E.2d 373; see, also, *State v. Adams,* 103 Ohio St.3d 508, 2004
> Ohio 5845, 817 N.E.2d 29, P29-32 (failure to file motion to suppress
> pretrial statements constituted "tactical judgment" and not ineffective
> assistance of counsel).

*Hand,* 107 Ohio St.3d at 410-11.

At the evidentiary hearing before this Court, the Court took testimony from Mr. Cline

and Mr. Sherman, Mr. Hand's trial counsel.  It is now evident from *Cullen v. Pinholster*, 563 U.S.

___, 131 S. Ct. 1388 (2011), that this testimony should not have been admitted and it is not further considered in this Report.

As this Court noted in its discussion of Ground I, *supra*, the admission into evidence of Mr. Welch's statements did not raise Confrontation Clause issues because the statements were nontestimonial. Therefore, assuming that counsel had introduced credible testimony that Mr. Hand killed Mr. Welch in self-defense and Mr. Welch's statements were therefore inadmissible because Mr. Hand had *not* engaged in conduct that was *designed* to prevent Mr. Welch from testifying and the trial court nevertheless admitted the statements into evidence, while it may have been an error of state law for the trial court to do so, it was not an error of constitutional magnitude. Further, even if counsel had presented evidence of self-defense at the hearsay hearing and the trial court did not admit Mr. Welch's testimony into evidence, there was enough other evidence introduced to support the jury's verdicts and the imposition of the death penalty. For example: (1) there was no sign of forced entry into the Hand's residence; (2) there was evidence that Mr. Hand was having financial difficulties; (3) there was evidence that there was $1,006,645.27 in life insurance and other benefits in effect at the time of Jill Hand's murder which would be payable to Hand in the event of her death; (4) there was forensic evidence that there were bloodstain patterns on Mr. Hand's shirt which had DNA consistent with Mr. Welch's and which indicated that Mr. Hand had been exposed to an impact of blood and which contradicted his version of the events which included his chasing Mr. Welch during a gun battle; (5) there was testimony from Mr. Grimes that Mr. Hand told him he had killed his wife and the man he had hired to kill her; (6) Mr. Hand's inconsistent statements about his knowing Mr. Welch and his relationship with him; (7) the inconsistency between Mr. Hand's statement that Jill Hand had never met Mr. Welch and the photograph of Mr. Welch serving as best

man at Mr. and Mrs. (Jill) Hand's wedding; and (8) Mr. Hand's inconsistent statements about his intention to file for bankruptcy.

Because Mr. Hand is not able to establish that he was prejudiced by any alleged error that counsel may have made, his claim contained in Subclaim H of Ground IV is without merit. Accordingly, the Ohio Supreme Court's finding with respect to the issue raised in Subclaim H of Ground IV is not contrary to nor an unreasonable application of, clearly established federal law.

### Subclaim I

### The failure to call Phillip Anthony as a defense witness

In Subclaim I of Ground IV, Mr. Hand alleges that his trial counsel were constitutionally ineffective for failing to call as a defense witness Mr. Welch's cousin Phillip Anthony.

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it as follows:

> **Failure to call a defense witness.** Hand also argues that his counsel were ineffective by failing to call Phillip Anthony, Welch's cousin, as a defense witness.
>
> During the evidentiary hearing on the admissibility of Welch's statements, Anthony testified that sometime during 1986 or 1987, Welch admitted killing Donna and Lori. Welch also told Anthony that he had "snuck into a basement window and that all the doors and windows in the house were sealed and locked, * * * and made the second murder identical to the first." Retired Police Detective Sam Womeldorf, the investigator of Donna's death, had earlier testified that the basement "windows were locked on the inside. It appeared that no entry was made through either of these windows." Retired Police Lieutenant Robert Britt, who had been an investigator into Lori's death, also testified that the basement windows were locked.
>
> The trial court ruled that Anthony's testimony was admissible, but the state decided not to call Anthony as a witness. However, Hand argues that his counsel was deficient by not calling Anthony as a witness,

because Welch's statements contradicted police testimony that the basement windows were not the entry point for the killer.

"Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh* (2001), 90 Ohio St.3d 460, 490, 2001 Ohio 4, 739 N.E.2d 749; *State v. Hughbanks,* 99 Ohio St.3d 365, 2003 Ohio 4121, 792 N.E.2d 1081, P82. Welch's statement to Anthony that he entered the basement window to kill Donna and Lori appears to contradict police testimony. However, Anthony's testimony would have also strengthened the state's case.

During the evidentiary hearing, Anthony testified that Welch discussed the plans to kill Jill. During the first two weeks of January 2002, Welch asked Anthony to find him a gun. Anthony testified that Welch said he needed a gun, explaining, "'[T]he guy I did that thing for * * * said he wants me to do another one.'" Welch told him, "I need this [gun] now * * * I can't wait a week, I can't wait a day, I really need this now, I've got something to do." On the night before the murders, Welch asked whether Anthony had found him a gun, and Anthony told him no. Welch expressed his unease about meeting Hand and asked Anthony for a ride to Hand's house to "watch [his] back a little bit." Welch indicated that he "wasn't going up there to kill nobody. The deal was * * * they were going up there to iron it out. How much, where, how, when, type of situation." Thus, Welch was "planning to go up, talk to Mr. Hand, iron out all the specifics of the murder, and that's it."

Trial counsel were not deficient by choosing not to call Anthony as a defense witness even though some of his testimony might have helped the defense case. Welch's comments to Anthony showed a sense of urgency to obtain a weapon to murder Jill that was not otherwise in evidence. Moreover, Welch's statements show that he did not intend to murder Jill when he went to Hand's home on the evening of January 15. Anthony's testimony undermined Hand's claim that Welch was an intruder who entered his home and murdered his wife. Such testimony would have contradicted Hand's self-defense theory. Thus, trial counsel made a legitimate tactical decision to not call Anthony as a defense witness. *State v. Bradley,* 42 Ohio St.3d at 144, 538 N.E.2d 373.

*Hand,* 107 Ohio St.3d. 408-410.

As noted above, *Strickland* requires that the defendant must overcome the

100

presumption that, under the circumstances, counsel's challenged action "might be considered sound trial strategy." *Strickland,* 466 U.S. 689. Counsel's tactical decisions are particularly difficult to attack. *O'Hara v. Wigginton,* 24 F.3d 823, 828 (6th Cir. 1994). Indeed, strategic choices by defense counsel are "virtually unchallengeable." *Buell v. Mitchell,* 274 F.3d 337, 359 (6th Cir. 2001), quoting *Meeks v. Bergen,* 749 F.2d 322, 328 (6th Cir. 1984). Reasonable lawyers may disagree on the appropriate strategy for defending a client. *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir.2004), quoting *Strickland,* 466 U.S. at 689. The strategy "need not be particularly intelligent or even one most lawyers would adopt, but it must be within the range of logical choices an ordinarily competent attorney handling a death penalty case would assess as reasonable to achieve a 'specific goal'". *Cone v. Bell,* 243 F.3d 961, 978 (6th Cir. 2001), *rev'd on other grounds*, 535 U.S. 685 (2002).

Mr. Anthony testified at the hearsay hearing that he was Mr. Welch's cousin, they had a close relationship, they could have open discussions, and that they were "real close." Trial Tr., Vol. 14 at 2270-71. Mr. Anthony testified further that Mr. Welch had spoken with him about Mr. Hand's wives and that on one occasion when they were at Mr. Anthony's home, in referring to a plastic dry cleaner bag, Mr. Welch told him (Mr. Anthony), that the bag made a good weapon. *Id.* at 2273-74. The following exchange then took place between Mr. Anthony and David Gormley, counsel for the state:

> **Mr. Anthony:** Basically, like I said, we was sitting there, and he said "that's a good weapon there". And I said, "What?" and he said, "the cleaning bag". And he'd tell me about he snuck in, this man – offered him this money to take out his wife, said he'd do it, he snuck in the place, and he used the bag to suffocate her. And he told me that he – he told him to ask him to do it again, you know, some years later. And he did it the exact same way, same place and everything.
>
> **Mr. Gormley:** Did he talk about the names? Did he mention names of this man or these women?

101

**Mr. Anthony:** He just said – yeah, he mentioned Mr. Hand but, other than that, he didn't, you know, let me know that's who he was doing it for.
...

**Mr. Gormley:** ... Did Lonnie Welch mention the names of these wives?

**Mr. Anthony:** He might have, but it was probably so insignificant I didn't pay attention, but I don't believe he did. ... He just said Mr. Hand's wives and, you know, he explained to me how he snuck into a basement window and that all the doors and windows in the house were sealed and locked, and how he put her in the chair and made the second murder identical to the first, and that's about all he really told me.  And he kind of laughed about the police, how –

**Mr. Gormley:** And he was talking about – is it a dry cleaner bag?  Is that what you're calling it?

**Mr. Anthony:** Yeah; it's sort of like a swan heavy dry cleaning bag.  You know, the kind you get your trench coats back.  It's kind of a thicker grade than, you know, like the one we use now.  It's kind of thin like – but it was a thicker grade, almost like a travel bag, you know, one of those suit travel bags that are clear, but not that thick.
...

**Mr. Gormley:** Did Lonnie talk at all about why he had done this?

**Mr. Anthony:** Money.  ... He didn't say any amounts or anything like that.  He just said money, you know.

**Mr. Gormley:** Did he way who paid him?

**Mr. Anthony:** Yeah.

**Mr. Gormley:** Who was that?

**Mr. Anthony:** He said Bob Hand was paying him.  He didn't say he had paid him, He said he was paying him.

**Mr. Gormley:** Was paying him?

**Mr. Anthony:** Yeah.

102

**Mr. Gormley:** As if it was on-going. Did you say anything in response when Lonnie told you about this?

**Mr. Anthony:** No, I didn't. It kind of set me back; kind of shocked me a little, you know. Because he didn't seem like that kind of person.

**Mr. Gormley:** Did you ever tell anyone about the conversation?

**Mr. Anthony:** No.

**Mr. Gormley:** Did you ever consider going to the police or consider asking Lonnie to do so?

**Mr. Anthony:** No.

**Mr. Gormley:** And why not?

**Mr. Anthony:** Just----just kind of looking back, I just didn't know how to take it or what to do with that type of information.

**Mr. Gormley:** I want to focus next on the first two weeks of January, 2002, just before Lonnie died on January 15th, 2002. Did you talk with Lonnie during those last few days of his life?

**Mr. Anthony:** Yes, I did.

**Mr. Gormley:** And can you tell us about the first conversation that you had with him?

**Mr. Anthony:** The first conversation – Lonnie came over, it was – I can't say it was late, but it was dark out, because I was on my computer, so I was really lost on time. But he came in and said something, "Do me a favor". And I said, "What's up"? he said, "I need to find a gun". And then I said, "Well, this is not really a good time to be looking for guns, there's no guns out there", you know, "I don't know where to find any". He said, "Well, can you look for me"? I said, "Well, why do you need a gun, Lonnie"? He said, "Well, I'm getting calls from" – and kind of just, did kind of like a little motion, like, "The guy I did that thing for, and he said he wants me to do another one". I said, "That's not too smart, you all had a falling out"? He's like, "Well, that's what the gun's about". I said, "If you're worried about it, don't even mess with him". He said,

"Well, you know, I got to do what I go to do".  I said, "Okay, I'll
look for you".  And, pretty much, that was about it.  And he left and
he said, "I'll come back to check you out in a couple of days and see
what we've got".  A couple days came and –
...

**Mr. Gormley:** Was anyone else present besides you and Lonnie?

**Mr. Anthony:** No.

**Mr. Gormley:** And you talked about a falling out, or he did.  Can
you elaborate on what he said and what you said there?

**Mr. Anthony:** Well, no.  I knew that Lonnie and Bob had fell out,
you know, years before, you know.  And ... he's talking about this
gun and he's telling me. you know, he didn't trust what was going on
and it didn't seem right, you know, I was – it's – I don't know, its
kind of hard to explain, I mean, you know, it was like – he was
around all my life, you get feelings more so than, you know, you got
to say things verbally, you know, you could – and it was kind of a,
just – just kind of weird.

**Mr. Gormley:** Okay.  So, it was your understanding there had been
some sort of falling out.

**Mr. Anthony:** Yeah, yeah. ...

**Mr. Gormley:** So this [falling out] was tied to the radiator business?

**Mr. Thomas:** Yeah. ...

**Mr. Gormley:** So, the night in January of 2002, Lonnie said that he
was talking to Bob Hand again, I gather?

**Mr. Thomas:** Yeah; he said that Hand had tried to get in contact with
him; he had called several different people there; he got in contact
with him; he had talked to Hand, you know, and Hand had explained
to him, you know, "This is what the deal is, I've got another wife I
need to get rid of her", you know, can – let's work out the details,
you know.  And that's all he kept telling Lonnie, so that's basically
where he was[; th]at is all I know.
...

**Mr. Gormley:** And what was said about a gun?

104

**Mr. Thomas:** He just asked me if I could secure one for him, because he couldn't find and, you know; and I told him, I said I want – now, I'd look for him, but I said I couldn't – at the time, I couldn't find nothing, you know, because I had other people ask me, too.

**Mr. Gormley:** And did Lonnie tell you when he needed this gun or what was going to happen going forward?

**Mr. Thomas:** He said he needed it like today.  And he told me when – that was a couple days before he passed, he said, "You know, I need this now, you know; I can't wait a week, I can't wait a day, I really need this now, I've got something to do".  I told him, "Hey, it's going to take me a couple days, and I'll see what I can work for you".

**Mr. Gormley:** Did Lonnie talk at all about meeting with the defendant, Bob Hand?

**Mr. Thomas:** Yes.

**Mr. Gormley:** Tell us about that.

**Mr. Thomas:** We, what he was telling me is that Hand wanted to talk to him, wanted to meet with him, to iron out the details on offing his next wife, on having his wife murdered.  All right?  Like several times, you know – I'd be seeing him talk on the phone too much – and, most of this I'm getting from what Lonnie told me. ... But, the conversations, you know, weren't coming like they were before, so, you know, he was just – I think that's probably what's going on, but that's, you know, basically what he was telling me.  You know, it wasn't the same as before, you know, but, I don't know.

**Mr. Gormley:** So Lonnie said that these arrangements with Bob Hand were not like before, meaning the first wives?

**Mr. Thomas:** Yeah, the first two wives; yeah.

**Mr. Gormley:** So did he explain what was different?

**Mr. Thomas:** He just said it didn't feel right, just, you know, saying the way the man was talking and kind of, you know, getting him to come here, go there type stuff, and ... he was uneasy, just very uneasy.

**Mr. Gormley:** Did he talk at all about where this murder or meeting was not take place?

**Mr. Thomas:** Yeah; the second time he asked me if I would take him up there, and I said I couldn't do that. He said, "take me up there by the zoo". I said, "I can't do that; it's too far". and he's like, "Oh, well, I'll find a way".

**Mr. Gormley:** And you mentioned there, this was at a second meeting?

**Mr. Thomas:** Yeah; this was like the night of or the night before he went up there.

**Mr. Gormley:** And tell us where this conversation –

**Mr. Thomas:** This also happened in my front room in the house.
...

**Mr. Gormley:** And what did Lonnie say at the second meeting?

**Mr. Thomas:** He – Basically, he just came and said, "Did you find me a gun yet"? And I was like, "No, there's nothing out there, like I told you". I said – but I told him the best I could find for him was an antique double-barrel four-foot shotgun or a starter pistol. And I said, I "won't give you a starter pistol, cuz, because I don't want to see you get killed and you know you can't use a shotgun". And he said, "Okay", and he sat down, and he said, "Well, why don't you take me up there", you know, "and watch my back a little bit"? And I said, "No, that's too far, and if you're worried about your back being watched, what you need to do is write stuff down and put it in an envelope and put it up somewhere with somebody so that you've got your back secured" – and he said, "Well, I've got to find my way up here again somehow, cuz, because he keeps calling me and I got to see what he wants". I said, "Okay". Well, he went up there to go meet with him and iron out the details.
...

**Mr. Gormley:** Did Lonnie talk at all about why he needed this gun?

**Mr. Thomas:** Because he didn't – it didn't feel right; he didn't feel safe going up there without nothing.

**Mr. Gormley:** So the gun, it was your understanding, was to protect

106

Lonnie as to opposed to actually killing the wife?

**Mr. Thomas:** When Lonnie was going up, he wasn't going up there to kill nobody.  The deal was at that time was they were going up there to iron it out.  How much, where, how, when, type of situation.

**Mr. Gormley:** And so he wanted a gun just to have a gun?

**Mr. Thomas:** Yeah, because he thought – because, you know, you've got this man's son calling and looking for you about this matter, and he just didn't feel right about it.

**Mr. Gormley:** And neither of these conversations that you had with Lonnie in January, 2002, was there any mention of money?

**Mr. Thomas:** He mentioned how as going to get paid; no amount was ever given, you know.  That's one thing he never talked about was the amounts.

**Mr. Gormley:** Now, did you ever locate a gun for Lonnie?

**Mr. Thomas:** No.

**Mr. Gormley:** And did you agree to drive Lonnie up to wherever he needed to go?

**Mr. Thomas:** No, No. ... My last conversation [with Lonnie] he was planning to go up, talk to Mr. Hand, iron out all the specifics of the murder, and that's it.  No money or anything was talked about, exchanging hands that day; nothing, from the way he told me.

**Mr. Gormley:** And what was your understanding as to where this place was that Lonnie was going to?

**Mr. Thomas:** He said it was Mr. Hand's house.  Take him up in Delaware to his house.

**Mr. Gormley:** Did he use the word "Delaware"?

**Mr. Thomas:** Yeah; and I was like, "Where the hell is Delaware"? He said, "Up by the zoo".  I said, "That's really too far".
...

*Id.* at 2071-2290.

107

When Mr. Hand's counsel cross examined Mr. Anthony, the following colloquy took

place:

> **Mr. Sherman:** ... [Lonnie] told you that with respect to each wife, he entered the residence through the basement window; correct?
>
> **Mr. Anthony:** Correct.
>
> **Mr. Sherman:** And he told you that he then went upstairs; am I right? He told you he went upstairs?
>
> **Mr. Anthony:** I didn't – he didn't say that, but I assumed that; yeah.
>
> **Mr. Sherman:** Well, in one of your statements, you said he told you he put each girl in a chair; didn't he tell you that?
>
> **Mr. Anthony:** Yeah.  He said he put them in a chair to make them identical.
>
> **Mr. Sherman:** And the only thing he told you is he suffocated them with a swan cleaner bag?
>
> **Mr. Anthony:** Right.
>
> **Mr. Sherman:** He didn't say anything about any other weapons?
>
> **Mr. Anthony:** No.
> ...
>
> **Mr. Sherman:** And then you said, a couple of days before Lonnie's death he talked to you again?
>
> **Mr. Anthony:** Correct.
>
> **Mr. Sherman:** And he wanted a gun?
>
> **Mr. Anthony:** Correct.
> ...
>
> **Mr. Sherman:** ... Now, Lonnie Welch told you a couple days before his death that he was going to go see Bob Hand; correct?  Is that right?

**Mr. Anthony:** Correct.

**Mr. Sherman:** And he was worried about Bob Hand; correct?

**Mr. Anthony:** He was worried about the way the situation was coming about; yes.

**Mr. Sherman:** And you knew that – and he was looking for a gun, so you knew he was going to see Bob Hand; right?

**Mr. Anthony:** Not like that; not he's looking for a gun to go see Bob Hand. He was looking for a gun for his protection when he went to see Bob Hand.
**...**

**Mr. Sherman:** Just so I'm clear. At the time that Lonnie Welch was killed he was not, in fact, to your knowledge, cooperating with the police department?

**Mr. Anthony:** Correct.

**Mr. Sherman:** At the time Lonnie Welch was killed, he was not going to testify against Bob Hand?

**Mr. Anthony:** Correct.

**Mr. Sherman:** And the only thing that could independently verify what Lonnie told you was that he went through the windows, he crawled through the basement windows of 191 South Eureka where these women lived. That would be the only independent verification that he told you anything, right?

**Mr. Anthony:** That would be the only indication – I guess, yeah.
...

**Mr. Sherman:** And he told you clearly, each time he went through the basement window?

**Mr. Anthony:** In fact, he said he went in the exact same way –

**Mr. Sherman:** Each time was the basement window; correct?

**Mr. Anthony:** Correct.

**Mr. Sherman:** And he killed each one of these women while they were seated in a chair; correct?

**Mr. Anthony:** Well, he pretty much said they were in a chair when he left them, with the bag –

**Mr. Sherman:** He left them in the bag in the chair.  Both times. Left them in the bag in the chair?

**Mr. Anthony:** Right.

*Id.* at 2295-2308.

It is clear that Mr. Anthony's testimony that Mr. Welch had told him that when he killed Donna Hand and Lori Hand he had entered the house through the basement window and that he had left both Donna Hand and Lori Hand in a chair.   That, of course, contradicted the state's evidence that, with respect to both Donna Hand's and Lori Hand's murders, it did not appear that entrance to the house had been through a basement window and that both women were found on the basement floor.  However, if Mr. Hand's counsel had called Mr. Anthony to testify before the jury, in addition to disputing the state's evidence on those two facts, the jury would have heard testimony which was detrimental to Mr. Hand's defense.  Specifically, the jury would  have heard  that Mr. Welch told Mr. Anthony: (1)  that a plastic dry cleaner bag made a good weapon (police found Donna Hand's body with a plastic bag over her head and police found Lori Hand's body with a plastic sheet wrapped around her head); (2) he had murdered Mr. Hand's first two wives for money; (3) Mr. Hand asked him to "do another one"; (4) Mr. Hand said, "I've got another wife I need to get rid of her."; (5)  that he was going to meet Mr. Hand, not to kill anybody, but to "iron it out.  How much, where how, when, type of situation. ... to talk about the specifics of the murder"; (6) he and Mr. Hand had previously had a falling out; (7) he asked Mr. Anthony for a ride to Mr. Hand's house so he could "watch [his] back a little bit."; and that (7) he was looking for a gun for his own

110

protection when he went to see Mr. Hand.

Mr. Anthony's potential testimony would have indicated that Mr. Welch was not an intruder into Mr. Hand's home as Mr. Hand claimed but, rather, had gone to Mr. Hand's home to "iron out" the details of Jill Hand's murder. In addition, it would have contradicted Mr. Hand's theory of self-defense. Further, Mr. Anthony's potential testimony would have given credence to the state's theory that Mr. Welch and Mr. Hand had conspired to kill Jill Welch.

In view of the testimony Mr. Anthony gave at the hearsay hearing, this Court concludes that it was a reasonable trial strategy to conclude that it was a bad idea to have Mr. Anthony testify on Mr. Hand's behalf. Accordingly, the state court's decision was a reasonable application of *Strickland*.

### **Subclaim H**

### **The failure to request jury instructions**

In this Subclaim, Mr. Hand alleges that his trial counsel were ineffective for failing to request limiting instructions on other acts evidence and a separate instruction defining course-of-conduct for one of the death specifications.

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it as follows:

> **Failure to request jury instructions.** Hand argues that his counsel were deficient in failing to request a limiting instruction regarding "other acts" evidence and by failing to request a jury instruction defining "course of conduct." As we discussed in connection with proposition of law II, Hand was not prejudiced by his counsel's failure to request limiting instructions on "other acts" evidence. Similarly, as we discussed in proposition of law VI, Hand was not prejudiced by trial counsel's failure to submit an instruction defining "course of conduct."

111

*Hand,* 107 Ohio St.3d at 411.

Mr. Hand's trial counsel requested that the trial court deliver to the jury certain instructions.  App. Vol. 2 at 288; 307-327; App. Vol. 3 at 176-77; App. Vol. 4 at 211; App. Vol. 5 at 228-245.  In addition, following the jury charge conference, Mr. Hand's counsel filed written objections to the proposed jury instructions.  App. Vol. 3 at 172-76.

In addressing Ground II above, this Court noted that federal habeas is available only to correct federal constitutional violations and that a federal constitutional claim must be "fairly presented" to the state courts in a way which provides them with an opportunity to remedy the asserted constitutional violation including presenting both the legal and factual basis of the claim. That discussion is applicable to this claim as well.

In raising this ineffective assistance of counsel claim before the Ohio Supreme Court, Mr. Hand couched the claim as a purely state law question and raised to no federal constitutional arguments at all..  App. Vol. 6 at 316-18.   Although Mr. Hand did cite two United States Supreme Court cases, he relied on them for the general proposition that a state must tailor and apply its death penalty law in a manner that avoids the arbitrary and capricious infliction of the death penalty and that it must properly narrow its application.  *Id.*

Mr. Hand's presentation to the Ohio Supreme Court of his claim that his counsel were ineffective for failing to request certain jury instructions was inadequate to put that court on notice of a federal claim.[6]  In other words, Mr. Hand failed to federalize his claim.  Additionally, the claim addresses a matter of state law.  Therefore,  Subclaim H of Ground IV is not cognizable in federal

---

[6] It is questionable, at best, as to whether Mr. Hand has raised a federal constitutional claim before this Court.  *See,* Doc. 11 at 28-29, PAGEID# 72-73; Doc. 32 at 52-54, PAGEID# 536-38.  It is also questionable as to whether Mr. Hand addressed the question of how he may have been prejudiced by any alleged ineffectiveness of counsel with respect to the jury instruction claim contained in Subclaim H of Ground IV.  *Id.*

habeas corpus.

### Subclaim I

### The cumulative impact of defense counsel's errors

In his final Subclaim of Ground IV, Mr. Hand alleges that the cumulative effect of his trial counsels' errors prejudiced him.

First, the Court notes that Mr. Hand did not raise a "cumulative error" claim before the Ohio Supreme Court and therefore any such claim is procedurally defaulted. *Lorraine v. Coyle,* 291 F.3d 416, 477 (6th Cir. 2002), *cert. denied,* 538 U.S. 947 (2003) (claim of cumulative error with respect to ineffective assistance of counsel claims and prosecutorial misconduct claims not raised in the state procedurally defaulted). Moreover, assuming that the claim is not procedurally defaulted, as the *Lorraine* court noted, the Supreme Court has never held that distinct constitutional claims can be cumulated to grant habeas relief. *Id.*

Therefore, the claims Mr. Hand raises in Ground IV should be rejected.

### GROUND V

### Hand was denied the effective assistance of counsel at the sentencing phase of his trial in violation of his Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendment rights.

In his Ground V, Mr. Hand alleges that his trial counsel were ineffective in several ways during the mitigation phase of his trial.

The right to effective assistance of counsel and the principles of *Strickland* apply to the mitigation phase of a capital trial. *See, Wiggins* 539 U.S. at 522-23; *see also, Eley,* 604 F.3d at 968.

### Subclaim A

**The failure to present expert psychological testimony in mitigation**

In Subclaim A of Ground V, Mr. Hand argues that his trial counsel were ineffective for failing to introduce expert psychological testimony during the mitigation phase of his trial. Specifically, Mr. Hand claims that although the defense received court-approved funds to hire forensic psychologist Dr. Daniel Davis, counsel restricted Dr. Davis' testimony to the issue of Mr. Hand's ability to adjust to prison life if he were sentenced to life without parole.  Mr. Hand's position is that Dr. Davis could have provided  valuable mitigating testimony about Mr. Hand's psychological profile including testimony that: (1)  Mr. Hand was truthful, open, and cooperative; (2) his test results did not reveal characteristics similar to those of an individual with an anti-social personality disorder; and (3) his psychiatric profile was not consistent with the typical traits of a "cold calculating antisocial personality."

Respondent argues that this claim is procedurally barred from federal habeas review and Mr. Hand has not responded to that argument.

Mr. Hand did not raise this specific claim on direct appeal to the Ohio Supreme Court.  Although Mr. Hand did mention in direct appeal Dr. Davis' testimony, he did so in the context of a general claim that counsel were ineffective for failing to reasonably investigate and prepare for mitigation and not as a failure to introduce Dr. Davis' testimony with respect to Mr. Hand's psychological profile.  App. Vol. 6 at 319-27.

The first time that Mr. Hand raised this specific claim was as his fourth ground for relief in his post-conviction petition. App. Vol. 10 at 94-96.   In denying Mr. Hand's Petition, the Delaware County Court of Common Pleas held that the fourth ground was barred by *res judicata* as it should have been raised on direct appeal.  App. Vol. 11 at 160-61.  In affirming the trial court,

114

the court of appeals said:

> Appellant claims the trial court erred in finding the doctrine of res judicata barred the consideration of claims one, two, three, four, five, six, eight, eleven, and twelve in his petition for post-conviction relief. We disagree.
>
> ...
>
> Appellant's second, third, fourth, fifth, sixth, eighth and elevenths grounds for relief assert ineffective assistance of appellant's trial counsel.
>
> The Sixth Amendment right to effective counsel should be raised on appeal and cannot be re-litigated in a post-conviction petition if the basis for raising the issue of ineffective counsel is drawn from the record. *State v. Lentz* (1994), 70 Ohio St.3d 527, 1994 Ohio 532, 639 N.E.2d 784. In *State v. Jackson* (1980), 64 Ohio St.2d 107, 413 N.E.2d 819, syllabus, the Supreme Court of Ohio held the following:
>
>> In a petition for post-conviction relief, which asserts ineffective assistance of counsel, the petitioner bears the initial burden to submit evidentiary documents containing sufficient operative facts to demonstrate the lack of competent counsel and that the defense was prejudiced by counsel's ineffectiveness.
>>
>> Broad assertions without a further demonstration of prejudice do not warrant a hearing for all post-conviction petitions. General conclusory allegations to the effect that a defendant has been denied effective assistance of counsel are inadequate as a matter of law to impose an evidentiary hearing. See *Rivera v. United States* (C.A.9, 1963), 318 F.2d 606.
>
> Because appellant's claims are based upon ineffective assistance of counsel, we will use the following standard set out in *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraphs two and three of the syllabus, certiorari denied (1990), 497 U.S. 1011, 110 S. Ct. 3258, 111 L. Ed. 2d 768. Appellant must establish the following:
>
>> 2. Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. (*State v. Lytle* [1976], 48 Ohio St.2d 391, 2 O.O.3d 495, 358 N.E.2d 623; *Strickland v. Washington* [1984], 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, followed.).
>>
>> 3. To show that a defendant has been prejudiced by counsel's

deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different.

A review of appellant's direct appeal indicates he specifically raised numerous claims of ineffective assistance of counsel, including: ineffective assistance of counsel during voir dire; failure to call witnesses during both the guilt and mitigation phases of trial; failure to investigate, prepare and present evidence during both phases; and failure to form a reasonable trial strategy. However, appellant asserts, without evidence gathered outside the record, there was insufficient evidence available in the record to assert the claims at issue on direct appeal. We disagree.

...

Claims four, five, six, eight and eleven allege ineffective assistance of counsel in the penalty mitigation phase.

Initially, we note, assuming arguendo the claims are not barred by the doctrine of res judicata, we would not find counsel's performance ineffective trial strategy. The decision to call or not call a witness is squarely within the notion of trial strategy. *State v. Phillips* (1995), 74 Ohio St.3d 72, 85, 1995 Ohio 171, 656 N.E.2d 643. The decision to call additional witnesses is a matter of trial strategy as well. *State v. Clayton* (1985), 45 Ohio St.2d 49. Likewise, the scope of questioning is generally a matter left to the discretion of defense counsel. *State v. Singh* (2004)*,* 157 Ohio App.3d 603, 2004 Ohio 3213, 813 N.E.2d 12. Upon review, we find appellant has not demonstrated the trial outcome would have been different had his trial counsel decided to call the witnesses; rather, any such alleged prejudice would be speculative.

Upon review of the record, appellant does not offer evidence outside the record precluding the application of res judicata as to the fourth, sixth, and eighth grounds for relief. Rather, the record demonstrates the issues were cognizable and capable of review on direct appeal.

*Hand,* 2006 WL 1063758 at *4-5; App. Vol. 12 at 366-69.

Supreme Court law does not preclude a finding that a state procedural rule was actually enforced where the state court decision also relies on an alternative ground. *Scott v. Mitchell*, 209 F.3d 854 (6th Cir.), *cert. denied,* 531 U.S. 1021 (2000)

At first blush, it appears that in rejecting the claim that Mr. Hand has raised in

Subclaim A of Ground V, the state post-conviction appeals court addressed the merits of that claim. In other words, for purposes of a procedural default analysis, it initially appears that the state court did not actually enforce its procedural rule of *res judicata*. In that case, this Court would not be precluded from addressing the merits of Mr. Hand's claim. However, on closer analysis, the Court finds that to the extent that the state appellate court may have rejected Petitioner's claim on the merits, it did so as an alternative ruling.

In addressing this claim, the state court noted that Mr. Hand had raised on direct appeal numerous claims of ineffective assistance of counsel. The court stated that it disagreed with Mr. Hand's argument that there was insufficient evidence in the record to assert the present claim on direct appeal. Indeed, the court noted that Mr. Hand failed to gather any evidence outside the record. In contrast, the court's alternative ruling simply relied on the principle of "trial strategy" without any extensive analysis of that principle and how it applied to Mr. Hand's claim.

This Court concludes that the three prongs of the *Maupin* test have been satisfied with respect to this claim. First, as the appeals court noted, *supra,* in Ohio, this claim of ineffective assistance of counsel could have properly been brought on direct appeal. Second, when Mr. Hand attempted to raise this issue in his post-conviction proceedings, the Ohio courts relied on *res judicata* in rejecting his claim. As noted, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default. Finally, Mr. Hand has not addressed Respondent's argument that this claim is procedurally defaulted and therefore has not attempted to argue, let alone establish, cause for the default.

This Court concludes that Subclaim A of Ground V is procedurally defaulted.

**Subclaim B**

117

**The failure to investigate and present mitigation through family and friends regarding Hand's abysmal childhood and dysfunctional family background**

In Subclaim B of Ground V, Mr. Hand alleges that his trial counsel were ineffective for failing to investigate and present evidence about his family background. Mr. Hand's position is that counsel failed to present testimony from family members which would have shown "a compelling portrait of the chaotic, abusive home in which [he] was raised" as well as testimony from long-term friends about his generosity.

Respondent argues that this claim is procedurally defaulted. This Court disagrees. Although Mr. Hand raised this claim on direct appeal as part of his proposition of law VIII, *see,* Subclaim E, *infra*, Mr. Hand again raised this claim in post-conviction as his fifth claim for relief. App. Vol. 10 at 97-99. In affirming the trial court's denial of Mr. Hand's petition, the court of appeals stated:

> Appellant claims the trial court erred in finding the doctrine of res judicata barred the consideration of claims one, two, three, four, five, six, eight, eleven, and twelve in his petition for post-conviction relief. We disagree.
> ...
> Appellant's fifth claim for relief asserted ineffective assistance of trial counsel for failing to present testimony of appellant's friends and family at the mitigation phase. Upon review, we conclude the trial court did not err in dismissing appellant's fifth claim for relief, as appellant has not demonstrated prejudice as a result of trial counsel's claimed ineffective assistance; rather, appellant merely speculates the outcome of the trial would have been different, but for counsel's failure to call the witnesses.

*Hand,* 2006 WL 1063758 at *4-5; App. Vol. 12 at 369.

In contrast to disposing of Mr. Hand's fourth ground for relief on the basis of *res judicata* as well as on an alternative ground, in  addressing Mr. Hand's fifth ground for relief, the

118

appellate court made a finding as to the merits of Mr. Hand's claim. That is, the court specifically found that Mr. Hand failed to establish the prejudice requirement of a claim of ineffective assistance of counsel. Therefore, the appellate court did not enforce the state's procedural rule of *res judicata* and addressed the merits of Mr. Hand's claim. This Court will do the same.

Although it is true that Mr. Hand's trial counsel did not call as witnesses any of his family members to testify about Mr. Hand's childhood and family background, the jury nevertheless heard testimony about Mr. Hand's background. For example, psychologist Dr. Davis testified at the mitigation phase that he had reviewed the reports of extensive interviews of a variety of individuals, personally interviewed Mr. Hand's mother and sister, and that he had reviewed Mr. Hand's military records, his school records, his medical records, and children's services records. Trial Tr. Vol. 22 at 3869-71. Dr. Davis testified further that Mr. Hand came from a family where his father was an alcoholic, there was considerable strife and abuse between the husband and wife, and where his father left and his parents divorced when he was a child. *Id.* at 3871. Dr. Davis also testified that the family came to the attention of children's services when there was an allegation of Mr. Hand's mother openly cohabitating with men in front of the children, that at one time Mr. Hand and his siblings were removed from the home and placed temporarily in a receiving center, then placed with an aunt. *Id.* Dr. Davis testified that Mr. Hand had attended a number of different elementary schools during his early years which was disruptive to his education, he left high school, joined the United States Army, served in Vietnam, and that he received an honorable discharge from the Army. *Id.* at 3871-72.

Frank Haberfield testified at the mitigation phase that he knew Mr. Hand through the Boy Scouts, that Mr. Hand was a volunteer Boy Scout troop leader, he organized the troop and took

them on field trips, he advocated on behalf of the members of his troop, and that he (Mr. Haberfield) never heard anything negative about Mr. Hand. *Id.* at 3883-84.

Robert Hand, Mr. Hand's son, testified that Mr. Hand was the only close family member he ever had to look up to, that Mr. Hand provided for him and pushed him through school, and that Mr. Hand became involved with the Boy Scouts after he (Robert) graduated from the Cub Scouts to the Boy Scouts. *Id.* at 3887-90.

First, the Court notes that the jury had before it the kind of testimony which Mr. Hand claims counsel did not present. That is, while it is true that Mr. Hand's mother, siblings, and friends did not testify at the mitigation phase, Dr. Davis' testimony provided a comprehensive review of Mr. Hand's life. As noted, Dr. Davis testified as to the chaotic childhood, family life, and education that Mr. Hand experienced as a child. In addition, Dr. Davis' testimony included Mr. Hand's service in the United States Army including his combat experience in Vietnam and his honorable discharge from the Army. Mr. Haberfield testified about Mr. Hand's volunteer leadership work with the Boy Scouts as well as the fact that he (Mr. Haberfield) had never heard anything negative about Mr. Hand. Finally, Mr. Hand's son testified about the warm, supportive relationship he has with his father. Second, Mr. Hand merely speculates as to how the result of his trial would have been different if counsel had presented additional witnesses who would have also testified about information that the jury already had by way of Dr. Davis, Mr. Haberfield, and Robert Hand. Specifically, Mr. Hand simply alleges that if the jury had been confronted with additional witnesses there is a reasonable probability that at least one juror would have struck a different balance.

The state court's decision on this claim is a proper application of *Strickland* and is not contrary to nor an unreasonable application of, clearly established federal law.

120

### Subclaim C

**The failure to present pharmacological and lay witness testimony
to explain Hand's demeanor during his guilt-phase testimony**

Mr. Hand argues in this Subclaim that his trial counsel were ineffective during the
mitigation phase for failing to introduce evidence which would have allegedly explained to the jury
his demeanor at trial.  Mr. Hand's position is that when he testified during the guilt phase of his trial
he was under the influence of several medications which the jail physicians had prescribed for him
and that they influenced his behavior and demeanor on the stand in that he was not able to present
information clearly.  Mr. Hand claims that this inability affected his credibility with the jury.
Respondent argues first that this Subclaim is procedurally defaulted and Mr. Hand has not addressed
that argument.

Mr. Hand did not raise this issue on direct appeal to the Ohio Supreme Court.  The
first time Mr. Hand raised this claim was in his post-conviction petition as his sixth ground for relief.
App. Vol. 10 at 100-02.  The trial court determined that Mr. Hand's sixth ground was barred by *res
judicata.*  App. Vol. 11 at 160-61.  The court of appeals agreed on the same basis that the court
determined that the trial court properly disposed of the claim Mr. Hand raised in Subclaim A of
Ground V, *supra.*  That is, the court of appeals determined that the claim Mr. Hand raised in his
sixth ground for relief was barred by the doctrine of *res judicata*.  *Hand,* 2006 WL 1063758 at *4-5;
App. Vol. 12 at 366-69.  The Court notes that, again as with Subclaim A of Ground V, the court of
appeals made an alternative ruling based on the principle of "trial strategy" without any extensive
analysis of that principle and how it applied to Mr. Hand's claim.  *Supra.*

As with Subclaim A of this Ground, this Court concludes that  the three prongs of the
*Maupin* test have been satisfied with respect to this Subclaim.  Specifically,  this claim of ineffective

assistance of counsel could have properly been brought on direct appeal, when Mr. Hand attempted

to raise this issue in his post-conviction proceedings, the Ohio courts relied on *res judicata* in

rejecting his claim and Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as

an adequate and independent state ground to justify default, and Mr. Hand has not addressed

Respondent's argument that this claim is procedurally defaulted and therefore has not attempted to

argue nor has he established cause for the default.

      This Court concludes that Subclaim C of Ground V is procedurally defaulted.

### Subclaim D

### The failure to present testimony regarding Hand's third wife

      Mr. Hand alleges in this Subclaim that his trial counsel were constitutionally

ineffective because they failed to introduce evidence about his third wife.  Mr. Hand's position is

that extensive evidence was presented throughout his trial about his first, second, and fourth wives,

but that there was little mention of his third wife.  Mr. Hand argues that the state's theory was that

he killed his wives for insurance proceeds and so it should have been shown that he divorced his

third wife. Additionally, Mr. Hand argues that Glenna Hand was the most abusive and overbearing

of his wives and therefore the most likely to be the target of violence if he did in fact murder his

spouses.  Mr. Hand claims that he was prejudiced by his counsel's ineffectiveness "because the

jurors never got to hear about his one marriage that did not end in murder."

      Respondent argues that this claim is procedurally defaulted.  Mr. Hand indirectly

acknowledges that he did not bring this claim on direct appeal by arguing that the state post-

conviction court erroneously relied on *res judicata* in denying this claim because in bringing it, he

relied on evidence outside the record.

Mr. Hand raised this claim in his post-conviction petition as his eighth ground for relief. App. Vol. 10 at 105-06. In support of his claim, Mr. Hand submitted to the post-conviction court the December 20, 2004, affidavit of his sister Sally Underwood and the December 20, 2004, affidavit of his son Robert Lee Hand, both of which described the alcoholic and abusive nature of Glenna Hand's personality. Vol. 10 at 468-71. The court of common pleas rejected the claim on the ground it was barred by *res judicata*. App. Vol. 11 at 160-61. The court of appeals affirmed the trial court and held that Mr. Hand did not offer evidence outside the record precluding the application of *res judicata* as to his eighth ground for relief and that the record demonstrated the issue was cognizable and capable of review on direct appeal. *Hand,* 2006 WL 1063758 at *5; App. Vol. 12 at 369. In addition, and as before, the court of appeals made the alternative finding that counsels' performance was not constitutionally ineffective on the basis of trial strategy. *Id.*

Although the state court of appeals seemed to say that Mr. Hand did not offer evidence outside of the record, it is likely that the court determined that Mr. Hand did not offer evidence outside the record which precluded the application of *res judicata*. In other words, the court may very well have concluded that the affidavits which Mr. Hand submitted in support of his eighth ground did not, in and of themselves, provide a basis for considering the claim in the merits. However, because it is not entirely clear as to whether the state court erroneously determined that Mr. Hand did not provide evidence outside the record or whether it determined that the affidavits Mr. Hand did submit were insufficient to bar the application of *res judicata*, it is not clear to this Court whether the state court properly applied *res judicata*. Therefore, because death is different, this Court will address the merits of this Subclaim.

Contrary to Mr. Hand's position that the jury was deprived of information regarding

123

his third wife, Glenna, Mr. Hand himself testified at his trial about her.  Trial Tr. Vol. 19 at 3451-55.

Specifically, Mr. Hand testified about how he met Glenna, that they dated for about two or three

months before he moved in with her, and that they lived together for about seven or eight years

before they married.  *Id.*  Mr. Hand also testified that Glenna was very good at raising Robbie

although others thought she was too strict and abusive with him.  *Id.*  Mr. Hand testified further that

it was Glenna's idea to get a divorce, she wanted it because she thought that Mr. Hand "was boring",

and that he did not want a divorce because he cared for her.  *Id.*  Additionally, Mr. Hand testified

that Glenna was aware of his credit card scheme and how he was managing finances, that at the time

of the divorce, there was about $100,000.00 in credit card debt, and that at the time of the divorce,

Glenna signed away her dower rights with respect to certain real estate.  *Id.*

       Contrary to Mr. Hand's current argument, the jury indeed was presented with

testimony about Mr. Hand's third wife, Glenna.  As noted above, that information included the fact

that Mr. Hand thought that Glenna was very good with his son Robbie, that it was she who wanted

the divorce,  that he did not want to divorce her, and that he cared for her.  The clear inference of

Mr. Hand and Glenna divorcing is that he did not kill her or conspire with anyone to kill her in order

to get out of the marriage.  It is simply not clear what additional testimony counsel could have

presented on the issue of Mr. Hand's marriage to and subsequent divorce from Glenna that would

have changed the outcome of the mitigation phase of Mr. Hand's trial.

       Further, in contrast to the affidavit testimony which Mr. Hand submitted to the post-

conviction court from his sister Sally Underwood and his son Robert Hand both of whom portrayed

Glenna Hand as an abusive alcoholic, Mr. Hand testified that he thought Glenna was "very good"

at raising his son and that he didn't want to divorce her because he cared for her.  In other words,

124

the testimony in the affidavits contradicts Mr. Hand's own trial testimony.  It was, therefore, reasonable trial strategy for counsel to not present testimony which would contradict their client's own testimony.

This Court concludes that Subclaim D of Ground V is without merit.

**Subclaim E**

**The failure to investigate and present an ineffective [sic] mitigation strategy, coupled with the failure to give a penalty phase closing argument**

Mr. Hand argues in Subclaim E that his counsel were ineffective for failing to investigate and present an effective mitigation strategy and for failing to give a penalty phase closing argument.  Mr. Hand's position is that counsel should have investigated and presented evidence about his abysmal childhood and his psychological profile rather than pursuing the strategy that he would be a model prisoner which was an unreasonable strategy since the jury had convicted him of escape.  Mr. Hand also claims that counsel were ineffective for failing to make a residual doubt argument and that they wholly abdicated their responsibility to plead for his life by waiving closing argument.

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it stating:

> **Failure to investigate and prepare for mitigation.** Hand contends that his counsel failed to spend sufficient time preparing for the penalty phase of the trial. Hand argues that his counsel's billing sheets show that counsel spent fewer than 30 hours preparing for mitigation, family members were not interviewed until the day before the start of the trial's penalty phase, and his counsel filed an insufficient number of pretrial motions relative to mitigation. However, we find no merit in this argument.
>
> The presentation of mitigating evidence is a matter of trial strategy.

125

*State v. Keith* (1997), 79 Ohio St.3d 514, 530, 1997 Ohio 367, 684 N.E.2d 47. "Moreover, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *State v. Bryan,* 101 Ohio St.3d 272, 2004 Ohio 971, 804 N.E.2d 433, P189, quoting *Wiggins v. Smith* (2003), 539 U.S. 510, 521, 123 S.Ct. 2527, 156 L.Ed.2d 471.

Here, the defense employed a mitigation specialist, an investigator, and a psychologist. Each of these individuals began working on Hand's case several months before the penalty phase. The defense reviewed Hand's military records, his school records, and his medical records prior to the penalty phase. Dr. Davis, the defense psychologist, testified that "one of the attorneys conducted extensive interviews of a variety of individuals who knew Mr. Hand and obtained background information." Thus, the record shows that the defense thoroughly prepared for the penalty phase of the trial.

Hand's assertion that billing records show that his counsel spent fewer than 30 hours on mitigation appears to be based on billing records between May 30 (the date of the guilty verdict) and June 4 (the start of the mitigation hearing). Hand fails to recognize the time that his counsel, the mitigation specialist, the investigator, and his psychologist spent in preparing for mitigation before the end of the guilt-phase proceedings on May 30. Indeed, "the finding as to whether counsel was adequately prepared does not revolve solely around the amount of time counsel spends on the case or the numbers of days which he or she spends preparing for mitigation. Instead, this must be a case-by-case analysis." *State v. Lewis* (Fla.2002), 838 So.2d 1102, 1114, fn. 9.

Hand provides no evidence supporting his claim that his attorneys did not begin interviewing his family members until the day before the penalty phase. Defense records show that several months before trial Debra Gorrell, the mitigation specialist, contacted Hand's mother, his two sisters, and his son. Even assuming that his counsel did not interview family members until the day before the penalty phase, Hand fails to show what additional information family members could have provided earlier, or how such testimony could have aided him in sentencing.

We also reject Hand's argument that the lack of defense pretrial motions on mitigation shows that his counsel were ineffective. The defense filed pretrial motions to obtain Hand's childhood records with Franklin County Children Services, his military records, and his

126

records as a Scoutmaster. Hand's counsel also filed a motion for penalty-phase instructions and proposed instructions on residual doubt. Finally, Hand fails to mention what additional motions his counsel should have submitted that would have made a difference in the outcome of his case.

**2. Failure to form a reasonable trial strategy.** Hand claims that his counsel's trial strategy was ineffective by focusing on his "future value behind bars."

Judicial scrutiny of counsel's performance must be highly deferential, and reviewing courts should refrain from second-guessing tactical decisions of trial counsel. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

The trial counsel's strategy was to convince the jury that Hand should receive a life sentence by showing that he would be a model prisoner and would have value in prison society. The trial counsel emphasized that Hand's "got intelligence; he's got mechanical ability; he loves children; [and] Bobby can continue to be a source of support and guidance to his son, Robby, and his grandchildren." Trial counsel also pointed out that as a prisoner "he will not be a predator; he will not be a source of violence with respect to other inmates; * * * he has skills; he can work in the prison auto shop; he can teach other inmates mechanical skills, and then they can leave the system with a skill * * *." Finally, the defense argued that Hand's life should be spared on the basis of mercy.

In support of the defense strategy, Dr. Davis testified that Hand should do well in prison because he adjusted to the structured setting of the army, he has no prior criminal record, he has no substance-abuse problems, and he is older. Robert, his son, also testified that he would stay in contact with Hand in prison and continue to look to him for guidance. Finally, Hand said in an unsworn statement, "If allowed to live, I swear to each of you, I will be a model inmate; I will help anyone and everyone that I can help; I would devote my life to my son and his children; I will volunteer for any program to further the cause of man." The defense theory, although unsuccessful, was coherent and fit into the testimony of the witnesses. Thus, counsel made a "strategic trial decision" in presenting the defense theory of mitigation, and such decision "cannot be the basis for an ineffectiveness claim." *State v. Bryan,* 101 Ohio St.3d 272, 2004 Ohio 971, 804 N.E.2d 433, P190; see, also, *State v. Mason* (1998), 82 Ohio St.3d 144, 169, 1998 Ohio 370, 694 N.E.2d 932.

127

Hand also argues that his counsel failed to form a reasonable mitigation strategy because of his counsel's unwillingness to spend more time in presenting the defense mitigation case. Hand points to counsel's remarks during his penalty-phase opening statement.

> The mitigation evidence that we're about to present to you won't be very long. We'll be done in a couple of hours. I don't want to delay this case more than it needs to be, so I've elected to tell you the things that I think you [ought] to think about now, rather than waiting until closing arguments.
>
> * * *
>
> Now, I've been a lawyer for 30 years. Yes, I have been involved in a number of mitigation hearings. In some of those hearings, I presented evidence how the defendant was raised; if he was abused and neglected, if drugs were involved. But I'm not going to insult you by telling you the events of Bobby's childhood led him to commit these offenses; that would be intellectually dishonest. I'm not doing that. What we will be telling you and are telling you is that imposing a death sentence on Bobby, you're going to be saying, he has nothing left to give; he has nothing of value; he's an empty box with nothing for anything.

Trial counsel's comment about not delaying the case was a means of maintaining the defense's credibility and focusing the jury's attention on the mitigating factors supporting a life sentence. Indeed, the trial counsel's opening statement forcefully pointed out numerous mitigating factors that justified a life sentence. Trial counsel's remark about not relying on "the events of Bobby's childhood" was also aimed at maintaining the defense's credibility during the penalty phase. We find that counsel's decision to present this theory of mitigation represented a legitimate "tactical decision." See *State v. Hartman* (2001), 93 Ohio St.3d 274, 296, 2001 Ohio 1580, 754 N.E.2d 1150; See, also, *State v. Ballew* (1996), 76 Ohio St.3d 244, 256, 1996 Ohio 81, 667 N.E.2d 369.

**Failure to adequately present mitigating evidence.** Hand contends that his counsel were deficient by failing to present his mother and sister as witnesses, failing to present any witnesses from the army or evidence about his military service, failing to present any witnesses or evidence about his performance in school, and failing to present any witnesses or evidence from Franklin County Children Services.

128

He also claims that his counsel were deficient in presenting his unsworn statement.

However, "the decision to forgo the presentation of additional mitigating evidence does not itself constitute proof of ineffective assistance of counsel." *Keith,* 79 Ohio St.3d at 536, 684 N.E.2d 47. Moreover, " '[a]ttorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy,* 91 Ohio St.3d at 542, 747 N.E.2d 765, quoting *United States v. Davenport* (C.A.7, 1993), 986 F.2d 1047, 1049.

Dr. Davis's testimony presented information to the jury about Hand's military, education, and Franklin County Children Services records. Dr. Davis testified that Hand's father was an alcoholic and his parents were divorced when he was a child. Franklin County Children Services removed Hand from his home, but he was later reunited with his family. Dr. Davis also testified that Hand attended five different elementary schools, but left high school to join the army. He stated that Hand served in Vietnam and received an honorable discharge from the army. Robert Hand, the defendant's son, also testified in Hand's behalf. We find that counsel's decision not to call additional family members as mitigation witnesses was a "tactical choice" and did not result in ineffective assistance of counsel. See *Ballew,* 76 Ohio St.3d at 256-257, 667 N.E.2d 369.

Finally, Hand argues that his counsel were deficient in presenting his unsworn statement because Hand's plea for a life sentence focused on his ability to serve as a model inmate. However, "the decision to give an unsworn statement is a tactical one, a call best made by those at the trial who can judge the tenor of the trial and the mood of the jury. * * * While subject to debate, that decision largely is a matter of style, and is a tactical decision that does not form the basis for a claim of ineffective assistance." *Brooks,* 75 Ohio St.3d at 157, 661 N.E.2d 1030. Here, Hand's unsworn statement was consistent with the defense strategy to convince the jury that Hand should receive a life sentence because he would be a model prisoner and has future value to his family and prison society. Moreover, Hand fails to indicate any additional matters he might have presented in his unsworn statement and thus failed to show that any alleged deficiencies made any difference in the outcome of the case. *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus. ...

**5. Failure to make a closing argument.** Hand also asserts that his

129

counsel were ineffective by failing to present a penalty-phase closing argument.

During his penalty-phase opening statement, counsel informed the jury, "I've elected to tell you the things that I think you [ought] to think about now, rather than waiting until closing arguments." The trial counsel then summarized the mitigating evidence:

> The evidence * * * will show you that Bobby does know how to live in orderly fashion behind prison walls: he's got intelligence; he's got mechanical ability; he loves children; that Bobby can continue to be a source of support and guidance to his son, Robby, and his grandchildren.

In his opening statement, counsel also made a plea for a life sentence:

> Collectively, we believe that [the penalty phase] will tell you Bobby is not a commodity, a useless commodity; he's a human being. And, although convicted of heinous crimes, we hope to show you that Bobby still can have value.
>
> "* * *
>
> Robby * * * by losing his mother, he was a victim once and by sentencing his father to death, he would be a victim twice. * * * By a death verdict, not only are you going to be punishing Bobby, but you're going to be punishing Robby.
>
> * * *
>
> Bobby can conform to prison life. He will not be a predator; he will not be a source of violence with respect to other inmates; * * * He can teach other inmates mechanical skills, and then they can leave the system with a skill * * *.
>
> * * *
>
> I believe that if Bobby is given a life sentence, he would still be in a position to contribute to mankind.
>
> Mr. Yost is right; I am going to be asking you to consider mercy as a mitigating factor because mercy is the dearest privilege that a person on this earth can be, is merciful. * * * I'm asking you to consider mercy and to temper justice with mercy.

Here, the trial counsel's decision to present the defense case and plea for a life sentence during opening statement rather than closing argument represented a "tactical decision" that did not fall below an objective standard of reasonable representation. Moreover, waiving closing argument may have been a "tactical decision" made by the defense counsel to prevent the state from splitting closing argument and staging a strong rebuttal. See *State v. Hoffner,* 102 Ohio St.3d 358, 2004 Ohio 3430, 811 N.E.2d 48, P47; *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 1995 Ohio 290, 653 N.E.2d 242. Finally, we find that Hand has failed to prove that a reasonable probability exists that his sentence would have been different had counsel made a closing argument. See *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph three of the syllabus.

For the foregoing reasons, we reject proposition of law VIII.

*Hand,* 107 Ohio St.3d at 411-16.

The Eighth Amendment requires a jury to consider the circumstances of the crime and the defendant's character and background during the sentencing phase of a capital trial. *Austin v. Bell,* 126 F.3d 843, 848 (6th Cir. 1997), *cert. denied*, 523 U.S. 1079 (1998), *citing, Boyde v. California*, 494 U.S. 370, 377-78 (1990) and *Lockett v. Ohio*, 438 U.S. 586, 604 (1978). The Constitution also requires defense counsel to reasonably investigate a defendant's background and present it to the jury. *Austin,* 126 F.3d at 848. Failure to investigate or present mitigating evidence at sentencing may constitute ineffective assistance of counsel. *Id., citing, Glenn v. Tate*, 71 F.3d 1204, 1206-08 (6th Cir.1995), *cert. denied*, 519 U.S. 910 (1996).

First, the Court notes that the state did not present any additional evidence or call any witnesses to testify at the mitigation phase of Mr. Hand's trial. Trial Tr. Vol. 22 at 3857. Rather, the state relied on the jury's determination during the guilt phase of the trial with respect to the aggravating circumstances of the murders of which the jury convicted Mr. Hand. *Id.* at 3846.

In contrast, Mr. Hand's counsel called three witnesses to testify in addition to

131

presenting Mr. Hand's unsworn statement. In addressing Subclaim B of this Ground, the Court reviewed the testimony which the three mitigation witnesses offered. *See, supra.* For example, the Court noted that psychologist Dr. Davis testified he had reviewed the reports of extensive interviews of a variety of individuals, personally interviewed Mr. Hand's mother and sister, and reviewed various records including Mr. Hand's military records, school records, medical records, and children's services records. Trial Tr. Vol. 22 at 3869-71. Additionally, as noted above, Dr. Davis testified as to Mr. Hand's family background including the facts that Mr. Hand came from a family where his father was an alcoholic, there was considerable strife and abuse between the husband and wife, his father left and his parents divorced when he was a child, that the family came to the attention of children's services when there was an allegation of Mr. Hand's mother's openly cohabitating with men in front of the children, at one time Mr. Hand and his siblings were removed from the home and placed temporarily in a receiving center, then placed with an aunt, that Mr. Hand had attended a number of different elementary schools during his early years which was disruptive to his education, he left high school, joined the United States Army, served in Vietnam, and that he received an honorable discharge from the Army. *Id.* at 3871-72.

Again as noted above, Frank Haberfield testified at the mitigation phase that he knew Mr. Hand through the Boy Scouts, Mr. Hand was a volunteer Boy Scout troop leader, he organized the troop and took them on field trips, he advocated on behalf of the members of his troop, and that he (Mr. Haberfield) never heard anything negative about Mr. Hand. *Id.* at 3883-84.

Finally, Mr. Hand's son Robert Hand testified about the close relationship that he had with Mr. Hand, that Mr. Hand provided for him and pushed him through school, that he continued to rely on Mr. Hand for advice, and that he would maintain his close relationship with Mr.

Hand if he were incarcerated for life and would encourage his (Robert's) son to maintain a relationship with Mr. Hand.  *Id.* at 3887-90.

Mr. Hand does not identify any additional evidence which counsel should have pursued and presented during the mitigation phase.  While it is true that counsel did not have any of Mr. Hand's other relatives or friends testify, Dr. Davis adequately described to the jury Mr. Hand's family and childhood background.  Mr. Hand has not come forth with anything additional about his "abysmal childhood" which counsel failed to present to the jury.  In addition, Mr. Hand has not pointed to any additional evidence about his background or family relationships such as physical or sexual abuse, drug use, or serious mental illnesses which counsel should have presented to the jury.

Mr. Hand focuses on counsel's failure to present a closing argument to the jury.  However,  Mr. Hand's counsel presented an opening statement during which he pointedly told the jury about several mitigating factors.  Those factors included Mr. Hand's value to his family and to a prison community, his intelligence and skills, and his ability to adjust to prison life.  Counsel also asked the jury to be merciful toward Mr. Hand.   After Mr. Hand's counsel presented his opening statement, the state did not present any dramatic or impressive testimony which Mr. Hand's counsel had to rebut or challenge in a closing argument.  Indeed, as noted above, the state did not present any testimony during the mitigation stage of the trial.  Finally, by not giving a closing argument, Mr. Hand's counsel did not give the state the opportunity to rebut anything they said and re-state the aggravating factors and portray Mr. Hand as a cold, heartless killer just before beginning deliberations.

Mr. Hand also argues that his counsel were ineffective during the mitigation phase

133

of his trial because they failed to argue residual doubt. Mr. Hand's argument fails.

The United States Supreme Court neither requires nor disallows consideration of "residual doubt" as a mitigating factor in a capital crime. *See, e.g., Franklin v. Lynaugh,* 487 U.S. 164, 173 (1988). However, Ohio has determined that residual doubt cannot be used as a mitigating factor:

> Residual or lingering doubt as to the defendant's guilt or innocence is not a factor relevant to the imposition of the death sentence because it has nothing to do with the nature and circumstances of the offense or the history, character, and background of the offender.

*McGuire v. Ohio,* 80 Ohio St.3d 390, 403 (1997), *cert. denied,* 525 U.S. 831 (1998), habeas corpus denied sub nom, *McGuire v. Mitchell,* No, 3:99-cv-140, 2007 W.L. 1893902 (July 2, 2007), *aff'd,* ___ F.3d ___, 2010 WL 3396849 (Aug. 31, 2010). The Sixth Circuit has approved this approach. *See, Coleman v. Mitchell,* 268 F.3d 417, 447 (6th Cir. 2001), *cert. denied,* 535 U.S. 1031 (2002).

The Ohio Supreme Court's decision on this Subclaim was not contrary to nor an unreasonable application of, clearly established federal law. Therefore, Subclaim E of Ground V is without merit.

## Subclaim F.

## The failure to object to the admission of all guilt phase evidence

In Subclaim F of Ground V, Mr. Hand alleges that counsel were ineffective at mitigation for failing to object to the admission of all of the evidence that was admitted during the guilt phase of his trial. Mr. Hand's position is that the evidence included autopsy photographs and reports, crime scene evidence, and exhibits relating to the escape all of which were irrelevant to the issue of whether he should be sentenced to life or death. In his Reply, Mr. Hand identifies the allegedly offending exhibits as primarily autopsy reports, photographs, including autopsy

134

photographs of Jill Hand, Walter "Lonnie" Welch, and Donna Hand, and certain demonstrative

exhibits such as bullet fragments, a mannequin, and a tooth.  (Doc. 32 at 71-73; PAGEID# 577-79).

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it

as follows:

> **4. Failure to object to the readmission of guilt-phase evidence.**
> Hand argues that, with the exception of the exhibits involving the
> escape charge, his counsel were ineffective by failing to object to the
> reintroduction of all guilt-phase exhibits. Hand does not specify
> which exhibits he believed prejudiced him. Moreover, counsel were
> not ineffective by  failing to object to this evidence, because the
> reintroduction of guilt-phase evidence is permitted by R.C.
> 2929.03(D)(1). *State v. DePew* (1988), 38 Ohio St.3d 275, 528
> N.E.2d 542, paragraph one of the syllabus; *State v. Foust,* 105 Ohio
> St.3d 137, 2004 Ohio 7006, 823 N.E.2d 836, P157.

*Hand,* 107 Ohio St.3d at 415.

As previously noted, it is not the province of a federal habeas court to reexamine state

court determinations on state law questions.  *Estelle,* 502 U.S. 67-68.

> In Ohio, trial courts have considerable discretion in determining what
> evidence is relevant to the penalty phase and reviewing courts are
> loath to interfere with the exercise of that discretion. *Cf., State v.
> Hancock,* 108 Ohio St.3d 57, 76, 840 N.E.2d 1032 (2996) (noting that
> trial judges are "clothed with a broad discretion" in determining the
> relevancy of trial phase evidence to the penalty phase); see also *State
> v. Jackson,* 107 Ohio St.3d 53, 71072, 836 N.E.2d 1173 (2995)
> (finding no error in readmission or guilt phase testimony from
> surviving victims because testimony was relevant to course-of-
> conduct aggravating circumstance); *State v. Ahmed*, 103 Ohio St.3d
> 27, 43, 813 N.E.2d 166 (2002) (finding no error in readmission of
> photographs or demonstrative exhibits demonstrating the weapons
> used because evidence "bore some relevance to" the nature and
> circumstances of the course-of-conduct aggravating circumstance):
> *State v. Fears,* 86 Ohio St.3d 329, 345-45 [sic], 715 N.E.2d 136
> (1999)(holding that even though a trial court should exclude evidence
> irrelevant to the penalty phase, the trial court in this case was not
> required to exclude the evidence of the killings, including gruesome
> photographs, because § 2929.03(D)(1) requires the trial court to

consider the nature and circumstances of the offense and permits repetition of much or all that occurred during the guilty stage (citing [*State v.*] *DePew,* 38 Ohio St.3d [275] at 282-83; 528 N.E.2d 542 [(1988)]. The Ohio Supreme Court has clarified, however, that even though R.C. § 2929.03(D)(1) and (2) permit repetition of much or all of what happened during the culpability phase, trial courts are not relieved [of] their duty to determine which culpability phase evidence is relevant to sentencing issues, See *State v. Getsy,* 84 Ohio St.3d 180, 201, 702 N.E.2d 866 (1998) (holding that *State v. Summ*, 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus (1994) "appears to require the trial court to determine what evidence is relevant"); see also *State v. Lindsey,* 87 Ohio St.3d 479, 484-85, 721 N.E.2d 995 (2000) (holding that it was error for trial court to readmit guilt-phase evidence in toto without determining which evidence was relevant to penalty phase issues).

*Cowans v. Bagley,* 624 F.Supp.2d 709, 811-12 (S.D. Ohio 2008), aff'd., ___ F. 3d ___, 2011 U.S. App. LEXIS 8171(Apr. 21, 2011)  (citations omitted).

In this case, the trial court readmitted in the mitigation phase all of the evidence that had been introduced in the guilt phase with the exception of the state's exhibits which involved the escape charge as well as two of Mr. Hand's exhibits.  Trial Tr. Vol. 22 at 3830.  The court did not address each exhibit separately nor did it make a finding as to the mitigation phase relevance of each exhibit.  *Id.*  Even if the trial court committed error as a matter of state law when, prior to admitting it at the penalty phase, it failed to determine whether the guilt phase evidence  was relevant to any penalty phase issues, as noted above, an error of state procedural or evidentiary law is not cognizable in federal habeas.  However, as the *Cowans* court noted, even in the face of such an error, Ohio "state law dictates that the error could not possibly have prejudiced the outcome of petitioner's sentencing hearing and was therefore harmless." *Id.* at 813.  It follows, then, that if there was no prejudicial error in admitting the guilt phase evidence in the penalty phase that counsel were not constitutionally ineffective for failing to object to the admission of that evidence.

136

The state court's decision on the issue Mr. Hand raises in Subclaim E was not contrary to nor an unreasonable application of, clearly established federal law.

**Subclaim F**

**Cumulative Error of Ineffectiveness in Mitigation**

Mr. Hand argues in this Subclaim that the cumulative impact of his trial counsels' errors so prejudiced him as to result in a sentence that was obtained in violation of his constitutional rights.  Respondent argues that this claim is procedurally defaulted.  Mr. Hand has not addressed this argument.

Mr. Hand did not raise in state court a cumulative error claim with respect to counsels' alleged mitigation phase ineffectiveness.  App. Vol. 6 at 319-27.  Therefore, this claim is procedurally defaulted.  *Lorraine*, 219 F.3d at 447.  Moreover, the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief.  *Id.*  Finally, there simply are no mitigation phase counsel error to cumulate.

Mr. Hand's Subclaim F is without merit.

For the foregoing reasons, Mr. Hand's Ground V should be rejected in its entirety.

## GROUND VI

**The trial court's failure to conduct an adequate colloquy to determine whether prospective jurors were biased from their exposure to pretrial publicity violated Hand's Fifth, Sixth, Ninth, and Fourteenth Amendment rights**.

Mr. Hand claims in Ground VI that the trial court failed to conduct an adequate colloquy of jurors regarding pretrial publicity to determine whether any of the prospective jurors were biased which resulted in violations of his constitutional rights.

137

Respondent argues first that this claim is procedurally defaulted and second, that even assuming it is not procedurally defaulted, the claim has no merit. Mr. Hand argues that the claim is not procedurally defaulted because the post-conviction court relied on evidence outside the record to reject his claim.

This claim is strikingly similar to the claim that Mr. Hand raised in Subclaim B of Ground IV, *supra.* Mr. Hand did not raise the present claim on direct appeal to the Ohio Supreme Court. He did, however, raise it in post-conviction as well as in his application to reopen his appeal. *See,* App. Vol. 9 at 32-34; App. Vol. 10 at 85-87. The Ohio Supreme Court denied Mr. Hand's application to reopen his appeal. App. Vol. 9 at 43.

The Delaware County Court of Common Pleas rejected Mr. Hand's pre-trial publicity claim on the basis that *res judicata* barred it. App. Vol. 11 at 159-60. The court of appeals agreed saying:

> Appellant claims the trial court erred in finding the doctrine of res judicata barred the consideration of claims one, two, three, four, five, six, eight, eleven, and twelve in his petition for post-conviction relief. We disagree.
>
> Claim one challenges the jury venire. Appellant argues the trial court should have made further inquiry of the jury concerning the effects of pretrial publicity. Upon review, appellant was not precluded from directly appealing the issue, as the issue could be determined by reviewing the voir dire transcript. The record clearly demonstrates the trial court discussed the pretrial publicity during voir dire and discussed the same with the jurors. Appellant's attachment of exhibits demonstrating pre-trial publicity to the post-conviction relief petition, though admittedly outside the original trial record, merely supplements appellant's argument which was capable of review on direct appeal on the then extant record. Accordingly, we agree with the trial court res judicata applies.

*Hand,* 2006 WL 1063758 at *3-4; App. Vol. 12 at 366.

138

As this Court noted in addressing Ground IV, Subclaim B, Ohio's doctrine of *res judicata* provides, in relevant part, that a final judgment of conviction bars a convicted defendant from raising in any proceeding, except an appeal from that judgment, any issue that was raised, or could have been raised, at trial or on appeal from that judgment. *Williams,* 380 F.3d at 967. With respect to a procedural default analysis, Ohio's doctrine of *res judicata*, is an adequate and independent state procedural ground. The Sixth Circuit has rejected claims that Ohio has failed to apply the doctrine of *res judicata* consistently. *Id.* In other words, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default. *Carter,* 443 F.3d at 538.

Similar to Subclaim B of Ground IV, the first and second prongs of the *Maupin* test have been satisfied with respect to this claim. First, as the appeals court noted, *supra,* in Ohio, whether pretrial publicity resulted in a partial jury can be determined by reviewing the voir dire transcript. Second, when Mr. Hand attempted to raise this issue in his post-conviction proceedings, Ohio courts specifically relied on *res judicata* in rejecting his claim. As noted, Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default.

With respect to the third prong of the *Maupin* test, Mr. Hand has not attempted to argue, let alone establish, cause for the default. Rather, and similar to the argument he raised in Ground IV Subclaim B, Mr. Hand's position is that this claim is not procedurally defaulted because the post-conviction court relied on evidence outside the record. Again, the Court is not persuaded by this argument. It is true that the court of appeals referred to the exhibits which Mr. Hand had attached to his post-conviction petition in support of his argument. However, the court of appeal's

139

references to those exhibits were for purposes of explaining that their attachment did not defeat the

application of *res judicata*. Those courts did not use those exhibits for the purpose of rejecting the

merits of Mr. Hand's claim.

This Court concludes that the pre-trial publicity claim Mr. Hand has raised in Ground

VI is procedurally defaulted. Therefore, Ground VI should be rejected.

## GROUND VII

**The joinder of an unrelated escape charge with Hand's aggravated murder trial violated Hand's rights to due process and a fair trial.**

In Ground VII, Mr. Hand argues that the trial court violated his rights to due process

rights and a fair trial when it joined the escape charge with his aggravated murder trial. The

Warden essentially argues that Mr. Hand has raised purely a question of state law and therefore his

claim is not cognizable in federal heabeas.

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it

stating:

> ***Joinder of escape charge.*** In proposition of law III, Hand contends that the trial court erred in denying his motion to sever Count Six, the escape charge, from the rest of the charges.
>
> Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." In fact, "the law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged 'are of the same or similar character.'" *Lott,* 51 Ohio St.3d at 163, 555 N.E.2d 293, citing *State v. Torres* (1981), 66 Ohio St.2d 340, 343, 20 O.O.3d 313, 421 N.E.2d 1288.
>
> A defendant requesting severance has the "burden of furnishing the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair

140

trial." *Torres,* 66 Ohio St.2d at 343, 20 O.O.3d 313, 421 N.E.2d 1288. A defendant claiming error in the denial of severance must affirmatively show that his rights were prejudiced and that the trial court abused its discretion in refusing separate trials. *Id.* Here, the trial court did not abuse its discretion in denying the motion to sever. Nor was Hand prejudiced by the joinder.

First, Hand's participation in the escape attempt was evidence of flight and was admissible as tending to show his consciousness of guilt. Indeed, an accused's "'flight, escape from custody, resistance to arrest, concealment, assumption of a false name, and related conduct, are admissible as evidence of consciousness of guilt, and thus of guilt itself.'" *State v. Eaton* (1969), 19 Ohio St.2d 145, 160, [*402] 48 O.O.2d 188, 249 N.E.2d 897, quoting 2 Wigmore on Evidence (3d Ed.1979) 111, Section 276; see, also, 1 Giannelli & Snyder, Evidence (2d Ed.2001) 167-170, Section 401.9.

The defense did not challenge instructions on evidence of flight at trial. However, Hand now contends that his minimal participation in the escape attempt would not have been admissible as evidence of flight if he had had a separate murder trial. We reject that argument because Hand was actively involved in the escape attempt. Beverly testified that Hand served as a lookout when Beverly was sawing through the cell bars, Hand provided advice on how to cut through the metal bars, and Hand talked to Beverly about alternative ways of escaping. Moreover, Grimes testified that Hand and Beverly devised a plan to escape through the front of the cell block. Under this plan, Hand would "sidetrack the nurses and guards and Mr. Beverly would go and apprehend one of the guards * * * and they would go through the front door, because time was getting near for both of them, and the door wasn't ready to come through."

Hand also argues that joinder was not justified, because more than nine months elapsed between the murders (January 15, 2002) and the escape attempt (October 30, 2002, through November 26, 2002). However, admissibility of evidence of flight does not depend upon how much time passes between the offense and the defendant's flight. See *State v. Alexander* (Feb. 26, 1987), Cuyahoga App. No. 51784, 1987 Ohio App. LEXIS 7187, 1987 WL 7079, *2. Indeed, flight on the eve of trial can carry the same inference of guilt as flight from the scene. *Id.* Here, Hand's escape attempt occurred while pretrial hearings were underway. Thus, this argument also lacks merit.

Finally, the evidence of Hand's guilt is "amply sufficient to sustain each verdict, whether or not the indictments were tried together."

> *Torres,* 66 Ohio St.2d at 344, 20 O.O.3d 313, 421 N.E.2d 1288. In
> this case, circumstantial evidence, forensic testimony, Welch's
> statements, and Hand's own statements proved Hand's guilt of the
> murders. Additionally, Grimes's and Beverly's testimony provided
> independent evidence of Hand's guilt of escape. Thus, the strength of
> the state's proof "establishes that the prosecution did not attempt to
> prove one case simply by questionable evidence of other offenses."
> *State v. Jamison* (1990), 49 Ohio St.3d 182, 187, 552 N.E.2d 180.
>
> Based on the foregoing, we overrule proposition of law III.

*Hand,* 107 Ohio St.3d at 401-02.

As with his Ground II, *supra,* when Mr. Hand raised this issue on direct appeal to the

Ohio Supreme Court, he raised the claim as a question of state law with only cursory mentions of

due process and the Constitution.  App. Vol. 6, at 286-93. Specifically, Mr. Hand argued that,

"...judicial economy cannot overwrite the constitutional protections of due process and the

requirements for a reliable and fair sentence" and he concluded his arguments by stating,

"[t]herefore, joinder was unconstitutional and the convictions and sentences for all charges must be

reversed.  U.S. Const. amends. V, VI, VIII, IX, XIV; Ohio Const. art. I §§ 1, 2, 5, 9, 10, 16, 20."

*Id*.  Mr. Hand did not raise any constitutional arguments nor did he cite to any federal cases.  The

fifteen cases that Mr. Hand cited on direct appeal are Ohio cases on the subject of the

appropriateness of joinder under Ohio's statutes and criminal rules and his arguments focused solely

on the trial court's alleged errors of state law.  *Id.*   In other words, Mr. Hand failed to "federalize"

his claim on the issue of improper joinder.

Accordingly, Mr. Hand's presentation to the Ohio Supreme Court of his claim with

respect to the joinder of the escape charge with the aggravated murder charge was inadequate to put

that court on notice of a federal claim.  Therefore, this claim is not cognizable in federal habeas

corpus because it deals with a matter of state law and Ground VII should be dismissed.

142

## GROUND VIII

**Hand was convicted of escape absent sufficient evidence of his guilt in violation of the Fifth and Fourteenth Amendments.**

Mr. Hand alleges in Ground VIII that the evidence introduced at trial was insufficient to sustain his conviction of escape.  Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it as follows:

> ***Sufficiency of the evidence of escape.*** In proposition of law IV, Hand challenges the sufficiency of the evidence for his conviction of escape in Count Six.
>
> In reviewing a claim of insufficient evidence, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime  proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.
>
> Hand argues that the evidence of escape was insufficient because there was no evidence that he planned the unsuccessful escape attempt or directly assisted in cutting the locks or hiding the tools. Hand also contends that the testimony that he was acting as a lookout, if true, was insufficient to convict him.
>
> The record refutes Hand's claims. Testimony showed that Hand served as a lookout when Beverly was sawing through the cell bars, provided advice to Beverly on cutting through the cell bars, and helped devise an alternative plan to escape through the front door of the jail. Moreover, circumstantial evidence supported Hand's guilt. This evidence consisted of some torn-up teeshirt material and a pencil with a piece of teeshirt tied around it found in Hand's cell after the aborted escape attempt. According to Delaware County Detective Brian Blair, "[t]hese pieces of cloth are consistent to what was tied to the saw blades and it's consistent to what inmates do to hide things * * * so they can be easily accessed by pulling on this after tying something to it, i.e., saw blades." Thus, the evidence established that Hand actively participated in the escape attempt.
>
> Finally, even assuming that the evidence established only that Hand was acting as a lookout, Hand was an accomplice in the attempted escape. See *State v. Lett,* 160 Ohio App.3d 46, 2005 Ohio 1308, 825

143

N.E.2d 1158, P29, citing *State v. Trocodaro* (1973), 36 Ohio App.2d 1, 5, 65 O.O.2d 1, 301 N.E.2d 898 (aiding and abetting established by overt acts such as serving as a lookout). Under R.C. 2923.03(F), an accomplice "shall be prosecuted and punished as if he were a principal offender." See, also, *State v. Bies,* 74 Ohio St. 3d 320, at 325, 658 N.E.2d 754, 1996 Ohio 276.

Based on the foregoing evidence, viewed in the light most favorable to the prosecution, we find that sufficient evidence supports Hand's conviction for escape. Thus, we overrule proposition of law IV.

*Hand,* 107 Ohio St.3d at 402-03.

An allegation that a verdict was entered upon insufficient evidence states a claim under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Jackson v. Virginia*, 443 U.S. 307 (1979); *In re Winship*, 397 U.S. 358 (1970); *Johnson v. Coyle*, 200 F.3d 987, 991 (6th Cir. 2000); *Bagby v. Sowders,* 894 F.2d 792, 794 (6th Cir.)(en banc), *cert. denied,* 496 U.S. 929 (1990). In order for a conviction to be constitutionally sound, every element of the crime must be proved beyond a reasonable doubt. *In re Winship*, 397 U.S. at 364.

[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt . . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. at 319; *United States v. Paige,* 470 F.3d 603, 608 (6th Cir. 2006). This rule was adopted as a matter of Ohio law at *State v. Jenks*, 61 Ohio St. 3d 259 (1991), *superseded by state constitutional amendment on other grounds as stated in, State v. Smith,* 80 Ohio St.3d 89, 103 n. 4 (1997). Of course, it is state law which determines the elements of offenses; but once the state has adopted the elements, it must then prove each of them beyond a reasonable doubt. *In re Winship, supra.*

144

In an appeal from a denial of habeas relief, in which a petitioner challenges the constitutional sufficiency of the evidence used to convict him, we are thus bound by two layers of deference to groups who might view facts differently than we would. First, as in all sufficiency-of-the-evidence challenges, we must determine whether, viewing the trial testimony and exhibits in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). In doing so, we do not reweigh the evidence, re-evaluate the credibility of witnesses, or substitute our judgment for that of the jury. See *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993). Thus, even though we might have not voted to convict a defendant had we participated in jury deliberations, we must uphold the jury verdict if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. Second, even were we to conclude that a rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable. See 28 U.S.C. § 2254(d)(2).

*Brown v. Konteh,* 567 F.3d 191, 205 (6th Cir. Ohio 2009), *cert. denied,* ___ U.S. ___, 130 S.Ct. 1081 (2010).  In a sufficiency of the evidence habeas corpus case, deference should be given to the trier-of-fact's verdict under *Jackson v. Virginia* and then to the appellate court's consideration of that verdict, as commanded by AEDPA. *Tucker v. Palmer*, 541 F.3d 652 (6th Cir. 2008). *cert. denied,* ___ U.S. ___, 130 S.Ct. 109 (2009).

After a thorough review of the trail testimony, this Court concludes that Mr. Hand's sufficiency of the evidence of the claim in Ground VIII is without merit.

Michael Beverly testified at Mr. Hand's trial that he was in the Delaware County jail at the same time as Dennis Boster, Thomas Hines, and Gerald Hand.  Trial Tr., Vol. 16 at 2975-3006.  Mr. Beverly also testified that he had pled guilty to escape and that the idea to escape was his as well as another inmate's whose last name was Wedderspoon but who had gone home in October

145

before law enforcement discovered the escape plan. *Id.* Mr. Beverly testified further that: he had obtained hacksaw blades by way of a friend of Mr. Wedderspoon's who had mailed them to Mr. Hines; there was a piece of white fabric attached to the blades so he could hide the blades under the sink in your cell and he could retrieve the blades by pulling on the string; his role was mainly cutting the lock at the jail's back exit; at one time he had attempted to cut through the bars of Mr. Hines' and Mr. Boster's cell, but that the bars had roller bars inside and he couldn't get through them so he abandoned that plan; the whole process took about six weeks from the beginning of October until November 26, when they got caught; while he was cutting the lock on the back door, usually two inmates would serve as lookouts and stand by the [correction officers'] observation window; usually Mr. Boster stood by the window and either Mr. Hines or Mr. Hand would help; that if Mr. Hand helped it was basically as a lookout; sometimes Mr. Hand would give him advice on how to break one of the saw blades so he could use it to cut through the bar; he and Mr. Hand discussed alternative ways of getting our of the jail; Mr. Hand's role as lookout was necessary to the plan; everyone in the cell block knew that he was cutting the locks; Mr. Hand did not bring in any saw blades, cut any bars, hide the saw blades; when he gave the police a statement on November 26, he probably did not mention Mr. Hand's name and didn't mention it until the police asked him if Mr. Hand was involved; there were some inmates who did not participate; and that he did not expect Mr. Hand to leave with him if the escape attempt was successful. *Id.*

Kenneth Grimes testified that he was Mr. Hand's cellmate while he was in the Delaware County jail. *Id.,* Vol. 16 at 3007-34; Vol. 17 at 3036-65. Mr. Grimes testified further that: while he was in the jail, there was an escape attempt that Mr. Beverly organized; Mr. Beverly had a hacksaw blade and was sawing the back door; the main characters involved were Mr. Boster and

Mr. Hines and all the inmates knew about it; he did not participate in the attempt and when Mr.

Beverly worked on the door he (Mr. Grimes) would go to his cell; one evening Mr. Beverly

approached Mr. Hand and they comprised [sic] an idea of going through the front of the jail; the idea

was that Mr. Hand would sidetrack the nurses and guards and Mr. Beverly would go and apprehend

one of the guards at the same time and they would go through the front door; Mr. Hand worked as

a lookout and would tell Mr. Beverly when someone was coming; there were times when Mr. Hand

prevented Mr. Beverly from getting caught; when the investigation started, he (Mr. Grimes) was

worried about being charged with escape; and that when the investigation began, he gave the police

a statement which didn't mention Mr. Hand.  *Id.*

Terry Neal testified at Mr. Hand's trial that he was in the Delaware County jail in the

fall of 2002, from November 18, through December, that he knew Mr. Hand, Mr. Beverly, and Mr.

Grimes, and that he was aware that Mr. Beverly was involved in an escape attempt.  *Id.,* Vol. 19 at

3346-70.  Mr. Neal also testified that there were three people involved in the plan, he didn't believe

Mr. Hand was involved, he told investigators that Mr. Hand didn't have anything to do with the

plan, and that while he was in the jail, if someone even mentioned the plan to him he would not want

to talk about it, and that he didn't want anything to do with it.  *Id.*

Dennis Boster testified at trial that he was in the Delaware County jail with Mr. Hand,

he was involved in the escape and pled guilty to escape, he and Mr. Hines would be the lookouts and

Mr. Beverly would do the cutting, and that everyone else just basically sat back and didn't want

anything to do with it. *Id.*, at 3370-85.  Mr. Boster also testified that he was pretty sure that everyone

knew about the plan, that Mr. Hand did not involve himself at all and did not act as a lookout, and

that he never saw Mr. Hand express a willingness to be involved.  *Id.*  Mr. Boster testified further

147

that when he pled guilty, the judge asked him what Mr. Hand had to do with the escape and he told

the judge that Mr. Hand hd nothing to do with it.  *Id.*  Additionally, Mr. Boster testified that his only

function was as lookout, Mr. Beverly was using saw blades that had pieces of string made from tee

shirts and that blades were frequently stored in the walls and under sinks.  *Id.*

   With respect to the escape, Mr. Hand testified that he tried to stay away from Mr.

Beverly as much as possible, when Mr. Beverly asked him if he wanted to go when he escaped, Mr.

Hand told him he did not, and that he told Mr. Beverly several times to get away from him.  *Id.* at

3496-99.  Mr. Hand testified further that everyone knew that Mr. Beverly had saw blades and was

trying to get out and that he did not aid Mr. Beverly in any way.  *Id.*  Mr. Hand also testified that the

investigators recovered some strings from his pockets, that they were made from tee shirts, that

everyone tore up tee shirts to use as wash rags and hand towels and things like that,  and that he used

the strings to hang plastic bags containing his commissary purchases over the side of his bed to keep

the ants out of the bags.  *Id.*

   The Ohio Revised Code reads in relevant part, "No person, knowing the person is

under detention or being reckless in that regard, shall purposely break or attempt to break the

detention...".  O.R.C. § 2921.34(A)(1). In addition, the Code provides, "No person, acting with the

kind of culpability required for the commissioner of an offense, shall do any of the following: ... (2)

Aid or abet another in committing the offense; ... . (F) Whoever violates this section is guilty of

complicity in the commission of an offense, and shall be prosecuted and punished as if he were a

principal offender... ."  Ohio Revised Code § 2923.03(A)(2) and (F).

   As noted above, Mr. Hand testified that he had did not participate in the attempted

escape plan and Mr. Boster testified that Mr. Hand did not participate in the escape.  Mr. Neal's

testimony about Mr. Hand's involvement was, at best, equivocal about Mr. Hand's involvement (he "did not believe" that Mr. Hand participated). While this testimony may support Mr. Hand's claim that he did not participate in the escape, the jury was, of course, under no obligation to accept Mr. Hand's, Mr. Boster's, or Mr. Neal's testimony as truthful. In contrast, there is sufficient testimony that indicates that Mr. Hand actively participated in the escape. For example, Mr. Beverly and Mr. Grimes both testified that Mr. Hand participated in the escape in various ways. That is, both Mr. Beverly and Mr. Grimes testified that Mr. Hand functioned as a lookout while Mr. Beverly was sawing the back door lock. In addition, both Mr. Beverly and Mr. Grimes testified that Mr. Hand gave Mr. Beverly various advice on pursuing escape. Finally, the testimony that Mr. Hand had in his possession some strings that were made from tee shirts and which were similar to the strings which were attached to the hacksaw blades which Mr. Beverly used in the escape attempt certainly suggested that Mr. Hand played a part in the attempted escape.

Even assuming that Mr. Hand did not intend to leave the jail once an escape was underway, a finding that he participated in the execution or the planning of the escape was sufficient to find him guilty of escape. *See,* O.R.C. § 2923.03(A)(2) and (F)

It was, of course, the jury's responsibility to resolve conflicts in the evidence, to determine the credibility of the various witnesses, to weigh the evidence, and to draw reasonable inferences from the testimony. In viewing the trial testimony in the light most favorable to the prosecution, any rational trier of fact could have found that the prosecution established the essential elements of the crime of escape beyond a reasonable doubt.

The Ohio Supreme Court's finding that there was sufficient evidence to convict Mr. Hand of escape is not contrary to nor an unreasonable application of, clearly established federal law.

149

Therefore, Mr. Hand's Ground VIII should be rejected.

**Ground IX**

> **The trial court improperly instructed the jury in violation of Hand's Sixth and Fourteenth Amendment rights.**

In Ground IX, Mr. Hand challenges four of the jury instructions which the trial court gave to the jury.

To warrant habeas relief, the challenged jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. *Scott,* 209 F.3d at 882 (citation omitted). Allegations of trial error raised in challenges to jury instructions are reviewed for harmless error by determining whether they had a substantial and injurious effect or influence on the verdict. *Id.* (citation omitted). The challenged instruction is not to be judged in isolation; it must be considered in the context of the entire jury charge. *Hardaway v. Withrow,* 305 F.3d 558, 565 (6th Cir. 2002), *cert. denied,* 538 U.S. 1036 (2003).

> **Subclaim A**

> **Hand's Sixth and Fourteenth Amendment rights were violated when the trial court instructed the jury on complicity despite the State's theory that Hand was the principal offender.**

In Subclaim A of Ground IX, Mr. Hand alleges that the trial court prejudiced him by providing a complicity instruction to the court of aggravated murder associated with Jill Hand. Coupled with an argument about the State's bill of particulars, Mr. Hand raised this argument on direct appeal. The Ohio Supreme Court rejected Mr. Hand's proposition stating:

> ***Amended bill of particulars.*** In proposition of law V, Hand argues that the trial court erred in permitting the state to amend the bill of particulars at the close of the evidence and argue that Hand was a complicitor. He also argues that the trial court erred in instructing the

150

jury on complicity.

Before trial, the state provided the defense with a bill of particulars that set forth in Count One that "on or about the 15th day of January, 2002, the Defendant did, purposefully and with prior calculation and design, cause the death of Jill J. Hand by means of a firearm." On May 28, 2003, at the close of the evidence and prior to final instructions, the state provided the defense with an amended bill of particulars. The amendment to Count One stated that Hand killed Jill "by firing that weapon himself, or by soliciting or procuring Walter 'Lonnie' Welch to commit the offense, and in either case, the defendant acted purposely and with prior calculation and design." The defense objected to the proposed complicity instructions because of the late notice of complicity in the amended bill of particulars. Thereafter, the trial court instructed the jury on complicity to commit murder.

Crim.R. 7(E) states: "[Upon timely request or court order], the prosecuting attorney shall furnish the defendant with a bill of particulars setting up specifically the nature of the offense charge and of the conduct of the defendant alleged to constitute the offense. A bill of particulars may be amended at any time subject to such conditions as justice requires." Crim.R. 7(D) authorizes the court to amend a bill of particulars "before, during, or after a trial," provided that "no change is made in the name or identity of the crime charged."

Hand argues that because the original bill of particulars indicated that he was the principal offender on Count One, he lacked notice that the trial court would instruct on complicity on that count. However, this claim lacks merit. R.C. 2923.03(F) states: "A charge of complicity may be stated in terms of this section, or in terms of the principal offense." This provision adequately notifies defendants that the jury may be instructed on complicity, even when the charge is drawn in terms of the principal offense. See *State v. Keenan* (1998), 81 Ohio St.3d 133, 151, 1998 Ohio 459, 689 N.E.2d 929, citing *Hill v. Perini* (C.A.6, 1986), 788 F.2d 406, 407-408.

Additionally, for the amendment to constitute reversible error, Hand must demonstrate that the amendment hampered his defense or prejudiced him. See *State v. Chinn* (1999), 85 Ohio St.3d 548, 569, 1999 Ohio 288, 709 N.E.2d 1166.  Hand fails to point out how he could have defended himself differently, given notice that complicity would also be an issue as to Count One. From the beginning of the

151

police investigation into Jill's murder, Hand claimed that he was not involved in Jill's murder. Hand asserted that Welch was an intruder into his home and that Welch shot Jill. Hand's denial of involvement in Jill's murder would not have changed the main thrust of his defense regardless of whether the state proceeded on the theory that Hand was the principal or a complicitor. See *State v. Herring* (2002), 94 Ohio St.3d 246, 251, 2002 Ohio 796, 762 N.E.2d 940 (rejecting defense claims of prejudice from late notice of the state's complicity theory). Thus, we find that Hand's claims of prejudice are speculative and lack merit.

Moreover, we reject Hand's complaint about lack of notice because Hand did not request a continuance upon receiving the amended bill of particulars. Clearly, the defense could have requested a continuance if counsel needed additional time to prepare a defense to the complicity theory.

In sum, Hand was not misled or prejudiced by the state's notification of complicity in the amended bill of particulars. Moreover, the trial court did not err in instructing on complicity. Thus, proposition of law V is overruled.

*Hand,* 107 Ohio St.3d at 403-404.

The thrust of Mr. Hand's argument is that he was initially charged with the aggravated murder of Jill Hand with prior calculation and design and that throughout its case-in-chief the state's theory was that he was the person who actually killed Jill Hand, yet that at the end of its case, the state amended the bill of particulars essentially alleging that perhaps it was Mr. Welch who killed Jill Hand and that the court's instruction on complicity followed. Mr. Hand complains of the late notice as to the state's theory about who killed Jill Hand. Mr. Hand does not argue that the evidence did not support his conviction under the instruction for complicity. Nor has he suggested any ways in which he would have differently presented his defense if he had initially been indicted for complicity

Ohio statutory and case law put Mr. Hand on notice that although he was charged as

a principal, he could be convicted of complicity, conspiracy, or aiding and abetting.  O.R.C. §

2923.03.  The Sixth Circuit has rejected an argument similar to the one Mr. Hand has made here:

> While it is not customary for a person to be charged apparently as a
> principal offender and subsequently to be found guilty as an
> accomplice to the alleged crime, we find no federal law or rule which
> prohibits this practice.  In fact, this court has expressly acknowledged
> that a defendant may be indicted for the commission of a substantive
> crime as a principal offender and convicted of aiding and abetting its
> commission, although not named in the indictment as an aider and
> abettor, without violating federal due process.  *Stone v. Wingo*, 416
> F.2d 857 (6th Cir. 1969).

*Hill v. Perini,* 788 F.2d 406, 406-07 (6th Cir.), *cert. denied,* 469 U.S. 934 (1984).

Based on the authority of *Perini*, this Court concludes that the Ohio Supreme Court's

findings and conclusions with respect to the Mr. Hand's allegations in Subclaim A of Ground IX

are not contrary to nor an unreasonable application of, clearly established federal law.

### Subclaim B

**The trial court failed to give the appropriate
narrowing construction [sic] to the course of
conduct specification.**

In Subclaim B of Ground IX, Mr. Hand seems to allege that the course-of-conduct

instruction the trial court gave to the jury was unconstitutionally vague.  Mr. Hand's argument seems

to be that the trial court failed to specify that the killings of Jill Hand and Lonnie Welch were the

only factors that the jury was to consider in determining course-of-conduct.  The Ohio Supreme

Court rejected this claim as follows:

> *Course-of-conduct instructions.* In proposition of law VI, Hand
> argues that the course-of-conduct instruction was defective in failing
> to specify the names of the murder victims covered by the
> specification. He also attacks the course-of-conduct instruction as
> unconstitutionally vague.

153

**Constitutional challenge.** "The course-of-conduct specification set forth in R.C. 2929.04(A)(5) is not void for vagueness under either the Eighth Amendment to the United States Constitution or Section 9, Article I of the Ohio Constitution." *State v. Benner* (1988), 40 Ohio St.3d 301, 533 N.E.2d 701, 535 N.E.2d 315, syllabus. Accord *State v. Cornwell* (1999), 86 Ohio St.3d 560, 569, 1999 Ohio 125, 715 N.E.2d 1144; *State v. Brooks* (1996), 75 Ohio St.3d 148, 155, 1996 Ohio 134, 661 N.E.2d 1030. We find no basis to overturn that ruling.

**Trial court's course-of-conduct instruction.** The bill of particulars specified that the course of conduct set forth in Specification One of Count One and Count Two involved the murders of "Jill J. Hand and Walter M. 'Lonnie' Welch, and the course of conduct began and ended on January 15, 2002." The guilt-phase instructions on course of conduct in Specification One of Count One stated:

"Before you can find the defendant guilty of Specification One, under the first count of the indictment, you must find beyond a reasonable doubt that the aggravated murder of Jill [J.] Hand was part of a course of conduct involving the purposeful killing of two or more persons by the defendant."

The guilt-phase instructions on course of conduct in Specification One of Count Two stated:

"Before you can find the defendant guilty of Specification One, under the second count of the indictment, you must find beyond a reasonable doubt that the aggravated murder of Walter Lonnie Welch was part of a course of conduct involving the purposeful killing of two or more persons by the defendant."

The defense never objected to either of these instructions and thus waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332, syllabus.

First, Hand complains about the lack of guidance for determining whether two or more murders occurred as part of a course of conduct. However, after the completion of briefing in this case, we decided *State v. Sapp,* 105 Ohio St.3d 104, 2004 Ohio 7008, 822 N.E.2d 1239, which sets forth a test for course of conduct: "The statutory phrase 'course of conduct' found in R.C. 2929.04(A)(5) requires that the state *establish some factual link* between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. In order to find that two offenses constitute a single course of conduct

154

under R.C. 2929.04(A)(5), the trier of fact 'must * * * discern some connection, common scheme, or some pattern or psychological thread that ties [the offenses] together.'" (Emphasis added.) *Id.* at the syllabus, quoting *State v. Cummings* (1992), 332 N.C. 487, 510, 442 S.E.2d 692. Moreover, "the factual link might be one of time, location, murder weapon, or cause of death." *Sapp* at P52. Ultimately, "when two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), all the circumstances of the offenses must be taken into account." *Id.* at P56.

The facts surrounding the murders of Jill and Welch meet *Sapp's* criteria for course of conduct. The two murders occurred at the same time and place, and Hand had related motives for the murders. Hand's motive in murdering Jill was to collect her life insurance and pay off his massive debts. Hand's motive in murdering Welch was to eliminate the witness against him for Jill's murder and the murders of his previous two wives. Thus, the two offenses were related by time, place, and motive and establish a single course of conduct.

Second, Hand contends that the instructions were deficient by failing to specify Jill's and Welch's murders as the subject of the course-of-conduct specifications. Hand argues that this lack of specificity resulted in prejudicial error because the jury might have also considered Donna's and Lori's murders as part of the course of conduct. The two course-of-conduct specifications accompanied the murder counts for Jill's and Welch's murders. However, there were no murder counts for Donna's and Lori's murders. Under these circumstances, the jury was not misled and could reasonably find that the course-of-conduct related only to Jill's and Welch's murders. Thus, we find no plain error.

Moreover, there was no risk that the defense suffered any prejudicial error. During the penalty-phase instructions, the trial court advised the jury:

"The aggravating circumstance that you shall consider as to Count One of the indictment involving the death of Jill Hand is that this offense was part of a course of conduct involving the purposeful killing of Jill J. Hand and Walter Lonnie Welch by the defendant. "

Thus, the penalty-phase instructions clearly stated that Jill's and Welch's murders were the subject of the course-of-conduct aggravating circumstance. See *State v. Loza* (1994), 71 Ohio St.3d 61, 79, 1994 Ohio 409, 641 N.E.2d 1082 ("[i]t is presumed that the jury will follow the instructions given to it by the judge"). Thus, there

155

was no risk that the jury sentenced Hand to death for the murders of Donna and Lori.

In sum, we find no outcome-determinative plain error, and proposition of law VI is overruled.

*Hand,* 107 Ohio St. at 405-07.

At the end of the guilt phase, the trial court instructed the jury as follows**:**

Before you can find the defendant guilty of Specification One, under the first count of the indictment, you must find beyond a reasonable doubt that the aggravated murder of Jill [J.] Hand was part of a course of conduct involving the purposeful killing of two or more persons by the defendant.
...

Before you can find the defendant guilty of Specification One, under the second count of the indictment, you must find beyond a reasonable doubt that the aggravated murder of Walter Lonnie Welch was part of a course of conduct involving the purposeful killing of two or more persons by the defendant.

Trial Tr. Vol. 20 at 3760; 3772.

At the beginning of the mitigation phase the court gave the jury the following instruction:

In this case, the aggravating circumstance in count one is that the aggravated murder of Jill J. Hand was part of a course of conduct involving the purposeful killing of Jill J. Hand and Walter Lonnie Welch by the defendant, Gerald R. Hand.

Trial Tr. Vol. 22 at 3842.  The court delivered the following instruction at the close of the mitigation phase:

The aggravating circumstance that you shall consider as to count one of the indictment involving the death of Jill Hand is that this offense was part of a course of conduct involving the purposeful killing of Jill J. Hand and Walter Lonnie Welch by the defendant.

*Id.* at 3907.

156

Mr. Hand failed to plead in his Petition how the court's guilt phase instruction was so vague that it did not provide the jury with any guidance as to how it was to determine if the specification had been met. However, in his Reply he seems to argue that the court's mitigation phase instructions were "better" than the guilt phase instructions because they specified what killings the jury was to consider in its course-of-conduct deliberations to wit: the killings of Jill Hand and  Lonnie Welch and  therefore the guilt phase instructions were unconstitutionally vague.

In determining whether the instruction has caused a constitutional violation, a reviewing court seeks to determine how a reasonable juror could have interpreted the instruction. *See*, *Sandstrom v. Montana*, 442 U.S. 510, 514 (1979).  Review of a claimed deficient jury instruction requires that the instruction be viewed in the context of the overall charge. *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973).  "An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).

Even assuming that the mitigation phase instructions the court gave the jury were "better" than the ones the court gave at the close of the guilt phase, that, of course, does not establish that the guilt phase instructions somehow violated the constitution.  Rather, the question, is how a reasonable juror could have interpreted the instruction.

A review of the trial court's guilt phase instructions, which take approximately fifty-nine pages in the trial transcript, reveals that the court consistently  referred to the killings of Jill Hand and Walter "Lonnie" Welch. *See, e.g.,* Trial Tr. Vol 20 at 3755, 3758-62, 3766-69,  3771-72, 3774-76, 3779-83.  When the court instructed the jury on the course-of-conduct specifications, the court referred only to the killings of Jill Hand and Walter "Lonnie" Welch.  Trial Tr. Vol. 20 at 3760, 3772.

157

While the court's instructions did briefly refer to the killings of Donna A. Hand and Lori L. Hand, those references were with respect to specifications five and six under the second count of the indictment.  Trial Tr. Vol. 20 at 3776; 3777.  Of the fifty-nine transcript pages of jury instructions, the instructions with respect to Donna A. Hand and Lori L. Hand for purposes of the elements related to specifications five and six under the second count of the indictment are just over one page in length.  Indeed, the instructions are about thirty-six transcript lines in length.

Considering the instructions about which Mr. Hand complains in the context of the overall instructions the trial court gave the jury, this Court concludes that no reasonable juror would interpret the trial court's instructions to permit the jury to take into consideration any other killings other than those of Jill Hand and Lonnie Welch in resolving the course-of-conduct issue.  Stated differently, the trial court's guilt phase instructions on the issue of course-of-conduct were not unconstitutionally vague.

Accordingly, the Ohio Supreme Court's findings and decision as to Subclaim B are not contrary to or an unreasonable application of clearly established federal law.

### Subclaim C

**The trial court failed to appropriately instruct the jury on the relevance of the guilt phase exhibits at sentencing.**

Mr. Hand argues in Subclaim C that the trial court erred by readmitting into evidence during the mitigation phase the exhibits which the court admitted during the guilt phase.  The Respondent argues that this claim is procedurally barred because this is the first time Mr. Hand has raised it outside the context of an ineffective assistance of counsel claim.  Mr. Hand has not challenged Respondent's argument.

158

Mr. Hand never raised in the Ohio state courts the claim contained in Subclaim C as a free-standing claim. App. Vol. 6 at 245-386; *Hand,* 107 Ohio St.3d 378; App. Vol X at 77-111App. Vol 11 at 8-14; App. Vol. 12 at 80-128; *Hand,* 2006 WL 1063758; App. Vol. 13 at 29-74. Although he had the opportunity to do so, Mr. Hand failed to raise this alleged trial court error as he now raises it in Subclaim C.

As noted above in the Court's analysis of Ground IV Subclaim A, Ohio law provides that an appellant must raise his claims on appeal at the first opportunity to do so. *Jacobs ,* 265 F.3d at 417; *Broom,* 40 Ohio St.3d at 288-89. As also noted, this Court must assume that Ohio courts would follow their own procedural rules and bar this claim on the basis of *res judicata, Simpson* 94 F.3d at 203, assertion of *res judicata* to bar claims not raised at the earliest opportunity is an adequate and independent ground upon which Ohio may rely to foreclose habeas review. *Jacobs, supra*, and Ohio's *res judicata* rule has been repeatedly upheld in the Sixth Circuit as an adequate and independent state ground to justify default. *Carter,* 443 F.3d at 538.

The first three prongs of *Maupin's* test are satisfied because Mr. Hand failed to comply with Ohio's procedural rules, the state courts would have enforced those rules if they had been given the opportunity to do so, and the waiver doctrine and *res judicata* constitute adequate and independent state grounds upon which the state courts would foreclose review of the issue in Subclaim C. Finally, the fourth *Maupin* prong is satisfied because Mr. Hand has not suggested that there is cause for him to fail to follow Ohio's procedural rule. In fact, as noted above, Mr. Hand has not addressed the Respondent's procedural default argument.

This Court concludes that Subclaim C of Ground IX is procedurally defaulted.

### Subclaim D

**The trial court failed to appropriately instruct the
jury as to the definition of reasonable doubt.**

In Subclaim D, Mr. Hand argues that the trial court's instruction on reasonable doubt

was improper because the language of Ohio Revised Code § 2901.05 on which the instruction was

based is flawed for three reasons: (1) the "willing to rely and act" language did not guide the jury

because it was too lenient; (2) the "firmly convinced" language represents only a clear and

convincing standard; and (3) the use of the phrase "moral evidence" was improper.

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it

stating:

> ***Reasonable doubt.*** In proposition of law XII, Hand challenges the
> constitutionality of the instructions on reasonable doubt during both
> phases of the trial. However, we have repeatedly affirmed the
> constitutionality of R.C. 2901.05(D). See *State v. Jones* (2001), 91
> Ohio St.3d 335, 347, 2001 Ohio 57, 744 N.E.2d 1163; *State v. Goff*
> (1998), 82 Ohio St.3d 123, 132, 1998 Ohio 369, 694 N.E.2d 916.
> Proposition of law XII is overruled.

*Hand,* 107 Ohio St.3d at 417.

The trial court instructed the jury at the close of the guilt phase as follows:

> Reasonable doubt is present when, after you have carefully
> considered and compared all the evidence, you cannot say you are
> firmly convinced of the truth of the charge. Reasonable court is a
> doubt based upon reason and common sense. Reasonable doubt is
> not mere possible doubt, because everything relating to human affairs
> or depending on moral evidence, is open to some possible or
> imaginary doubt. Proof beyond a reasonable doubt is proof of such
> character that an ordinary person would be willing to rely and act
> upon it in the most important of his or her own affairs.

Trial Tr. Vol. 20 at 3750.

At the close of the mitigation phase, the trial court delivered the following instruction

to the jury:

160

Reasonable doubt is present when, after you have carefully considered and compared all the evidence, you cannot say you are firmly convinced that the aggravating circumstance of which the Defendant was found guilty outweighs the mitigating factors. Reasonable doubt is doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending upon moral evidence is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most [ ] of his or her own affairs.

Trial Tr. Vol. 22 at 3906-07.

The Ohio Revised Code reads in relevant part:

**Presumption of innocence; proof of offense; of affirmative defense; as to each; reasonable doubt**
...

(C) As part of its charge to the jury in a criminal case, the court shall read the definitions of "reasonable doubt" and "proof beyond a reasonable doubt," contained in division (D) of this section.

(D) As used in this section:
...

(E) "Reasonable doubt" is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. "Proof beyond a reasonable doubt" is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

O.R.C. § 2901.05(D).[7]

The Sixth Circuit has explicitly approved of giving, in both phases of a capital trial,

---

[7] O.R.C. § 2901.05 was amended in 2008 by Sub. S. B. 184. 2008 Ohio Laws File 92 (Sub.S.B. 184) (eff. Sept. 9, 2008). However, the only effect the amendment had on the definition of reasonable doubt was to reflect gender-neutral language. With that exception, the language cited here is as it was at the time of Mr. Hand's trial. In other words, the substance of the definition of reasonable doubt was the same then as it is now.

the reasonable doubt instruction based on Ohio Revised Code § 2901.05. *Thomas v. Arn,* 704 F.2d 865, 870 (6th Cir. 1982); *Byrd v. Collins,* 209 F.3d 486, 527 (6th Cir.), *cert. denied,* 531 U.S. 1082 (2000); *White v. Mitchell,* 431 F.3d 517, 534 (6th Cir. 2005), *cert. denied sub nom., Houk v. White,* 549 U.S. 1047 (2006), *citing, Buell v. Mitchell,* 274 F.3d 337, 366 (6th Cir. 2001).

The instructions which the trial court gave at the close of both the guilt phase and the mitigation phase of Mr. Hand's trial were based on the language of Ohio Revised Code § 2901.05. In view of the above-cited authorities, the Ohio Supreme Court's findings and decision on Mr. Hand's challenge to the reasonable doubt instructions are not contrary to or an unreasonable application of clearly established federal law.

For the foregoing reasons, Mr. Hand's Ground IX should be dismissed in its entirety.

## GROUND X

**The jury's failure to properly conduct the weighing process before imposing the death penalty violated Hand's Fifth, Sixth, Eighth, and Fourteenth Amendment rights.**

In his Ground X, Mr. Hand argues that the jury failed to properly conduct the weighing process before imposing the death penalty thereby violating his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Mr. Hand's position is that a particular juror failed to follow the trial court's instructions regarding the weighing process necessary to determine his death sentence. Mr. Hand raised this claim in his post-conviction petition and the Delaware County Court of Common Pleas rejected his claim and the court of appeals affirmed as follows:

> Appellant's seventh ground for relief asserted in his petition for post-conviction relief asserts juror misunderstanding and misapplication of the trial court's instructions. The trial court dismissed the claim finding the affidavit relied upon by appellant was hearsay.

162

In support of his claim for relief, appellant attached and cited the affidavit of Mitigation Specialist, Jennifer Cordle, interpreting the misunderstanding of a juror.

Evidence Rule 606(B) governs the issues, and provides:

**Competency of juror as witnesses**

**"(B) Inquiry into validity of verdict or indictment**

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or an other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. However, a juror may testify without the presentation or any outside evidence concerning any threat, and bribe, any attempted threat or bribe, or any improprieties of any officer of the court. His affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying will not be received for these purposes."

Appellant's claim attempts to admit the affidavit of a non-juror regarding statements of a juror, which is prohibited by Evid.R. 606. Accordingly, the trial court properly dismissed appellant's claim finding the affidavit impermissible hearsay, and finding the claim unsupported by additional evidence outside the record.

*Hand,* 2006 WL 1063758 at *6; App. Vol. 12 at 370-71.

"By the beginning of this century, if not earlier, the near-universal and firmly established common-law rule in the United States flatly prohibited the admission of juror testimony to impeach a jury verdict." *Tanner v. United States,* 483 U.S. 107, 117 (1987) (citation omitted).

Let it once be established that verdicts solemnly made and publicly returned into court can be attacked and set aside on the testimony of those who took part in their publication and all verdicts could be, and many would be, followed by an inquiry in the hope of discovering

163

> something which might invalidate the finding.  Jurors would be
> harassed ... in an effort to secure from them evidence of facts which
> might establish misconduct sufficient to set aside a verdict.  If
> evidence thus secured could be thus used, the result would be to
> make what was intended to be a private deliberation, the constant
> subject of public investigation; to the destruction of all frankness and
> freedom of discussion and conference.

*McDonald v. Pless*, 238 U.S. 264, 267-68 (1915).  Exceptions to this rule were recognized only in

situations in which an "extraneous influence" was alleged to have affected the jury.  *Tanner*, 483

U.S. at 117, *citing, Mattox v. United States,* 146 U.S. 140, 149 (1892).

> Lower courts used this external/internal distinction to identify those
> instances in which juror testimony impeaching a verdict would be
> admissible.  The distinction was not based on whether the juror was
> literally inside or outside the jury room when the alleged irregularity
> took place; rather, the distinction was based on the nature of the
> allegation.  Clearly a rigid distinction based only on whether the
> event took place inside or outside the jury room would have been
> quite unhelpful.  For example, under a distinction based on location
> a juror could not testify concerning a newspaper read inside the jury
> room.  Instead, of course, this has been considered an external
> influence about which juror testimony is admissible.  *See United
> States v. Thomas,* 463 F.2d 1061 (CA 7 1972).  Similarly, under a
> rigid locational distinction jurors could be regularly required to
> testify after the verdict as to whether they heard and comprehended
> the judge's instructions, since the charge to the jury takes place
> outside the jury room.  Courts wisely have treated allegations of a
> juror's inability to hear or comprehend at trial as an internal matter.
> *See Government of the Virgin Islands v. Nichols*, 759 F.2d 1073
> (CA3 1985); *Davis v. United States,* 47 F.2d (CA5 1931)[*cert.
> denied,* 284 U.S. 646 (1931)](rejecting juror testimony impeaching
> verdict, including testimony that jurors had not heard a particular
> instruction of the court).

*Tanner,* 483 U.S. at 117-18.

The Court notes that the affidavit on which Mr. Hand relied in support of his

argument on post-conviction is the affidavit of Jennifer Cordle, a mitigation specialist who is

employed by the Ohio Public Defender.  App. Vol. 10 at 379-80.  Ms. Cordle's affidavit reflects that

she met with juror Bret Bravard on December 13, 2004, and that when she asked him why the jury had returned a sentence of death, he said that, "they had to because Mr. Hand was guilty of an aggravated murder and they had to follow the judge's instructions". *Id.*

First, the Court observes that Ms. Cordle's affidavit is a classic example of hearsay as to what Mr. Bravard said to her. Specifically, it is an out of court statement offered as evidence "to prove the truth of the matter asserted." *See,* Ohio Evid. R. 801(C); *see also,* Fed.R.Evid.R. 802. Second, this Court's review of that affidavit reveals that it does not support Mr. Hand's allegation that the jury did not properly engage in the weighing process before reaching a death sentence. Indeed, Ms. Cordle's affidavit makes it clear that Mr. Bravard indicated to her that the jury followed the trial judge's instructions.

These observations aside, the affidavit at issue sets forth information internal to the jury deliberations. The affidavit deals specifically with the mind-set and the behavior of the jurors as allegedly described by Mr. Bravard to Ms. Cordle. As such, the affidavit cannot properly be considered or used to challenge the verdict. Ohio Evid. R. 606(B); Fed.R.Evid. 606(b). There are not allegations of juror misconduct or other external influences which arguably would take Mr. Bravard's presumptive testimony outside the rules prohibiting its admission. Additionally, even assuming that Mr. Bravard did not understand or comprehend the trial judge's instructions, that would be an internal matter and any testimony on that issue would be, and is, prohibited. *Tanner, supra.*

Mr. Hand's claim that the jury failed to properly conduct the weighing process before imposing the death penalty is not supported by the facts upon which he would rely. More importantly, however, the Ohio courts' conclusion as to Mr. Hand's claim in Ground X is not

165

contrary to nor an unreasonable application of, clearly established federal law.  Accordingly, Mr.

Hand's Ground X should be rejected.

## GROUND XI

**Hand was deprived of the effective assistance of counsel on direct appeal in violation of his Sixth and Fourteenth Amendment rights.**

In his Ground XI, Mr. Hand has raised six claims of ineffectiveness of appellate counsel.

By way of review, and as noted above, at the time he filed his present Petition, Mr. Hand conceded that he had failed to exhaust in state court three of his ineffective assistance of appellate counsel claims, but he alleged that exhaustion in state court would be futile.  However, after filing this Petition, Mr. Hand filed with the Ohio Supreme Court a motion to reopen his appeal on the basis of ineffective assistance of appellate counsel. The Ohio Supreme Court denied Mr. Hand's motion on the procedural ground that he had failed to comply with the 90-day filing deadline of that court's S.Ct.Prac.R. XI(6)(A).

Ohio law provides that an individual convicted of a capital offense has an appeal as a matter of right to the Ohio Supreme Court.  O.R.C. § 2929.05(A); *see also,* Ohio Const. Art. IV, § 2.  "A first appeal as of right is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."  *Evitts v. Lucey,* 469 U.S. 387, 396 (1985). Ineffective assistance of appellate counsel claims are governed by the same *Strickland* standard as claims of ineffective assistance of trial counsel.  *Shaneberger v. Jones,* ___ F.3d ___, 2010 WL 2794195 *3 (6th Cir. July 16, 2010), citing, *Smith v. Robbins,* 528 U.S. 259, 285 (2000).

An attorney need not advance every argument, regardless of merit, urged by the

166

appellant. *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983). ("Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues.").  Effective appellate advocacy is rarely characterized by presenting every non-frivolous argument which can be made. *Williams v. Bagley*, 380 F.3d 932, 971 (6th Cir.2004), *cert. denied sub nom., Williams v. Bradshaw*, 544 U.S. 1003 (2005).  However, failure to raise an issue can amount to ineffective assistance. *McFarland v. Yukins*, 356 F.3d 688 (6th Cir.2004), *citing, Joshua v. Dewitt*, 341 F.3d 430, 441 (6th Cir.2003); *Lucas v. O'Dea*, 179 F.3d 412, 419 (6th Cir.1999); and *Mapes v. Coyle*, 171 F.3d 408, 427-29 (6th Cir.), *cert. denied,* 528 U.S. 946 (1999). Counsel's failure to raise an issue on appeal could only be ineffective assistance if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *McFarland*, 356 F.3d at 699, *citing, Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir.2001), *cert. denied*, 535 U.S. 940 (2002). "Counsel's performance is strongly presumed to be effective." *McFarland,* 356 F.3d at 710, *quoting Scott*, 209 F.3d at 880. To prevail on a claim of ineffective assistance of appellate counsel, a petitioner must show that appellate counsel ignored issues which are clearly stronger than those presented. *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citation omitted).

Therefore, to prevail on his ineffective assistance of appellate counsel claims, Mr. Hand must show that counsels' performance was deficient and that as a result he was prejudiced. *See, Shaneberger, supra, citing, Strickland,* 466 U.S. 687.

### Subclaim A

### The failure to preserve the collateral estoppel argument

In his first Subclaim of Ground XI, Mr. Hand alleges that his appellate counsel were

ineffective for failing to preserve the collateral estoppel argument with respect to his recovery from the Ohio victim's fund following his first wife Donna Hand's death.  Mr. Hand's position that at trial, his counsel elicited testimony that as a prerequisite to the victim's fund monetary award, the state found that he was not at fault for Donna's murder, that subsequently counsel moved the court to dismiss the second death penalty specification on count two on the basis of collateral estoppel, and that the trial court denied that motion.  Mr. Hand contends that appellate counsel was ineffective for not preserving that issue.  Respondent argues that this claim is procedurally defaulted and Mr. Hand has not addressed that argument.

This Court finds that Mr. Hand's Subclaim A of Ground XI is procedurally defaulted. First, there is a state procedural rule that is applicable to Mr. Hand's claim, to wit: the timeliness requirement of Ohio's S.Ct.Prac.R. XI.6.  Second, the Ohio Supreme Court actually enforced the timeliness requirement (90-days) of its rule of practice.

The question becomes, then, whether the Ohio S.Ct.Prac.R. XI.6 is an adequate and independent state ground.

As noted above, the Ohio Supreme Court denied Mr. Hand's direct appeal on January 18, 2006, and his application to reopen his direct appeal on April 18, 2006.  At the time Mr. Hand filed his application to reopen his direct appeal, he did not include in his ineffective assistance of appellate counsel claim the claim which he raises in this Subclaim.  It was not until September 24, 2007, when Mr. Hand filed his Motion to Reopen Appeal on the Basis of Ineffective Assistance of Appellate Counsel, that Mr. Hand raised this particular claim.  App. Vol. 9 at 47-61.  As noted above, on December 12, 2007, the Ohio Supreme Court denied Mr. Hand's Motion to Reopen on the procedural ground that he failed to comply with the 90-day filing deadline of S.Ct.Prac.R.

168

XI(6)(A).  *Id.* at 207.

      "Because capital defendants whose crimes were committed after January 1, 1995,

appeal their conviction and sentence directly to the Ohio Supreme Court, rather than to the Ohio

Court of Appeals, [Ohio S.Ct. Prac. R. XI(6)(A)] was meant to provide such defendants a forum in

which to assert ineffective assistance of appellate counsel." *Stallings v. Bagley,* 561 F.Supp.2d 821,

832 n.2 (N.D. Ohio 2008).  Of course, prior to the availability of direct appeal to the Ohio Supreme

Court, capital defendants appealed their convictions to the intermediate court of appeals.  It was to

those courts that an application to reopen an appeal to raise ineffectiveness of appellate counsel

claims were brought.  *See,  State v. Murnahan*, 63 Ohio St. 3d 60 (1992); *see also,* Ohio App. R.

26(B).

      In death penalty habeas litigation, for purposes of procedural default analysis, the

Sixth Circuit Court of Appeals has noted in the past that in the past the Ohio Supreme Court had

been erratic in its enforcement of the timeliness requirement respecting applications to reopen direct

appeals.  *Franklin v. Anderson*, 434 F.3d 412, 420 (6th Cir. 2006), *cert. denied sub nom., Houk v.

Franklin,* 549 U.S. 1156 (1997).  The *Franklin* court noted that "[f]or several years following the

enactment of . . . Rule 26(B), the Ohio Supreme Court regularly enforced the rule's timeliness

requirements," citing nine cases spanning the years between 1995 and 2000.  *Franklin*, 434 F.3d at

420.  The court went on to observe, however, that in 2000, the state supreme court began addressing

applications to reopen on their merits in spite of their untimeliness, even when a state appellate court

had already denied the application on timeliness grounds.  *Franklin*, 434 F.3d at 420-21 (citing

nineteen Ohio Supreme Court decisions from 2000 to 2004 in support).  The Ohio Supreme Court,

however, again  began to affirm dismissals of applications to reopen in capital cases on timeliness

grounds in more recent years.  *Id*. at 421 (citing three 2004 Ohio Supreme Court cases in support). The court concluded that in light of the fluctuating treatment of Rule 26(B) applications by the Ohio Supreme Court, at the time Mr. Franklin filed his motion to reopen, the timeliness component of Ohio's rule permitting reopening of a direct appeal was not firmly established and regularly followed by the Ohio Supreme Court, and that it consequently was not an independent and adequate state procedural rule upon which to premise the  procedural default of a claim in habeas corpus. *Id.*

Subsequently, in *Fautenberry v. Mitchell,* 515 F.3d 614, 641 (6th Cir.), *cert. denied,* ___ U.S. ___, 192 S.Ct. 412 (2008), the Sixth Circuit declined to recognize "an all-encompassing, ever-applicable legal proposition that [would] forever (or at least for a very long time) bar the federal courts from finding that an ineffective assistance of appellate counsel claim has been procedurally defaulted where the state court refused to address the merits of that claim because of the time constraints in Ohio App. R. 26(B)."  The court noted that "the 'firmly established and regularly followed' inquiry cannot be made once and for all", and that "instead we must consider whether the 'adequate and independent state procedural bar ... (was) firmly established and regularly followed *by the time as of which it (was) to be applied*.'" *Id., citing, Ford v. Georgia,* 498 U.S. 411, 424 (1991)(emphasis in original).  In other words, the question is "whether, at the time of the petitioner's actions giving rise to the default, the petitioner could ... be deemed to have been apprised of the rule's existence."  *Fautenberry,* 515 F.3d at 641 (citation omitted).

This Court concludes that at the time Mr. Hand filed his September, 24, 2007, motion to reopen his appeal and at the time the Ohio Supreme Court denied that motion, the Ohio Supreme Court had been consistently enforcing Ohio App. R. 26(B) and, more importantly, its counterpart, S.Ct.Prac.R. XI(6)(A).  *See, State v. Cassano,* 103 Ohio St.3d 1475 (table), 2004 WL 2289693 (Oct.

170

13, 2004); *State v. Bryan,* 103 Ohio St.3d 1490 (table), 2004 WL 2387327 (Oct. 27, 2004); *State v. Ahmed,* 105 Ohio St.3d 1450 (table), 2005 WL 488752 (Mar. 2, 2005); *State v. Cunningham,* 114 Ohio St.3d 1503 (table), 2007 WL 2446222 (Aug. 29, 2007); *State v. Turner,* 116 Ohio St.3d 1408 (table); 2007 WL 4118971 (Nov. 21, 2007).

The Court is aware that in the case of *Issa v. Bradshaw,* No. 1:03-cv-280, Report and Recommendations, Dec. 20, 2007 (Doc. 134 at 21-22)(PAGEID# 2817-18), this Court concluded that a claim of ineffective assistance of appellate counsel was not procedurally defaulted because Ohio's time limits for reopening a direct appeal for bringing ineffective assistance of appellate counsel claims was not an adequate and independent state ground for purposes of *Maupin.* The Court relied on *Franklin, supra*, in reaching that conclusion with respect to Mr. Issa's claim. However, since *Franklin,* the Sixth Circuit has decided *Fautenberry* which makes it clear that *Franklin* is not the law for time eternal. The Court concludes that since it decided *Issa,* and since the Sixth Circuit decided *Fautenberry,* the Ohio Supreme Court has consistently enforced the time requirements of Ohio App. R. 26(B) and, more importantly, its counterpart, S.Ct.Prac.R. XI(6)(A) Accordingly, this Court concludes that the second prong of *Maupin* is satisfied.

With respect to the third prong of the *Maupin* test, Mr. Hand has not argued nor established cause for the default.

### Subclaim B

### The failure to raise an ineffective assistance of counsel challenge to the fact that trial counsel did not object to the testimony of Hand's bankruptcy attorney on the grounds of attorney-client privilege

As with Subclaim A of Ground XI, Mr. Hand did not raise this claim until he filed his September 24, 2007, Motion to Reopen Appeal on the Basis of Ineffective Assistance of

Appellate Counsel, that Mr. Hand raised this particular claim.  App. Vol. 9 at 47-61.  Respondent argues that this claim is procedurally defaulted and Mr. Hand has not addressed that argument.

For the same reasons that Subclaim A is procedurally defaulted, this Subclaim is procedurally defaulted.

### Subclaim C

**The failure to challenge the trial court's ruling denying Hand's motion to dismiss the specifications relating to the murder of Hand's first two wives**

As with Subclaims A and B of Ground XI, Mr. Hand did not raise this claim until he filed his September 24, 2007, Motion to Reopen Appeal on the Basis of Ineffective Assistance of Appellate Counsel, that Mr. Hand raised this particular claim.  App. Vol. 9 at 47-61.  Respondent argues that this claim is procedurally defaulted and Mr. Hand has not addressed the Respondent's argument.

For the same reasons that Subclaims A and B are procedurally defaulted, this Subclaim is procedurally defaulted as well.

### Subclaim D

**The failure to challenge the sufficiency of the evidence as to the aggravating circumstances and specifications of count two, specifications two through six**

In Subclaim D, Mr. Hand alleges that his appellate counsel were ineffective for failing to raise an insufficiency of the evidence claim with respect to the state's theory that he killed Mr. Welch to prevent him from disclosing information about the murder of his (Mr. Hand's) first two wives.  Respondent argues that this claim is defaulted because Mr. Hand did not properly bring it in state court.

172

Contrary to Respondent's claim, a review of Mr. Hand's Application for Reopening Pursuant to S.Ct.Prac.R. XI, Section 6 which he filed in the Ohio Supreme Court on April 18, 2006, shows that he did raise this claim in state court. App. Vol. 9 at 28-39. Specifically, in Proposition of Law I, Mr. Hand argued that his appellate counsel were ineffective for failing to raise the claim that his conviction was against the manifest weight of the evidence because the state failed to prove beyond a reasonable doubt the underlying aggravating circumstances and specifications of Count 2, specifications 2-6. *Id.* The Ohio Supreme Court denied Mr. Hand's April 18, 2006, Application without reasoning. App. Vol. 9 at 43. Therefore, because the Ohio Supreme Court did not adjudicate Mr. Hand's claim on the merits, this Court will address the claim *de novo*. *Hawkins*, 547 F.3d at 546; *Nields v. Bradshaw*, 482 F.3d at 449-50.

The basis of Mr. Hand's claim is that there was insufficient evidence to convict him of the death specifications contained in Count Two of the Indictment. Mr. Hand's position is that the only evidence which supports his conviction of the aggravating circumstances and specifications of Count Two, specifications two through six, was the testimony of Mr. Grimes, a jailhouse informant. Mr. Hand claims that Mr. Grimes provided the only evidence demonstrating that he (Mr. Hand) sought to silence Mr. Welch to avoid apprehension for the deaths of his first two wives. Mr. Hand further claims that Mr. Grimes' testimony was inconsistent because in addition to testifying that Mr. Hand told him he had killed Mr. Welch to silence him, he also testified that Mr. Hand told him he killed Mr. Welch because he suspected he was having an affair with Lori Hand.

In reviewing the state court proceedings in this matter, the Court noted that the state charged Mr. Hand in a four count Indictment and that the second count addressed the killing of Mr. Welch. The Court further noted:

173

Count Two of the Indictment, involving the murder of Mr. Welch, also contained capital specifications for the following: that the Aggravated Murder was committed for the purpose of escaping detection, apprehension, trial or punishment for another crime committed by the offender, being complicity to commit the murder of Donna Hand (Specification Two); that the Aggravated Murder was committed for the purpose of escaping detection, apprehension, trial or punishment for another crime committed by the offender, being complicity to commit the murder of Lori L. Hand (Specification Three); that the Aggravated Murder was committed for the purpose of escaping detection, apprehension, trial, or punishment for another crime committed by the offender, being complicity to commit the murder of Jill J. Hand (Specification Four); that the victim, Mr. Welch, was a witness to an offense, being the murder of Donna A. Hand, and was purposely killed to prevent the victim's testimony in any criminal proceeding (Specification Five); that the victim, Mr. Welch, was a witness to an offense, being the murder of Lori L. Hand, and was purposely killed to prevent the victim's testimony in any criminal proceeding and that the aggravated murder was not committed during the commission of the offense for which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for the victim's testimony in any criminal proceeding (Specification Six).

*See,* App. Vol. 1 at 55-59.

In addressing Ground VIII, this Court discussed the applicable law with respect to a claims of sufficiency of the evidence.  That discussion is incorporated herein by reference.

In *State v. Jones*, 91 Ohio St.3d 335, 346-47, *cert. denied,* 534 U.S. 1004 (2001), the Ohio Supreme Court stated:

R.C. 2929.04 sets forth the criteria for imposing the sentence of death for the commission of a capital offense. The statute provides that the death penalty may be imposed when it is proven beyond a reasonable doubt that the capital offense "was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense *committed by the offender*." (Emphasis added.) R.C. 2929.04(A)(3).  Appellant contends that, under this statute, the state must prove that the defendant committed the offense for which he sought to avoid apprehension  by proof beyond a reasonable doubt. We agree.

174

It is clear, then, that in order for Mr. Hand to have been convicted of specifications two through six of Count Two of the Indictment, the state was required to proved beyond a reasonable doubt that he killed Mr. Welch for the purpose of silencing him to avoid apprehension for the deaths of his first two wives.

First, the Court notes that contrary to Mr. Hand's argument, Mr. Grimes' testimony was not the only evidence the state produced with respect to Mr. Hand's murder of Mr. Welch. Specifically, as noted in the Court's discussion of Ground I, the trial court properly admitted into evidence the numerous statements which Mr. Welch made to several individuals regarding his complicity with Mr. Hand in Donna's and Lori's, as well as Jill's, murders. In addition, and again contrary to Mr. Hand's position, Mr. Grimes' testimony did not require one to conclude that Mr. Hand killed Mr. Welch because he suspected Mr. Welch was having an affair with Jill Hand. As noted above, Mr. Grimes did testify that Mr. Hand told him that "wasn't satisfied with his wife, he thought she was being permiscuous [sic]" and that "he was going to have her knocked off", but he did not identify Mr. Welch as the individual with whom Jill Hand was allegedly having an affair. Indeed, Mr. Grimes testified that Mr. Hand told him that he "killed his wife and the man *he* was involved with." Trial Tr. Vol. 16 at 3025 (emphasis supplied). Additionally, Mr. Grimes testified further that Mr. Hand told him that the man who supposedly killed his wife was a business partner, that he was hired to do that job, that "took care of them both", and that "he shot the man and his wife...".

This Court concludes that viewing the trial testimony in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime related to the second through sixth specifications of Count Two of the Indictment beyond a reasonable

175

doubt. *Jackson,* 443 U.S. at 319.  Therefore, because Mr. Hand's conviction  is supported by sufficient evidence, his appellate counsel were not ineffective for failing to raise the claim on direct appeal.

Mr. Hand's Subclaim D of Ground XI is without merit and should be denied.

**Subclaim E**

**The failure to amend the brief to include juror bias issues**

In Subclaim E of Ground XI, Mr. Hand argues that his appellate counsel were ineffective for failing to amend the direct appeal brief to include issues of alleged juror bias. Respondent argues first that this claim is procedurally defaulted.

As with Subclaim D, and again contrary to Respondent's claim, a review of Mr. Hand's Application for Reopening Pursuant to S.Ct.Prac.R. XI, Section 6 which he filed in the Ohio Supreme Court on April 18, 2006, shows that he did raise this claim in state court. App. Vol. 9 at 28-39.  A review of Mr. Hand's Application reveals that in Proposition of Law II, Mr. Hand argued that his appellate counsel were ineffective for failing to amend his appellate brief to include juror bias issues.  *Id.*  For the same reasons that this Court addressed  Mr. Hand's Subclaim D *de novo,* it addresses this Subclaim *de novo*.

Although Mr. Hand's Subclaim  E is not procedurally defaulted, it fails. Specifically, as this Court concluded in addressing Subclaim B of Ground IV, Mr. Hand's claim with respect to pre-trial publicity and alleged juror bias is without merit.  For the same reasons given as to Subclaim B of Ground IV, Mr. Hands claims in this Subclaim E should also be denied.

**Subclaim F**

**The failure to allege that the trial court's inquiry into potential juror bias resulting from extensive pretrial publicity was**

**constitutionally defective.**

In Subclaim F, Mr. Hand alleges that his appellate counsel were ineffective for failing to raise the claim that the trial court failed to properly question the prospective jurors regarding their exposure to pretrial publicity and other potential biases.  Respondent first argues that this claim is procedurally defaulted.

Again, as with Subclaims D and E of this Ground, a review of Mr. Hand's April 18, 2006, Application for Reopening which he filed with the Ohio Supreme Court, he raised this claim as Proposition of Law III.  App. Vol. 9 at 28-39.   For the same reasons this Court addressed Subclaims D and E *de novo,* this Court addresses Subclaim F *de novo*.

Mr. Hand has raised similar claims with respect to specific jurors and pre-trial publicity in Subclaim B of Ground IV.  In addressing that Subclaim, this Court reviewed the law which is applicable to the requirement of a fair trial by a panel of impartial, indifferent jurors as well as the law with respect to pre-trial publicity.  That law is also relevant to this claim.

Although not procedurally barred, Mr. Hand's Subclaim F fails on the merits. In discussing Mr. Hand's claims in Ground IV Subclaim B, this Court noted that the court divided the panel of potential jurors into small groups.  This Court then reviewed the trial court's *voir dire* of the potential jurors who were in the same group as Ms. Ray and Ms. Finamore were in.  A review of the trial transcript reveals that the court asked similar questions of each group of potential jurors. Trial Tr. Vol. 4 at 166-67; 306-07; 417-18; Trail Tr. Vol. 5 at 521; 658- 59; 755-56.  Nobody in the pool of potential jurors testified that she or he was unable to set aside anything she or he had seen or heard in the media about Mr. Hand's case.   Indeed, not one prospective juror testified that he or she could not base a decision solely on the evidence presented in the court room.  Moreover, none

177

of the potential jurors gave any testimony during the court's *voir dire* which would should have led

the court to ask additional questions about pre-trial publicity.  Further, there is nothing in the record

which would indicate that any of the jurors who served in Mr. Hand's case had been exposed to such

an enormous amount of pre-trial publicity which so infected her or his deciding process that she or

he was improper juror resulting in a violation of Mr. Hand's right to a fair trial.

Mr. Hand's Subclaim F of Ground XI is without merit and should be denied.

## GROUND XII

**The Ohio death penalty statutes are facially unconstitutional.**

In this Ground, Mr. Hand argues that the Ohio death penalty scheme is facially

unconstitutional for various reasons.  However, Mr. Hand concedes that courts have upheld the

constitutionality of the Ohio death penalty statutes on numerous occasions and  he has raised the

issue here solely for the purpose of preserving the record.  *See, e.g.,* Doc. 11 at 50 n. 3; Doc. 32 at

116 n. 7.

In rejecting his challenge to the constitutionality of the Ohio death penalty statutes,

the Ohio Supreme Court wrote:

> In proposition of law XIII, Hand attacks the constitutionality of
> Ohio's death-penalty statutes. However, we also reject this claim.
> *State v. Carter* (2000), 89 Ohio St.3d 593, 607, 2000 Ohio 172, 734
> N.E.2d 345; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311,
> 473 N.E.2d 264, paragraph one of the syllabus.

*Hand,* 107 Ohio St.3d at 417.

As an initial matter, this Court notes that the Sixth Circuit has continued to reject

challenges to the constitutionality of Ohio's death penalty statutes including many of the challenges

Mr.  Hand raises in this Petition.  *See Buell,* 274 F.3d at 337;  *Scott,* 209 F.3d at 884-85.  The Court

178

turns to Mr. Hand's specific challenges to the Ohio death penalty statutes.

Mr. Hand's first claim is that the Ohio death penalty statutes allow for the imposition of the death penalty in racially disparate ways. The United States Supreme Court has held that in order for this claim to succeed, the petitioner must demonstrate "purposeful discrimination" in his own case. *See, McCleskey v. Kemp*, 481 U.S. 279, 293-94, (1987). Mr. Hand has failed to acknowledge this standard, let alone show purposeful discrimination in his case.

Next, Mr. Hand argues that Ohio's death penalty scheme imposes the unconstitutionally vague duty on the jury to weigh the aggravating circumstances and mitigating factors against each other to determine the appropriate sentence. This argument has been rejected by the United States Supreme Court. *See*, *Tuilaepa v. California,* 512 U.S. 967, 979 (1994), and *Proffit v. Florida,* 428 U.S. 242, 257-59 (1976).

Mr. Hand claims that the Ohio death penalty scheme burdens the right to a jury trial by permitting defendants who plead guilty or no contest to request that a judge dismiss the death specifications in the interests of justice whereas no similar benefit is afforded to defendants who plead not guilty and are tried by a jury. The United States Supreme Court rejected this argument in *Corbitt v. New Jersey,* 439 U.S. 212 (1978).

Mr. Hand's fourth challenge to the Ohio death penalty statutes is that they violate the constitutional right to due process by requiring that pre-sentence reports and mental evaluations be submitted to the fact-finder once requested by the defense. Rejection of this same claim was affirmed by the Sixth Circuit Court of Appeals in *Byrd*, 209 F.3d at 539.

Next, Mr. Hand argues Ohio's felony-murder death penalty provision violates the constitutional requirement that States must narrow the range of offenders eligible for the ultimate

179

sentence and it violates equal protection requirements because it automatically qualifies the defendant for the death penalty.  Contrary to Mr. Hand's argument, the Sixth Circuit has upheld the constitutionality of Ohio's felony murder provision.  *Scott,* 209 F.3d at 884-85.

Mr. Hand claims that the Ohio death penalty statutes are unconstitutionally vague because they permit the jury to consider the statutory mitigating factor of the nature and circumstances of the offense as an aggravator.  The United States Supreme Court has previously rejected this argument. *Tuilaepa*, 512 U.S. at 976.

Mr. Hand argues that the Ohio's system of proportionality and appropriateness review is inadequate and incomplete both at the trial and appellate levels.  The Sixth Circuit rejected a similar challenge to Ohio's system of proportionality and appropriateness review in *Cooey v. Coyle,* 289 F.3d 882 (6th Cir. 2002), *cert. denied,* 528 U.S. 947 (2003).

Mr. Hand's final challenge to the constitutionality of Ohio's death penalty scheme in his twelfth ground  is that it violates various international law, charters, treaties, and conventions. However, the Sixth Circuit has addressed this claim and found that Ohio's death penalty scheme does not violate international law as applicable to the States through the Supremacy Clause.  *Buell,* 274 F.3[rd] at 367**.**

The Ohio Supreme Court's findings and decision with respect to Mr. Hand's challenges to the constitutionality of Ohio's death penalty scheme contained in this ground for relief are not contrary to nor an unreasonable application of, clearly established federal law. Therefore Mr. Hand's  Ground XII should be dismissed.

### **GROUND XIII**

**The exclusion of residual doubt as a mitigating factor violated Hand's right against cruel and unusual punishment and rights to**

**due process and a fair trial.**

Mr. Hand raised this claim on direct appeal and the Ohio Supreme Court rejected it as follows:

> In proposition of law X, Hand contends that the trial court's refusal to instruct on residual doubt as a mitigating factor violated his constitutional rights. However, we summarily reject that argument. See *State v. McGuire* (1997), 80 Ohio St.3d 390, 1997 Ohio 335, 686 N.E.2d 1112, syllabus; see, also, *State v. Brinkley,* 105 Ohio St.3d 231, 2005 Ohio 1507, 824 N.E.2d 959, *State v. Cunningham,* 105 Ohio St.3d 197, 2004 Ohio 7007, 824 N.E.2d 504.

*Hand,* 107 Ohio St.3d at 417.

The United States Supreme Court has stated:

> Our edict that, in a capital case, " 'the sentencer ... [may] not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense,' " *Eddings v. Oklahoma*, 455 U.S. 104, 110 (1982) (quoting *Lockett* [ *v. Ohio* ], 438 U.S. [586,] ... 604 [ (1978) ] ), in no way mandates reconsideration by capital juries, in the sentencing phase, of their "residual doubts" over a defendant's guilt. Such lingering doubts are not over any aspect of petitioner's "character," "record," or a "circumstance of the offense." This Court's prior decisions, as we understand them, fail to recognize a constitutional right to have such doubts considered as a mitigating factor.

*Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988).

Based on the authority of *Franklin,* Mr. Hand does not have a constitutional right to have residual doubt considered as a mitigating factor. The Ohio Supreme Court's conclusion on Mr. Hand's claim about residual doubt is not contrary to or an unreasonable application of, clearly established federal law. Therefore Mr. Hand's Ground XIII should be rejected.

## GROUND XIV

**Ohio's use of the lethal injection procedure to administer executions constitutes cruel and unusual punishment in violation**

**of Hand's Eighth, Ninth, and Fourteenth Amendment rights.**

In this Ground, Mr. Hand argues Ohio's use of the lethal injection for executions constitutes cruel and unusual punishment in violation of his various constitutional rights.  However, as he did with respect to his Ground XII, Mr. Hand concedes that courts have upheld the constitutionality of the Ohio death penalty statutes on numerous occasions and that he has raised the issue here solely for the purpose of preserving the record.  *See, e.g.,* Doc. 32 at 137 n. 8, PAGEID# 643; Doc. 90 at 42 n. 9, PAGEID# 2149.

Mr. Hand raised this claim as his Ninth Ground for Relief  in his post-conviction petition.  App. Vol. 10 at 107-09.  In rejecting the claim, the post-conviction court, citing *State v. Carter,* 89 Ohio St.3d 593 (2000), determined that the claim on had no legal basis.

Mr. Hand has not cited any case which supports his allegation that the lethal injection procedure is unconstitutional.

Based on the authority of *Baze v. Rees,* 553 U.S. 35 (2008) (three-drug protocol) and *Cooey v. Strickland*, 589 F.3d 210 (6th Cir. 2009), *cert. denied,* ___ U.S. ___, 103 S.Ct. 826 (2009) (one-drug protocol), Mr. Hand's Ground XIV should be dismissed.

## GROUND XV

**The cumulative errors at Hand's trial, sentencing, and on direct appeal command issuance of a writ of habeas corpus.**

In this Ground, Mr. Hand argues that the cumulative errors he claims occurred during his trial, sentencing, and appeal violated his constitutional rights to the extent that this Court should grant his Petition.

The Constitution entitles a criminal defendant to a fair trial, not a perfect one.  *Delaware v. VanArsdall*, 475 U.S. 673, 681 (1986).  Indeed, there can be no such thing as an error-

free, perfect trial. *United States v. Hastings,* 461 U.S. 499, 508-09 (1983).

As noted above, the Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. *Lorraine,* 291 F.3d at 447. "[W]e have held that, post-AEDPA, not even constitutional errors that would not individually support habeas relief can be cumulated to support habeas relief." *Moore v. Parker,* 425 F.3d 250, 256 (6th Cir. 2005), *cert. denied. sub nom. Moore v. Simpson,* 549 U.S. 1027 (2006), citing *Scott v. Elo,* 302 F.3d 598, 607 (6th Cir. 2002), *cert. denied,* 537 U.S. 1192 (2003) and *Lorraine v. Coyle,* 291 F.3d 416, 447 (6th Cir.2002)

First, there were no errors of a constitutional magnitude which can be accumulated. for purposes of this Ground.  Moreover, Mr. Hand's "cumulative error" is not cognizable in federal habeas.  Therefore, his Ground XV should be rejected.

**Conclusion**

Mr. Hand's Petition for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254, (Doc. 11), should be denied. It is therefore respectfully recommended that judgment  be entered in favor of the Respondent and against the Petitioner dismissing the Petition with prejudice.   Any recommendation on a certificate of appealability is reserved for a supplemental report.

April 25, 2011.

s/ **Michael R. Merz**
United States Magistrate Judge

J:\Death Penalty\Hand v. Houk\Hand Filed Merits R&R.wpd

183

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to seventeen days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F. 2d 947 (6th Cir., 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).