UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Gerald Hand,                         :   Case No. 2:07-cv-846

          : 

      Petitioner,          : 

          : 

vs.                                : 

          : 

Marc Houk, Warden,         : 

          : 

      Respondent.        : 

**ORDER**

Petitioner, Gerald Hand, was convicted by an Ohio jury of the aggravated murders of his wife, Jill Hand, and of his friend and former employee, Walter Lonnie Welch. The same jury recommended that Hand be sentenced to death. After unsuccessful attempts to challenge his conviction and his sentence in state courts, he filed a petition for a writ of habeas corpus in this court. The Magistrate Judge has recommended that his petition be denied, a recommendation to which Hand has objected. For the following reasons, the Court overrules Hand's objections.

**FACTUAL BACKGROUND**

The Ohio Supreme Court described at length the particular facts and circumstances that led to Hand's indictment on two counts of aggravated murder (and other charges), as they were presented in his jury trial held in May-June 2003:

State's Case

Murder of Donna Hand. On the evening of March 24, 1976, Hand notified police that his wife had been murdered at their home on South Eureka Avenue in the Hilltop section of Columbus. According to Hand, he returned home after being out with his brother but was unable to open his front door because it was double latched from the inside. Hand entered

the house through a side door and found Donna's body.

The police found Donna's fully clothed body at the bottom of the basement stairway.  She had a bag over her head and it was tied with a spark-plug wire.  The police found no sign of forced entry.  Drawers in the upstairs bedroom had been removed and turned over, but the room did not appear to have been ransacked.  Moreover, no property was missing from the house.

Dr. Robert Zipf, then a Franklin County Deputy Coroner, examined Donna's body at the scene and found blood around the head where the body was lying.  However, no blood spatters or other bloodstains were found on the stairs, which indicated that Donna had not hit her head falling down the steps.

During the autopsy, Dr. Zipf found "three chop wounds to the back of [Donna's] head" that were caused by "some type of blunt object, maybe a very thin pipe or a dull hatchet."  However, Dr. Zipf determined that Donna had died from strangulation caused by the spark-plug wire around her neck.

During the fall of 1975, Donna told Connie Debord, her sister, that she planned to divorce Hand and move back to their parents' home.  Donna felt that "everything was over" and "feared for her life."  About two weeks before she was killed, Donna told Evelyn Latimer, another sister, that she was going to file for divorce.

Hand received $ 67,386 in life insurance following Donna's death.  Hand also filed a claim for reparations after Donna's death and received $50,000 from the Ohio Victims of Crime Compensation Division of the Court of Claims.

During 1975 or 1976, Teresa Fountain overheard [Lonnie] Welch talking to Isaac Bell, Fountain's boyfriend, about "knocking his boss's wife off to get some insurance money."  Sometime after Donna's murder, Welch told Fountain, "I hope you didn't hear anything and * * * you keep your mouth shut, * * * you didn't hear anything."

Murder of Lori Hand.  Hand married Lori Willis on June 18, 1977, and Welch was the best man at the wedding.  Hand and Lori lived in the home on South Eureka Avenue in which Donna had been murdered.

By June 1979, Hand's marriage to Lori was falling apart.  Lori told her friend, Teresa Sizemore, that she was unhappy with her marriage and was making plans to file for a divorce.  Sizemore also saw Lori and Hand

interact, but she "didn't see any warmth there because [Lori] wasn't happy."

Around 8:30 a.m. on September 9, 1979, Hand and his baby, Robby, left home so that Lori could clean the house for a bridal shower planned for that afternoon. Steven Willis, Lori's brother, picked up Hand at his house. The three of them then spent the next few hours visiting a flea market, a car show, and Old Man's Cave in Hocking Hills. They also went go-cart racing.

Around 9:30 a.m., Lois Willis, Lori's mother, arrived at Hand's home to help Lori prepare for the bridal shower. After Lois knocked and did not get an answer, she left and returned about an hour and half later. Upon returning, Lois noticed that the front door was ajar and entered the house. Alarmed, she called Hand's family, who found Lori's body in the basement.

Police discovered Lori's body on the basement floor with a plastic sheet wrapped around her head. Lori's pants were unfastened with the zipper down, and her blouse was pulled up against her breast line. Bloodstains and blood spatters were found on the wall near Lori's body, and a spent lead projectile was found near her body. Lori had been shot twice in the head, but neither gunshot killed her. Dr. Patrick Fardal, a Franklin County Deputy Coroner, determined that strangulation was the cause of death.

Lori's vehicle had been stolen from Hand's garage. Police recovered her vehicle about three blocks from the Hand home.

Police found the first and second floor levels of the house in disarray, with drawers and other items of property dumped on the floor. Nevertheless, the house did not appear to have been burglarized, because there were no signs of forced entry and the rooms were only partially ransacked. Investigators also seized a cash box containing credit card slips, currency, and a .38 caliber handgun from the trunk of Hand's car parked in the garage.

After he learned of Lori's death, Hand returned home. Hand told police that he had been out of the house with Steve and his young son when Lori was murdered. Hand said that "everyone, including * * * his brothers and help at the shop would have known" that he was going to be gone from the house that morning.

Hand told police that he was very possessive of Lori. He admitted having sexual problems with Lori because he "wanted sex at least once a night and she didn't want to do that." When asked about insurance, Hand said that he had in the past year doubled its value and that it should pay off

-3-

both of his mortgages. Hand received $126,687.90 from five separate life insurance policies after Lori's death.

On September 10, 1979, the police recovered a pair of gloves near where Lori's vehicle was found. The fingers of the gloves were bloody, and the gloves had been turned inside out. Human bloodstains were found on the gloves, and debris from inside the gloves was preserved.

On October 9, 1979, the police reinterviewed Hand. Hand provided the names of Welch and others who worked for him and said that he did not trust any of them. He told police that everyone, including all of his neighbors, was aware that he had received $ 50,000 after his first wife's murder. Hand also said that his wife was not planning to separate from or divorce him and that they were "extremely in love with each other."

During the fall of 1979, Welch went to the home of Pete Adams, Welch's first cousin, and told Adams that he had "killed Donna and Lori Hand" and had done it for Bob Hand. Adams did not notify police about this conversation until after Welch's death in 2002.

During 1979 and 1980, Betty Evans, Welch's sister, observed that Welch had a "wad of money," cars, and a girlfriend who wore a mink jacket, a diamond necklace, and rings. Around the same time, Welch told Evans that if she "knew anything, not to say anything because him and Bob had a pact and if anything got out, they were going to kill each other's mother."

In the 1980s and 1990s, Welch intermittently worked as a mechanic at Hand's radiator shop in Columbus. Hand also provided Welch with extra money on a frequent basis and gave him cars and a washer and dryer. In the late 1980s, Welch started using crack cocaine and spent a lot of money on it.

Sometime after Lori's death, Hand met and married Glenna Castle. They were married for seven to eight years and then divorced.

Hand's marriage to Jill and his financial problems. In October 1992, Hand married Jill Randolph, a widow, and moved into Jill's home on Walnut Avenue in Galena, Delaware County. Jill was employed at the Bureau of Motor Vehicles in Columbus and was financially secure. Hand was the beneficiary of Jill's state retirement and deferred-compensation accounts in the event of her death, and he was the primary beneficiary under her will.

By 2000, Hand's radiator shop had failed, and he was deeply in debt. During the 1990s and early 2000, Hand obtained thousands of dollars by

making credit card charges payable to Hand's Hilltop Radiator. By January 2002, Hand had amassed more than $ 218,000 in credit card debt.

At some point, Jill found out about the extent of Hand's debt. During 2000, she learned that Hand had charged more than $ 24,000 on a credit card in her name. Jill was upset and told her daughter, Lori Gonzalez, that "[s]he was going to have Bob pay off that amount that he had charged up with the sale from his business."

In October 2000, Hand sold his radiator shop and the adjoining buildings. In May 2001, Hand started working as a security guard in Columbus and earned $ 9.50 an hour. Despite his enormous debt, Hand continued to pay on several credit cards to maintain life insurance coverage on his wife, including payments in December 2001 and January 2002.

Hand and Jill grew increasingly unhappy with one another. During 2001, Hand told William Bowe, a friend of Hand's, that he was "quite tired of her." Abel Gonzalez, Jill's son-in-law, lived at the Hand home from April to June 2001. Abel said that Hand and Jill's marriage was "on the down slope. * * * There was no warmth there. * * * It seemed everything Bob would do would antagonize Jill, and she made it real clear that she was upset."

Plans to murder Jill Hand. In July or August 2001, Welch asked Shannon Welch, his older brother, if he had a pistol or could get one. Welch also asked, "Do you know what I do for extra money?" He continued, "Well, I killed Bob's first wife and * * * I got to kill the present wife and I'll have a lot of money after that." Welch said he was going to be well off enough to retire and talked about buying an apartment complex. Thereafter, Welch asked Shannon about a pistol "maybe once a week, sometimes twice a week."

Between December 21, 2001, and January 3, 2002, Welch was in jail for various motor vehicle violations. During that time, Welch told his cellmate, David Jordan Jr., that he planned to "take somebody out for this guy named Bob" and mentioned that he had "put in work for him before." Welch said he needed a driver because his eyes were "messed up." He asked Jordan if he wanted the job and offered to pay him between $5,000 and $6,000. Welch said this job was supposed to happen in January, and he gave Jordan his phone number.

During December 2001, Shannon asked Hand whether he could provide bond money to get Welch out of jail. Hand said, "Well, I can't have no contact with Lonnie * * * because we got business" and refused to give

him any money.

On January 14, 2002, Welch told Tezona McKinney, the daughter of Welch's common-law wife, that he was going to buy a car for her mother. Welch said he "was going to get the money the next day" and would buy the car "because [he] didn't buy her anything for Christmas because [he] was in jail."

Around 5:00 p.m. on January 15, 2002, Welch attended a family gathering at Evans's home in Columbus to celebrate Evans's birthday. Welch told Shannon that he had to "be ready * * * to see Bob because [he] might be taking care of * * * business tonight." Before leaving, Welch told Evans that he "was going to pick up some money and he'd be right back."

Murder of Jill and Welch. Around 6:45 p.m. on January 15, 2002, Hand arrived home from work. At 7:15 p.m., Hand made a 911 call to report that his wife had been shot by an intruder. Hand also reported that he had shot the intruder.

Police found Welch's body lying face down on Hand's neighbor's driveway. Inside Hand's house, Jill's body was found lying between the living room and the kitchen. Hand told police that he had shot the intruder but did not know his identity. He also gave police two .38-caliber revolvers that he used to shoot him. On the way to the hospital, Hand saw the intruder's vehicle and told Mark Schlauder, a paramedic, that "it could have belonged to somebody that worked for" Hand.

Around 8:00 p.m. on January 15, Detective Dan Otto of the Delaware County Sheriff's Office interviewed Hand at the hospital. Hand said that after arriving home, he had dinner with Jill and then went to the bathroom. Upon exiting, Hand heard Jill scream, "Gerald," heard two gunshots, and saw a man in a red and black flannel shirt at the end of the hallway. Hand then retrieved two .38 caliber revolvers from the master bedroom. Hand started down the hallway firing both guns at the intruder, but had trouble shooting because the guns were "misfiring" and "missing every other round." Hand followed the intruder out the front door and continued firing at him as he ran toward his car, and then the intruder fell on the neighbor's driveway.

During the interview, Hand repeated that he did not recognize the gunman, but recognized Welch's car in the driveway. Hand said he "didn't know [Welch] that well; that he did odd jobs around the shop; that he was a thief; that he was a cocaine addict; that he * * * [came] in to the shop area from time to time." Hand also said that it had been a year since he had had any contact with Welch, and Welch had no reason to be at his

-6-

home that night.

Investigators found no sign of forced entry at Hand's residence. Blood spatters were found inside the front door and on the front-door stoop. The top of the storm door was shattered, and particles of glass extended 13 feet into the front yard. All the glass fragments were found on top of the blood spatters. Police also found a black jacket on the front stoop, a spent bullet and glass fragments on top of the jacket, and a tooth outside the front door.

According to Agent Gary Wilgus, a crime-scene investigator, the blood spatters indicated that the victim was bleeding and "blood was dropping from his body" as he was moving away from the house. A bloody trail led onto the sidewalk and through the front yard and ended where Welch was lying in the driveway. Welch was wearing cloth gloves, and a knit hat with two eyeholes and a mouth hole was next to his head. Police also found a .32-caliber revolver on the front lawn.

Inside the house, police found glass fragments and bloodstains extending two to three feet from the front door and another tooth just inside the front door. Jill's body was 12 feet from the front door, her legs pointed towards the front door, and she was wearing a nightgown. Jill had been shot in the middle of her forehead. A second bullet deflected off the floor and was found on the carpet next to Jill's head.

Investigators found a bullet in the living room ceiling, and a second bullet was found in the living room window frame. While investigators could not determine the exact trajectory of the two bullets, they determined that they most likely originated from gunshots in the hallway area. No evidence of gunplay was found elsewhere in the house.

On January 17, 2002, Detective Otto re-interviewed Hand, and Hand provided a different version of events. Hand stated that after his wife was shot, he retrieved two guns from the master bedroom, went into the hallway, and saw Welch "coming down the hallway towards the master bedroom at him." Hand and Welch then began firing at each other in the hallway and were within four feet of each other during the gun battle. Hand repeated that he chased Welch outside the house but "couldn't get his guns to fire; that he was missing every other round and * * * they weren't firing." When asked about the .32-caliber revolver in the front yard, Hand stated that he did not know who owned it.

During the second interview, Hand said, "I was misquoted on the first interview at the hospital" about not knowing Welch. Hand said that he had known Welch, a former employee, for over 20 years. However, Hand

continued to give the impression that they were not close. When asked about a wedding photo showing Welch as his best man, Hand said he "couldn't find anybody else to stand in as [his] best man." Hand repeated that "the only thing he saw" on the night of the murder was an unknown person in "red and black flannel," and he had "no clue who this unknown person was." Hand also said that "Jill had never met Lonnie; Lonnie's never been to Walnut Avenue; he had no idea why he was there."

In discussing his financial situation, Hand said he sold his radiator shop in October 2000 and received $300,000, and later received $33,000 from the sale of his share of the business and its inventory, and $140,000 from somewhere else. Hand said he "always needed money, but if he needed money, he could get some; that he had money." Hand also told police that he was "hiding the money and that he was considering filing bankruptcy; that that was against Jill's wishes." Later, Hand said that he "wasn't going to file for the bankruptcy * * * and they were going to work it out." When asked if he had any offices, Hand said that his office was in a bedroom in the house. However, Hand failed to disclose that he kept business records at another location.

On January 19, 2002, the police seized several boxes containing Hand's business and personal records from the storage area above a hardware store near Hand's former radiator shop. These records included credit cards, credit-card-and-life-insurance-account information, payment receipts, a list of credit card debt prepared by Jill, and other information about Hand's finances.

Heather Zollman, a firearms expert, testified that the .32-caliber revolver found in the front yard was loaded with two fired and three unfired .32-caliber Smith and Wesson ("S & W") Remington-Peters cartridges. Bullet fragments removed from Jill's skull were consistent with being an S & W .32-caliber bullet. In testing the .32-caliber revolver, Zollman found that "on more than 50 percent of [her] testing, the firearm misfired" as a result of "a malfunction of the firearm." The stippling pattern shown in Jill's autopsy photographs indicated that "the muzzle to target distance was greater than six inches, and less than two feet."

Zollman tested the two .38-caliber revolvers and found that they were both in proper working order, and neither weapon showed any tendency to misfire. A bullet removed from Welch's right forearm was "consistent with the .38 caliber." Zollman also concluded that the bullet and fragments recovered from Welch's mouth and his lower back had rifling class characteristics corresponding with the S & W .38-caliber revolver. Further, gunshot residue around the bullet hole on the back of Welch's shirt revealed a muzzle-to-target distance greater than two feet from the

garment but less than five feet.

Jennifer Duvall, a DNA expert, conducted DNA testing of bloodstains found on the shirt Hand was wearing on the night of the murders.  Five of the bloodstains were consistent with the DNA profile of Welch. The odds that DNA from the shirt was from someone other than Welch was "one in more than seventy-nine trillion in the Caucasian population; one in more than forty-four trillion in the African-American population, and one in approximately forty-three trillion in the Hispanic population."

Michele Yezzo, a forensic scientist, examined bloodstain patterns on Hand's shirt. There were more than 75 blood spatters of varying sizes on the shirt.  Yezzo concluded that the shirt was "exposed to an impact" that "primarily registered on the front of the garment."  Yezzo also examined glass fragments collected from Hand's residence and "found tiny fragments of clear glass" on Hand's shirt, trousers, tee-shirt, and pair of socks that he was wearing on the night of the murders.  However, she found no glass fragments on Welch's boots.  Yezzo conducted a fiber analysis of the bullet from Welch's mouth, but found "no fibers suitable for comparison."

Ted Manasian, a forensic scientist, found particles of lead and barium on both gloves that Welch was wearing, and these are "highly indicative of gunshot residue."  Manasian could not determine how the gunshot residue got on the glove, just that it was there. Thus, Welch could have fired the gun, or was in the proximity of the gun when it was discharged, or handled an item that had gunshot residue on it.

Detective Otto testified that $1,006,645.27 in life insurance and state-benefit accounts were in effect at the time of Jill's death. This amount included $113,700 in Jill's Ohio Public Employees Retirement System account and $42,345.29 accumulated in the Ohio Public Employees Deferred Compensation program.

Dr. Keith Norton, a forensic pathologist in the Franklin County Coroner's office, conducted the autopsy of Jill and Welch.  He concluded that Jill died from a single gunshot wound to the head.  Dr. Norton found that Welch had been shot five times: in his mouth, left upper chest, left forearm, right shoulder, and lower back.  The gunshot wound to Welch's lower back went into the spinal cord and would have paralyzed his legs. However, the gunshot wound to the chest was the cause of death.

According to Kenneth Grimes Jr., Hand's former cellmate in the Delaware County Jail, Hand told him that he "killed his wife and the man he was involved with."  Hand said he hired a man and they had "been doing

business together for years."  Hand said he "hired the man to kill his wife and, in turn, the deal went sour.  He wanted more money, so he killed two birds with one stone.  He got both and didn't have to pay anything."  Hand said he had agreed to pay $25,000 to have his wife killed, and the man "wanted it doubled."  Hand said he was going to claim self-defense.  He also said the evidence against him was "circumstantial and there were many witnesses that didn't have * * * any actual, proof."

Attempted jail escape.  Hand was incarcerated in the Delaware County jail beginning on August 8, 2002.  On November 26, 2002, correction officers discovered an escape attempt in Hand's cell block.

An attempt had been made to cut through the lock on the rear emergency exit of the cell block and through a cell bar.  Officers searching Michael Beverly's cell found two saw blades.  Police also seized some torn-up tee-shirt material and a pencil with a teeshirt tied around it from Hand's belongings in his neighboring cell.

Michael Beverly and Wedderspoon, another inmate, came up with the idea for the escape.  Beverly said that he obtained two hacksaw blades and began cutting through the rear-exit lock and one cell bar. Dennis Boster, another inmate, was the lookout, and once in a while Hand would relay messages to Beverly that a guard was coming.  Hand also advised Beverly on how to cut through the metal bar.

According to Grimes, Beverly and Hand discussed escaping through the front of their cell block. The plan was that while Hand distracted the guards and nurses by requesting his medication, Beverly would apprehend a guard, and they would escape through the front door. Grimes also identified Hand as a lookout.

Defense Case

Sally Underwood, Hand's sister, was a bartender in the Columbus Hilltop area from 1992 until 1994.  During that time, Welch frequently came into the bar selling televisions, stereos, and other electronic equipment.  When asked where he obtained this property, Welch said that he "had just stolen it from a house down the street."  Underwood could tell that Welch was "on something" when he entered the bar.

According to Terry Neal, another inmate in Hand's cell block, Hand was not involved in the escape attempt.  Dennis Boster, who was convicted of escape, also testified that Hand was not involved in the escape attempt and never served as a lookout.

-10-

Hand testified in his own behalf.  He said, "I did not kill my wife or have anything to do with the planning of killing my wife, either."  Hand also denied conspiring with Welch or anyone else to kill Donna or Lori.  Hand did not remember "too much" about the day Donna was killed.

When Hand married Lori, Welch was the best man at the wedding because his brother backed out at the last minute.  Hand said that he had a great sexual relationship with Lori before his son, Robert, was born, but thereafter, they started having sexual problems.  However, his business was going well, and his financial condition was "great."

During his marriage to Lori, Hand took over his father's radiator shop, purchased the underlying property, and bought some extra lots.  Welch worked part-time at the radiator shop and was paid under the table.  Around this time, Hand embarked on a credit card scheme.  He used personal credit cards, charged them to his business, and used this money to finance his business and purchase real estate.

The wedding shower at his home on September 9, 1979, had been planned weeks in advance.  When he learned that Lori had been killed, Hand "didn't believe it at first" and then went "hysterical."  Hand later told police that he suspected that his brother, "Jimbo," had killed Lori because they were not "getting along that good and he had the keys to [Hand's] house."

Shortly before Hand and Jill were married in 1992, he moved into her Delaware County home.  After they had been married for a couple of years, Jill found out about Hand's credit card scheme.  Hand said, "She didn't like it; * * * She just didn't want no part of it."  She also learned about Hand's debt, which at one point, was close to a million dollars.  Jill was also aware that Hand had life insurance on her through his credit cards.

In 2000, Jill learned that Hand used her credit card to pay for repairs to one of Hand's properties.  Jill was upset and wanted a "total refinance of everything."  Hand then "started selling everything * * * and then paying the credit cards and the mortgages and everything down."  In 2001, Hand sold his radiator shop.  By May 2001, Hand had sold all his properties, had paid thousands of dollars on his credit card debt, and had gone to work as a security guard.

According to Hand, he arrived home from work around 6:45 p.m. on January 15, 2002.  Hand was coming out of the bathroom when he heard Jill shout, "Gerald, Gerald."  He then heard a couple of shots and saw a man dressed in red flannel.  Hand retrieved two guns from the bedroom dresser, and as he came out of the bedroom, he saw the intruder coming

down the hallway.  Hand started "firing, and * * * assumed [the intruder] was firing."  However, Hand thought his guns were "misfiring because [the intruder] wasn't going down."  Hand said he chased the intruder out the front door and continued firing at him until the intruder fell on the driveway. He then returned to the house and called 911.

Hand did not know how many shots he fired.  He retrieved the guns and started firing, later explaining, "I wanted to protect myself * * * and shoot him, the son-of-a-bitch that shot my wife."  Hand did not recognize the intruder, but recognized Welch's car in the driveway.  He had no idea why Welch had come to his house that night.

Hand denied telling Grimes that Welch was already in the house when he came home from work, denied telling him that Welch wanted to renegotiate his fee, and denied telling him that he killed his wife and then killed Welch.  As for the escape, Hand said that he tried to stay away from Beverly as much as possible.  Beverly asked Hand if he wanted to join in the escape, and Hand told him "no, and just get away."  Hand also claimed that he did not aid Beverly in any way.  Finally, he said that the string found in his cell was used for hanging a bag with food items to keep out the ants.

State v. Hand, 107 Ohio St.3d 378, 379-389 (2006).

Hand was indicted in August 2002.  Count One charged him with Jill Hand's murder with prior calculation and design, and with a course-of-conduct death penalty specification.  Count Two charged him with Welch's murder with prior calculation and design, and six specifications: course of conduct; three separate specifications for murdering Welch in order to escape detection for the murders of Donna, Lori, and Jill Hand, respectively; and two specifications of murdering Welch to prevent him from testifying against Hand regarding the murders of Donna and Lori.  Counts Three, Four and Five charged Hand with conspiracy to murder Jill, and each count included use of a firearm specification.  Count Six charged him with escape.[1]  The jury returned guilty

_____

[1] The escape charge was included in a separate indictment returned in December 2002.  A subsequent indictment returned in January 2003 charged him with

-12-

verdicts on all six counts of the indictment, and recommended that the court impose the death sentence for the two aggravated murders.  The trial court accepted that recommendation, imposing the death penalty for Counts One and Two, together with three years on the escape charge and three years on the firearm specifications.

Hand appealed his conviction and sentence to the Ohio Supreme Court, raising 13 propositions of law.  The court rejected all of Hand's contentions and affirmed his conviction and sentence (in the decision cited above) on January 18, 2006.  Hand filed an application to reopen his direct appeal on April 18, 2006 to raise three claims of ineffective assistance of appellate counsel, which the court summarily denied.  Hand's petition for certiorari was subsequently denied by the United States Supreme Court.  In September 2007 (after he filed his habeas petition in this case), Hand filed a motion to reopen his direct appeal to raise three additional claims of ineffective assistance of appellate counsel.  The Ohio Supreme Court denied that motion as untimely.

Hand also pursued post conviction relief in the state trial court in December 2004, eventually raising twelve claims for relief.  The court rejected them all and dismissed the petition on May 27, 2005.  Hand's appeal from that order, which raised three assignments of error, was rejected by the Ohio Fifth District Court of Appeals. The Ohio Supreme Court declined review, and certiorari was denied by the United States Supreme Court.

Hand filed his habeas petition in this district on August 22, 2007, raising fifteen

──────────────────────────

conspiracy but expanded the time frame to include the months preceding Jill's death. All three indictments were consolidated for trial, and the counts are described here as they were by the Ohio Supreme Court in its opinion on Hand's direct appeal.

claims, some with several subparts. (Doc. 11) The Magistrate Judge granted in part Hand's motion to conduct discovery with respect to his third claim, alleging <u>Brady</u> violations, and with respect to his claims of ineffective assistance of counsel. After an evidentiary hearing and the submission of post-hearing briefs, the Magistrate Judge issued his initial Report, recommending that this Court deny Hand's petition. (Doc. 101) Hand filed objections (Doc. 108), and the Magistrate Judge's Supplemental Report addressed those objections (Doc. 111). Hand then filed his omnibus objections to all of the Magistrate Judge's recommendations. (Doc. 117) The Magistrate Judge also granted Hand's motion to postpone briefing on a certificate of appealability until after this Court's decision on his objections. (Doc. 113) Hand's omnibus objections are therefore ripe for review.

**DISCUSSION**

<u>Standard of Review</u>

Hand's petition is governed by the requirements of the Antiterrorism and Effective Death Penalty Act. Under that statute, a federal court may not grant habeas corpus relief to a state prisoner unless it concludes that the state court's adjudication on the merits of the prisoner's claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "A state court renders an adjudication 'contrary to' clearly established federal law when it 'arrives at a conclusion opposite to that reached by [the

Supreme] Court on a question of law' or 'decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.'" Carter v. Mitchell, 443 F.3d 517, 524 (6th Cir. 2007), citing Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A state court unreasonably applies clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.

In order to find that the state court's application of federal law is "objectively unreasonable," it must be more than simply incorrect. "To conclude that a state court's application of federal law was unreasonable, the Court must decide that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" Jackson v. Bradshaw, 681 F.3d 753, 759 (6th Cir. 2012), quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011). The Supreme Court has emphasized that "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 131 S.Ct. at 786 (quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring in judgment).

The doctrine of procedural default bars a habeas petitioner from raising claims that were not properly presented to the state court. If a state court previously dismissed a state prisoner's federal claim because the prisoner failed to comply with a state procedural rule, a federal court ordinarily cannot consider the merits of that claim. See Coleman v. Thompson, 501 U.S. 722, 729-731 (1991). This doctrine bars habeas review of such claims if: (1) the petitioner failed to comply with a state procedural rule;

-15-

(2) the state court clearly enforces that rule; (3) the rule is an adequate and independent state ground for denying review of the federal constitutional claim; and (4) the petitioner cannot show cause and prejudice that would excuse the default.  Guilmette v. Howes, 624 F.3d 286, 290 (6th Cir. 2010 (en banc)(internal quotations omitted); Maupin v. Smith, 785 F.2d 135, 138 (6th Cir. 1986).

Under the fourth prong, a petitioner can excuse a default by establishing good cause for the default, and that he was actually prejudiced by the constitutional error irrespective of the default.  Maupin, 785 F.2d at 139.  Alternatively, a petitioner may establish that the state court outcome amounts to a fundamental miscarriage of justice that requires habeas relief.  This is a rare situation, such as when petitioner comes forward with new evidence demonstrating that a constitutional violation has probably resulted in his conviction despite his actual innocence.  Moore v. Mitchell, 708 F.3d 760, 775 (6th Cir. 2013), citing Murray v. Carrier, 477 U.S. 478, 495-96 (1986).

After the evidentiary hearing in this case, the Supreme Court held in Cullen v. Pinholster, __ U.S. __, 131 S.Ct. 1388 (2011) that a federal habeas court's review of a state court's merits decision must be based upon the record that was before the state court at the time of that decision.  In Robinson v. Howes, 663 F.3d 819, 823 (6th Cir. 2011), the Sixth Circuit explained that after Pinholster,

> ... a federal habeas court may not rely on evidence introduced for the first time in that court and reviewed by that court in the first instance to determine that a state court decision was 'contrary to' or an 'unreasonable application of' clearly established federal law. ...  However, if the claim was never 'adjudicated on the merits' in state court, the claim does not fall under 28 U.S.C. § 2254(d) and Pinholster does not apply.  In such cases, a federal habeas court may order an evidentiary hearing, provided the threshold standards for

admitting new evidence in federal district court are met, see 28 U.S.C. § 2254(e)(2), and decide the habeas petition under pre-AEDPA standards of review.  See Pinholster, 131 S.Ct. at 1401 ("Section 2254(e)(2) continues to have force where 2254(d)(1) does not bar federal habeas relief. ... [N]ot all federal habeas claims by state prisoners fall within the scope of 2254(d), which applies only to claims 'adjudicated on the merits in State court proceedings.'")

With these standards in mind, the Court addresses Hand's objections to the Magistrate Judge's recommendations on each of his claims.

**Ground One**

Hand contends that his constitutional rights were violated when the trial court admitted testimony from eight different witnesses, each of whom testified about certain statements that Lonnie Welch had made to each of them before Welch was killed. Hand alleges that the admission of this testimony violated his Due Process and Confrontation Clause rights.  Hand raised this claim as his first proposition of law in his direct appeal, contending that the testimony violated Ohio's evidence rules and the federal Confrontation Clause.  The Ohio Supreme Court discussed Hand's claim and summarized the disputed testimony as follows:

> Over defense objection, the trial court admitted Welch's statements to various witnesses describing Welch's complicity with Hand in the murders of Donna, Lori, and Jill. First, Pete Adams, Welch's cousin, testified that a week or two after Lori's murder in the fall of 1979, Welch came to his home and told him that he "killed Donna and Lori Hand" and "did it for Bob."
>
> Second, Shannon Welch, Welch's brother, testified that during July or August 2001, Welch asked Shannon "if [he] had a pistol or if [he] could get one."  Welch then asked, "Do you know what I do for extra money?"  Welch continued, "Well, I killed Bob's first wife and * * * I got to kill the present wife and I'll have a lot of money after that."  About a week

-17-

and a half before Jill's and Welch's murders, Welch told Shannon that he "might get to take care of his business with Bob tonight."  On January 15, Welch told Shannon, "Well, I got to go take a shower and change clothes and be ready to go to see Bob because I might be taking care of my business tonight."

Third, Barbara McKinney, described in the record as Welch's common-law wife, testified that Welch told her that he had visited Hand's home in Delaware [Ohio] and "Bob showed him the house."  When Welch was in jail between December 2001 and January 2002, Welch directed Barbara on the phone, "Call my friend and see if he'll pay my bond to get me out of jail."  Welch identified his friend as Bob Hand and said, "[D]on't say his name on the phone any more."

Fourth, Tezona McKinney, Barbara's daughter, testified that on January 14, 2002, the day before the murders, Welch told her, "Well, if I get this little money * * * tomorrow, I want to buy your mother this car because I didn't buy her anything for Christmas."  Welch then pointed out the car to Tezona and said, "I want your mother to have that car.  And if I can, I'm going to try to make sure I get it for her, if I get this money."  On another occasion, Welch told Tezona that "Bob Hand killed his first two wives."

Fifth, Betty Evans, Lonnie Welch's sister, testified that around 1979 or 1980, Welch told her that if she "knew anything, not to say anything because him and Bob had a pact and if anything got out, they were going to kill each other's mother."  On the evening of the murders, Welch told Evans that "he was going to pick up some money and he'd be right back; that he was sorry he didn't have anything for [her] birthday; that when he comes back, he'll take care of it."

Sixth, Teresa Fountain, Shannon Welch's ex-girlfriend, testified that during 1975 or 1976, she overheard Lonnie Welch "talking to [her boyfriend] Isaac all about insurance money and knocking his boss's wife off to get some insurance money."  Later, Welch told Fountain, "I hope you didn't hear anything and * * * you keep your mouth shut, * * * you didn't hear anything."

Seventh, Anna Hughes, a friend of Lonnie Welch, testified that although Welch often missed work, he was not fired

-18-

> from his job working for Hand.  On one occasion, Welch said
> to her, "I didn't go to work * * * [but] I got it like that."
> Sometime around 1998, Welch mentioned to Hughes that he
> was "going out to Bob's."  He added, "I've got to get me a hit
> and I ain't got no money."
>
> Finally, David Jordan Jr., Welch's Franklin County Jail
> cellmate, testified that during December 2001, Welch said
> that he was "going to take somebody out for this guy named
> Bob" and added, "I've put in work for him before."  Welch
> offered Jordan between five and six thousand dollars to be
> his driver.  Welch also said the murder would "happen
> sometime in January" and gave Jordan his phone number.

State v. Hand, 107 Ohio St.3d at 390-391.

The trial court conducted an evidentiary hearing outside of the jury's presence to

determine the admissibility of all of this testimony.  All eight of these witnesses, along

with Phillip Anthony (another of Welch's cousins),[2] were examined about Welch's

statements to each of them.  The trial court then held that the state had shown "... by a

preponderance of the evidence under Rule 804, that, number one, the witness,

accomplice, victim, Lonnie Welch's death was caused by the defendant, and it's

obviously by virtue of that to cause his unavailability."  State v. Hand, 107 Ohio St.3d at

391.  The Ohio Supreme Court rejected Hand's contention on appeal that the admission

of the eight witnesses' testimony violated Ohio Evid. Rule 804(B)(6):

> First, Hand argues that the trial court should have used the
> clear-and-convincing standard of proof, rather than a
> preponderance-of-the-evidence standard, in proving the
> predicate facts.  However, the majority of United States
> Courts of Appeals applying the federal rule have followed the
> preponderance-of-the-evidence standard in ruling on

---

[2] Anthony, who was not called as a witness by the state, testified at the hearing
that shortly before Jill's murder, Welch asked Anthony to help him get a gun, and said
he needed a gun because Hand wanted Welch to murder Hand's current wife.

> preliminary determinations of admissibility under Fed.R.Evid.
> 804(b)(6). ...  Thus, the trial court properly applied the
> preponderance-of-the evidence standard in ruling on
> admissibility."

Id. at 392.  The court also rejected Hand's second argument, that the trial court failed to

consider Hand's self-defense arguments in ruling on the admissibility of the testimony,

because Hand did not offer any self-defense evidence during the evidentiary hearing.

Hand's third argument was that the state failed to show that Hand killed Welch in

order to eliminate him as a witness, a finding required for admissibility under Rule

804(B)(6).  The Supreme Court noted that the Rule extends to potential witnesses, and

that the lack of charges against Hand at the time of Welch's killing did not preclude

admission of the statements.  Nor is there a requirement that the state show that Hand's

sole motive was to eliminate Welch as a witness; the state only needed to show that

Hand "was motivated *in part* by a desire to silence the witness."  Id. at 392, quoting

United States v. Houlihan, 92 F.3d 1271, 1279 (1st Cir. 1996)(emphasis in original).

The court specifically cited the testimony of Kenneth Grimes, Hand's pre-trial cellmate,

who testified that Hand admitted he killed Welch to eliminate him as a potential witness.

In addition, the Supreme Court rejected Hand's arguments that the statements

were unreliable and that the trial court erred in concluding otherwise.  Hand claimed that

all of the witnesses were Welch's friends and family members, and one was Welch's

cellmate (while Welch was in jail on unrelated charges just before Jill's murder).  He

argued that Welch's family and friends were angry at him for killing Welch, and Jordan

was trying to negotiate a bargain for himself, rendering their testimony unreliable.  The

trial court found that each of the witnesses who testified were credible, a decision the

Supreme Court noted was well within the trial court's discretion. The Supreme Court further observed that there was no evidence that the friends and family members or the cellmate were lying, and any bias they may have harbored was a proper subject for cross-examination: "Indeed, courts generally hold that 'where a declarant makes a statement to someone with whom he has a close personal relationship, such as a spouse, child, or friend, ... that ... relationship is a corroborating circumstance *supporting* the statement's trustworthiness. ... Moreover, the testimony of Welch's friends and family members was corroborated by Jordan, Welch's cellmate, and Grimes, who testified that Hand admitted hiring Welch to kill Jill." Id. at 393 (internal citations omitted). For all of these reasons, the Supreme Court concluded that the trial court did not abuse its discretion in admitting the testimony of these witnesses under Ohio Evid. Rule 804(B)(6).

The Supreme Court alternatively considered Hand's objections under other state evidence rules. Welch's statements to several of the witnesses that he was involved in the murders of all three of Hand's wives were admissible as statements against Welch's interest under Rule 804(B)(3), as the statements would clearly subject Welch to criminal liability such that "... a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." The court noted that Welch volunteered these statements to family and friends, and did not try to shift blame to anyone else. These circumstances clearly supported the conclusion that the statements were trustworthy. Welch's statement to Shannon that "I got to kill the present wife and I'll have a lot of money after that," as well as his statement that he was going to see Hand "because I might be taking care of my business tonight," were

admissible under Ohio Evid. Rule 803(3), as a statement of current intent to take future action. His statements to Evans and to Jordan just before Jill's murder were also admissible under this Rule. The Supreme Court also found that some of Welch's statements to Shannon and Jordan were admissible as statements of a co-conspirator. Grimes' testimony provided "independent proof of the conspiracy's existence. ... Hand called Welch a business partner and said he had hired Welch to kill his wife. The facts show that by July 2001, Hand and Welch had entered into a conspiracy to murder Jill." State v. Hand, 107 Ohio St.3d at 395.

The Supreme Court then addressed Hand's contention that the admission of Welch's statements violated his Sixth Amendment right of confrontation. Hand relied on Crawford v. Washington, 541 U.S. 36 (2004), which overruled Ohio v. Roberts, 448 U.S. 56 (1980) and held that testimonial statements of an unavailable witness are not admissible absent a prior opportunity for cross-examination. The Supreme Court observed that Crawford "... explicitly preserved the principle that an accused has forfeited his confrontation right where the accused's own misconduct is responsible for a witness's unavailability." State v. Hand, 107 Ohio St.3d at 395. After the hearsay evidentiary hearing and prior to presenting the testimony to the jury, the trial court concluded that Hand killed Welch to prevent him from testifying against Hand. Hand admitted as much to his cellmate Grimes. Given those findings, the Supreme Court concluded that Hand forfeited his constitutional confrontation rights because of his own misconduct in killing Welch. This conclusion did not depend on the specific state evidentiary rule upon which the trial court had admitted any of the challenged statements. Id. at 396.

-22-

In his Report, the Magistrate Judge considered whether Welch's statements attributed to him by the trial witnesses were "testimonial" for purposes of the Confrontation Clause analysis under <u>Crawford</u>.  He cited the Sixth Circuit's lengthy analysis of the issue in <u>Miller v. Stovall</u>, 608 F.3d 913 (6th Cir. 2010), which reaffirmed the standard set forth in <u>United States v. Cromer,</u> 389 F.3d 662, 675 (6th Cir. 2004): "The proper inquiry, then, is whether the declarant intends to bear testimony against the accused.  That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."

After reviewing the challenged trial testimony and these authorities, the Magistrate Judge concluded that the various statements attributed to Welch were **not** "testimonial" under <u>Crawford</u> and its progeny.  Seven of the eight challenged witnesses were Welch's relatives, friends or acquaintances, and one was his cellmate (Jordan). Welch's statements were informal and they were not made within the context of any formal proceedings.  For instance, Welch told his cousin, Pete Adams, that he killed Donna and Lori Hand; he asked his brother, Shannon Welch, if Shannon knew how he made extra money, then volunteered that he killed Hand's first wife.  He told his common law wife, Barbara McKinney, that he had been to Hand's home, and asked her to call Hand to get bail money for him when he was arrested before Jill's murder. Jordan testified that Welch told him he was "going to take somebody out" and that he was doing the work "for a guy named Bob...".  Welch said he had known "Bob" for years, and "the money is good."  And Welch offered Jordan money to drive him to this "job" which was going to happen in January.  (Trial Trans. Vol. 16 at 2820-2821)

Nothing in any of the statements, or about the circumstances under which Welch made any of the challenged statements, reflects any intent by Welch to "bear testimony" against Hand.  There is nothing in this testimony or in the record raising the possibility that any of these witnesses would cooperate or were cooperating with any investigation at the time Welch made any of the statements.

The Ohio Supreme Court did not expressly determine if Welch's statements were "testimonial" under Crawford, as the Court found that Hand forfeited his confrontation rights by his own misconduct in murdering Welch.  But this Court agrees with the Magistrate Judge's conclusion that the challenged statements (as summarized  by the Magistrate Judge in his Report at pp. 50-51) were not "testimonial" under Crawford. The Sixth Circuit has often noted that statements made to friends and family are more reliable, both for hearsay and Confrontation Clause analyses, than statements that are made to law enforcement personnel or officials.  See, e.g., United States v. Gibson, 409 F.3d 325, 337-38 (6th Cir. 2005) (describing statements as nontestimonial where the "statements were not made to the police or in the course of an official investigation . . . [nor in an attempt] to curry favor or shift the blame . . . ."); United States v. Johnson, 581 F.3d 320, 326-327 (6th Cir. 2009)(statements made to a friend and confidant, someone the defendant saw every day for meals and at social activities, were not testimonial); United States v. Franklin, 415 F.3d 537, 545-548 (6th Cir. 2005) (statements by non-testifying co-defendant to a friend, implicating both defendant and the co-defendant in an armed robbery, were not testimonial and bore sufficient indicia of reliability under Crawford).

Even if the challenged hearsay statements were "testimonial," the Magistrate

Judge alternatively concluded that Hand forfeited his confrontation rights by killing Welch to prevent him from testifying against Hand.  After the evidentiary hearing held during Hand's trial, the trial court orally ruled that the government had satisfied its burden of showing that Hand killed Welch to cause his unavailability as a witness.  (Trial Trans. Vol. 14 at 2331-2336)  The trial court concluded its ruling by stating: "... Mr. Hand has waived his confrontation issues.  The statements made are not facially unreliable.  The court does not find the statements so lacking in reliability that a conviction would violate due process, ...".  (Id. at 2336)  The Ohio Supreme Court affirmed this conclusion, stating that Hand "... killed Welch to eliminate him as a potential witness.  Indeed, Hand admitted to Grimes that he killed Welch to achieve that purpose (i.e., to prevent him from being a witness against him)."  State v. Hand, 107 Ohio St.3d at 396.  The Magistrate Judge cites Grimes' testimony at the evidentiary hearing and again in front of the jury, that Hand said he "took care" of both Jill and Welch, and that "anybody who messed with him would disappear."  (Trial Trans. Vol. 14 at 2251)  Grimes also testified that Hand told him he had "hired the man to kill his wife and, in turn, the deal went sour.  He wanted more money, so [Hand] killed two birds with one stone.  He got both and didn't have to pay anything."  (Trial Trans. Vol. 16 at 3025)

The Magistrate Judge also noted that after Crawford, the Supreme Court revisited the common law "forfeiture by wrongdoing" doctrine in light of Crawford's distinction between testimonial and non-testimonial statements.  In Giles v. California, 554 U.S. 353, 367-368 (2008), the court held that the doctrine permits the admission of unconfronted testimonial statements only when the trial court finds that the defendant's wrongdoing was specifically intended to prevent the declarant from testifying against the

-25-

defendant. <u>Giles</u> was decided in 2008, two years after the Ohio Supreme Court affirmed Hand's conviction. The Magistrate Judge found that under <u>Teague v. Lane</u>, 489 U.S. 288, 301 (1989), <u>Giles</u> most likely would not apply retroactively to the review of Hand's habeas claims. <u>Crawford</u> was the Supreme Court's controlling authority at the time Hand's direct appeal was decided, and the Ohio Supreme Court expressly applied <u>Crawford</u> to reject Hand's arguments. As the Ohio Supreme Court noted, <u>Crawford</u> held that "[t]he rule of forfeiture by wrongdoing (which we accept) extinguishes confrontation claims on essentially equitable grounds; it does not purport to be an alternative means of determining reliability." <u>State v. Hand</u>, 107 Ohio St.3d at 396, quoting <u>Crawford</u>, 541 U.S. at 62. The court's determination that Hand deliberately killed Welch is sufficient under <u>Crawford</u> to admit the challenged testimony. Even under <u>Giles</u>, the Magistrate Judge cited the Supreme Court's affirmance of the trial court's finding that Hand killed Welch to eliminate him as a potential witness, a finding that would also satisfy <u>Giles</u>.

Hands objects to the Magistrate Judge's conclusions. In his initial objections, he argues that, to the extent Welch's statements "are deemed to be testimonial," it was error to admit them under the forfeiture by wrongdoing exception as limited by <u>Giles</u>. He notes that the Sixth Circuit has not specifically decided whether <u>Teague v. Lane</u> bars the retroactive application of <u>Giles</u>. Hand further contends there is no evidence in the record supporting the Magistrate Judge's conclusion that Hand killed Welch for the purpose of preventing Welch from testifying against him, or that Hand even anticipated that Welch might testify. At the time of Welch's and Jill's murders, Hand had not been charged with Donna's or Lori's murders, and there is no evidence suggesting that Hand or Welch knew that those murders were under investigation. Responding to these

objections in his Supplemental Report, the Magistrate Judge notes that the Supreme Court has held that Crawford itself does not apply retroactively; see Whorton v. Bocking, 549 U.S. 406 (2007). There is no cogent reason to think that the Supreme Court might reach a different conclusion with respect to Giles. And this Court notes that Greene v. Fisher, ___ U.S. ___, 132 S.Ct. 38 (2011), decided after the Magistrate Judge's Report was issued, counsels against such a conclusion. Greene reaffirmed the principle that a habeas court's review of a state court's merits decision under Section 2254(d)(1) must apply controlling Supreme Court precedent when the claim was adjudicated on the merits, and not when the conviction became final.

In his objections to the Supplemental Report (Doc. 117 at 2), Hand argues that it is impossible to evaluate whether many of the hearsay statements were in fact testimonial. He asserts that he lacked access to the Columbus Police Department's "cold case" investigation file, and suggests that something in that file might show that some of the admitted statements were testimonial, particularly those by Jordan, Welch's cellmate. This speculation does not persuade the Court to reject the Magistrate Judge's conclusion that the statements are non-testimonial, and the trial transcript clearly supports his conclusion. Welch freely made these statements to Barbara McKinney, his common law wife with whom he lived for many years, and to her daughter Tezona; his sister, Betty Evans, and his brother Shannon; Shannon's girlfriend, Teresa Fountain; his cousin Pete Adams; and his friend Anna Hughes, who testified that she had known him since childhood and that they grew up together. (Trial Trans. Vol. 16 at 2801-2802) Jordan testified at the evidentiary hearing that he played chess with Welch while they were both held in the county jail, that he previously served time with Shannon Welch in

Lucasville, and that he was in jail again in late 2001 for burglary and facing a six-year
sentence.  Sometime after Welch's murder, Jordan was incarcerated at the Chillicothe
prison, and read a newspaper article reporting that Welch was killed during a burglary
attempt.  Jordan later appeared in court for a post-conviction hearing, and he told a
deputy sheriff about his conversations with Welch in the county jail, saying "Lonnie went
there to kill somebody" not to "pull no burglary."  He also wrote to the Columbus
prosecutor, saying that he "wanted help" on his own sentence, and had information
about Welch's murder.  (Id. at 2822-2825)  Jordan was vigorously cross-examined
about his story as well as his statement that he wanted help on his own case, and the
trial court observed that the ultimate evaluation of Jordan's credibility was a matter for
the jury to determine.  The trial court also noted that the controlling issue for admitting
his testimony was not Jordan's motive in revealing the statements; the controlling issue
was the declarant's (Lonnie Welch) state of mind at the time of the statements.  (Id. at
2855)  Jordan's testimony does not fairly support a conclusion that Welch's statements
to Jordan while they were in jail together were "testimonial" under Crawford.

    Hand also objects to the Magistrate Judge's conclusions that he failed to present
a federal due process claim to the Ohio Supreme Court, and that the admission of
Welch's statements did not violate Hand's due process rights under the Fourteenth
Amendment.  He argues that he did present a due process claim but the Ohio Supreme
Court did not address it, and confined its discussion to state evidentiary law.  Hand's
first proposition of law on direct appeal alleged: "When the State fails to prove by clear
and convincing evidence that a witness is unavailable due to a criminal defendant's
wrongdoing, and the proposed evidence does not meet standards of reliability, it is

constitutional error to admit this evidence against the defendant."   (Apx. Vol. 6 at 269)
The last sentence of the introductory section for the arguments supporting this
proposition states that the testimony violated his constitutional rights "under the
Confrontation Clause of the Sixth Amendment to the United States Constitution as well
as his rights to due process and a fair trial guaranteed by the Fourteenth Amendment."
(Id. at 269-270)   In the body of the brief, he argued that the admission of Welch's
statements under Ohio Evid. R. 804(B)(6) was error, and in the concluding section
argued that the statements violated his Confrontation Clause rights.  (Id. at 277-278)
The passing reference in the introductory section, with no mention of due process in the
proposition itself and no substantive argument or citation of authorities on that subject,
is not  sufficient to "fairly present" a federal claim to the state court.

        The Magistrate Judge also observed that in his brief on appeal, Hand referred to
the "probable" due process requirement that hearsay statements are found to be
reliable, and he argued that the trial court erred in finding that Welch's statements were
reliable.  (Id. at 273-277)  The Ohio Supreme Court expressly addressed the reliability
of the statements at some length, and held that the trial court acted well within its
discretion in determining that each witness was credible.  The court stated that "No
evidence supports Hand's allegations that Welch's friends and family members were not
telling the truth, and their bias could have been explored on cross-examination. ...
Moreover, the testimony of Welch's friends and family members was corroborated by
Jordan, Welch's cellmate, and Grimes, who testified that Hand admitted hiring Welch to
kill Jill."  State v. Hand, 107 Ohio St.3d at 393.  The Supreme Court did not use the
words "due process" nor explicitly conduct its reliability analysis with reference to the

-29-

Due Process Clause or the 14th Amendment.  But in <u>Harrington v. Richter</u>, 131 S.Ct. 770, 784-785 (2011), the Supreme Court clearly held that a state court is not required to write a detailed opinion explaining the state court's reasoning on a claim in order for the decision to be entitled to deferential review under Section 2254(d).  And as the Magistrate Judge further observed, Hand does not identify any substantive difference between a 14th Amendment Due Process reliability analysis, and the state court's reliability analysis in the context of Evid. Rule 804(B)(6).  This Court also finds no meaningful distinction to be made.

It is clear that the Ohio Supreme Court rejected the substance of Hand's due process challenge when it thoroughly reviewed the reliability of the challenged testimony and the veracity of the witnesses, in affirming the trial court's admission of the testimony.  That decision is not contrary to clearly established federal law.  Therefore, this Court agrees with the Magistrate Judge's analysis with respect to Hand's first ground for relief, and overrules Hand's objections.

**Ground Two**

Hand contends that the admission at his trial of certain character and "other acts" evidence violated Ohio Evid. Rule 404(b), as well as his constitutional rights to due process, a fair trial, and a reliable determination of his guilt.  Hand also contends that the trial court erred in failing to give a limiting instruction to the jury about this evidence. Hand raised this claim as his second proposition of law on direct appeal, citing five separate incidents involving "other acts" evidence:

(1) **The State's closing argument.**  Hand's accountant, Allen Peterson,

prepared Hand's business income tax returns for his radiator business. Over Hand's

objection, Peterson testified for the state that Hand's business had sustained losses

before it was finally closed. Hand's business tax returns were also admitted over

Hand's objection, and the trial court granted Hand's request for a limiting instruction

regarding the returns. (Trial Trans. Vol. 10 at 1462) The trial court instructed the jury

that "... exhibits that were admitted, being the tax returns from yesterday, those are

admitted solely for showing a motive. They are not to be construed by [sic] in any other

way, for any other purpose, such as how record keeping may have taken place, strictly

on that sole issue." (Trial Trans. Vol. 11 at 1470) Later in the trial, Hand testified in his

own defense and said that he had paid Welch and Adams (Welch's cousin) "under the

table" to avoid withholding taxes. Hand also admitted that he had not filed a personal

tax return for at least 15 years.

The prosecutor's closing argument included the following comments:

> And did you catch his statement * * * about he and his father
> like to save on their taxes by paying employees under the
> table in cash? We all know that tax avoidance is common in
> this country, but what he calls saving on taxes is actually
> fraud. The fact that he so breezily engaged in that kind of
> behavior * * * *tells us much about his respect for the law and
> his willingness to lie and deceive.* This wasn't just a
> rinky-dink, every once in a while practice, that the defendant
> engaged in during the slow season of his business. Exhibit
> 275, prepared by Detective Otto, indicates that the
> defendant billed more than one hundred thousand dollars
> fraudulently to his own business on his own credit cards.
> *This was fraud on a massive scale, and it exemplifies the
> way in which this man operates.*

State v. Hand, 107 Ohio St.3d at 397 (emphasis in original). The Supreme Court held

that most of the prosecutor's statements were "fair comment" on Hand's credibility, but

that the statement that Hand committed "fraud on a massive scale" was an overly broad and improper comment on his character.  Nevertheless, as there had been no objection to these comments at trial, the Supreme Court reviewed only for plain error and found none, "in view of the overwhelming evidence of Hand's guilt."  Id. at 398.

(2)  **Hand's reaction to his wives' deaths.**  The state presented testimony from Sam Womeldorf, a retired Columbus homicide detective who initially investigated the deaths of Donna and Lori Hand.  Over Hand's objection that Womeldorf was offering an improper opinion testimony, he described Hand's demeanor when Hand was told about Lori's death, stating that Hand "wasn't crying; there were no tears."  The Supreme Court found the testimony satisfied the requirements for a lay opinion; Womeldorf had personally observed Hand, and the "lack of grief was relevant in showing Hand's strange reaction after learning that Lori had been killed."  Id. at 398.  The court also rejected Hand's contention that Abel Gonzalez, Hand's son-in-law, should not have been permitted to testify that after Jill's death, Hand did not show remorse.  Gonzalez described Hand's demeanor as "just a matter of fact.  It was more like just a business conversation, let's say."  Gonzalez testified that he "can't say [Hand] was sad; no."  The Supreme Court noted that Hand's emotions were of "questionable relevance."  But no objection had been made to Gonzalez's testimony, and the court found no plain error in its admission.  Id. at 399.

3.  **Sex-related testimony**.  Detective Womeldorf testified that Hand had described himself during an interview as "... a horny old man" and that Hand "wanted sex at least once a night and [Lori] didn't want to do that."  Id. at 399.  The court found

the testimony was relevant to Hand's possible motive for Lori's murder. Barbara McKinney testified that Hand had come to her house frequently over the years to pick up Welch, and that Hand "had an infatuation, I guess, for my youngest daughter." The court found this non-responsive remark was harmless, noting that it had not been repeated.

4. **Hand's interest in "true crime" stories**. William Bowe, Hand's childhood friend, testified that when they were young, Hand like to read "perfect crime" stories. While noting the marginal relevance of such testimony, there had been no objection and the court held its admission was not plain error.

5. **Hand's obsession with money and his treatment of his father**. Bowe had previously worked for Hand for about ten years, when Hand and his father owned the radiator business together. Bowe testified that Hand had an argument or disagreement of some sort with his father, after which Bowe heard Hand tell his father he had "three days to move out of here." When Hand's father left, Bowe left with him and worked for the father's business. The Supreme Court found this testimony of "highly questionable relevance" but due to a lack of a contemporaneous objection, held its admission did not constitute plain error. Bowe's testimony that Hand had always wanted to make a lot of money, and that "his quest in life is money," was admissible as a lay opinion and was relevant to Hand's financial motives. Id. at 400-401.

6. **Lack of limiting instruction**. Hand also argued that the trial court erred in failing to give a limiting instruction with respect to all of this "other acts" evidence. The Supreme Court noted that the trial court granted Hand's request for a limiting instruction

-33-

regarding the tax returns.  But Hand did not ask for additional limiting instructions, and the failure to provide them did not rise to the level of plain error.  The court also found nothing in the record suggesting that the jury used any of this evidence to convict Hand "on the theory that he was a bad person."  State v. Hand, 107 Ohio St.3d at 401.

The Magistrate Judge recommended that this claim be denied because Hand did not fairly present a federal constitutional argument on these issues to the Ohio Supreme Court on direct appeal.  He notes that Hand's brief made only cursory references to "due process" or to the constitution, and his arguments were framed by and presented under state law.  The Magistrate Judge correctly described Hand's direct appeal brief.  Proposition of Law No. 2 alleged: "The introduction and admission of prejudicial and improper character and other acts evidence and the failure of the trial court to properly limit the use of the other acts evidence denied Gerald Hand his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the United States Constitution, Amends. V, VI, VII and XIV; Ohio Const. Art. I, §§ 10 and 16."  (Apx. Vol. 6 at 279)   Section 2 of the discussion contains Hand's arguments on admissibility of other acts evidence; it spans three paragraphs and cites Ohio case law, Ohio Evid. Rule 404(A) and (B), and R.C. 2945.59.  In Section 5, Hand addressed the trial court's failure to give additional limiting instructions and cited only Ohio cases.  Section 6 addressed harmless error and cited one federal case,  Chapman v. California, 386 U.S. 18 (1967).  The conclusion section generally asserted that he was denied a fair trial in violation of the Fourteenth Amendment's Due Process clause.  (Apx. Vol. 6 at 285)

Hand objects, contending that his brief expressly argued that his fair trial and due

-34-

process rights "as guaranteed by the United States Constitution" had been violated. He contends that the Ohio Supreme Court's failure to address the federal claims should not result in a default. Hand cites <u>Carter v. Bell</u>, 218 F.3d 581 (6th Cir. 2000), a habeas case (arising pre-AEDPA) in which the petitioner contended that Tennessee's statutory definition of aggravating circumstances was unconstitutionally vague and violated the Eighth Amendment. The district court found the federal claim was defaulted because it was not presented to the state court. The Sixth Circuit disagreed because Carter's post-conviction petition (which he filed pro se) argued that the

> ... entire statute failed to genuinely narrow the class of death-eligible murders. Even if we agreed with the district court that such allegations were 'bald' or 'general,' we find that they are substantively the same claim as that made to us. We do not require word-for-word replication of the state claim in the habeas corpus petition in order to address the merits therein, only that the petitioner 'fairly present' the substance of each of his federal constitutional claims to the state courts. ... A petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns.

<u>Id</u>. at 606-607 (internal citations omitted).

In a later case, the Sixth Circuit reiterated these principles:

> Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts. A claim may only be considered 'fairly presented' if the petitioner asserted both a factual and legal basis for his claim in state court. ... Although general allegations of the denial of a 'fair trial' or 'due process' have been held insufficient to 'fairly present' federal constitutional claims, ... a petitioner need not recite 'book and verse on the federal constitution.' A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon

-35-

> state cases employing federal constitutional analysis; (3)
> phrasing the claim in terms of constitutional law or in terms
> sufficiently particular to allege a denial of a specific
> constitutional right; or (4) alleging facts well within the
> mainstream of constitutional law.

Newton v. Million, 349 F.3d 873, 877 (6th Cir. 2003)(internal citations omitted).   There,

the court rejected the state's argument that the petitioner failed to fairly present  his

federal due process claim to the state court.  He had requested his trial court to instruct

the jury about his right to defend himself against two aggressors, and not limit the

instruction to the one individual of whose murder the petitioner was charged and

convicted.  He argued that the evidence at trial supported his claim that both individuals

attacked him and he acted to defend himself from both of them.  His state appeal brief

had included a detailed recitation of the facts adduced at trial and argued that the failure

to instruct the jury violated his right to due process of law under the Fifth and Fourteenth

Amendments.  The Sixth Circuit found that this was sufficient to present his claim and

avoid default.

　　　　In contrast, in McMeans v. Brigano, 228 F.3d 674 (6th Cir. 2000), the court found

that the petitioner (charged and convicted of rape) did not fairly present his federal

Confrontation Clause claim raised in his habeas petition to the state court in his direct

appeal.  The issue was the trial court's limitation on questioning his accuser about her

subsequent rape accusations against other men.  On direct appeal, he argued that the

limitation violated his "... right to a fair trial, and to due process of law as guaranteed by

the Fifth and Fourteenth Amendments to the U.S. Constitution ...".  Id. at 678.   The

Sixth Circuit affirmed the district court's conclusion that he failed to fairly present a

Confrontation Clause claim:

> In his direct appeal, the petitioner focused entirely on the
> applicability of Ohio's rape shield law, Ohio Rev. Code Ann.
> §2907.02.  He did not cite any federal precedent and his
> appellate brief only alleges that the trial judge's limitation on
> cross-examination denied him a "fair trial" and "due
> process."  As this court recognized in *Franklin [v. Rose, 811
> F.2d 322 (6th Cir. 1987)]*, this is not sufficient to alert a state
> court that an appellant is asserting the violation of a specific
> constitutional right.  While it is true that a few of the state
> cases cited by the petitioner on direct appeal contain
> references to the Confrontation Clause, the majority of those
> cases were concerned with Ohio evidence law.  We do not
> think that a few brief references to the Confrontation Clause
> in isolated cases is enough to put state courts on notice that
> such a claim had been asserted. Thus, we hold that the
> petitioner failed to "fairly present" his Confrontation Clause
> claim to the Ohio courts.

Id. at 682.

The Court reaches the same conclusion with respect to Hand's claim.  Hand

argued in state court that the admission of the challenged testimony created a

reasonable probability that the jury convicted him because of his bad character, or that

"he was the type of person who could have committed" the murders.  (Apx Vol. 6 at 284)

While his Proposition of Law cited "fair trial" and "due process" rights, as well as the 5th,

6th, 7th and 14th Amendments, no constitutional analysis under any of these

amendments was included in the brief.  And in this Court's opinion, the five incidents of

which Hand complains do not, individually or collectively, clearly fall within "the

mainstream of constitutional law" regarding due process or fair trial rights.  As the

Magistrate Judge observed, the substance of this claim was presented, argued, and

addressed by the Ohio Supreme Court under Ohio evidence law and not as a federal

constitutional violation.

But even if the reference to the federal amendments in the Proposition itself was

enough to present and preserve a due process or fair trial challenge, Hand has failed to show how these five instances actually deprived him of due process or the presumption of innocence.  The five incidents about which Hand complains - the prosecutor's comment about the way he operates, Wolmendorf's description of Hand's demeanor, his own admission to police that he was a "horny old man," his childhood interest in "true crime" stories, and the description of his dispute with his father - were all brief statements or passing  comments in a lengthy trial in which over 75 state witnesses appeared.  Moreover, as the Magistrate Judge notes, Hand did not object to most of this testimony, resulting in plain error review by the Supreme Court, which is another basis upon which to find the claim defaulted.  Where he did object (to Wolmendorf's description of his demeanor), the trial court properly admitted it as a lay opinion.  This Court would conclude that no due process violation resulted from an experienced detective testifying to his firsthand observations of Hand's demeanor upon learning that his wife had been murdered.  The Court would also conclude that none of the other incidents raised in this claim are the sort of evidence that, either individually or collectively, seriously impugned the fundamental fairness of the proceedings or denied Hand due process or a fair trial.

With regard to the failure to give limiting instructions on any of the five incidents he raises in this ground for relief, Hand cites Mackey v. Russell, 148 Fed. Appx. 355 (6th Cir. 2005)(unpublished) in his petition.  There, the Sixth Circuit affirmed the grant of habeas relief based upon ineffective assistance of counsel due, in part, to counsel's failure to request a limiting instruction.  At petitioner's murder trial, the state court allowed the state to cross-examine his girlfriend about his prior bad acts, in order to

impeach her testimony that he was not a jealous or violent person. On appeal, the state court found no error in permitting the questioning under Ohio's evidence rules, and the Sixth Circuit held that "[t]his reasonable conclusion evinces no constitutional error." Id. at 361. However, the court of appeals also concluded that trial counsel was ineffective in failing to request a limiting instruction about the testimony, admitted under Rule 404(A)(3) to attack the girlfriend's character for truthfulness or motive. The facts of that case and the nature of the disputed testimony differ substantially from the testimony at issue in this ground for relief. The petitioner, Mackey, and his girlfriend had a verbal altercation with an off-duty police officer in a bar. They left the bar to avoid any further confrontation, but they claimed that the officer and his friend followed them out and that the officer drew his gun; Mackey then drew his own gun and shot and killed the officer. Mackey was charged with murder and asserted that he acted in self-defense, because the officer drew his gun first. The only two witnesses were Mackey's girlfriend and the deceased's friend, neither of whom was able to testify with certainty which gun was drawn first. The Sixth Circuit noted that the entire case revolved around the jury's evaluation of credibility of both Mackey and his girlfriend. It found that counsel's failure to request a limiting instruction on the girlfriend's testimony combined with his failure to object (1) to the state's evidence about Mackey's extensive gun ownership, (2) to the prosecutor's questions to Mackey about his post-arrest silence, and (3) to the prosecutor's unchallenged and unsupported assertion to the jury that the deceased officer was "legally permitted" to carry his gun into the bar that evening, all resulted in substantial prejudice to Mackey's defense:

> It should be noted that cases such as this one, where there

are no witnesses and no physical evidence that would cast
any light upon the central question in the case, are rare. ...
[W]here a case is as close as Mackey's was, with so little
evidence, the teaching of *Strickland*, that counsel's
effectiveness must be evaluated in light of the 'totality of the
evidence,' means that we ... must scrutinize more closely
than usual the cumulative effects of such errors such as
those made here.

Id. at 370.

Here, in contrast, the five incidents Hand cites, when considered within the

totality of the evidence presented at Hand's trial, are not the sort of damaging and

prejudicial testimony that was involved in Mackey.  The Court concludes that the lack of

a limiting instruction on any of the challenged testimony did not render Hand's trial

fundamentally unfair or deprive him of due process.

For all of these reasons, the Court agrees with the Magistrate Judge's conclusion

that Hand failed to fairly present this federal claim to the Ohio court.  Alternatively, even

if he did, the Court would deny this ground for relief on the merits.

**Ground Three**

Hand contends in his third ground for relief that the state failed to disclose

exculpatory material it was required to disclose under Brady v. Maryland, 373 U.S. 83

(1963).  This claim arose from an episode of a cable television program called

"American Justice," broadcast in July 2004, after Hand's trial and while his direct appeal

was pending.  That episode, entitled "The Black Widower," was about Hand and the

murders of his wives.  The program apparently alluded to the fact that, sometime before

Jill's death, the Columbus Police Department had re-opened a "cold case" investigation

into the deaths of Donna and Lori.  This claim was raised in Hand's post-conviction

-40-

petition; it was denied by the state trial court on res judicata grounds and because the claim was not supported by the record that Hand submitted.  The Ohio Court of Appeals affirmed solely on res judicata grounds:

> Constitutional error results when the State withholds material evidence favorable to the defendant if it is reasonably probable the evidence would lead to a different result in the proceeding.  *United States v. Bagley*, 473 U.S. 667, 682 (1985).  Again, appellant's claim of a violation of his due process rights is barred by the doctrine of res judicata, if nothing precluded him from directly appealing the issue.
>
> Upon review, the files of the Columbus Police Department were turned over to appellant's counsel, and appellant had access to the information.  Further, the issue was cognizable and reviewable on direct appeal, therefore, precluded by res judicata.

State v. Hand, 5th Dist. No. 05CAA060040, 2006-Ohio-2028, at ¶¶ 48-49.

The Magistrate Judge concluded that the state courts misapplied Ohio's res judicata doctrine, because Hand specifically asserted that he did not know about the existence of this "cold case" investigation until the television episode aired in July 2004, which was one year after he filed his direct appeal.  Because the state courts incorrectly applied a procedural bar, the Magistrate Judge reviewed its merits.  This Court agrees with and adopts the Magistrate Judge's analysis and conclusions with respect to the application of res judicata  (See Doc. 101 at 60-62), and will also review the merits of Hand's claim.[3]

The Magistrate Judge granted Hand leave to conduct discovery on this issue,

_____

[3] The Magistrate Judge further noted that when a state court does not address the merits, the habeas court conducts an independent review which "is not a full, de novo review" but a deferential one, in keeping with AEDPA's requirements.  Doc. 101 at 35-36.

including the deposition of Detective Graul of the Columbus Police Department. Hand submitted several deposition transcripts prior to the evidentiary hearing, but did not file depositions of anyone from the Columbus Police Department involved with the "cold case" investigation. As the Magistrate Judge observed, "... this Court has given Mr. Hand every opportunity to learn what he didn't know with respect to his <u>Brady</u> claim, [but] he has failed to provide this Court with any facts to support his claim." (Doc. 101 at 63) The record does not show what the allegedly withheld evidence may have been, or how the lack of that evidence would have caused Hand any actual prejudice. The Magistrate Judge therefore recommended that this claim be denied.

Hand objects, arguing that he specifically described the exculpatory evidence: the contents of the CPD's cold-case investigation file. He suggests that its contents would point to "alternative suspects and/or theories" about the murders that would clearly be exculpatory. And he contends that he was actually prejudiced by the file's nondisclosure. He notes that the state's case rested on its theory of a Hand-Welch conspiracy, and any different theory that may have been investigated by the police would undercut the existence of a conspiracy, and would demonstrate a reasonable probability of a different result at trial. Detective Graul did not testify at his criminal trial, and nothing about the "cold case" investigation or its existence was disclosed before 2004. He further suggests that it would be manifestly unjust to give the state the benefit of the uncertainty created by the failure to disclose the investigative file, even if the reason for nondisclosure was simple negligence.

Hand does not respond to the Magistrate Judge's straightforward observation that he was granted leave to take discovery and to depose Detective Graul, but that he

has failed to proffer any facts that the deposition or his discovery efforts uncovered. As the Magistrate Judge aptly notes in his supplemental report, "simply describing a file does not prove its contents or that they would have been exculpatory." (Doc. 111 at 12) This Court cannot grant habeas relief based simply on Hand's speculation that "something" in the file "might" have suggested the possibility of an alternate suspect or theory about the murders that might have led to exculpatory evidence that might have led to a different result at trial. Ground Three of his petition is therefore denied.

**Ground Four**

In this ground for relief, Hand raises a number of sub-claims of ineffective assistance of trial counsel during the guilt phase of his trial.

**(A)  Failure to object to testimony from Hand's bankruptcy attorney that was protected by attorney-client privilege**. This issue was first raised in Hand's application to reopen his direct appeal filed in September 2007, where Hand was represented by his federal habeas counsel. The Ohio Supreme Court denied that application because it was not timely filed. The Magistrate Judge concluded this sub-claim is procedurally defaulted because it should have been, and was not, raised on direct appeal. Ohio's res judicata doctrine requires a claim to be raised at the first opportunity or it is waived. This doctrine is clearly recognized as an adequate and independent state ground upon which to find a habeas claim defaulted. And there is little doubt that the Ohio courts would enforce this rule, as it did so with several other claims that Hand raised for the first time in his post-conviction petition.

The Magistrate Judge also rejected Hand's argument that he established cause

-43-

for the default and actual prejudice resulting from a constitutional error.  Procedural default may be excused by such a showing, or by a demonstration that the failure to review the claim will result in a fundamental miscarriage of justice.  <u>Coleman v. Thompson</u>, 501 U.S. 722, 749 (1991).  Hand contends that he was represented by the state public defender's office on direct appeal and for his post-conviction proceedings.  But the public defender did not represent him at trial, and no conflict prevented his new appellate lawyers from raising any claim of ineffective assistance of trial counsel in his direct appeal.  The fact that the public defender's office also represented him in post-conviction proceedings does not affect that conclusion.

He also contends that he has shown cause for the default based on ineffective assistance of appellate counsel.  Because his appellate lawyers were all from the public defender's office, Hand argues that his earliest opportunity to raise an appellate counsel claim was in his untimely petition to reopen his direct appeal.  He suggests that his testimony about the advice he received from his bankruptcy lawyer, which was elicited by the state during Hand's cross-examination, was not only prejudicial, it was "devastating" because it strengthened the state's argument that Hand had a financial motive to kill Jill.

As discussed below with respect to sub-claim (B) of Hand's Eleventh Ground for relief, Hand's ineffective assistance of appellate counsel sub-claim regarding this issue is procedurally defaulted.  The Ohio Supreme Court summarily rejected Hand's 2007 motion to reopen his direct appeal which included this sub-claim because his motion was untimely.  Hand's ineffective appellate counsel claim is therefore itself defaulted, and it cannot serve as good cause for his admittedly defaulted ineffective assistance of

-44-

**trial** counsel sub-claim.

Moreover, even if the claim is not defaulted, the testimony at issue concerned State Exhibit 70, a letter from a local bankruptcy law firm addressed to Hand to confirm an appointment at the firm.  Earlier in the trial, the judge read the parties' stipulation about that letter to the jury: "If called [as a witness], a records custodian of the law firm Semons and Semons would testify that the appointment book for their law firm would indicate an appointment for the defendant regarding bankruptcy issues for May 19th, 2001, and that the defendant did not keep this appointment, but re-scheduled it.  The witness would further testify that the defendant never kept the appointment and did not consult with any attorney in the law firm."  (Trial Trans. Vol. 11 at 1470-1471)   Later on, during his direct testimony in his defense case, Hand explained that Jill Hand was upset when she learned about the fact that he had a very large credit card debt, and that they had worked out a plan to reduce his debt.  He testified that "... some of [the plan] consisted of a bill consolidation, Chapter 13, or something, ... where they consolidate it, make an agreement, lower your payment, lower what you owe them, and then pay it off in a so many year program.  We was going to file bankruptcy; I was going to file bankruptcy by myself on all these bills."  (Trial Trans. Vol. 19 at 3471)   He said that he was not concerned about filing for bankruptcy, because he did not have anything to protect, and Jill owned her own home and his creditors could not touch her assets.  (Id. at 3472)   Hand's lawyer questioned him how the idea of bankruptcy first came to him, asking "... was that something you talked to about with anybody?"  Hand responded that he talked to several people about bill consolidation, to stop creditors from calling him at home; he also admitted that his name and phone number were "in the book" at the law

firm.  (Id. at 3475)  Then on cross-examination, Hand was asked about the letter from the bankruptcy law firm.  Hand remembered going to an appointment, and said he had talked to a lawyer on two occasions.  The prosecutor asked if that lawyer told him that he could not eliminate his debt through bankruptcy, and Hand answered: "He did not say that; no, sir.  He just told me what he wanted - that he wanted W-2 forms from me, since I wasn't including Jill in the bankruptcy."  (Id. at 3531)  Hand also testified that he never actually filed a bankruptcy petition.

Hand voluntarily disclosed the fact that he had contemplated filing for bankruptcy protection, and the letter from the law firm was admitted by stipulation.  Moreover, the Court doubts that his testimony describing what the lawyer told him about the kind of documents needed in order to prepare a bankruptcy petition revealed privileged information.  This Court would conclude that this brief testimony did not prejudice Hand's defense or result in a fundamentally unfair trial, even if Hand could overcome his default of this sub-claim.

**(B)  Failure to adequately question potential jurors about pretrial publicity**. Hand contends that his trial counsel failed to adequately question two jurors about their exposure to pre-trial publicity.  This sub-claim was not raised on direct appeal, but was raised in Hand's post-conviction petition.  The trial court found it was barred by res judicata, and the Ohio Court of Appeals affirmed because Hand did not offer "... any new evidence outside the record, precluding the application of res judicata.  We note the record on direct appeal was supplemented with the jury questionnaires which [Hand] asserts merit review under post conviction relief herein."  State v. Hand, 2006- Ohio-

2028 at ¶ 33.[4]

Hand contends he can establish cause for this default, based on his appellate counsel's failure to amend his direct appeal merit brief to specifically present this sub-claim. This sub-claim is related to sub-parts (E) and (F) of Hand's ineffective assistance of appellate counsel claims (raised in his Eleventh Ground for Relief), and the Magistrate Judge concluded that those sub-claims were not defaulted. Because ineffective assistance of appellate counsel can serve as good cause to excuse a procedural default, the Magistrate Judge addressed whether Hand was prejudiced by appellate counsel's failure to raise this issue on appeal. If not, then Hand has not shown that he can avoid the procedural bar of the state court's application of res judicata. In order to do so, Hand must establish that his trial counsel was deficient in failing to specifically question the two jurors about their responses to the juror questionnaires indicating that they had seen some pre-trial publicity, and that he was actually prejudiced by that failure (and thus by his appellate lawyer's failure to appeal the issue). After reviewing the record, the Magistrate Judge found that Hand has not satisfied that burden.

The juror questionnaires asked the prospective jurors if they had seen or heard anything about the case, and if so, "What impression did [the article] leave in your mind?" Ms. Ray responded that she had seen a local newspaper article in April 2003 that left her "wondering." (Apx. Vol. 10 at 213) She also stated that despite the article,

---

[4] The record reflects the fact that the Ohio Supreme Court granted Hand's unopposed motion to unseal the questionnaires and to supplement the direct appeal record on April 19, 2004. (Apx. Vol. 6 at 57) Hand's merit brief was filed on May 3, 2004. (Id. at 245-386)

she had no opinion on whether Hand was guilty, that she could put the article out of her mind, and could follow the court's instructions.  She reported that she believed in the death penalty but thought it was not appropriate for most murder cases.  Id. at 215.  Hand's counsel did not directly question Ms. Ray about her questionnaire response in voir dire.

Juror Finamore stated in her questionnaire that she had seen articles and news reports about the case two or three times, which left her with the impression that Hand was probably involved in the murder, and was guilty.  She also stated that she would be able to put that information out of her mind, and base a decision on the evidence and the court's instructions.  She responded that she would have no trouble following the instruction to avoid news media during the trial.  Answering a question about the death penalty, she stated that life in prison was a greater punishment than the death penalty in some cases, and that the death penalty was not appropriate for most murder cases.  She was not directly questioned during voir dire about her responses concerning the articles and news reports.

The trial court conducted voir dire by posing initial questions to small groups of potential jurors, excusing jurors who would face financial hardships or would not be available for the projected length of the trial, and then considering challenges for cause within the small group.  In the initial questioning of the small group of seven that included Ray and Finamore, the trial court asked a few preliminary questions, and then asked if anyone in the group had any changes to their responses to the written questionnaires; all seven answered in the negative.  (Trial Trans. Vol. 4 at 301-305)  The judge reminded the group that any verdict must be based on evidence presented in

-48-

the courtroom, and "not on the basis of what you may have read, heard or seen in the
news media. Is there anything that you may have read, heard or seen that caused you
to form an opinion as to the defendant's guilt or innocence that you could not put
aside?" (Id. at 306) All jurors responded negatively; and the court asked again, "Any of
you?" and again there were no responses. The court asked, "So were you all able to
put aside anything you saw, heard or read in the media and decide this case strictly on
evidence that's presented within the walls of this courtroom?" (All answered in the
affirmative.) "Does anybody have any concerns about that?" There were no responses.
"No, all right. I'm sure none of you want to reach a significant and important decision in
your lives based on something you might have seen in the news, is that fair?" All of the
jurors answered yes. (Id. at 306-307)

Hand's counsel then asked Ms. Ray if she would be able to consider a verdict
other than death; she replied "Yes, you know, if it leaned that way. It depends on the
evidence, the law that is presented." She said that the state would have to prove that
the sentence was appropriate. (Id. at 320) Defense counsel then asked the group
about the "eye for an eye" adage, and Ms. Ray said she did not believe in that,
explaining that "I believe in the New Testament and not the Old." Ms. Finamore
responded that she agreed "to a certain extent, but again, you hear about turning the
other cheek also. I don't necessarily think that if someone kills a person, their life
should be taken. I don't think it's an automatic death penalty." (Id. at 322) Finamore
felt the same way about someone who committed more than one murder. (Id. at 323)
The prosecutor also asked Ms. Finamore about her feelings about the death penalty,
noting that she wrote in her questionnaire, "I see more shades of gray rather than black

and white."  She explained: "I would want to be absolutely certain.  I mean, I don't know the details of the situation, but I believe it was in Illinois that recently everybody was taken off death row because they have found that there were people on death row that were not guilty and that kind of thing bothers me some.  I would not want to sentence someone to death and find out later that they were innocent."  (Id. at 331)  She said she understood the law and that the death penalty is appropriate in many situations, but she would want to be "firmly convinced."  (Id. at 332)  The prosecutor then asked the entire group of seven, "I take it nobody has any views on the pre-trial publicity questions from yesterday that cause you any trouble?  You don't have any particular views that apply in this group of seven based on things you've heard?"  All of the group, including Finamore and Ray, answered no.  (Id. at 323-324)

The Magistrate Judge concluded that Hand has not shown actual prejudice resulting from his trial counsel's failure to further question Ray or Finamore about publicity.  With regard to Ms. Ray, her exposure to publicity was minimal and she said that it left her "wondering" about the case.  Her other responses to both the questionnaire and to the voir dire questions were clear: she believed she was able to put that article out of her mind and to follow the court's instructions.  Moreover, she may have been a very favorable juror, given her responses to questions about the death penalty and her rather firm rejection of the "eye for an eye" adage.  Ms. Finamore's questionnaire answers raised a greater concern than Ms. Ray's, especially her comment that the media stories she had seen led her to think that Hand was guilty.  Despite that statement, the Magistrate Judge concluded that she had been rehabilitated during voir dire.  She repeatedly affirmed that she would be able to put all of her initial

impressions and exposure to publicity out of her mind, and would follow the court's instructions. And like Ms. Ray, many of her responses, particularly regarding the death penalty, strongly suggested she would be a favorable juror. For example, she stated that even if a defendant killed more than one person, the death penalty would not be automatic in her mind, and that any sentence would depend upon the evidence presented.

Hand objects to the Magistrate Judge's conclusion, arguing that he did not understand the legal basis of this sub-claim, which Hand contends is ineffective assistance of counsel, not a "biased jury" claim: "Hand does not claim, as the Magistrate [Judge] implies, that his jury was not fair and impartial or comprised of a fair cross-section of his peers, but instead faults his attorneys for not adequately questioning Jurors Ray and Finamore to determine whether they should be the subject of peremptory challenges." (Doc. 108 at 11) Hand cites Quintero v. Bell, 256 F.3d 409, 414 (6th Cir. 2001), affirming the grant of habeas relief due to trial counsel's failure to adequately examine potential jurors. The petitioner in that case escaped from prison with a group of several other prisoners. He was eventually caught and tried on the charges. Seven of his trial jurors had served on the jury that two months earlier had convicted one of his fellow escapees. His trial counsel did not object to the presence of these jurors, and there were no questions asked during voir dire about the jurors' ability to serve due to their exposure to the prior trial. The state courts found that his claims of a biased jury and ineffective assistance of counsel were procedurally defaulted. The federal district court granted his habeas petition and the Sixth Circuit affirmed, noting that the case raised two prejudice inquiries: prejudice resulting from the tainted jury, and

prejudice caused by ineffective assistance of counsel. The court concluded that the tainted jury was itself a Sixth Amendment violation that rose to the level of structural error. And the court found good cause to excuse the procedural default of that claim, due to the ineffective assistance of petitioner's trial counsel in failing to question or challenge in any way the seating of those jurors. Despite the petitioner's admission at his trial that he had escaped from prison (which the state argued established that no prejudice resulted), the court concluded that including the jurors who participated in the previous case undermined the fundamental fairness of petitioner's entire trial.

The facts at issue here do not come close to structural error, much less a Sixth Amendment violation. Indeed, Hand admits that he is **not** claiming that his jury was biased or lacked impartiality; nevertheless, he contends that he has shown actual prejudice because his trial counsel should have questioned the two jurors more extensively. To be entitled to habeas relief on this claim, Hand must demonstrate that he was actually prejudiced by counsel's failure to ask more questions, not simply raise the possibility that additional questions might have elicited additional or different responses than those the jurors gave to the court's questions. Moreover, as the Magistrate Judge noted, these jurors gave very favorable responses to issues concerning the applicability of the death penalty.

Given the extent of the voir dire that was actually conducted of these two jurors and of the small group they were questioned with, the Court must conclude that Hand has not shown that he was actually prejudiced by trial counsel's failure to further question these jurors, or by appellate counsel's failure to amend his direct appeal brief to specifically raise this sub-claim. Therefore, as the Magistrate Judge concluded, Hand

has not satisfied the cause-and-prejudice requirements that would excuse his

procedural default of this ineffective assistance of trial counsel sub-claim.

   **(C)  Counsel's failure to move for a change of venue and to exercise all**

**available peremptory challenges**.  Based on the pre-trial publicity about his case,

Hand alleges that trial counsel should have sought a change of venue, and should have

exercised all of his allotted peremptory challenges in order to move for a change of

venue.  Respondent argues that this claim is procedurally defaulted; Hand raised the

claim in his post-conviction petition, and the state court held it was barred by res

judicata.  The Magistrate Judge agreed, finding that the state court properly applied res

judicata.  In his post-evidentiary hearing brief filed in this case, Hand argued that

ineffective assistance of appellate counsel excuses his default.  The Magistrate Judge

rejected that contention due to the lack of argument and evidence with respect to this

sub-claim.  (See Doc. 101 at 80-82)

   In his objections, Hand asserts that he properly presented this sub-claim in his

post-conviction petition because he submitted evidence outside the trial record, thereby

precluding application of Ohio's res judicata doctrine.[5]  In rejecting Hand's post-

conviction petition, the Ohio Court of Appeals held:

> Claim One challenges the jury venire.  Appellant argues the
> trial court should have made further inquiry of the jury
> concerning the effects of pretrial publicity.  Upon review,
> appellant was not precluded from directly appealing the
> issue, as the issue could be determined by reviewing the voir
> dire transcript.  The record clearly demonstrates the trial
> court discussed the pretrial publicity during voir dire and

---

[5] Exhibit 1 to the post-conviction petition (Apx. Vol. 10 at 113-204) is a collection
of pre-trial newspaper articles about the murders and Hand's indictment.

> discussed the same with the jurors.  Appellant's attachment
> of exhibits demonstrating pre-trial publicity to the post-
> conviction relief petition, though admittedly outside the
> original trial record, merely supplements appellant's
> argument which was capable of review on direct appeal on
> the then extant record.  Accordingly, we agree with the trial
> court [that] res judicata applies.

State v. Hand, 2006-Ohio-2028, at ¶ 23.  The court of appeals also rejected Hand's

second and third claims, the third mirroring this habeas claim alleging ineffective

assistance of trial counsel for failing to move for change of venue and to exhaust

peremptory challenges.  The court of appeals court held: "We find the claims presented

were cognizable and capable of review on direct appeal.  Appellant does not offer any

new evidence outside the record precluding the application of res judicata."  Id. at ¶ 33.

Hand does not identify what evidence outside the record he presented, other

than the series of newspaper articles that the court of appeals expressly rejected as

sufficient to overcome the res judicata bar.  These articles were all available to Hand at

the time of trial, along with the jury questionnaires which clearly established the fact that

extensive publicity had occurred.  This issue should have been raised on direct appeal.

This Court agrees with the Magistrate Judge that Hand has not established a basis

upon which to overcome the procedural default on this issue, and therefore this sub-

claim is rejected.

**(D)  Hand's report to his lawyer about the escape attempt.**  Hand contends

that while he was held at the Delaware County jail before trial, he told his attorneys

about the plan by Beverly and several other inmates to escape from the jail.  He argues

that his lawyers were ineffective because they failed to disclose his report to the

authorities, arguing that if they had done so, it would have supported his claim at trial

that he did not participate in the escape plan.  He also suggests that if this information

had been revealed before trial, the jury could not have been instructed to consider his

participation as evidence of his consciousness of guilt of the murders.  Hand raised this

sub-claim as Claim 11 in his amended post-conviction petition (Apx. Vol. 11 at 9-11),

supported by Hand's affidavit describing a conversation he had with his attorneys, in

which they advised him to stay away from Beverly and not participate in any escape

plans.  (Id. at 15-16)  The court of appeals found this sub-claim was barred by res

judicata: "The record clearly demonstrates appellant himself testified at trial as to his

statements to counsel; therefore, appellant's claim does not provide new evidence

outside the record and the Supreme Court could have considered the argument on

direct appeal."  State v. Hand, 2006-Ohio-2028, at ¶ 38.

The Magistrate Judge concluded that this claim is defaulted, and that Hand has

not established cause or prejudice to excuse the default.  Hand objects, arguing that his

attorneys did not independently disclose his report until after trial, which he asserts is

itself evidence outside the trial record.  He further argues that if the attorneys had told

the authorities about the escape plan, it "would have effectuated a more reasonable

mitigation strategy" by supporting the argument that Hand would be able to adapt to life

in prison.  (Doc. 108 at 12)

This Court agrees with the Magistrate Judge that this claim is defaulted.  Simply

presenting "additional" evidence in a post-conviction petition is not sufficient to avoid

Ohio's res judicata bar, as was true with respect to sub-claim (C) above.  Hand testified

at trial that he told his attorneys about Beverly's plan to escape.  (Trial Trans. Vol. 19 at

3497)   As the Ohio Court of Appeals explained in rejecting Hand's post-conviction

claim, "... the evidence presented outside the record 'must meet some threshold standard of cogency; otherwise it would be too easy to defeat the res judicata doctrine by simply attaching as exhibits evidence which is only marginally significant and does not advance the petitioner's claim beyond mere hypothesis[.]' " State v. Hand, 2006-Ohio-2028 at ¶ 21 (quoting State v. Lawson, 103 Ohio App.3d 307, 315 (12th Dist.)). Hand's post-conviction affidavit essentially reiterated his own trial testimony. The court of appeals also noted that at trial, Hand denied his involvement in the escape attempt, but that other inmates testified to the opposite. The fact that Hand's attorneys did not tell jail authorities or the prosecutor about Hand's report does not establish that he was actually prejudiced. It is simply speculative to assume that if the information had been disclosed, he would not have been charged and/or convicted of escape, or that he would have received a sentence other than death on the murder charges. This sub-claim is therefore denied.

(E) **Failure to exclude a biased juror**. Hand contends his trial counsel were ineffective in failing to strike Juror Lombardo from the panel. He raised this claim in his direct appeal, and the Ohio Supreme Court rejected it on the merits.

During voir dire, Lombardo revealed that she had learned about the case when she and her husband were at a function at her husband's company (he was an investigator for the Ohio Attorney General's office). She said that her husband was acquainted with Jill Hand, and that they had worked together "on and off for about 12 years. She was with DMV and he was with the Attorney General's Office." (Trial Trans. Vol. 5 at 697) Hand's counsel asked Lombardo about her questionnaire response, stating that she was "not sure" if she had formed any opinions about Hand's guilt or

innocence; he asked if she believed that "Mr. Hand is entitled to a fair and just trial."
(Id.) She responded that "He absolutely is." (Id. at 699) Counsel also asked Lombardo
whether, if the jury found Hand guilty of a premeditated murder with specifications, she
would be able to follow the law and consider a sentence other than death. Lombardo
responded "Yes." (Id. at 700-701) Lombardo also revealed that she "lost a daughter in
the past and I pretty much went through a lot of stuff. I felt very sad, but I really didn't
pursue it. I just really have a yearning to know more about it. Of course, I had feelings
about it, sadness. I would still need to know more about what happened." (Id. at 698)

Hand argued on direct appeal that counsel failed to explore Lombardo's potential
bias based upon her husband's relationship with Jill Hand, and the circumstances
surrounding her daughter's death. The Ohio Supreme Court concluded that the juror's
answers indicated that her husband's position would not influence her as a juror. She
responded that it would not be difficult for her to keep the events of the trial separate
from her relationship with her husband. Noting Lombardo's firm affirmation that Hand
was "absolutely" entitled to a fair trial, the court held that "trial counsel's decision not to
question Juror Lombardo any further about the loss of her daughter, a very personal
issue, was a proper exercise of discretionary judgment." State v. Hand, 107 Ohio St.3d
at 408.

Hand raised a third issue with respect to this juror, her disclosure that about 30
years earlier, she witnessed her employer confront an intruder at her workplace. Her
employer was charged with murder after he shot and killed the intruder. During voir
dire, Lombardo explained that the incident occurred when she was 18 and working in an
auto body shop. A man came into the shop to see her boss, and she could see that the

man was obviously very drunk and angry, and he was carrying a gun. He walked right past her and into the garage area where her boss was working. She heard shouting and gunshots, and she quickly ran out of the shop. She later testified on his behalf at his trial, and the jury acquitted him, finding that he acted in self defense. She stated that her experience would not make it difficult for her to serve as a juror. (Id. at 711-712) Hand's counsel asked her if she believed "... that a person who has been put in danger, or his life is threatened should have the right to defend himself or herself?" and she responded "Yes," stating that was the very situation she dealt with during the incident with her employer, "... it was considered self-defense, is the way the verdict was." (Id. at 727) The Ohio Supreme Court found that these views were favorable to Hand's contention that he killed Welch in self defense. The court rejected Hand's ineffective assistance claim based on the failure to challenge Lombardo for cause or utilize a peremptory challenge to remove her from the panel.

Hand contends that because the state supreme court did not cite or discuss federal law when it rejected this claim, de novo review should apply. The Magistrate Judge concluded that the lack of federal case law in the state court's opinion did not control because the relevant question for habeas review is whether the state court's decision contradicts clearly established federal law. The Magistrate Judge addressed the issue at length, quoting extensively from the voir dire of Lombardo, particularly her statement describing how she learned about Hand's case when attending a social function at her husband's workplace. After discussing that incident as well as the loss of her daughter, Hand's counsel questioned her about the importance of evidence that a murder was premeditated. Lombardo said that was "very important. That has a lot to

do with my thinking on that. ... That's very important to me, whether it will be proven it's premeditated or not or whether ... whether he would maybe do it again.  Those things would be important to me."  (Trial Trans. Vol. 5 at 696-701)  Counsel also asked her how she felt about the fact that the law does not require every premeditated murder to result in the death penalty; she stated "I'm OK with it," and that  she would be able to apply that law to Hand's case.  (Id.)

The Magistrate Judge concluded that there was no indication in any of Lombardo's answers and statements that she was prejudiced against Hand.  She was not personally acquainted with Jill Hand, and her husband's relationship with Jill was at best a professional one.  There was no information provided about the cause of Lombardo's daughter's death, and Hand is simply speculating that her death may have been caused by a criminal act.  While Lombardo witnessed an incident that resulted in a shooting death, Lombardo's responses about that incident were very favorable to Hand's self-defense claim, as she had first-hand knowledge of someone who acted in self defense yet was charged with murder.  Finally, the Magistrate Judge noted Lombardo's favorable responses to questions about Hand's right to a fair trial and the fact that the death penalty was not an automatic outcome for her, even for a premeditated murder.  Her responses to counsel's questions and to those of the trial court gave no indication that she was biased, or that she could not be an impartial juror. The Magistrate Judge therefore concluded that Hand's counsel was not ineffective in failing to challenge this juror for cause or to peremptorily excuse her, and that the state court's decision was not contrary to or an unreasonable application of federal law.

Hand objects, urging the Court to review this sub-claim de novo.  He contends

that the Magistrate Judge failed to address Supreme Court precedent requiring an attorney to "expose potential juror bias," and citing Wainwright v. Witt, 469 U.S. 412 (1985), and Morgan v. Illinois, 504 U.S. 719 (1992). Wainwright clarified the standard by which to determine "... when a prospective juror may be excluded for cause because of his or her views on capital punishment. That standard is whether the juror's view would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " Wainwright, 469 U.S. at 424 (internal citation omitted). There is nothing in her voir dire responses that would suggest that Juror Lombardo should have been excused under this standard. To the contrary, Lombardo stated that the death penalty may not be appropriate even for a pre-meditated murder, a view that does not suggest she would be substantially impaired in performing a juror's duties. Morgan v. Illinois involved the trial court's blanket denial of a defendant's request for voir dire. At the time of defendant's trial, Illinois law required the trial court to conduct the entire voir dire. The court granted the state's motion and questioned the venire if any of them were opposed to the death penalty no matter what the facts might be. But the court denied the defendant's motion to question the jurors whether they would automatically vote to impose the death penalty upon a conviction. The Supreme Court held that defendant's due process rights to a fair and impartial jury were violated by the trial court's refusal to grant defendant's request, because that question could have uncovered prejudicial bias that would not be disclosed by an answer to the state's question.

Here, in contrast, Hand's counsel questioned Juror Lombardo about her knowledge of Jill Hand and the case, and whether or not she could follow the judge's

instructions.  Her answers regarding self-defense and the death penalty were on balance very favorable to Hand.  The entire voir dire record shows that Hand's trial counsel engaged in significant voir dire of this juror, and that her answers to all of the questions put to her did not exhibit bias or prejudice.  Even applying de novo review of this issue, this Court could not conclude that Juror Lombardo was biased or prejudiced against Hand.  For that reason, the Court finds that Hand's counsel was not ineffective in failing to challenge Juror Lombardo for cause or to peremptorily excuse her, and that the Ohio Supreme Court's rejection of this sub-claim was not contrary to nor an unreasonable application of established federal law.

**(F)  Failure to object to Welch's statements to friends and family members as co-conspirator statements.**  This sub-claim is grounded in the facts relating to the first ground for relief, the admission of the testimony from Welch's friends and family members about Welch's statements to them.  On direct appeal, Hand argued that the state failed to prove the existence of a conspiracy, making the statements inadmissible as a co-conspirator's statements pursuant to Ohio Evid. R. 801(D)(2).  The Ohio Supreme Court concluded (as an alternative ground) that Welch's statements to Shannon Welch and David Jordan (Welch's cellmate) were properly admitted under Rule 801(D)(2)(e).[6]  Grimes' testimony provided independent proof of the conspiracy's existence, and Welch's statements to Shannon about needing a gun and murdering Jill, and his statements to Jordan about his involvement, were within the scope of Welch's conspiracy with Hand.  State v. Hand, 107 Ohio St.3d at 395.  Based on this conclusion,

---

[6] The court had already concluded that these statements were properly admitted as Welch's statements against interest under Evid. Rule 804(B)(3).

the Supreme Court rejected this ineffective assistance of counsel claim because Hand suffered no prejudice. Id. at 410. The Magistrate Judge reached the same conclusion.

Hand objects, and incorporates his arguments that the admission of these hearsay statements violated his Confrontation Clause rights, an argument rejected on the merits with respect to Ground One discussed above. This Court agrees with the Ohio Supreme Court and the Magistrate Judge, that Hand has not shown any actual prejudice from counsel's failure to object to the statements that fell within the co-conspirator rule. This sub-claim is therefore denied.

**(G) Failure to object to other "bad acts" evidence**. This subpart of Hand's ineffective assistance claim is related to his Second Ground for Relief, the admission of "other acts" evidence: Hand's reaction to learning of Jill's death; his relationship with his father; his obsession with money; his "horny old man" comment to the investigator and McKinney's reference to his "infatuation" with McKinney's daughter; and the prosecutor's closing argument comments. Hand's counsel did not object to any of this testimony or to the state's closing argument, which Hand contends was ineffective assistance of counsel. The Ohio Supreme Court rejected this claim on direct appeal, relying on its conclusion that Hand was not prejudiced by any of the testimony or by the closing argument. The Magistrate Judge reached the same conclusion, based on his recommendation with respect to Ground Two.

Hand objects, relying on the same arguments he raised in Ground Two to argue that he has established actual prejudice under Strickland. This Court concluded that the admission of the challenged testimony did not violate any of Hand's constitutional rights and that he was not actually prejudiced by the testimony. The Court rejects this sub-

-62-

claim for the same reason, that Hand has not shown actual prejudice resulted from his counsel's failure to object.  This sub-claim is denied.

**(H)  Failure to present self-defense evidence at the hearsay hearing**.  In this sub-claim, Hand contends his trial counsel was ineffective by failing to present evidence during the hearsay evidentiary hearing to support Hand's contention that he shot Welch in self defense.  The Ohio Supreme Court rejected this claim on the merits in Hand's direct appeal.  The court cited Grimes' testimony that Hand claimed he was going to plead self-defense, but later changed his story and told Grimes that he killed Jill and Welch, "...[because] anybody that messed with him would disappear."  After Grimes told Hand that he could be convicted based solely on circumstantial evidence, Hand said "If there's no witnesses, there's no case."  (Trial Trans. Vol 14 at  2254)  The Ohio Supreme Court concluded:

> ... it is highly speculative whether the presentation of additional evidence of self-defense would have made any difference in the trial court's ruling on the admissibility of Welch's statements.  Moreover, it is almost certain that Hand would have had to testify at the hearing in order to raise the issue of self-defense.  The record does not show whether Hand or his counsel made the decision to forgo Hand's testimony during the evidentiary hearing.

State v. Hand, 107 Ohio St.3d at 410-411.  The court found that either of those alternatives would foreclose Hand's argument: it was either Hand's own decision not to testify, or it was his counsel's tactical decision to avoid an early cross-examination by the prosecutor, a decision that the court would not second-guess.[7]

_____

[7] As the Magistrate Judge notes, any testimony of Hand's trial counsel taken during these proceedings that might bear on this question must be disregarded, pursuant to Cullen v. Pinholster.

The only issue before this Court is whether the state court's determination runs afoul of 28 U.S.C. § 2254(d). It does not. If Hand had come forward with some evidence that credibly suggested he shot Welch in self-defense (and he has not identified what that might have been, other than his own testimony), and the trial court had so found, Welch's statements may have been excluded. Alternatively, the subsequent admission of Welch's hearsay statements may have violated some of the Ohio evidence rules discussed in the Supreme Court's decision. But as the Magistrate Judge observed, because none of the statements in question were testimonial statements under Crawford (as discussed in Ground One above), there was no federal constitutional error resulting from their admission. That is, under pre-Crawford law, Welch's statements to family and friends bore sufficient indicia of reliability to be admitted under Ohio v. Roberts; and under Crawford, they were not testimonial and did not implicate the Confrontation Clause.

The Magistrate Judge alternatively concluded that even if the testimony about Welch's statements had been excluded because Hand had come forward with some credible evidence of self-defense during the hearsay hearing, significant probative evidence that was otherwise admitted at trial amply supported Hand's convictions. This includes the evidence and testimony that there were no signs of forced entry at Hand's home; Hand's financial difficulties and the large amount of Jill's life insurance of which Hand was the sole beneficiary; the forensic evidence that contradicted Hand's version of how he shot Welch; Grimes' testimony that Hand admitted killing both Welch and Jill; Hand's inconsistent statements about his and Jill's relationships with Welch; and the evidence regarding Hand's plan to reduce his debts and file bankruptcy.

-64-

Hand objects to the Magistrate Judge's conclusion, relying on his Confrontation Clause and due process arguments that this Court rejected with respect to Ground One. He also objects to the alternate conclusion that sufficient evidence supported the verdicts against him even if Welch's statements had been excluded. He argues that the state would have had no direct evidence of his guilt without Welch's statements, and would have been forced to rely much more heavily on Grimes' testimony. He cites Ege v. Yukins, 485 F.3d 364 (6th Cir. 2007), where the Sixth Circuit affirmed the grant of habeas relief based on the admission of questionable "bite mark" identification testimony from an expert who was later found to be totally unreliable by the county prosecutor, and who was barred from testifying for the state. The Sixth Circuit noted that habeas relief for a due process claim is warranted only if an evidentiary ruling is "so egregious that it results in a denial of fundamental fairness." That question turns upon "whether the evidence is material in the sense of a crucial, critical highly significant factor." Id. at 375 (internal citations and quotations omitted). The expert in question not only identified a mark on the victim's cheek as a bite mark based solely upon his review of photographs (and directly contradicting the coroner's opinion at the time of the autopsy); he further opined that the "bite mark" could only have been made by the petitioner, and not by any one of the other 3.5 million Detroit residents. Labeling the expert's opinion as "complete bunk," the Sixth Circuit held that his testimony substantially prejudiced the outcome of the trial despite the admission of other circumstantial evidence pointing to the petitioner's guilt. Moreover, the state habeas court had concluded that the admission of the expert's testimony was an error, but denied relief because trial counsel failed to object. The Sixth Circuit found that the lack

of objection amounted to ineffective assistance of trial counsel that excused the procedural default, concluding that it was objectively completely unreasonable for counsel not to object to an opinion that so completely lacked any statistical or scientific support.  Id. at 379-380.  The court also noted the state court's expression of concern about the "troubling" conviction of the defendant, how many other "logical suspects" existed, and the long delay by the state in charging the petitioner, in concluding that habeas relief was properly granted.

The evidence against Hand, unlike the circumstantial evidence described in Ege, included forensic analyses of bullet fragments found inside and outside of Hand's home, as well as some removed from Welch's body.  Hand did not challenge any of this evidence.  The Ohio Supreme Court concluded that the forensic evidence contradicted Hand's story about the timeline of events on the night of the murders.  In addition, Hand's story of the events of that night changed over time in his interviews with the police.  Even without Welch's statements, the Court agrees with the Magistrate Judge's alternative conclusion that sufficient evidence would support the verdicts.  This sub-claim is therefore denied.

**(I)   Failure to call Phillip Anthony as a defense witness.**  In this sub-claim, Hand argues that Phillip Anthony, Welch's cousin, should have testified on Hand's behalf.  Anthony testified during the hearsay evidentiary hearing that sometime in 1986 or 1987, Welch admitted that he had killed Donna and Lori.  According to Anthony, Welch "... explained to me how he snuck into a basement window and that all the doors and windows in the house were sealed and locked, and how he put her in the chair and made the second murder identical to the first, and that's about all he really told me."

-66-

(Trial Trans. Vol. 14 at 2275) The trial court found Anthony's testimony was admissible (along with the other eight witnesses presented during the hearing), but the state chose not call him to testify during its case. Hand contends that his lawyers should have called Anthony in the defense case, and that they were ineffective in failing to do so. Hand contends that Welch's statement to Anthony about entering the house through a basement window contradicted the state's evidence that there was no sign of forced entry found during the investigations into Donna's and Lori's murders.

The Ohio Supreme Court rejected this claim on direct appeal. The court noted that Anthony had also testified in the hearing that in early 2002, Welch asked Anthony to find him a gun because "the guy I did that thing for ... said he wants me to do another one. ... I need this [gun] now ... I can't wait a week, I can't wait a day, I really need this now, I've got something to do." State v. Hand, 107 Ohio St.3d at 409. On the night before the murders, Welch asked Anthony again about a gun, and Anthony said he could not find one. Welch said he was uneasy about going to meet Hand alone, and asked Anthony to give him a ride and "watch his back a little bit." Anthony said that Welch told him he wasn't "going up there to kill nobody. The deal was ... they were going up there to iron it out. How much, where, how, when, type of situation, ... [to] talk to Mr. Hand, iron out all the specifics of the murder, and that's it. ..." Id. The Supreme Court concluded:

> Trial counsel were not deficient by choosing not to call
> Anthony as a defense witness even though some of his
> testimony might have helped the defense case. Welch's
> comments to Anthony showed a sense of urgency to obtain
> a weapon to murder Jill that was not otherwise in evidence.
> Moreover, Welch's statements show that he did not intend to
> murder Jill when he went to Hand's home on the evening of

-67-

> January 15. Anthony's testimony undermined Hand's claim
> that Welch was an intruder who entered his home and
> murdered his wife. Such testimony would have contradicted
> Hand's self-defense theory. Thus, trial counsel made a
> legitimate tactical decision to not call Anthony as a defense
> witness.

State v. Hand, 107 Ohio St.3d at 409-410.

The Magistrate Judge concluded that while Anthony's statements about access

through a basement window in Hand's home may have contradicted the police

investigators' testimony, the bulk of Anthony's testimony was clearly detrimental to

Hand's defense, and would only have bolstered the state's case that Hand and Welch

conspired to kill Jill. Counsel's decision not to call Anthony was not strategically

unreasonable, and therefore the Ohio Supreme Court's decision was not contrary to

established federal law. Hand objects, arguing that there is nothing in the record to

support the conclusion that his counsel's failure to call Anthony was a strategic decision,

as opposed to an oversight or a lack of foresight.

The Magistrate Judge quoted extensive excerpts of Anthony's testimony during

the hearsay hearing under questioning by the state and by the defense. (Doc. 101 at

101-110) Anthony testified about a conversation with Welch approximately twenty

years before Jill's murder, in which Welch described how he killed both Donna and Lori

using a plastic dry cleaning bag. Welch said that he got into the house through a

basement window, and that Hand paid him to kill both of his wives. Anthony described

a "falling out" between Welch and Hand that occurred some years earlier. But he said

that Welch told him that the early 2002 contact from Hand was different, and that "it

didn't feel right...". When Welch spoke to Anthony in early January, Welch said that

-68-

Hand told him: "This is what the deal is, I've got another wife I need to get rid of her, ... let's work out the details, you know." Welch told Anthony that "Hand wanted to talk to him, wanted to meet with him, to iron out the details on offing his next wife, on having his wife murdered." But Welch was uneasy about meeting Hand and he "didn't feel safe" going to meet Hand without a gun. When Anthony told him he could not find a gun, Welch asked Anthony, "Well, why don't you take me up there, you know, and watch my back a little bit, ... Well, I've got to find my way up there again somehow, because he keeps calling me and I got to see what he wants... ". In Anthony's last conversation with Welch, Welch said he "was planning to go up, talk to Mr. Hand, iron out all the specifics of the murder, and that's it. ... He said it was [at] Mr. Hand's house. Take him up [to] Delaware to his house." (Doc. 101 at 103-107, quoting Trial Trans. Vol. 14 at 2271-2290) On cross-examination by Hand's counsel, Anthony said that as far as he knew, Welch was not cooperating with the police in January 2002 and was not planning on testifying against Hand.

The Court notes that prior to the evidentiary hearing in which Anthony testified, the state presented testimony from retired detectives Robert Britt and Sam Wolmendorf, both of whom were involved in investigating the murders of Donna and Lori. Both testified that the contemporaneous investigation reports noted no signs of forced entry at the home on either occasion, in particular with respect to windows in the basement where both bodies had been found. (See Trial Trans. Vol. 13 at 2091, Britt testimony noting that basement windows were locked; and at 2152 and 2157, Wolmendorf testimony confirming there were no signs of forced entry on either occasion.) Later in Hand's trial, after the evidentiary hearing and the court's ruling permitting Anthony and

the other witnesses to testify, the state recalled Detective Otto to the stand. Otto was

the principal investigator into the Jill and Welch murders and had already testified. At

the close of Otto's direct testimony, an unreported sidebar conference was held, after

which defense counsel objected to the court's sidebar ruling, and did not ask Otto any

questions. (Trial Trans. Vol. 18 at 3234) Later, during a recess and out of the

presence of the jury, the trial court took up the sidebar conference issue on the record,

explaining that Hand had asked "to cross-examine Detective Otto concerning a hearsay

statement made to another witness that Detective Otto interviewed concerning a

window and what that witness would have said about what [was] said by the declarant,

which is Lonnie Welch [sic]." (Id. at 3253-3254) Hand's counsel explained that he

asked for the sidebar to avoid mentioning in front of the jury that he wanted to cross-

examine Otto about Anthony's statement to Otto during an interview Otto conducted, in

which Anthony described Welch's statement that he "snuck into" Hand's house through

the basement window to kill Donna and Lori. The trial court had denied counsel's

request to pursue that line of cross-examination during the unreported sidebar, which he

affirmed on the record. Counsel then requested the trial court, pursuant to Ohio Rule

614, to call Anthony as a court witness

> ... because I can't vouch for his veracity. The prosecution
> brought him in here, and you held that he was reliable and
> probative, and now they're not calling him, and I - it would be
> my opportunity through Phillip Anthony to cross-examine him
> and impeach the credibility of Lonnie Welch. Throughout
> this whole trial, you've let all this hearsay in about what
> Lonnie Welch had to say about the homicide and, through
> Phillip Anthony, if we're permitted to cross-examine him as a
> court witness, we believe we can impeach the declarant's
> statements through the physical evidence. ... I think, in the
> name of justice, and throughout this whole trial, we were led

> to believe that he was going to come in. We commented on
> the windows in our opening statement throughout the whole
> cross-examination, and we believe that that's a very
> important aspect to determine the credibility of the declarant,
> being Lonnie Welch, and to you letting in all that hearsay
> about Lonnie Welch.

(Id. at 3254-55)

The trial court denied Hand's request, noting that both the state and Hand were free to call the witnesses they chose to call, and that Hand had wide latitude to cross-examine the state's witnesses in order to impeach Welch. Hand's counsel then made a specific offer of proof as to Anthony's anticipated testimony about Welch's description of the basement windows:

> And that is the specific area that we wish to pursue with Mr.
> Anthony, we wish to impeach at the scene of Lonnie Welch
> because, physically, that cannot be so. Physically, it could
> not have happened the way that Lonnie Welch told Phillip
> Anthony the way it happened, ... we're not impeaching Phillip
> Anthony at this point, and we're not impeaching Lonnie
> Welch's character, we're just impeaching a specific method
> of entry and exit as a barometer by which Lonnie Welch - did
> he really commit these offenses or not ... . I can't vouch for
> the credibility of Phillip Anthony, because I think he's not
> credible, but I think I have a right to do that, and you, in your
> position as a trier of fact, have the authority to bring him in
> and let both sides cross-examine so that it would further the
> cause of justice ... .

(Id. at 3257-58) The state opposed the request, noting that Hand could call Anthony if he wanted to. The court denied the request, and Hand's counsel did not present Anthony during the defense case. Hand now contends that failure amounts to ineffective assistance of counsel, and that the Ohio Supreme Court erroneously assumed that counsel made a strategic decision to avoid calling Anthony as a defense witness.

The Supreme Court has cautioned that, in reviewing ineffective assistance of

counsel claims:

> A fair assessment of attorney performance requires that
> every effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of counsel's
> challenged conduct, and to evaluate the conduct from
> counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a
> strong presumption that counsel's conduct falls within the
> wide range of reasonable professional assistance; that is,
> the defendant must overcome the presumption that, under
> the circumstances, the challenged action might be
> considered sound trial strategy.

Strickland v. Washington, 466 U.S. 668, 694 (1984) (internal quotations and citations

omitted).  It is clear to this Court that presenting Anthony as a defense witness in view

of the entirety of his hearing testimony would have posed a serious risk to Hand's

primary claim that he acted in self-defense.  Hand's trial counsel argued that he could

not vouch for Anthony's credibility given his admitted criminal background, which led

counsel to seek permission to cross-examine Detective Otto about Anthony's interview

statements.  When that request was denied, counsel asked the trial court to call

Anthony as a court witness.  Given the complete history of the circumstances involving

Anthony and the eloquent proffer that Hand's counsel made to the trial court, it is

extremely unlikely that counsel simply "forgot" about Anthony or overlooked him, as

Hand suggests.  Rather, the record supports the Magistrate Judge's conclusion that a

decision not to have Anthony testify was a strategic decision that did not amount to

ineffective assistance of counsel.  Anthony's harmful testimony, in the Court's view, far

outweighs any potential favorable impact of Anthony's statement about the basement

windows.  The Court therefore concludes that the Ohio Supreme Court's rejection of this

-72-

sub-claim was not contrary to nor an unreasonable application of clearly established federal law.

  **(J) Failure to request jury instructions.** Hand alleges that his lawyers should have requested limiting instructions on the "other acts" evidence admitted at trial, and an instruction specifically defining the phrase "course of conduct" as used in the first specification for Counts One and Two (the murders of Jill and Welch, respectively). Hand raised this claim on direct appeal; the Supreme Court rejected it, relying on its conclusion with respect to Hand's second proposition of law (concerning admission of the other acts evidence), and his sixth proposition of law, Hand's challenge to the course of conduct instructions that were given by the trial court. The Supreme Court found that Hand was not prejudiced by the lack of any additional instructions, and this lack of prejudice barred his ineffective assistance of counsel claim.

  The Magistrate Judge concluded that Hand did not sufficiently "federalize" this sub-claim in his direct appeal. Hand's merit brief framed his arguments within the parameters of state evidence law, and summarily cited only two U.S. Supreme Court cases: McCleskey v. Kemp, 481 U.S. 279, 305 (1987), and Godfrey v. Georgia, 446 U.S. 420, 428 (1980). Both of those cases involved challenges to Georgia's capital sentencing scheme. Both generally held that a state must establish "... carefully defined standards that must narrow a sentencer's discretion to impose the death sentence..." (McCleskey, 481 U.S. at 304), and that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." Godfrey, 446 U.S. at 427.

  Hand objects to the Magistrate Judge's conclusion, arguing that ineffective

assistance of trial counsel "is by its very nature a federal claim, [because] alleging that defense counsel failed to preserve a defendant's rights under state law necessarily raises a Sixth Amendment issue." (Doc. 108 at 16) In Moreland v. Bradshaw, 699 F.3d 908 (6th Cir. 2012), the Sixth Circuit found that a habeas petitioner did not default his claim by failing to sufficiently federalize that claim in state court. The petitioner's brief to the Ohio Supreme Court argued that the trial court erred by conducting an inadequate evidentiary hearing on the competency and admissibility of an eleven year old witness's testimony against him, and by excluding his expert testimony. The Sixth Circuit noted that the petitioner's appeal brief stated that the trial court's errors violated his rights under the "Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution," a statement that the court found sufficient to preserve his federal claim. Id. at 921, n.4.

Here, Hand's second proposition of law in his direct appeal brief alleged that the failure to give a limiting instruction violated his rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. And his sixth proposition alleged that the failure to give a narrowing instruction on the course of conduct specification violated his rights under the Eighth and Fourteenth amendments, and he cross-referenced the argument presented in support of his second proposition. The Court also notes that the Ohio Supreme Court began its discussion of Hand's Proposition of Law VII, raising ineffective assistance of counsel based on the failure to request these instructions, by citing Strickland's two-prong requirement. State v. Hand, 107 Ohio St.3d at 407. Out of an abundance of caution, and in view of Moreland, the Court will assume that this sub-claim is not defaulted for failing to properly federalize it in Hand's direct appeal.

-74-

However, the Court concludes that this sub-claim lacks merit.  To satisfy Strickland's standards, Hand must show that his counsel's failure to seek a limiting instruction not only fell below an acceptable performance standard, but must also establish that he was prejudiced by that failure.  In his habeas petition, Hand alleges that the jury "likely considered the other acts evidence presented by the state as affirmative evidence of Hand's guilt...".  (Doc. 11 at ¶ 81)  But the Ohio Supreme Court specifically rejected that contention, holding that "nothing suggests that the jury used other-acts evidence to convict Hand on the theory that he was a bad person."  State v. Hand, 107 Ohio St.3d at 401.  Moreover, given the brief references in the testimony that Hand argues were impermissible "other acts" evidence, it is just as likely that counsel did not wish to call the jury's attention to or to over-emphasize many of these statements.  It is sheer speculation to assume that if Hand's trial counsel had requested a limiting instruction regarding any or all of the "other acts" testimony (and the trial court had so instructed the jury), that instruction would reasonably have resulted in a different outcome.

With regard to counsel's failure to request a specific instruction defining the meaning of "course of conduct" specifications, Hand's Ninth Ground for Relief (discussed below) contends that the trial court erred in failing to give a specific or limiting construction on the meaning of the "course of conduct."  As is fully discussed below with regard to that claim, there was no error in the trial court's instructions on this issue.  For the reasons discussed in the Ninth Ground, the Court also concludes that Hand has not shown that he was prejudiced by his counsel's failure to request such a limiting instruction.  This sub-claim is therefore denied.

**(K)  Cumulative impact of errors.**  Hand alleges that the cumulative impact of all of these ineffective assistance sub-claims actually prejudiced his defense.  Hand did not raise a cumulative impact claim on direct appeal.  The Magistrate Judge found this claim to be procedurally defaulted as a result, citing Lorraine v. Coyle, 291 F.3d 416, 447 (6th Cir. 2002), holding that a procedurally defaulted cumulative error claim is not cognizable in habeas actions.

Hand argues that he did raise a cumulative impact argument in his post-conviction petition.  But that is not sufficient under Ohio's res judicata rules; the cumulative impact of the individual errors that he did raise on direct appeal is an issue that should have been raised at the same time.  In addition, as the Magistrate Judge notes, there is no Supreme Court precedent recognizing a distinct constitutional claim based on the effect of cumulative trial error.  In Sheppard v. Bagley, 657 F.3d 338, 348 (6th Cir. 2011), the Sixth Circuit held that post-AEDPA, a cumulative error claim is not cognizable in habeas proceedings, citing Moore v. Parker, 425 F.3d 250, 256 (6th Cir. 2005).  Hand's cumulative impact sub-claim is therefore denied.

For all of these reasons, the Court overrules Hand's objections, and denies the Fourth Ground for Relief and each sub-claim contained therein.

**Ground Five**

Hand raises a number of penalty-phase ineffective assistance of trial counsel sub-claims as his Fifth Ground for Relief.

**(A)  Failure to present additional expert psychological testimony.**  Hand's trial counsel applied for and received funds to hire a forensic psychologist, Dr. Davis, to assist with his mitigation case.  Hand contends that his attorneys unduly restricted

Davis's mitigation testimony to the issue of Hand's ability to adjust to prison life. Hand's petition argues that Dr. Davis should have testified that Hand was "truthful, open, and cooperative; that his test results did not reveal characteristics similar to those of an anti-social personality disorder; and that Hand's psychiatric profile was not consistent with the typical traits of a 'cold calculating antisocial personality.'" (Doc. 11 at ¶86) This sub-claim was not specifically raised on direct appeal (although Hand discussed Dr. Davis in the context of his broader claim that his trial counsel did not reasonably investigate and present mitigation evidence). Hand raised this sub-claim in his post-conviction petition, where he argued that capital defendants "... frequently manifest anti-social personality disorder characteristics in the MMPI test results. Prosecutors will then capitalize on these findings and use that information against the defendants during cross-examination of the defense's psychologist. That was not the case with Petitioner." (Apx. Vol. 10 at 81, post-conviction petition at ¶11) Hand included Dr. Davis's affidavit, which reported his MMPI test results, with his post-conviction petition. (Apx. Vol. 10 at 352-56) The state court of appeals found that this claim was barred by res judicata:

> A review of appellant's direct appeal indicates he specifically raised numerous claims of ineffective assistance of counsel, including: ineffective assistance of counsel during voir dire; failure to call witnesses during both the guilt and mitigation phases of trial; failure to investigate, prepare and present evidence during both phases; and failure to form a reasonable trial strategy. However, [Hand] asserts, without evidence gathered outside the record, there was insufficient evidence available in the record to assert [these] claims on direct appeal. We disagree.

State v. Hand, 2006-Ohio-2028 at ¶ 33. The court also stated that "assuming arguendo" that res judicata did not apply, the decision to call a witness and the scope of

questioning is largely a matter for defense counsel's discretion. Id. at ¶ 35. The court ultimately concluded that "the record demonstrates the issues were cognizable and capable of review on direct appeal." Id. at ¶ 36.

The Magistrate Judge observed that "at first blush," it appears as if the Ohio Court of Appeals addressed the merits of this sub-claim, in which case it would not be defaulted. (Doc. 101 at 116) However, he concluded that the state court's brief discussion of counsel's trial strategy regarding the witness was merely an alternative analysis, not a decision on the merits. The court of appeals did not analyze the question in depth, and relied on its basic conclusion that the issue should have been raised in Hand's direct appeal. The Magistrate Judge ultimately concluded that this claim is defaulted because Hand has not shown cause for the default. Hand objects, arguing that the Ohio Court of Appeals was incorrect in stating that he failed to include material outside the trial record in support of this claim, because he proffered Dr. Davis' affidavit reporting his MMPI results.

Ohio's res judicata doctrine applies to claims that were raised or could have been raised on direct appeal. State v. Perry, 10 Ohio St.2d 175, 180 (1967). Hand clearly knew about his own MMPI tests well before the jury's verdict. Dr. Davis' post-conviction affidavit states that the day before he testified, he told Hand's trial lawyers about those results. Davis averred that counsel "seemed to only focus on how well [Hand] would be able to adapt to prison life if the jury sentenced him to life without parole." (Apx. Vol. 10 at 354, Davis Affidavit at ¶7) The affidavit clearly shows that this evidence was available during the trial and that Hand was aware of it. This sub-claim should have been raised on direct appeal.

-78-

But even assuming that res judicata does not apply and the claim is not defaulted, Hand argues that his situation falls "within the gambit" of Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995), a pre-AEDPA decision finding that counsel's complete failure to discover and present any relevant mitigation evidence amounted to ineffective assistance of counsel.  Hand also cites Williams v. Taylor, 529 U.S. 362, 395 (2000), where the Supreme Court granted habeas relief based on defense counsel's failure to investigate the petitioner's truly nightmarish childhood.  The fact that Hand's MMPI results were not discussed by Dr. Davis during his trial testimony does not come close to the magnitude and significance of the utter failure to investigate a defendant's background that was addressed in both Glenn and Williams.  If Dr. Davis had testified that Hand does not suffer from a manifest anti-social personality disorder, an area of cross-examination might have been eliminated as Hand argued in his post-conviction petition.  But Dr. Davis does not opine or even suggest that Hand was psychologically incapable of committing the murders, or of conspiring with Welch to commit them.  The state's primary theory was that Hand killed Jill because he badly needed money, and he killed Welch to eliminate him as a witness to Jill's murder.  The fact that the jury did not learn that Hand was not diagnosed with anti-social personality disorder is not the sort of powerful mitigating evidence, such as the type of evidence discussed in Williams, that supports a reasonable likelihood that the jury would not have imposed the death penalty if Dr. Davis had discussed those test results.

Recent Supreme Court authorities support the conclusion that trial counsel's failure to elicit this testimony from Dr. Davis does not amount to ineffective assistance of counsel.  In Bobby v. Van Hook, 558 U.S. 4 (2009), the Court vacated the Sixth Circuit's

-79-

grant of habeas relief to petitioner Van Hook, which was based on a claim that trial counsel failed to conduct a thorough mitigation investigation.  Even under pre-AEDPA review standards, the Court noted that "it was not unreasonable for his counsel not to identify and interview every other living family member ... .  This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, ... or would have been apparent from documents any reasonable attorney would have obtained."  Id. at 19 (internal citations omitted).  In contrast, in Porter v. McCollum, 558 U.S. 30 (2009), the Court affirmed a district court's grant of habeas relief based on ineffective assistance at sentencing.  After spending the night drinking, Porter killed his former girlfriend and her new boyfriend.  His lawyer presented one mitigation witness, Porter's ex-wife, and read a small part of a deposition.  The lawyer told the jury that Porter was not "mentally healthy" and had "other handicaps," but he did not investigate Porter's background and did not introduce any evidence of an illness or handicap.  In his state post-conviction proceeding, Porter presented extensive evidence and testimony about his extremely violent and abusive childhood.  He enlisted in the Army at age 17 to escape his violent family; he then served in the Korean War under extremely difficult conditions, was seriously injured twice, and received several commendations including two Purple Hearts.  He presented expert testimony that he suffered serious post-traumatic stress syndrome and brain damage from his service that could cause impulsive, violent behavior.  His doctor also opined that Porter was substantially impaired in his ability to conform his conduct to law and that he suffered from an extreme mental disturbance, two of Florida's statutory mitigating circumstances.  The Supreme Court affirmed the grant of habeas relief,

finding that his lawyer had done nothing to advocate for Porter and that the deficiency was clearly prejudicial. The Court found that Porter's case was **not** one in which the additional mitigating evidence "would barely have altered the sentencing profile presented to the sentencing judge ...". Id. at 454 (quoting from Strickland, 466 U.S. at 700).

Even if Dr. Davis had testified that Hand did not have an antisocial personality disorder, or that he had depression and anxiety, that testimony would not establish a reasonable probability that Hand would have received a life sentence in lieu of the death penalty. Even if this claim is not barred by res judicata, as the Ohio Court of Appeals found, it would fail on its merits.

**(B) Failure to present family and friends as mitigation witnesses**. Hand alleges in this sub-claim that his trial counsel failed to present "comprehensive" testimony from his family and friends. He argues that other family members would have painted a portrait of the "chaotic, abusive home in which Hand was raised. In addition, several of Hand's long-term friends also were willing to testify about his generosity." (Doc. 11 at ¶ 90) Hand raised this claim on direct appeal as his eighth proposition of law, and the Ohio Supreme Court held that counsel's decision not to present his mother and sister as witnesses, or to call someone to testify directly about his military service, was not ineffective assistance. The court noted that Dr. Davis told the jury about Hand's alcoholic father, and that Hand had been removed from his mother's care for a time and placed with Children's Services. Davis also reviewed the records of Hand's military service. Hand's son Robert testified about his father's character and their positive relationship.

-81-

Hand also raised this claim in his post-conviction petition as his fifth claim, arguing that the state presented testimony during the trial about his generosity to Lonnie Welch and Welch's family, intending to imply to the jury "... that Hand was only doing this to keep Welch quiet about the alleged murderous work he had done for Petitioner." (Apx. Vol. 10 at 98)  Hand offered affidavits from several of his good friends, attesting that Hand would do anything for a friend, that he was a "straight arrow," and was always doing kind things for others without being asked.  (Id.)  The Ohio Court of Appeals affirmed the trial court's denial of relief, concluding that Hand did not demonstrate prejudice: "[R]ather, appellant merely speculates the outcome of the trial would have been different, but for counsel's failure to call the witnesses."  State v. Hand, 2006-Ohio-2028 at ¶ 37.  While the court of appeals found that res judicata barred review of many of Hand's ineffective assistance claims, it addressed this issue  (albeit briefly) on the merits, and did not expressly rely on res judicata.

In view of the state court's discussion, the Magistrate Judge reviewed the merits and recommended that this sub-claim be denied.  He describes Dr. Davis' testimony to the jury describing his extensive interviews with several of Hand's family members, including his mother and sister.  Davis informed the jury that Hand's father was a chronic alcoholic, which caused considerable strife and abuse between Hand's parents. They eventually divorced, and for a time Hand and his siblings were removed from the home and placed with his aunt.  Davis informed the jury that Hand served in the United States Army and received an honorable discharge.  The Magistrate Judge found that Dr. Davis provided the jury a comprehensive picture of Hand's upbringing and his family's dysfunction.  In addition, Frank Haberfield testified in the penalty phase;

Haberfield was Hand's friend and knew him from serving as a Boy Scout troop leader. Haberfield described Hand's efforts to organize the troop, and said that Hand took troop members on field trips. Haberfield never heard anything negative about Hand. Mr. Hand's son Robert testified about their good relationship, that he looked up to his father, and that Hand had pushed him to finish school. Robert said that Hand got involved in the Boy Scouts and organized the troop for Robert's benefit.

Hand suggests that if the jury had heard directly from his mother, his siblings, or other family members about his upbringing, that testimony would have swayed the jury to impose life in prison instead of a death sentence. He notes that none of the actual records from Children's Services were admitted in evidence, and that his family members would have described the dismal climate of his childhood in much more detail than did Dr. Davis. Hand submitted evidence with his post-conviction petition that many of his friends would have testified that he was a generous person, and that he often bought gifts for younger family members when their parents were unable to do so. And he contends that his own sworn mitigation statement to the jury was unhelpful, as it focused entirely on the issue of whether he would be a "model inmate." He argues this assertion lacked credibility after the jury had convicted him of escape.

As the Supreme Court held in Bobby v. Van Hook, supra, this is not a case where Hand's attorneys "... failed to act while potentially powerful mitigating evidence stared them in the face." A decision not to overemphasize Hand's childhood difficulties comports with a strategy of attempting to personalize Hand to the jury, and of demonstrating not only that he could adequately respond to life in prison, but that he could also contribute to improving other inmates' lives. Hand must demonstrate that

his counsel's decision to present this evidence through Dr. Davis, rather than through his mother or siblings, fell below an acceptable performance standard, and also that he was actually prejudiced by that decision.  The Court concludes that he has not done so, and therefore this sub-claim is denied.

(C)  **Failure to present testimony about Hand's demeanor at trial.**  Hand alleges that when he testified at his trial, he was taking prescribed medications which influenced his demeanor and hampered his ability to clearly present his testimony.  He suggests that the lack of evidence about these medications must have affected the jury's evaluation of his credibility.  This issue was first raised as his sixth claim in his post-conviction petition.  The Ohio Court of Appeals found this claim (as well as his fourth and eighth claims) barred by res judicata, because Hand did not offer admissible evidence that was outside of the trial record: "Rather, the record demonstrates the issues were cognizable and capable of review on direct appeal."  State v. Hand, 2006-Ohio-2028 at ¶ 36.  The Magistrate Judge concluded that this claim is defaulted, and that Hand did not show cause to excuse the default.

Hand objects, arguing that the essence of this claim is that his attorneys failed to introduce evidence about the medications and their alleged negative effect on his demeanor and his ability to testify.  As this claim would necessarily rely on evidence outside the trial record (records concerning the medications), he contends that he properly presented it in his post-conviction petition.  Hand submitted an affidavit with that petition from a mitigation specialist, describing her conversation with one of Hand's jurors, who reported that Hand's testimony was "awful," that Hand seemed very nervous, and that he kept changing his story.  (Apx. Vol. 10 at 380)   Aside from the

obvious hearsay problem, a juror's subjective impression of testimony offered at trial is inadmissible under Ohio's Evid. Rule 606(B), as the Ohio Court of Appeals held. Hand also submitted medical records from the time he was held in the Delaware County Jail before his trial, documenting administration of Buspar (for anxiety) and Trazadone (an anti-depressant). (Id. at 388-431) He argued that if his friends had been called as witnesses, they would have testified that he always had trouble "expressing himself" and was a "poor speaker." (Apx. Vol. 10 at 101) But Hand does not dispute the fact that all of this evidence was available at the time of trial. As the Ohio Court of Appeals held, the issue was cognizable and capable of review on direct appeal.

In his Supplemental Report, the Magistrate Judge further concluded that even if the claim is not barred by res judicata, the claim should be rejected on the merits. Even if Dr. Davis had testified that Hand's medications, his anxiety, or his general "social ineptness" contributed to his difficulty in expressing himself, or if his friends had testified about that difficulty, it is sheer speculation to assume that any of that testimony would have altered the outcome. (Doc. 111 at 19-20) The Court agrees with this alternate conclusion. In order to demonstrate prejudice resulting from ineffective assistance, Hand must demonstrate a reasonable probability of a different result, not simply identify additional evidence that could have been presented, or testimony that other witnesses might have given. This sub-claim is therefore denied.

**(D) Failure to present testimony about Hand's third wife**. Hand contends in this sub-claim that his trial counsel did not introduce evidence about Hand's third wife, to whom he was married for several years. He contends that his third wife, Glenna, was alcoholic, abusive and abrasive, and he eventually divorced her. Hand claims he was

prejudiced by the fact that the jury did not hear evidence about his one marriage that did not end in a murder. He did not raise this claim on direct appeal but included it in his post-conviction petition. Hand submitted affidavits from his sister, Sally Underwood, and his son, Robert, describing Glenna's abusive personality to support this claim, but the Ohio Court of Appeals found that he did not offer evidence outside the record. Despite that statement, the Magistrate Judge concluded that it was unclear if the state court actually applied res judicata to this sub-claim, noting that the state court also found that if res judicata did not bar review, the court would deny the claim on the merits: "Upon review, we find appellant has not demonstrated the trial outcome would have been different had his trial counsel decided to call the witnesses; rather, any such alleged prejudice would be speculative." State v. Hand, 2006-Ohio-2028 at ¶ 35. Since the court appeared to address the merits of the claim in some fashion, the Magistrate Judge concluded that it was not defaulted.

Hand testified at trial about how he met and married Glenna, and about their divorce some years later. He said that Glenna had a drinking problem, and that she was the one who insisted on a divorce over his objection. He testified that Glenna knew about his credit card scheme and his financial difficulties, and that she gave up some rights to his real estate in connection with their divorce. (Trial Trans. Vol. 19 at 3450-3455) The jury learned through Hand's own testimony that he did not conspire to murder Glenna in order to end their marriage. Hand also testified that Glenna was "very good" at raising his son Robert; yet Robert's post-conviction affidavit described Glenna as an abusive alcoholic. The Magistrate Judge concluded that it would be extremely speculative to conclude that testimony from Sally and Robert about Glenna's problems

-86-

would have altered the jury's decision, especially because the affidavits Hand offered partially contradicted his own testimony.

Hand objects, contending that evidence of Glenna's abuse was critical to demonstrate that Hand was capable of withstanding a difficult marriage without resorting to murder. But the state did not contend that Hand killed Jill to get out of a difficult marriage; it argued his primary motivation was to profit from her death and avoid his own financial difficulties. The Court agrees that Hand has failed to show that his counsel was ineffective in not providing additional evidence about Glenna's problems and personality, which Hand himself described in his testimony, because he has not demonstrated a reasonable probability of a different outcome.

**(E) Failure to develop an effective mitigation strategy and to present a penalty phase closing argument**. Hand contends that his lawyers did not properly investigate and present mitigation evidence about his difficult childhood and his psychological profile. Instead, defense counsel framed their mitigation arguments around the strategy of presenting Hand as a likely model inmate. He contends this was woefully inadequate. He also contends that his counsel failed to argue residual doubt, and waived closing argument at the sentencing hearing, prejudicing his defense.

Hand raised this two-pronged claim on direct appeal, arguing that his lawyers had not spent enough time preparing for sentencing. The Ohio Supreme Court noted:

> ... the defense employed a mitigation specialist, an investigator, and a psychologist. Each of these individuals began working on Hand's case several months before the penalty phase. The defense reviewed Hand's military records, his school records, and his medical records prior to the penalty phase. Dr. Davis, the defense psychologist, testified that "one of the attorneys conducted extensive

-87-

> interviews of a variety of individuals who knew Mr. Hand and
> obtained background information."  Thus, the record shows
> that the defense thoroughly prepared for the penalty phase
> of the trial.

State v. Hand, 107 Ohio St.3d at 411-412.  The court also rejected Hand's assertion

that his lawyers spent too little time on a mitigation investigation, because the record

demonstrated that significant efforts had been made to gather records and interview

witnesses.  Hand failed to show what additional information his family might have

provided to his lawyers at an earlier stage of the case that would have meaningfully

assisted his defense.  The Supreme Court also rejected his argument that his counsel's

mitigation strategy amounted to ineffective assistance.  The defense theory, that Hand

would be a model prisoner and would have value in prison society, "... although

unsuccessful, was coherent and fit into the testimony of the witnesses.  Thus, counsel

made a 'strategic trial decision' in presenting the defense theory of mitigation, and such

decision 'cannot be the basis for an ineffectiveness claim.' " Id. at 413 (internal citations

omitted).

        In addition, the Supreme Court rejected Hand's argument (raised again here) that

defense counsel was ineffective because he was unwilling to spend more time in front

of the jury during the mitigation hearing.  Counsel stated in his opening remarks that the

evidence he intended to present "... won't be very long.  We'll be done in a couple of

hours.  I don't want to delay this case more than it needs to be, so I've elected to tell

you the things that I think you [ought] to think about now, rather than waiting until

closing arguments."  Id.  Hand criticized his lawyer's statement that he was not "going to

insult" the jury by arguing that Hand's childhood led him to commit the crimes, as "that

would be intellectually dishonest. ... What we will be telling you and are telling you is that imposing a death sentence on Bobby, you're going to be saying, he has nothing left to give; he has nothing of value; he's an empty box with nothing for anything." The court found that these remarks were "a means of maintaining the defense's credibility and focusing the jury's attention on the mitigating factors supporting a life sentence." Id. at 414. It rejected Hand's argument that his lawyers should have taken more time to present more witnesses, including individuals to testify about his military service, his school performance, or his placement with children's services during his childhood. As noted previously, Dr. Davis's testimony adequately presented all of this information to the jury; the choice not to present additional witnesses covering the same information did not rise to the level of constitutionally ineffective assistance, because Hand has not shown a reasonable probability that the outcome would have been affected.

Finally, the Supreme Court rejected Hand's argument that his counsel was ineffective by his failure to make a mitigation closing argument. The court quoted at length from counsel's opening statements at sentencing, which summarized the mitigating evidence that would be presented, and urged the jury to "temper justice with mercy." The court held that counsel's choice did not fall below an objective standard of reasonableness, as it prevented the state from making a vigorous rebuttal argument to anything that defense counsel may have said in a closing summation. That fact strongly suggests that counsel made a strategic decision to include all of the mitigation points in his opening statement. (See Trial Trans. Vol. 22 at 3849-3857) Furthermore, even if it was an unreasonable decision, Hand did not demonstrate that the result would have been different if his lawyer had given a closing argument. State v. Hand, 107 Ohio

St.3d at 415-416.

The Magistrate Judge found that the Supreme Court's decision with respect to all of these mitigation arguments was not contrary to nor an unreasonable application of federal law. Strickland sets a high bar for a habeas petitioner to demonstrate ineffective assistance. Hand did not identify any specific evidence that the additional witnesses might have presented that would have been different from what the jury heard. The facts about his childhood, his Army service (which Hand also testified about in the guilt phase), his lack of criminal record, and his volunteer activities, were all placed before the jury through the testimony of the mitigation witnesses that were presented, particularly Dr. Davis. Counsel's opening statement summarized the mitigation evidence that would be presented, offered a coherent mitigation theory, and explicitly asked the jury to show mercy to Hand. The state did not present any testimony during mitigation, and only briefly cross-examined Hand's witnesses. This Court will not second-guess counsel's decision to forego a closing argument, thereby depriving the state of the opportunity for what likely would have been a forceful summation and reminder of the aggravating circumstances already found by the jury beyond a reasonable doubt. The Court notes that in his closing argument, the prosecutor did not dwell on the evidence supporting the aggravating circumstances, but argued that the mitigating evidence did not outweigh those circumstances. (Trial Trans. Vol. 22 at 3898-3904) A defense closing summation would have allowed the prosecutor to revisit the evidence surrounding the murders in great detail. As the Ohio Supreme Court concluded, Hand failed to show a reasonable probability that he would have received a different sentence if a closing argument had been made.

Finally, Hand argues that his counsel should have argued residual doubt during the mitigation hearing.  The Ohio Supreme Court rejected this contention, citing what the court described as a "settled issue" of Ohio law that "residual or lingering doubt as to the defendant's guilt or innocence is not a factor relevant to the imposition of the death sentence because it has nothing to do with the nature and circumstances of the offense or the history, character, and background of the offender."  State v. Hand, 107 Ohio St.3d at 417, citing State v. McGuire, 80 Ohio St.3d 390, 403 (1997).  The Magistrate Judge notes that the United States Supreme Court has held that the Constitution does not require or forbid the presentation of a residual doubt argument, citing Franklin v. Lynaugh, 487 U.S. 164, 173 (1988).  The Magistrate Judge therefore concluded that the Ohio Supreme Court's decision on this sub-claim was not contrary to clearly established federal law.

In his objections, Hand argues that the Magistrate Judge incorrectly analyzed this sub-claim, focusing only on the number of witnesses instead of the overall mitigation strategy and presentation of evidence.  He contends that the Magistrate Judge did not address the evidence submitted with his post-conviction petition or his  argument that counsel's mitigation strategy was unreasonable in view of his conviction on the escape charge.  He notes his trial lasted for several weeks and involved some 90 witnesses, yet the mitigation hearing spanned a single morning.  He suggests that if his lawyers concluded that evidence about his upbringing and childhood was truly irrelevant, they would not have presented Dr. Davis' testimony about those issues in what Hand asserts was an extremely truncated fashion.  He further contends that the failure to give a closing argument, standing alone, amounts to a total abandonment of defense counsel's

duties.

Hand cites a number of cases in which habeas relief was granted based on counsel's ineffective presentation of mitigation evidence and/or arguments.  In Carter v. Bell, 218 F.3d 581 (6th Cir. 2000), the court found that a closing argument spanning six transcript pages and that was primarily about defense counsel, was insufficient.  In Dobbs v. Turpin, 142 F.3d 1383 (11th Cir. 1998), counsel's failure to ask for mercy or for life in prison was enough to demonstrate ineffective assistance.  But the facts of those cases distinguish them from the facts at issue here.  In Carter, defense counsel did almost nothing to meaningfully investigate potential mitigation evidence.  In his habeas case, Carter adduced evidence showing that his childhood was extremely violent and unstable.  He had been beaten as an infant; his mother was an alcoholic and would use her welfare checks to buy liquor, letting her children go hungry; and he had very limited schooling and a low to borderline IQ.  A corrections department physician had recommended that he be considered for psychiatric hospitalization, and he was diagnosed as schizophrenic in 1991.  Another psychologist found symptoms consistent with paranoid schizophrenia or an organic delusional disorder.  Carter's jury heard none of this evidence, because his lawyers relied entirely on residual doubt of guilt during his sentencing hearing.  Given the utter lack of any meaningful investigation and the quantum of evidence that could have been presented to the jury, the Sixth Circuit found that Carter received ineffective assistance and granted the conditional writ, requiring the state to conduct a new penalty hearing.

And in Dobbs v. Turpin, defense counsel did not investigate Dobbs' background despite admitting to the jury in closing argument that he knew many people from Dobbs'

hometown. Counsel believed that the controlling law at that time prohibited the admission of mitigating evidence about Dobbs' childhood at the penalty phase. He also believed that any helpful evidence offered during the penalty hearing would simply allow the state to impeach Dobbs with his adult criminal convictions. Instead of giving a mitigation argument to the jury, he presented a "lecture" about the unfairness of the death penalty; he told the jury that the U.S. Supreme Court had struck down Georgia's previous death penalty statute and would likely do the same with the current version. He also minimized the jury's duty to meaningfully consider a proper sentence, telling the jury of his personal belief that no executions were likely to occur in Georgia. The Eleventh Circuit affirmed the district court's grant of the conditional writ, finding that Dobbs was entitled to a new penalty hearing.

Here, Hand's counsel did conduct an investigation, and did present significant evidence about Hand's background and his family history. Hand suggests that Dr. Davis' testimony was "extremely truncated" and did not fully address Hand's mental health. He argues that counsel's failure to give a closing argument deprived him of an opportunity to ask the jury to render mercy at the very end of the hearing, which Hand asserts amounts to a total abandonment of counsel's duties. The Court disagrees. The Ohio Supreme Court reviewed at some length the mitigation arguments and evidence that were presented at Hand's trial; it noted that counsel specifically asked the jury to spare his life and to show him mercy, and he emphasized Hand's value and his ability to contribute to prison life and to his son's life. Counsel's decision to present mitigation evidence in the fashion chosen, and to waive a closing argument, were legitimate tactical decisions that the Supreme Court refused to second guess.

-93-

This Court concludes that the Supreme Court's decision was not contrary to, nor an unreasonable application, of clearly established federal law. This sub-claim is therefore denied.

**(F) Failure to object to the introduction of guilt-phase evidence in the penalty phase hearing**. At the close of the sentencing hearing, the state moved to admit its exhibits from the guilt phase of the trial, except for those pertaining to the escape charge. Hand's counsel did not object. Hand contends that many of the exhibits were unduly inflammatory, including gruesome photographs of the victims, bullet fragments, and autopsy reports. He argues that these exhibits were irrelevant to the jury's sentencing determination. This claim was raised and rejected in Hand's direct appeal. The Ohio Supreme Court found that Hand did not specifically identify the exhibits that he believed had prejudiced him. And it concluded that counsel was not ineffective by failing to object because an Ohio statute, R.C. 2929.03(d)(1), specifically permits the reintroduction of guilt-phase evidence at sentencing. State v. Hand, 107 Ohio St.3d at 415.

The Magistrate Judge concluded that any error in the admission of these exhibits was an error of state procedural or evidentiary law, and thus not cognizable in this habeas proceeding. He further notes that while R.C. 2929.03 permits the introduction of this evidence, the statute does not relieve the trial court of its duty to determine the relevancy of any evidence admitted at the sentencing hearing. In State v. Gumm, 73 Ohio St.3d 413 (1994) (syllabus), the court identified five general categories of potentially relevant guilt phase evidence that are admissible in the penalty hearing pursuant to the statute:

-94-

(1) any evidence raised at trial that is relevant to the
aggravating circumstances specified in the indictment of
which the defendant was found guilty, (2) any other
testimony or evidence relevant to the nature and
circumstances of those aggravating circumstances, (3)
evidence rebutting the existence of any statutorily defined or
other mitigating factors first asserted by the defendant, (4)
the presentence investigation report, and (5) the mental
examination report.

Here, the trial court did not make a separate ruling on each guilt-phase exhibit

that was admitted at Hand's sentencing hearing.  Even if this failure amounts to an error

under the Ohio statute, it was not a prejudicial error that affected the outcome of the

sentencing hearing under Ohio law.  See, e.g., State v. Getsy, 84 Ohio St.3d 180, 201

(1998); State v. LaMar, 95 Ohio St.3d 181, 203 (2002), finding no error in admission

(over defendant's objection) of victim photographs and demonstrative exhibits depicting

the weapons used during the murders.  The Magistrate Judge also cited Cowans v.

Bagley, 624 F.Supp.2d 709, 811-814 (S.D. Ohio 2008), aff'd 693 F.3d 241 (6th Cir.

2011), where the district court reached a similar conclusion.[8]

Hand objects, contending that this sub-claim does not arise solely under state

law, but involves a federal constitutional claim of ineffective assistance of counsel.  But

assuming that Hand's trial counsel should have objected to some of the guilt-phase

exhibits, or to the trial court's failure to determine the relevance of each exhibit prior to

its admission, the Ohio Supreme Court found that Hand failed to identify any particular

exhibit that was irrelevant to the jury's consideration of his sentence.  In pleadings in

this case, he identifies victim photographs, bullets and bullet fragments, the autopsy

---

[8] It appears that a COA was not granted on this issue, because it is not directly
addressed in the Sixth Circuit's decision.

reports, and a tooth found in Hand's yard, as unduly prejudicial.  (Doc. 32 at 71-73)
Some of this evidence was undoubtedly graphic, such as photographs of Jill Hand or
portions of the autopsy reports.  However, the death penalty specifications in the
indictment included use of a firearm, and an aggravated murder committed during a
course of conduct or while attempting to kill two or more people.  The cited exhibits
would be relevant to the use of a firearm, as the photographs and autopsy reports would
illustrate and describe entrance and exit wounds, and the manner of death from use of a
firearm.  The autopsy reports from all three of Hand's wives would be relevant to the
course of conduct specification.  Even if it was error for trial counsel not to object to the
admission in toto of this evidence, this Court cannot conclude that the error was so
egregious that Hand's right to fundamental fairness guaranteed by the due process
clause was violated.  He has not demonstrated actual prejudice as a result.  This sub-
claim is therefore denied.

     **(F)  Cumulative error in mitigation phase**.  Hand contends that the cumulative
impact of these errors prejudiced the result of his sentencing hearing, thereby violating
his constitutional right to the effective assistance of counsel.  Hand did not raise this
cumulative error claim on direct appeal, and the Magistrate Judge concluded that it was
defaulted.  Moreover, as with his cumulative error claim raised in Ground Four with
respect to the guilt phase of the trial, the Supreme Court has never recognized a
cumulative error claim.  Since none of the alleged errors individually warrant relief, the
Magistrate Judge recommended that this cumulative error claim also be rejected.

     Hand objects, arguing that he raised this claim in his post-conviction petition.
That is true, and the Ohio Court of Appeals rejected it based on its analysis and

disposition of the errors he raised in his petition.  State v. Hand, 2006-Ohio-2028 at

¶¶ 50-51.  Even if this sub-claim is not defaulted to the extent it was raised in post-

conviction, this Court agrees that Hand has not shown that the cumulative effect of his

allegations of ineffective assistance of counsel at the mitigation stage resulted in a

fundamentally unfair trial.  The Court has rejected each of his claims, and also rejects

his contention that the cumulative impact of these errors actually prejudiced him.  As

noted previously, in Sheppard v. Bagley, 657 F.3d 338, 348 (6th Cir. 2011), the Sixth

Circuit held that a cumulative error claim is not cognizable in federal habeas

proceedings post-AEDPA.

　　　　This sub-claim and each of the sub-claims raised in Ground Five are therefore

denied.

**Ground Six**

　　　　In this ground for relief, Hand contends that the trial court erred in failing to

conduct an adequate colloquy to determine whether any prospective jurors were biased

by exposure to pretrial publicity.  This claim is related to one of the sub-claims raised in

Ground Four, alleging ineffective assistance of trial counsel regarding the inadequate

voir dire of Jurors Ray and Finamore (who stated in their questionnaires that they had

seen some pretrial publicity about the case).  As was discussed with respect to that sub-

claim, the trial court asked each of the small group of potential jurors during voir dire if

any of them had anything different to add to their questionnaire responses.  Jurors Ray

and Finamore, along with all other potential jurors, said they did not.  They also

responded negatively to the court's question whether they had read, heard or seen

anything that caused them to form an opinion about Hand's guilt or innocence.  Hand

contends that the trial court erred in failing to conduct a more detailed inquiry of the entire venire about exposure to pretrial publicity.

Hand did not raise this ground for relief in his direct appeal.  He raised the claim in his April 2006 application to reopen (Apx. Vol. 9 at 36-38), which the Ohio Supreme Court summarily denied.  (Id. at 43)  He also presented it in his post-conviction petition, supported by copies of the newspaper articles about the murders and his upcoming trial.  The Ohio Court of Appeals found the claim barred by res judicata:

> ... the issue could be determined by reviewing the voir dire transcript.  The record clearly demonstrates the trial court discussed the pretrial publicity during voir dire and discussed the same with the jurors.  Appellant's attachment of exhibits demonstrating pre-trial publicity to the post-conviction relief petition, though admittedly outside the original trial record, merely supplements appellant's argument which was capable of review on direct appeal on the then extant record.

State v. Hand, 2006-Ohio-2028 at ¶ 23.

The Magistrate Judge concluded that this claim is procedurally defaulted because the state court of appeals expressly relied on the res judicata doctrine.  As the Magistrate Judge observed, that doctrine bars Hand from raising an issue that was raised **or could have been raised** on direct appeal.  See Williams v. Bagley, 380 F.3d 932, 967 (6th Cir. 2004)(citing State v. Perry, 10 Ohio St.2d 175, 226 N.E.2d 104 (Ohio 1967)).  The issue of the venire's exposure to pretrial publicity could have been raised on direct appeal based on the jury questionnaires and the many references to and questions about that publicity in the voir dire transcript.  The state court specifically relied on the doctrine in rejecting his claim.  A petitioner cannot avoid the res judicata bar by simply attaching additional material to a post-conviction petition; that would

-98-

permit easy circumvention of the rule. The Magistrate Judge also concluded that Hand had not established cause for the procedural default.

Hand objects, citing the court of appeals' acknowledgment that the newspaper articles he submitted with his post-conviction petition were "admittedly outside the original trial transcript." He contends that the court of appeals erred in applying res judicata, and that this Court should review this claim on the merits. Hand notes that ten out of the twelve jurors who were eventually seated as trial jurors reported in their questionnaires that they had seen some news coverage of the murders. The trial court did not question any of these jurors individually about the coverage they had seen or heard.

The newspaper articles submitted with Hand's post-conviction petition were published primarily in two newspapers in the Columbus area, beginning shortly after Jill's murder and through the time of Hand's May 2003 trial. (Apx. Vol. 10 at 113-204) On the day jury selection began, the Columbus Dispatch published an article quoting inflammatory statements by Jeff Ray, Welch's cousin, who was asked to comment about Hand's escape charges. Ray reportedly said: "Certainly an innocent man would have just sat his time out. I think his actions speak for him. I'll just put this in God's hands. He'll have to answer to God."[9] Hand argues that the voir dire transcript alone would not reveal the extent or the content of this pretrial publicity, and therefore the state court erred in applying res judicata to this sub-claim. He cites <u>Hill v. Mitchell</u>, 400 F.3d 308 (6th Cir. 2005), where the Sixth Circuit held that the state court misapplied

---

[9] See Doc. 32 at 76, quoting from May 1, 2003 Dispatch article entitled "Murder Trial Might Provide Answers in Two Other Slayings" (Apx. Vol. 10 at 187).

Ohio's res judicata bar with respect to a claim of ineffective assistance of counsel,

based on the contention that his trial counsel first contacted his mitigation psychologist

just before the psychologist was scheduled to testify at the sentencing hearing.  This

late contact did not permit sufficient time to fully prepare his testimony (which addressed

the petitioner's drug addiction and "cocaine psychosis" when he committed a murder).

The post-conviction state appellate court concluded: "While we are puzzled by counsel's

seeming inattention [to the psychologist's preparation], Hill's claim is res judicata

because it could have been raised on direct appeal." Id. at 314.  The Sixth Circuit

disagreed, and affirmed the district court's conclusion that because Hill presented

evidence outside the trial record - the affidavit of his mitigation psychologist attesting to

the late contact and the manner in which it hampered his testimony - the state court

erroneously applied res judicata, and the claim was not defaulted.

Hand argues the same result should apply here to his claim that the trial court

failed to further voir dire each juror about the publicity.  This Court disagrees.  The

written questionnaires that were completed by each potential juror before voir dire

included a series of questions about media publicity about the case.  That section

began by stating: "This case received a significant amount of publicity in the media."  It

described the state's allegations, and quoted remarks made in some news reports, such

as "three wives murdered", "murder for hire plot," and other similar references.  The

jurors were asked to describe any media coverage they may have seen, how often they

had seen it, and what impressions it left in their minds.  They were also asked if media

exposure had led them to think that Hand was guilty of the crimes charged, and whether

they would be able to put all such information aside and base a decision solely on the

evidence and the court's instructions.  (See Apx. Vol. 14 at 1-12, the juror questionnaire

completed by Juror No. 481.)

　　　　As discussed above, the trial court conducted voir dire in small groups of seven

to nine jurors, and the trial court's method of examining these groups was basically

repeated each time.  After initial questioning about the length of the trial (and excusing

jurors from the group for that reason), the trial court asked the remaining group

members if they had any different responses to anything they put in the questionnaires.

The court reminded each group that Hand was presumed innocent unless and until the

jury would conclude that he was guilty beyond a reasonable doubt based on evidence

presented at trial, and "not on the basis of what some journalist may have said.  I'm sure

none of you would want to make significant life-changing decisions in your life based

upon some news account, and it's no different here.  Is there anything that you may

have read, heard, seen that caused you to form an opinion as to the Defendant's guilt or

innocence that you could not put aside?  Anybody? ... Are you all able to put aside

anything you saw, heard, read and decide this case solely on evidence presented within

the walls of this courtroom?"  (Trial Trans. Vol. 4 at 166-167)[10]   Clearly the issue of pre-

trial publicity was directly addressed by the trial court with each group of jurors.  This

claim should have been raised on direct appeal.

　　　　Even if this claim is not defaulted, however, Hand has not shown that his

_____

　　　　[10] The second small group of seven were questioned later the same day, and the
trial court asked the same questions (Trans. Vol. 4 at 305-307).  Ms. Finamore and Ms.
Ray were in this second group.  The same was true for the third group (Vol. 4 at 417-
418).  The procedure was repeated on Monday, May 5 (Vol. 5), and the jury was finally
selected on Tuesday, May 6 (Vol. 6).

constitutional rights were violated by the trial court's questioning of the venire.  A

criminal defendant is constitutionally entitled to an impartial jury, and

> ... voir dire is designed to protect [this right] by exposing
> possible biases, both known and unknown, on the part of
> potential jurors. ... [T]he necessity of truthful answers by
> prospective jurors if this process is to serve its purpose is
> obvious. ... [W]hen a juror's impartiality is at issue, the
> relevant question is did a juror swear that he could set aside
> any opinion he might hold and decide the case on the
> evidence, and should the juror's protestation of impartiality
> have been believed.

Dennis v. Mitchell, 354 F.3d 511, 520 (6th Cir. 2003)(internal citations and quotations

omitted).  Hand admits with respect to sub-claim (B) of Ground Four that he is not

claiming that his jury lacked impartiality; nevertheless, he argues here that the trial court

should have questioned each juror more carefully to flush out any potential bias based

on exposure to pretrial publicity.  The record shows that the trial court specifically asked

each juror, within each of the small groups questioned, if each of them were able to set

aside anything that they may have read or heard about the case, and to reach a verdict

solely upon the evidence at trial.  All jurors responded that they could do so.

The Court concludes that there was no error in the trial court's voir dire that

violated Hand's right to an impartial jury or to a fundamentally fair trial.  If not

procedurally defaulted, this ground for relief is denied.

**Ground Seven**

For his seventh ground for relief, Hand contends that the joinder for trial of the

escape charge with Hand's aggravated murder charges violated his due process rights

and deprived him of a fair trial.  The escape charge was brought by separate indictment

almost ten months after his original indictment, and the trial court denied his motion to

sever this charge from the rest of the charges. He raised this claim on direct appeal in

his third proposition of law. The Ohio Supreme Court rejected it, finding that his

participation in the escape attempt was evidence of flight, and therefore admissible to

show consciousness of guilt. It rejected Hand's argument that the lapse of time

between the murders and the escape attempt (approximately nine months) warranted

separate trials. The relevance and admissibility of evidence of flight do not depend

upon the time between the offense and the attempted flight, as any flight prior to a

conviction may give rise to the same inference of guilt. The Supreme Court also found

that there was ample evidence to support Hand's convictions of the murders and of the

escape attempt, concluding that the state did not improperly "... attempt to prove one

case simply by questionable evidence of other offenses." State v. Hand, 107 Ohio St.

3d at 402, quoting State v. Jamison, 49 Ohio St.3d 182, 187 (Ohio 1990).

   The Magistrate Judge concluded that Hand failed to sufficiently "federalize" his

improper joinder claim on direct appeal because he couched his argument exclusively in

state law, rendering it unreviewable by this Court. Hand objects, noting that he

specifically argued that joinder of the offenses "was unconstitutional" and cited the Fifth,

Sixth, Eighth, Ninth and Fourteenth Amendments. The Court notes that the segment of

Hand's direct appeal brief on this issue spanned eight pages, and argued that joinder of

the offenses was improper under Ohio Criminal Rules and statutes. He also argued

that he was prejudiced by the failure to sever, again citing Ohio criminal and evidentiary

rules. The last sentence of the conclusion of this section asserted that joinder "... was

unconstitutional and the convictions and sentences for all charges must be reversed.

U.S. Const. Amends. V, VI, VIII, IX, XIV; Ohio Const. Art I, 1, 2, 5, 9, 10, 16, 20." (Apx.

Vol. 6 at 293)   Unlike Hand's sub-claim (J) in the fourth ground for relief discussed

above, where Hand's proposition of law included an express constitutional argument

and a reference to specific amendments, Proposition of Law No. 3 in Hand's direct

appeal did not allude to any specific constitutional deprivation, but simply contended it

was "constitutional error."  (Id. at 246)

         Hand also suggests that he sufficiently federalized this claim because several of

the Ohio cases he cited in the brief analyzed the issue from a constitutional perspective,

including State v. LaMar, 95 Ohio St.3d 181 (Ohio 2002), State v. Coley, 93 Ohio St.3d

253 (2001), and State v. Bey, 85 Ohio St.3d 487 (1999).  The Court notes that Hand

cited these cases because they were distinguishable from his own.  LaMar was a

prosecution for several counts of aggravated murder against an Ohio inmate, stemming

from the Lucasville riot.  The defendant argued that the trial court should have severed

one of the counts because the facts and circumstances differed substantially from the

facts surrounding the other eight counts (the murder in questioned happened two days

after the riot was quelled).  The Court has reviewed the Ohio Supreme Court's opinion

rejecting LaMar's appeal, and cannot glean any "constitutional analysis" undertaken by

that court.  Rather, the court analyzed LaMar's claim under Ohio Crim. R. 8, permitting

joinder of offenses that "are of the same or similar character," or the same act or

transaction, or part of a course of conduct.  Severance may be granted if a defendant

establishes prejudice resulting from joinder, and appellate review of a trial court's

decision on that issue is for abuse of discretion.  The same is true with respect to State

v. Coley, 93 Ohio St.3d 253, 259-261 (2001), which rejected an improper joinder claim

by discussing cases permitting joinder when similar "other-acts" evidence is introduced,

and relying exclusively on Ohio law.

However, even assuming that Hand's conclusory citation to federal constitutional amendments was sufficient to "federalize" his claim, Hand has not articulated how the Ohio Supreme Court's decision runs afoul of Section 2254(d). In his habeas petition, he argued that joinder was improper because it greatly prejudiced his defense on the murder charges, arguing that the jury "was more likely to convict Hand for aggravated murder due to its belief that he participated in the escape plot." (Doc. 11 at ¶ 116) And he suggests that joinder created an undue prejudicial risk that the jury convicted him of murder because he had a propensity to commit crimes, rather than because the evidence established his guilt beyond a reasonable doubt, thereby depriving him of a fair trial. The only federal case cited in his petition is <u>United States v. Lane</u>, 474 U.S. 438 (1986), which involved father-and-son defendants federally indicted on several counts of mail fraud and conspiracy stemming from an arson scheme. They had unsuccessfully moved to sever their cases, arguing that a joint trial would violate Fed. R. Crim. Proc. 8(b). The Fifth Circuit vacated their convictions, concluding that misjoinder under the Rule is prejudicial per se. The Supreme Court reversed, holding that harmless error review should apply to misjoinder claims, and that Rule 8's standards are not of constitutional magnitude standing alone. Rather, misjoinder of defendants "would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." <u>Id</u>. at 446, n.8. And that would occur only if misjoinder had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Id</u>. at 449 (internal citation omitted). The Supreme Court found that misjoinder in that case was harmless, because any error in

-105-

refusing to sever the cases did not have a constitutionally improper substantial influence on the verdict.

In Davis v. Coyle, 475 F.3d 761 (6th Cir. 2007), the Sixth Circuit applied Lane to find that joinder for trial of aggravated murder and possession of a firearm under disability charges did not violate petitioner's constitutional rights, thus did not warrant habeas relief.  The petitioner argued that joinder of the offenses would result in the jury learning about his prior homicide conviction, which was admissible only to prove that he could not legally possess a firearm.  The trial court's denial of his motion led to his decision to waive a jury and opt for a trial before a three-judge panel.  The Sixth Circuit agreed that while a risk of prejudice clearly existed, joinder of the offenses did not result in an unfair trial or a deprivation of petitioner's due process rights.  The court also noted that it would not substitute its own judgment for that of the state court regarding the appropriate application of a state criminal rule, even though another method "may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at bar."  Id. at 778 (internal citation omitted).

Applying these standards, this Court cannot conclude that joinder of the escape charge had a "substantial and injurious effect" on Hand's trial or deprived him of his due process rights.  As the Ohio Supreme Court found, the evidence concerning his participation in the escape scheme, if accepted by the jury, could properly be considered to reflect consciousness of guilt.  The Ohio Supreme Court's decision was not contrary to the standards discussed in United States v. Lane, or in Davis v. Coyle, and did not unreasonably apply any clearly established federal law.  This ground for relief is therefore denied.

**Ground Eight**

Hand contends there was insufficient evidence introduced at his trial to support his conviction for escape.  Hand raised this claim on direct appeal, and it was rejected on the merits by the Ohio Supreme Court, applying the standards set forth in Jackson v. Virginia, 443 U.S. 307 (1979), as adopted in State v. Jenks, 61 Ohio St.3d 259 (1991): "[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."  State v. Hand, 107 Ohio St.3d at 402-403.  Moreover, as the Magistrate Judge noted, even if the court concludes that a "... rational trier of fact could not have found a petitioner guilty beyond a reasonable doubt, on habeas review, we must still defer to the state appellate court's sufficiency determination as long as it is not unreasonable."  Brown v. Konteh, 567 F.3d 191, 205 (6th Cir. 2009).

The Ohio Supreme Court cited Beverly's trial testimony that Hand served as a lookout, gave him advice on how to cut cell bars, and came up with the alternate escape plan.  The court also cited circumstantial evidence, including the torn-up teeshirt material and a pencil that was found in his cell.  A county detective testified that these materials were "consistent to what inmates do to hide things ... so they can be easily accessed by pulling on this after tying something to it, i.e., saw blades."  Moreover, even if Hand merely acted as Beverly's lookout, the Court concluded that he would be guilty as a accomplice.  Id. at 403.

The Magistrate Judge found that this claim lacks merit, reciting Beverly's trial testimony concerning specific details of the escape attempt.  Kenneth Grimes testified

that he overheard Beverly and Hand talking one evening when Hand presented his alternate escape plan (to go through the front of the cell).  Grimes admitted that when he first gave a statement to police after the escape plan was detected, he did not mention Hand's involvement.  Terry Neal testified that he knew about Beverly's involvement but he did not believe that Hand was involved, and Neal told investigators about his belief.  Dennis Boster admitted that he was involved in the plan (he pled guilty to the charge), but he testified that Hand was not involved, that he never heard Hand say he wanted to be involved, and that Hand did not act as a lookout for Beverly. During Boster's own plea hearing, he told the court that Hand had nothing to do with the escape attempt.  Hand testified in his own defense that he tried to stay away from Beverly, and told Beverly he did not want to involve himself with an escape.  He said that all of the inmates used torn tee shirts as wash rags or towels, and that he used strips of shirts to hang his commissary purchases over his bed in order to keep ants out. The Magistrate Judge notes that while some of this testimony supported Hand's claim of non-involvement, Beverly and Grimes clearly implicated him in the scheme.  The jury was under no obligation to accept the favorable testimony (or, in Neal's case, his somewhat equivocal statement  that he did not "believe" that Hand was involved), and was entitled to give more weight to the inculpatory testimony and evidence that the state presented.  That testimony and evidence was more than sufficient to lead a rational juror to conclude beyond a reasonable doubt that Hand was guilty.

In his objections, Hand contends that the two witnesses against him, Beverly and Grimes, lacked all credibility, and that the Magistrate Judge ignored "overwhelming evidence" of his innocence.  (Doc. 117 at 38)   He notes that when Beverly's escape

plan was discovered and he was first questioned by the police on November 26, 2002, Beverly did not tell the authorities that Hand was involved.  Beverly was interviewed the next day by a detective, and it was the detective who asked Beverly if Hand was involved.  (Trial Trans. Vol. 16 at 3002)   This fact was stressed by Hand's counsel during his cross-examination of Beverly; he also questioned Beverly about the relatively low sentence he ultimately received for the escape attempt.  (Id. at 2998-3003)  Similarly, Grimes admitted that when he was first questioned by the police, he said that Beverly and two inmates from Cell E-6 were involved in the plot; Hand was housed in Cell E-7.  Beverly and the two inmates who kept watch were, according to Grimes' initial statement, the "guys on the escape."  (Trial Trans. Vol. 17 at 3045)  This subject was fully explored by Hand's trial counsel during Grimes' cross-examination; Grimes was also questioned extensively about his own criminal record and the favorable sentence he received after he gave his statements to the detectives.  (Id. at 3036-3060)

Hand's claim essentially rests on a challenge to the jury's evaluation of the credibility of these witnesses.  This is an insufficient basis upon which the Court could grant habeas relief.  Hand's trial counsel cross-examined both of these witnesses, pointing out inconsistencies in their stories and their potential biases that Hand relies on as the "overwhelming evidence" of his innocence.  For these reasons, the Court agrees with the Magistrate Judge's recommendation, and denies Ground Eight of Hand's petition.

**Ground Nine**

In his ninth ground for relief, Hand raises a number of constitutional challenges to the trial court's jury instructions.

**(A)  Complicity instruction.**  At the close of the evidence and over Hand's objections, the trial court granted the state's motion to amend the bill of particulars to charge Hand with complicity in Jill's death.  The pre-trial bill of particulars regarding Count One alleged that Hand "... did, purposefully and with prior calculation and design, cause the death of Jill J. Hand by means of a firearm."  The amended bill alleged that Hand killed Jill "by firing that weapon himself, or by soliciting or procuring Walter 'Lonnie' Welch to commit the offense, and in either case, the defendant acted purposely and with prior calculation and design."  State v. Hand, 107 Ohio St.3d at 403-404.  Hand also objected to the trial court's intent to instruct the jury on complicity to commit murder, which the trial court overruled.

Hand raised both the amended bill of particulars and the complicity instruction objections on direct appeal as his fifth proposition of law.  The Ohio Supreme Court rejected his claims by citing Ohio Crim. R. 7(D), which states in relevant part: "The court may at any time before, during, or after a trial amend the indictment, information, complaint, or bill of particulars, in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged."  The Supreme Court held that the amendment did not run afoul of this Rule.  It also rejected Hand's argument that the trial court did not give him proper notice that it would instruct the jury on complicity.  The court cited R.C. 2923.03(F), which states that a complicity instruction may be given "even when the charge is drawn in terms of the principal offense."  The statute itself clearly provides any defendant with adequate notice that complicity may be an issue submitted to the jury, citing Ohio case law that in turn relied on Hill v. Perini, 788 F.2d

-110-

406 (6th Cir. 1986).  In that case, the Sixth Circuit held: "... this court has expressly

acknowledged that a defendant may be indicted for the commission of a substantive

crime as a principal offender and convicted of aiding and abetting its commission,

although not named in the indictment as an aider and abettor, without violating federal

due process.  *Stone v. Wingo*, 416 F.2d 857 (6th Cir. 1969)."  Hill, 788 F.2d at 407-408.

The Ohio Supreme Court also found that Hand failed to demonstrate that the

amended bill of particulars caused him prejudice or hampered his defense.  Hand

consistently denied any involvement in Jill's murder, and he claimed that he shot Welch

in self-defense.  His  defense theories would not have changed even if the state had

originally alleged both principal and complicitor liability in the first bill of particulars.

Hand did not identify any new evidence or any new arguments he would have raised if

the amendment had been sought prior to or earlier in his trial.  And he did not seek a

continuance from the trial court after it granted the state's motion to amend, which he

could have done if he truly required additional time to prepare a defense to the

complicity charge.  The court ultimately concluded that Hand was not misled or

prejudiced by the amended bill of particulars, and that there was no error in instructing

the jury on complicity.

The Magistrate Judge concluded this sub-claim lacks merit, observing that Hand

has not explained how he would have defended himself differently if the bill of

particulars had alleged complicity from the start.  The Magistrate Judge also cites Hill v.

Perini, holding that a complicity conviction (or for aiding and abetting a crime) does not

violate due process even though the indictment does not accuse a defendant of

complicity or aiding and abetting liability.  Hand objects, arguing that broadening the bill

of particulars unconstitutionally broadened the indictment.

For the reasons amply addressed by the Ohio Supreme Court and by the Magistrate Judge, Hand's argument is rejected. Hand was originally charged with Jill's murder, committed with prior calculation and design by use of a gun. The amended bill charged him with the same crime, murder with prior calculation and design by use of a gun. Whether he fired the gun himself, or hired Welch to fire the gun, does not change or broaden that crime in a manner that violated any of Hand's constitutional rights. As the Sixth Circuit long ago observed, "... a variance [in an indictment] is not material unless it misleads the accused to his prejudice in making his defense, or may expose him to the danger of being again put in jeopardy for the same offense." Stone v. Wingo, 416 F.2d 857, 864 (6th Cir. 1969). Moreover, Hand has not identified how the purported lack of notice prejudiced his defense, and he failed to seek a continuance after the amendment was granted. Hand's jury was properly instructed on complicity. The Ohio Supreme Court's decision on this issue is not contrary to or an unreasonable application of established federal law. This sub-claim is therefore denied.

**(B) Course-of-conduct narrowing instruction**. Hand was charged with a course-of-conduct death penalty specification for the aggravated murders of Jill Hand and of Lonnie Welch. Hand alleges in his petition that the instruction on the course of conduct specification that the trial court gave to his jury "... was unconstitutionally vague, and it failed to adequately achieve the genuine narrowing function for death eligibility factors mandated by the Eighth and Fourteenth Amendments." (Doc. 11 at ¶ 133) Hand did not object to the instruction at trial. Hand raised this claim on direct appeal, which the Supreme Court reviewed only for plain error and found none. The

court enforced Ohio's contemporaneous objection rule, and as the Magistrate Judge noted, that alone is an adequate and independent state ground for procedural default of this claim. See Biros v. Bagley, 422 F.3d 379, 387 (6th Cir. 2005).

However, as the Magistrate Judge further noted, the Supreme Court also addressed the substantive issue of the course of conduct specification of which Hand was convicted in light of State v. Sapp, 105 Ohio St.3d 104 (2004), which had been decided after the briefing in Hand's appeal was complete. Sapp discussed the quantum of evidence the state must produce in order to support a conviction on the course-of-conduct statutory aggravating factor. Applying Sapp to Hand's contentions, the Supreme Court held that the state is required to:

> ... establish some factual link between the aggravated murder with which the defendant is charged and the other murders or attempted murders that are alleged to make up the course of conduct. ... [t]he trier of fact must discern some connection, common scheme, or some pattern or psychological threat that ties [the offenses] together. That factual link might be one of time, location, murder weapon, or cause of death. ... [W]hen two or more offenses are alleged to constitute a course of conduct under R.C. 2929.04(A)(5), all the circumstances of the offenses must be taken into account.

State v. Hand, 107 Ohio St.3d at 405-406 (internal citations and quotations omitted). The court concluded that the facts adduced at Hand's trial about the murders of Jill and Welch satisfied this criteria, because the murders were related by time, place, and motive. On that basis, the court rejected Hand's contention that the jury instructions did not clearly specify that only Jill and Welch were the subject of the course-of-conduct specifications. Those specifications accompanied the only two murder counts in the indictment, one for Jill and one for Welch; there were no murder charges brought

against Hand for the murders of Donna or Lori.  The court found no plain error because the jury could not have been misled about the specific charges to which the specification applied.

Hand's habeas petition argues that there is little state law guidance on what constitutes a "course of conduct" for purposes of the Ohio specification.  He observes that his trial attorneys could not offer a definition of "course of conduct" when asked to do so by the trial court.  (Trial Trans. Vol. 19 at 3308)  The Court notes that this exchange occurred during the hearing on Hand's Rule 29 motion, in which he sought dismissal of the course of conduct specifications.  The trial court stated " ... I'm not sure there is a definition for course of conduct, and I'd like counsel to find me the definition of course of conduct."   Hand's counsel, Mr. Cline, responded: "We've tried."  After this exchange, the trial court went on to conclude:

> In any event, the evidence would show, of course, there are two killings which took place based upon reasonable inference.  The jury certainly could decide that killing of two different people involved a course of conduct, especially since there's evidence of some planning that took place in order for that to occur.  So we would deny Rule 29 on that specific issue.

(Trial Trans. Vol. 19 at 3308-3309)  The trial court's observation about the absence of a specific legal definition did not substantively affect the court's conclusion that there was sufficient evidence to submit the issue to the jury, as the transcript reflects.

Hand's petition cites the dissenting opinion in State v. Scott, 101 Ohio St.3d 31 (2004).  In that case, however, the Ohio Supreme Court affirmed a jury's verdict on a course of conduct death specification for two murders that appeared to be unrelated, occurred 19 days apart, and involved two unrelated individuals.  The defendant in that

-114-

case shot a man (Green) who had called him "bitch" while they were talking on the

street, and afterwards the defendant bragged about the killing to others.  A short time

later, defendant told a friend that he wanted to test drive a car and kill the owner during

the drive.  About a week after that, defendant arranged to test drive a car and then shot

the owner (Stoffer, who was sitting in the front seat) in the head.  He was indicted

(among other charges) for Stoffer's aggravated murder with a course of conduct death

penalty specification; the jury returned guilty verdicts and imposed the death penalty.

On appeal, he argued that there was insufficient evidence introduced by the state to

prove a nexus between the two murders, contending that he had "spontaneously killed

Green without robbing him, but he planned to kill Stoffer and take his vehicle."  Id. at 36.

The Supreme Court rejected his argument, holding that the specification applies to:

> ... multiple murders that an offender commits as part of a
> continuing course of criminal conduct, even if the offender
> does not necessarily commit them as part of the same
> transaction. ...  While Scott argues that killing Green was
> separate and distinct from killing Stoffer, the pattern of
> conduct he exhibited in the spontaneous execution of Green
> for no apparent reason, his bragging about that killing, and
> the threats he made to those who could report it, combined
> with his forecast of the Stoffer murder, the cold-blooded
> manner in which he carried it out, the threats he made
> surrounding that killing, and his bragging to Jewell about it,
> all suggest a deliberate effort by Scott to earn a reputation
> as an indiscriminate killer bent on enhancing his influence in
> the community by causing others to fear him.  Accordingly,
> construing the evidence most strongly in favor of the state, a
> rational trier of fact could have found Scott guilty of the
> course-of-conduct specification ...

Id. at 37-38 (internal citation omitted).  This decision does not support Hand's

arguments.  As the Ohio Supreme Court found, there was sufficient evidence for Hand's

jury to conclude beyond a reasonable doubt that the murders of Jill and Welch were part

of Hand's course of conduct, and that the murders were related by time, place and motive, a more substantive nexus between the two crimes than the facts that were discussed in State v. Scott.

In his Report, the Magistrate Judge quotes the course of conduct jury instructions that were actually given at Hand's trial. In the guilt phase, the trial court instructed the jury with respect to Count One (Jill's murder) that they "must find beyond a reasonable doubt that the aggravated murder of [Jill] was part of a course of conduct involving the purposeful killing of two or more persons by the defendant." With regard to Count Two and the specification for Welch's murder, the instruction required the jury to "find beyond a reasonable doubt that the aggravated murder of [Welch] was part of a course of conduct involving the purposeful killing of two or more persons by the defendant." (Trial Trans. Vol. 20 at 3760 and 3772) In the penalty phase, the court instructed the jury that the aggravating circumstance for each of these two counts was "a course of conduct involving the purposeful killing of [Jill] and [Welch] by the defendant, Gerald R. Hand." (Trial Trans. Vol. 22 at 3842, 3907)

Hand suggests that because the penalty phase instructions specifically cited the killing of Jill and Welch as the murders constituting the course of conduct, the guilt phase instructions (which did not include that specific reference) were unconstitutionally vague. The Magistrate Judge observed that throughout the 59 pages of guilt phase instructions (Trial Trans. Vol. 20 at 3748-3807), the trial court consistently and exclusively referred to the killings of Jill Hand and Lonnie Welch, particularly in the specification instructions. (Id. at 3760 and 3772) In contrast, Donna and Lori Hand were mentioned only regarding the additional specifications on Count Two. The second

-116-

specification was that Welch's murder "was committed by the defendant for the purpose of escaping detection, apprehension, trial or punishment for another offense, complicity to the murder of Donna A. Hand ..." (Id. at 3773). The third specification was that Welch's murder was committed "for the purpose of escaping detection, apprehension, trial, or punishment for another offense, the complicity to the murder of Lori Hand ..." (Id. at 3775). The trial court also instructed the jury that the "only difference" between specifications two and three on Count Two "is the reference to Lori L. Hand in this [third] specification, rather than Donna A. Hand, as in the [second] specification." (Id.) Donna and Lori were again specifically mentioned in the instructions for specifications five and six. The court instructed for specification five that: "(a) the victim of the aggravated murder, Walter Lonnie Welch, was a witness to the murder of Donna A. Hand, and (b) Walter Lonnie Welch was purposely killed by the defendant to prevent Lonnie Welch from testifying in any criminal proceedings, and (c) the aggravated murder of Walter Lonnie Welch was not committed during the murder of Donna A. Hand." (Id. at 3776-3777) The same instruction was given for specification six, substituting Lori Hand for Donna Hand. (Id. at 3777) This Court agrees with the Magistrate Judge that there is no reasonable possibility that the jury could not understand or was confused about the fact that the course of conduct specification applied only to Counts One and Two relating to the murders of Jill and Welch.

In his objections, Hand contends that even if a rational juror would not misinterpret the instructions in that fashion, the trial court failed to explain "what circumstance the jury was to consider under this specification" because the court did not specifically define "course of conduct." (Doc. 117 at 41-42) In Scott v. Houk, 2011 U.S.

-117-

Dist. LEXIS 133743 (N.D. Ohio, Nov. 18, 2011), the district court rejected the merits of a

substantially identical habeas claim.[11]  In that case, the court observed that the U.S.

Supreme Court "has given states wide latitude in determining the means by which to

narrow" the class of death-eligible offenders.  The district court quoted at length from

State v. Benner, 40 Ohio St.3d 301 (1988), which this Court also quotes here, where the

Ohio Supreme Court rejected the argument that R.C. 2929.04(A)(5) was

unconstitutionally vague:

> We believe that if appellant's vagueness argument is based
> on the possibility of differing interpretations of the term
> "course of conduct," it is misdirected since such a possibility
> is not the correct test for vagueness in capital cases. Claims
> of vagueness directed at aggravating circumstances defined
> in capital punishment statutes are analyzed under the Eighth
> Amendment and characteristically assert that the challenged
> provision fails adequately to inform juries what they must find
> to impose the death penalty and as a result leaves them and
> appellate courts with the kind of open-ended discretion which
> was held invalid in *Furman v. Georgia* [408 U.S. 238 (1972)]
> ...
>
> The R.C. 2929.04(A)(5) course-of-conduct specification is
> not the type of "open-ended" statute struck down in *Maynard
> [v. Cartwright*, 486 U.S. 356 (1988)], and *Godfrey v. Georgia*
> 446 U.S. 420 (1980). In *Godfrey*, the court found that an
> aggravating circumstance for murders that were
> "outrageously or wantonly vile, horrible or inhuman" did not
> adequately channel jury discretion: "A person of ordinary
> sensibility could fairly characterize almost every murder as
> 'outrageously or wantonly vile, horrible or inhuman.' "  *Id.* at
> 428-429.  Similarly, in *Maynard*, the court struck down an
> aggravating circumstance provision referring to "especially
> heinous, atrocious or cruel" murders, on the basis that "an
> ordinary person could honestly believe that every unjustified,
> intentional taking of human life is 'especially heinous.' "  486
> U.S. at 364.

---

[11] The habeas petitioner in that case was the defendant in State v. Scott,
discussed infra at pp. 115-116.

> Turning to the statute assailed sub judice, it is clear that no one could reasonably believe that every murder is "part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." Thus, we find that the specification R.C. 2929.04(A)(5) does not give the sentencing court the wide discretion condemned in both *Godfrey* and *Maynard*. Therefore, we hold that the course-of-conduct specification is not void for vagueness under either the Eighth Amendment of the United States Constitution or Section 9, Article I of the Ohio Constitution. The language of the statute is definitive and is circumscribed to cover only those situations which it fairly describes.

State v. Benner, 40 Ohio St.3d at 305 (quoted in Scott v. Houk, at **61-64).

Based on that discussion, the district court in Scott held:

> Using the established United States Supreme Court standards, the Ohio Supreme Court found that R.C. 2929.04(A)(5) sufficiently directed a capital sentencer about what facts it must find in order to find a defendant guilty of the course-of-conduct aggravating circumstance. Thus, the court found it complied with the requirements of the Eighth Amendment by sufficiently narrowing the class of capital defendants who would be eligible to have this aggravating circumstance found.

Scott v. Houk, 2011 U.S. Dist. LEXIS at *64.

This Court agrees with and fully adopts the analysis and the conclusion reached by the district court in Scott. The course of conduct instructions to Hand's jury mirrored the statute defining the specification: "... the offense at bar was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons by the offender." R.C. 2929.04(A)(5). Neither the Ohio statute nor the instructions given to Hand's jury are unconstitutionally vague. The instructions did not deprive Hand of a fair trial or violate the Eighth Amendment. This Court therefore concludes that the Ohio Supreme Court's rejection of Hand's argument was not contrary to nor an unreasonable

-119-

application of established federal law.  This sub-claim is denied.

**(C)  Trial court's failure to properly instruct on use of guilt phase evidence during sentencing.**  In sub-claim (F) of Ground Five discussed above, Hand alleges that the trial court erred in admitting the guilt-phase exhibits at sentencing.  In this sub-claim, he argues that the trial court failed to properly instruct the jury about  which portions of those exhibits they should consider in weighing the aggravating and mitigating factors.  Respondent's traverse argues that this sub-claim is procedurally defaulted because Hand never raised it in state court.  He did present an ineffective assistance of trial counsel claim based on counsel's failure to object to the admission of the guilt phase evidence, but that is a substantively different claim than this one.  The Magistrate Judge agreed with Respondent, and concluded that this sub-claim is procedurally defaulted.

In his objections, Hand concedes that he did not present this claim to the state court.  But he argues he can establish good cause to excuse the default due to ineffective assistance of **appellate** counsel in failing to include this issue in Hand's direct appeal.   But Hand never presented an ineffective assistance of **appellate** counsel claim on this ground to the state courts, and it therefore cannot serve as adequate cause to excuse the default of the underlying claim of trial error.  This Court agrees with the Magistrate Judge that this claim is procedurally defaulted.

**(D)  Reasonable Doubt Instruction**.  In this sub-claim, Hand contends that the trial court's reasonable doubt instruction was improper and unconstitutional.   During the guilt phase, the trial court instructed the jury:

Reasonable doubt is present when, after you have carefully

-120-

> considered and compared all the evidence, you cannot say you are firmly convinced of the truth of the charge. Reasonable doubt is a doubt based upon reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence, is open to some possible or imaginary doubt. Proof beyond a reasonable doubt is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of his or her own affairs.

(Trial Trans. Vol. 20 at 3750)  An almost identical instruction was given at the close of the mitigation phase.  (Trial Trans. Vol. 22 at 3906-07)   These instructions were based on R.C. 2901.05(D), Ohio's statutory definition of reasonable doubt:

> 'Reasonable doubt' is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge.  It is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. 'Proof beyond a reasonable doubt' is proof of such character that an ordinary person would be willing to rely and act upon it in the most important of the person's own affairs.

Hand contends there are three infirmities in the trial court's instructions.  First, the phrase "would be willing to rely and act" in the last sentence of the instruction is too lenient and does not properly guide the jury.  He cites several cases adopting "... a preference for defining proof beyond a reasonable doubt in terms of a prudent person who would hesitate to act when confronted with such evidence."  (Doc. 11 at ¶ 141) Second, he contends that the phrase "firmly convinced" represents a clear and convincing evidentiary standard, not a proper criminal standard.  Third, he argues that the phrase "moral evidence" is highly subjective, and its use in the instructions  amounts to structural error.

-121-

He raised this claim on direct appeal, and the Ohio Supreme Court summarily rejected its merits. The Magistrate Judge recommends that this sub-claim be denied because the Sixth Circuit has approved virtually identical reasonable doubt instructions based upon the language of R.C. 2901.05 on numerous occasions. See Byrd v. Collins, 209 F.3d 486, 527 (6th Cir. 2000): "Petitioner's challenge to the judge's instruction defining reasonable doubt must also fail. The trial judge's instruction was taken virtually verbatim from the statutorily required definition of reasonable doubt that the judge was required to give under Ohio law. ... This Circuit has previously upheld the constitutionality of this instruction. See *Thomas v. Arn*, 704 F.2d 865, 869 (6th Cir. 1983)." See also, White v. Mitchell, 431 F.3d 517, 534 (6th Cir. 2005), rejecting a habeas challenge to an essentially identical instruction: "We have specifically ruled that Ohio's articulation of the reasonable doubt standard does not offend due process. *Buell v. Mitchell*, 274 F.3d 337, 366 (6th Cir. 2001). Moreover, we rejected an identical challenge to the reasonable doubt instruction in *Coleman v. Mitchell*, 268 F.3d 417, 437 (6th Cir. 2001)."

Hand objects and cites Holland v. United States, 348 U.S. 121, 140 (1954), involving an appeal from a tax evasion conviction in which the appellants attacked the reasonable doubt instruction given to their jury. The entirety of the Supreme Court's discussion on this issue is as follows:

> Even more insistent is the petitioners' attack, not made below, on the charge of the trial judge as to reasonable doubt. He defined it as "the kind of doubt . . . which you folks in the more serious and important affairs of your own lives might be willing to act upon." We think this section of the charge should have been in terms of the kind of doubt that would make a person hesitate to act, see *Bishop v.*

-122-

> *United States*, 71 App. D. C. 132, 137-138, 107 F.2d 297,
> 303, rather than the kind on which he would be willing to act.
> But we believe that the instruction as given was not of the
> type that could mislead the jury into finding no reasonable
> doubt when in fact there was some. A definition of a doubt
> as something the jury would act upon would seem to create
> confusion rather than misapprehension. "Attempts to explain
> the term 'reasonable doubt' do not usually result in making it
> any clearer to the minds of the jury," *Miles v. United States*,
> 103 U.S. 304, 312, and we feel that, taken as a whole, the
> instructions correctly conveyed the concept of reasonable
> doubt to the jury.

Id. at 140. This discussion does not conflict with or undermine the merits of the Ohio

Supreme Court's rejection of Hand's claim. While other phrasings of a reasonable

doubt instruction might be acceptable or preferable to that set forth in Ohio's statutory

definition, as suggested in Holland, the Supreme Court held in that case that the

instructions as a whole did not mislead the jury. Given the wealth of subsequent federal

cases affirming the constitutionality of reasonable doubt instructions that are essentially

identical to those given at Hand's trial, the Ohio Supreme Court's summary rejection of

this sub-claim was not contrary to or an unreasonable application of federal law.

Therefore, this sub-claim and each of the sub-claims raised in Ground Nine are

denied.

**Ground Ten**

Hand contends in his tenth ground for relief that the jury did not properly weigh

the aggravating and mitigating factors during its penalty phase deliberations. He raised

this claim in his post-conviction petition, supported by an investigator's affidavit

describing a juror's statements about the jury's sentencing deliberations. The Ohio

Court of Appeals affirmed the trial court's dismissal of this claim because the affidavit

-123-

was impermissible hearsay, and because the juror's statements were incompetent and inadmissible pursuant to Ohio Evid. Rule 606(B).  State v. Hand, 2006-Ohio-2028 at ¶ 44.

The Magistrate Judge quotes the affidavit in question that was signed by Jennifer Cordle, a mitigation specialist with the Ohio Public Defender's Office.  Ms. Cordle met with the juror in December 2004, when the juror told her that the jury returned a death sentence because "they had to because Mr. Hand was guilty of an aggravated murder and they had to follow the judge's instructions...".  (Doc. 101 at 165, quoting from Cordle Affidavit, Apx. Vol. 10 at 379.)  The Magistrate Judge aptly labeled the affidavit "classic hearsay," offered to prove the truth of what the juror told Cordle, and thus inadmissible. Moreover, the affidavit is barred by the aliunde rule incorporated in Ohio's Evid. Rule 606(B), and mirrored in Fed. R. Evid. 606(B).  There is nothing in the affidavit suggesting that any improper outside information reached the jury, that any juror engaged in conduct that violated the instructions, or that any extraneous prejudicial information was brought to their attention during deliberations.

Hand objects, arguing that the jury failed to consider his character, history, and background in reaching its decision.  Even if the affidavit had some admissible evidentiary value, it does not fairly suggest that this was the case.  Rather, the juror told Ms. Cordle that Hand was guilty and they "had to follow the judge's instructions."  Hand simply has not shown why or how the Ohio Court of Appeals' rejection of this claim was contrary to or an unreasonable application of clearly established federal law.  The Court therefore denies Ground Ten of Hand's petition.

**Ground Eleven**

-124-

For his eleventh ground for relief, Hand contends he received ineffective assistance of appellate counsel, raising six sub-claims.  Sub-claims A, B, and C were included in Hand's habeas petition but had not previously been presented to the state courts.  This case was stayed to permit Hand to exhaust these sub-claims by filing a motion to reopen his direct appeal, which the Ohio Supreme Court denied as untimely.  The Magistrate Judge concluded that sub-claims A, B and C are procedurally defaulted based on that ruling.  The Court will consider these three sub-claims together, along with Hand's objections to the Magistrate Judge's recommendations with respect to each of them.

**(A)  Failure to appeal collateral estoppel argument**.  Hand filed a claim for reparations from the Ohio Victims of Crime Compensation Division, administered by the Ohio Court of Claims, after Donna Hand's murder.  The state found that he was not at fault for her murder, and he received an award of $50,000.  At Hand's criminal trial, the state presented testimony from the administrator of the Ohio Court of Claims, and a copy of the Court of Claim's written award to Hand was received in evidence as State Exhibit 45.  As part of his Rule 29 motion to dismiss at the close of the state's case, Hand's trial counsel moved to dismiss the second death penalty specification on Count Two of the indictment (complicity in Donna's murder), arguing that collateral estoppel precluded the state from alleging that Hand was responsible for or complicit in Donna's murder.  (Trial Trans. Vol. 19 at 3294-3295)  The trial court denied the motion, and noted its concern that Hand may have committed a fraud on the Court of Claims, which would permit a finding that its judgment should be set aside.  The trial court ruled that "... there's at least some evidence of fraud on that court and, therefore, this court would

-125-

not give credence to the Court of Claims in terms of the issue of preclusion that was argued here today, and I would deny the motion on Rule 29 on that count...". (Id. at 3309-3310)   This ruling was not raised in Hand's direct appeal.

**(B)   Failure to appeal trial counsel's failure to object to the testimony of Hand's bankruptcy attorney.**   In Ground Four, sub-claim A (discussed infra), Hand argued that he received ineffective assistance of trial counsel due to the failure to object to Hand's testimony about his communications with a bankruptcy attorney.  The Court found that claim was procedurally defaulted, and that Hand has not shown cause for the default.  In this sub-claim, Hand contends that his appellate counsel should have raised this issue in his direct appeal.

**(C)   Failure to appeal the denial of Hand's motion to dismiss the specifications relating to the murders of Donna and Lori Hand.**  Trial counsel filed a pre-trial motion to exclude "other acts" evidence under Evid. Rule 404(B), and specifically evidence relating to the murders of Donna and Lori.  (Apx. Vol. 1 at 232) The trial court denied the motion in a written judgment entry, noting that the state could not prove the specifications relating to those murders without evidence that Hand was involved in the murders.  (Apx. Vol. 1 at 390)   This ruling was not raised on direct appeal.

The Magistrate Judge concluded that these three sub-claims are procedurally defaulted.  All three were raised in state court for the first time in Hand's 2007 motion to reopen his direct appeal.  The Ohio Supreme Court denied that motion because "Appellant failed to comply with the 90-day filing deadline in S. Ct. Prac. R. XI(6)(A)." (Apx. Vol. 9 at 207)  The Supreme Court actually enforced this Ohio procedural rule.

The Magistrate Judge concluded that the rule is an adequate and independent state ground, by reviewing in some detail the history of the Ohio courts' enforcement of this rule (and its counterpart in Ohio Crim. Rule 26(B)) as discussed in several Sixth Circuit cases. In Franklin v. Anderson, 434 F.3d 412 (6th Cir. 2006), the Sixth Circuit found that the Ohio Supreme Court had not actually and regularly enforced the 90-day time limit for filing motions to reopen pursuant to Ohio Civil Rule 26(B), from sometime in 2000 until 2004. At that point, the Supreme Court apparently had resumed a pattern of strict enforcement of the timeliness rules, because three recent reported cases from the Supreme Court had enforced the rule and rejected untimely motions to reopen. Given the prior history of inconsistent enforcement, and the fact that the petitioner (Franklin) had filed his motion to reopen the day **before** Ohio's Civil Rule 26(B) took effect on July 1, 1993, the Sixth Circuit held that the rule did not constitute an adequate and independent state ground precluding habeas review of Franklin's ineffective assistance of appellate counsel claim. Franklin, 434 F.3d at 418-421.

A few years later, in Fautenberry v. Mitchell, 515 F.3d 614 (6th Cir. 2008), the Sixth Circuit again considered whether a habeas petitioner's claim was procedurally defaulted due to his untimely motion to reopen his direct appeal. Fautenberry's direct appeal had been originally denied in February 1994, and his application to reopen was filed in July 1996. The court found that he had shown good cause to excuse the delay between February 1994 and January 1996, when new appellate counsel was appointed to represent him. But that new lawyer waited six months after his appointment to file the motion to reopen. Moreover, the lawyer had filed a motion to reconsider the denial of his direct appeal in March 1996, well within 90 days of his appointment. Fautenberry

did not explain why a motion to reopen was not or could not have been timely filed in the same time frame. Fautenberry relied on <u>Franklin</u> to argue that Rule 26(B)'s 90-day limit was not regularly enforced by the state courts, but the Sixth Circuit rejected his argument, finding that <u>Franklin</u> was factually distinguishable. The court also stated that <u>Franklin</u> did not adopt an "all encompassing, ever-applicable legal proposition that will forever (or at least for a very long time) bar the federal courts from finding that an ineffective assistance of appellate counsel claim has been procedurally defaulted where the state court refused to address the merits of that claim because of the time constraints in Ohio App. R. 26(B)." <u>Fautenberry</u>, 515 F.3d at 641. Rather, the court held that the "adequate and independent state ground" analysis must be conducted on a case by case basis, and premised upon the time that the petitioner should have filed the motion to reopen.

Cases subsequent to both <u>Franklin</u> and <u>Fautenberry</u> confirm this case-by-case analytic requirement. For example, in <u>Landrum v. Mitchell</u>, 625 F.3d 905 (6th Cir. 2010), the petitioner's Rule 26(B) reopening application was filed in 1998 and denied as untimely. The Sixth Circuit held that the habeas claim raised in that application was procedurally defaulted because in 1998, Ohio law on the timeliness requirement of the Rule was well established. The court rejected Landrum's reliance upon <u>Franklin</u>:

> In *Franklin*, we considered whether Rule 26(B) was an adequate and independent state procedural bar and held that it was not firmly established and regularly followed. ... We bolstered our conclusion by describing the Ohio Supreme Court's "erratic" handling of untimely Rule 26(B) applications in capital cases. ... However, this analysis is inapplicable here for two reasons. Both turn on the fact that Franklin's motion was filed June 30, 1993, one day before Rule 26(B) went into effect. First, because we concluded in

-128-

> *Franklin* that applying Rule 26(B)'s timeliness requirement to
> cases filed before the effective date of the rule would give
> the rule impermissible retroactive effect, *Franklin*'s
> discussion of the Ohio Supreme Court's subsequent
> treatment of Rule 26(B) is thus dicta.  Second, the "firmly
> established and regularly followed" requirement is measured
> as of the time Rule 26(B) was to be applied. ...  As
> *Fautenberry* ... emphasized, although Rule 26(B) was not
> firmly established in 1993, it had become firmly established
> by 1996.

Landrum, 625 F.3d at 917 (internal citations and quotations omitted).

        In Hoffner v. Bradshaw, 622 F.3d 487 (6th Cir. 2010), the petitioner committed a

murder in September 1993.  He was eventually charged, convicted and sentenced to

death, and the Ohio Court of Appeals rejected his direct appeal on March 23, 2001.

The Ohio Supreme Court affirmed his conviction in a July 14, 2004 decision.  He filed a

Rule 26(B) application to reopen with the Court of Appeals on June 6, 2006, asserting

ineffective assistance of appellate counsel claims.  That court found that his petition was

untimely, but it also reviewed his ineffective assistance of appellate counsel claims and

rejected them on the merits.  He appealed that decision to the Ohio Supreme Court,

which affirmed solely on the ground that the petition was untimely.  The Supreme Court

rejected his arguments that his lack of appellate counsel or his own lack of legal

knowledge constituted good cause to excuse his failure to comply with the 90-day

requirement, and held: "Consistent enforcement of the rule's deadline by the appellate

courts in Ohio protects on the one hand the state's legitimate interest in the finality of its

judgment and ensures on the other hand that any claims of ineffective assistance of

appellate counsel are promptly examined and resolved."  State v. Hoffner, 112 Ohio

St.3d 467, 468-469 (2007), quoting State v. Gumm, 103 Ohio St.3d 162, 163 (2004).

In his subsequent habeas petition, Hoffner raised the same ineffective assistance of appellate counsel claims, and the Sixth Circuit found them to be procedurally defaulted because the time requirements of Rule 26(B) were firmly established and regularly followed by the Ohio courts in June 2006.  It rejected Hoffner's reliance on Franklin, noting that Franklin held that Rule 26(B) could not be applied retroactively, a situation that did not apply to Hoffner.

Finally, in Webb v. Mitchell, 586 F.3d 383 (6th Cir. 2009), the Sixth Circuit again addressed a petitioner's claim that Rule 26(B)'s timeliness requirement was not an adequate state ground to bar habeas review.  Webb's direct appeal had been denied by the Ohio court of appeals on May 24, 1993, which was before the effective date of Rule 26(B).  After his appeal to the Ohio Supreme Court was rejected, he filed an application to reopen in 1998, which was denied as untimely and on the merits by the state court of appeals.  The Sixth Circuit concluded that Webb

> ... did not procedurally default the appellate-counsel claim by filing an untimely Rule 26(B) motion.  We have previously held that the time limitation in Rule 26(B) is not an independent state ground that the Ohio courts have enforced for capital-sentence petitioners whose direct appeal had concluded, and whose post-conviction relief proceedings were initiated, after *Murnahan*.  See *Franklin*, 434 F.3d at 420-21; cf. *Beuke v. Houk*, 537 F.3d 618, 632 (6th Cir. 2008).  Ohio's Rule 26(B) time bar accordingly does not satisfy one of the *Maupin* requirements for procedural default.  *Franklin*, 434 F.3d at 420.

Webb, 586 F.3d at 398.  The court then rejected Webb's appellate counsel claims on the merits under AEDPA's deferential standard of review.[12]  Webb is consistent with

---

[12] Beuke v. Houk, cited in Webb, dealt with a pre-Murnahan procedure for raising ineffective assistance claims that applied only within Ohio's First District Court of Appeals.  The Sixth Circuit found that the claims were procedurally defaulted because

<u>Franklin</u> in concluding that Ohio law and the Rules governing ineffective assistance of appellate counsel claims were in flux in the early 1990's, and especially before the adoption of Rule 26(B).

Considering all of these authorities, it is clear that the specific dates that are relevant to Hand's state court appeal must control the analysis of whether these sub-claims are defaulted.  The Ohio Supreme Court denied Hand's direct appeal on January 18, 2006.  He filed a motion to reconsider on January 30, 2006, which was denied on March 29, 2006.  Hand's first motion to reopen, filed by his new appellate counsel, was filed on April 18, 2006, within 90 days of the denial of his direct appeal.  (Apx. Vol. 9 at 28-39)  The Supreme Court summarily denied that motion on August 2, 2006.  (<u>Id</u>. at 43)  Hand did not file his second motion to reopen with the Ohio Supreme Court until September 24, 2007.  Hand relies on <u>Franklin</u> to excuse his default, but <u>Franklin</u> is clearly distinguishable, as the Sixth Circuit held in both <u>Fautenberg</u> and in <u>Hoffner</u>. This Court finds that the timeline of relevant dates at issue in <u>Hoffner</u> is very similar to the timeline of Hand's appeal.  And in <u>Hoffner</u>, the Ohio Supreme Court  articulated the important state goals that are fostered by enforcement of the rules regarding timely appeals and motions to reopen.  The Magistrate Judge also cited five additional decisions from the Ohio Supreme Court from October 2004 through November 2007 that uniformly enforced the 90-day rule and rejected untimely motions to reopen.  (See Doc. 101 at 170-171)

the petitioner failed to follow that well-established procedure in 1989, when the denial of his direct appeal was final.  At that time, the procedure required him to present his claims in a motion for reconsideration in the court of appeals.  <u>Beuke</u> is not directly relevant to the facts concerning Hand's 2007 motion to reopen.

Based on all of these authorities, this Court finds that <u>Hoffner</u> fully supports the Magistrate Judge's conclusion that these three sub-claims are procedurally defaulted. Whatever inconsistency may have existed in the Ohio Supreme Court's consideration of untimely Rule 26 petitions in the first years of the last decade, it had clearly dissipated by late 2004 or 2005. Since then, as noted in <u>Hoffner</u>, the Supreme Court has consistently enforced its timeliness rules, and clearly did so with respect to Hand's motion.

But even if these three sub-claims were not procedurally defaulted, the Court would find them meritless. To establish ineffective assistance, Hand must show that his appellate counsel made an objectively unreasonable decision when choosing the issues to raise in his direct appeal, and that the omitted issues were "clearly stronger" than the issues that counsel did present. See <u>Smith v. Robbins</u>, 528 U.S. 259, 286-288 (2000). The trial court's collateral estoppel ruling was not "clearly stronger" than the issues that were raised in Hand's direct appeal, particularly the objections to the testimony about Welch's statements. The Court of Claims opinion awarding victim benefits to Hand states in pertinent part that the assault on Donna (which caused her death)

> ... was reported to the Columbus Police Department immediately upon discovery. **Lacking any evidence to the contrary**, it will be presumed, therefore, that neither the Applicant nor the decedent had such relationship with the person or persons responsible for the death as would preclude an award under R.C. 2743.60(B). (emphasis added).[13]

As the Warden's traverse argues, Hand made no attempt to satisfy the prerequisites for

---

[13] This opinion was admitted at Hand's trial as State's Exhibit 45.

the proper application of collateral estoppel, or issue preclusion, to the question of his complicity in Donna's murder that was at issue in his criminal trial. A fundamental requirement for the proper application of the estoppel doctrine is to show that the parties to the prior proceeding had a full and fair opportunity to litigate the specific issue in a prior proceeding; that is, the party asserting preclusion "... must prove that the identical issue was actually litigated, directly determined, and essential to the judgment in the prior action." Goodson v. McDonough Power Equipment, Inc., 2 Ohio St.3d 193, 201 (1983). The issue of Hand's complicity was not actually litigated or directly determined in the prior proceeding; the Court of Claims simply "presumed" that Hand was not involved because there had been no evidence uncovered at that time suggesting otherwise. The State of Ohio was not precluded from criminally prosecuting Hand on the specifications involving Donna's murder merely because the state had not discovered evidence linking Hand to her murder when the Court of Claims issued its decision.

The Court would also conclude that the sub-claim regarding the allegedly privileged testimony from Hand's bankruptcy attorney lacks merit. The underlying claim is procedurally defaulted, as the Court discussed previously with respect to sub-claim (A) of Ground Four. This sub-claim was not "clearly stronger" than the claims that were raised, given Hand's actual testimony and the likelihood that the information Hand voluntarily disclosed was not in fact privileged.

Regarding sub-claim C, the trial court's denial of Hand's motion to dismiss the death penalty specifications relating to the murders of Donna and Lori, the motion was based on Evid. Rule 404(B)'s limitations on the admission of "other acts" evidence.

-133-

Hand argued that the state sought to improperly taint the jury's impression of Hand's character through this evidence. Hand's appellate counsel directly challenged the admission of the "other acts" evidence under the Rule, as fully discussed with respect to Hand's other grounds for relief, challenging the admission of testimony and statements linking him to the murders. Moreover, the Ohio Supreme Court specifically found that nothing in the record suggested that the jury used any "other acts" evidence to convict Hand "on the theory that he was a bad person." State v. Hand, 107 Ohio St.3d at 401. The trial court's denial of the pre-trial motion to exclude the evidence was not a "clearly stronger" issue than the direct attack on the admission of the evidence, and the Ohio Supreme Court would likely have reached the same conclusion regarding the trial court's pre-trial ruling.

For all of these reasons, the Court agrees with the Magistrate Judge's conclusion that these three sub-claims are defaulted. Moreover, even if they were not, this Court would conclude that they each lack merit.

**(D) Counsel's failure to challenge the sufficiency of the evidence on the aggravating circumstances and specifications 2 through 6 of Count Two**. Hand argues in this sub-claim that his appellate lawyers should have raised an insufficient evidence claim regarding the state's contention that he killed Welch to prevent him from disclosing information about Donna and Jill's murders, or from testifying against Hand. The Magistrate Judge found that this sub-claim was not procedurally defaulted. It was raised in Hand's first application to reopen his direct appeal filed on April 18, 2006, which the Ohio Supreme Court summarily denied (but not on the basis that it was untimely). However, the Magistrate Judge concluded that the sub-claim lacks merit.

-134-

The standards for a sufficiency-of-the-evidence challenge are set forth in the Court's analysis of Ground Eight of Hand's petition: viewing the evidence in the light most favorable to the prosecution, could any rational juror have found the essential elements of the offense beyond a reasonable doubt.  Hand contends that the "only" evidence with respect to his murder of Welch to eliminate him as a witness is in Grimes' testimony.  The Court disagrees; Welch's own statements about Hand's involvement in the first two murders to his friends and family members, and his statements before Jill's murder that Hand asked him to kill her, were all evidence bearing on this question and were sufficient to support the jury's verdict.  Hand does not raise a particular objection to the Magistrate Judge's conclusion but incorporates his objections with regard to Ground Eight (his sufficiency of the evidence challenge to the escape charge).

This Court agrees with the Magistrate Judge, in view of the extensive evidence about Welch's statements to his friends and family about the murders of Hand's first two wives and about Welch's relationship with Hand.  Combined with Grimes' testimony - Hand told Grimes that Hand was going to have Jill killed by a man he was "involved with ...," a "business partner..." - a rational juror could have found Hand guilty of the specifications beyond a reasonable doubt.  The state court's summary rejection of Hand's argument was not contrary to nor an unreasonable application of clearly established federal law.

**(E)  Failure to amend Hand's appellate brief to raise juror bias**.  Hand also raised this claim in his April 2006 motion to reopen his direct appeal.  While it is not defaulted, the Magistrate Judge concluded that it lacks merit.  This Court rejected Hand's contention (raised in Ground Four, sub-claim (B)) that Hand's defense counsel

did not thoroughly question the jurors about their exposure to pretrial publicity. And as previously noted, Hand does not contend that his jury was actually biased or prejudiced. (See Doc. 117 at 13) For the same reasons discussed in Ground Four, the Court concludes that appellate counsel's failure to amend the appellate brief to specifically raise a separate claim of juror bias does not amount to constitutionally ineffective assistance of appellate counsel.

**(F) Failure to appeal the scope of the trial court's inquiry into juror bias**.

The claim underlying this sub-claim was rejected in Ground Six, and a similar argument with respect to the two jurors in Ground Four, sub-claim B. As discussed there, the trial court's inquiries to the jurors generally, and to the two jurors Hand particularly challenges, were adequate and did not violate Hand's constitutional rights. Neither of the jurors answered any questions which would have fairly warranted additional inquiry from trial court, and there is simply no evidence that Hand's right to a fair trial was violated by the trial court's questioning of the entire panel, or by any of the pre-trial publicity. This sub-claim is therefore rejected, because the state court's decision is not contrary to nor an unreasonable application of clearly established federal law.

For all these reasons, Ground Eleven of Hand's petition is denied.

**Ground Twelve**

In this ground for relief, Hand brings a facial constitutional challenge to Ohio's death penalty statutes, citing what he identifies as eight separate deficiencies in those statutes. The Ohio Supreme Court summarily rejected his claims on direct appeal, relying on prior authorities affirming the constitutionality of Ohio's death penalty law. State v. Hand, 107 Ohio St.3d at 417. The Magistrate Judge reviewed Hand's claims

-136-

and found them all to lack merit.  (Doc. 101 at 178-180)

In his objections, Hand concedes that the Ohio statutes have been upheld in the federal courts on numerous occasions in the face of similar constitutional challenges. He states that he raises this ground for relief solely to preserve the record in the event of a change in law.  Therefore, the Court finds that no extended discussion  of the substance of his claims is warranted, as the Court agrees with and adopts the Magistrate Judge's conclusions in toto.  Ground Twelve of the petition is denied.

**Ground Thirteen**

Hand argues that the exclusion of residual doubt as a mitigating factor at sentencing, and specifically the trial court's refusal to instruct the jury that they may consider residual doubt of his guilt in determining his sentence, violated the Eighth Amendment's prohibition on cruel and unusual punishment, as well as his due process and fair trial rights.

Hand requested that the trial court give the following instruction to the jury in the penalty phase:

> "Residual doubt" exists when a juror is not convinced beyond all possible doubt that the defendant committed the offenses for which he was convicted.  You will recall that the burden on the State of Ohio is to prove its case beyond a reasonable doubt, not beyond all possible doubt.  By your verdicts of guilty, you found that the State has met its burden of proof in this case.  If any juror believes that residual doubt exists in this case, that juror may consider his or her residual doubt as a mitigating factor to be weighed against the aggravating circumstance on each count.  The weight, if any, to be given such residual doubt is to be determined by each individual juror.

(Apx. Vol. 3 at 207)  The trial court declined to give this instruction, relying on State v.

-137-

McGuire, 80 Ohio St.3d 390, 402-404 (1997).  In McGuire, the Ohio Supreme Court

noted that the issue of residual doubt could be considered by a jury in mitigation.  But

because it is not a statutorily-defined mitigating factor, the court held that a defendant is

not entitled to a residual doubt instruction.  The Ohio Supreme Court summarily rejected

this claim in Hand's direct appeal, also relying on State v. McGuire.

The Magistrate Judge concluded this claim lacks merit, citing Franklin v.

Lynaugh, 487 U.S. 164 (1988).  There, the U.S. Supreme Court held that there is no

constitutional right to have a capital jury consider residual doubt of guilt as a mitigating

factor, because "[s]uch lingering doubts are not over any aspect of petitioner's

'character,' 'record,' or a 'circumstance of the offense.'"  Id. at 174 (internal citations

omitted).

Hand objects, contending that the Magistrate Judge overlooked his arguments

and the body of federal law cited in his traverse brief.  He contends that because he

raised self-defense at his trial, his situation is substantively different from the situation

presented to the Supreme Court in Franklin.  In the guilt phase, Hand testified that he

acted in self defense in killing Welch.  The trial court instructed the jury that In order to

succeed on that defense, Hand had to prove:

> ... (A) ... he was not at fault in creating the situation giving
> rise to the death of Walter Lonnie Welch; and (B) he had
> reasonable grounds to believe and held an honest belief that
> he was in imminent or immediate danger of death or great
> bodily harm, or he acted in defense of another, Jill J. Hand,
> who he believed in danger of death or great bodily harm, and
> that his only means of retreat or escape or withdrawal from
> that danger was by the use of deadly force; and (C) did not
> violate any duty to retreat or escape or withdraw to avoid the
> danger.  If the defendant was assaulted in his own home, or
> if the home was attacked, the defendant had no duty to

-138-

> retreat or escape or withdraw, and he could use such means
> as are necessary to repel the assailant from the home, or to
> prevent any forcible entry to the home, even to the use of
> deadly force, provided that he had reasonable grounds to
> believe and held an honest belief that the use of deadly force
> was necessary to the assailant [sic] or to prevent the forcible
> entry.

(Trial Trans. Vol. 20 at 3764-3765, excerpt of trial court's guilt-phase instructions on
self-defense.)  Hand presented mitigating evidence at the sentencing hearing about his
character, and he notes that he was entitled to present evidence about the
circumstances of the offense, including whether the victim induced or facilitated the
offense, and whether he was under duress at the time, all of which are statutory
mitigating factors under R.C. 2929.04(B).   Hand then suggests that the nature of a self
defense claim "inherently" places at issue these statutory mitigating circumstances.  He
further speculates that it is "possible" that the jury found that he had proved one or two
of the elements of his self defense claim.  And if the jury did so, for example by
concluding that he did not create the violent situation with Welch, then a residual doubt
instruction would have permitted the jury to consider his self-defense testimony during
the penalty phase.  He therefore argues that the trial court's refusal to instruct the jury
on residual doubt during the penalty phase of his trial violated the Eighth Amendment.

Hand does not cite any case, state or federal, that holds or even suggests that a
defendant who asserts self defense in a capital case is constitutionally entitled to a
separate residual doubt instruction at sentencing.  Moreover, the instructions that **were**
given in the penalty phase of Hand's trial include a specific instruction to the jury that
they should consider all mitigating factors and all the evidence raised at both phases of
Hand's trial.  The instructions included the following passage:

-139-

> Mitigating factors are factors about an individual or an offense that weigh in favor of a decision that a life sentence rather than a death sentence is appropriate. Mitigating factors are factors that lessen the moral culpability of the defendant, or diminish the appropriateness of a death sentence. You must consider all of the mitigating factors presented to you. Mitigating factors include, but are not limited to, the history, character, and background of the defendant, and any other factors that weigh in favor of a sentence other than death. This means you are not limited to the specific mitigating factors that have been described to you. You should consider any other mitigating factors that weigh in favor of the sentence other than death. ... [Y]ou shall consider all the testimony and evidence relevant to the aggravating circumstance the defendant was found guilty of committing and mitigating factors raised at both phases of the trial, the testimony or statements of the defendant, Gerald R. Hand, and arguments of counsel.

(Trial Trans. Vol. 22 at 3908-3910) The trial court did not limit Hand's ability to present any mitigating evidence in the penalty phase, as he implicitly admits. Hand was free to argue to the jury any mitigating factors and any evidence introduced at the trial that he believed weighed in favor of a life sentence, including any element of his claim of self defense.

Moreover, this Court sees no meaningful or relevant distinctions between Hand's claim of self defense, and the mistaken identity and "other causes of death" defenses raised by the petitioner in Franklin. Franklin was charged with aggravated murder, and incriminating physical evidence matching the victim was found in his home and his car. Franklin claimed that he had lent his car and his clothes to a friend on the evening of the murder. He argued that the jury should have been instructed on residual doubt of his guilt during the penalty phase of his trial, based on his claim of mistaken identity and his contention that a hospital's substandard medical care led directly to the victim's death.

-140-

The Supreme Court noted that it "... has never held that a capital defendant has a constitutional right to an instruction telling the jury to revisit the question of his identity as the murderer as a basis for mitigation." Franklin, 487 U.S. at 172-173.   While a capital jury cannot be precluded from considering any mitigating evidence of a defendant's character or the circumstances of the offense, the court held that the rule "... in no way mandates reconsideration by capital juries, in the sentencing phase, of their 'residual doubts' over a defendant's guilt." Id. at 174.

The Supreme Court recently re-emphasized that "[t]he starting point for cases subject to Section 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims."  Marshall v. Rodgers, 569 U.S. ___, 133 S.Ct. 1446, 1447 (2013) (citing Williams v. Taylor, 529 U.S. 362, 412 (2000)).  The only "clearly established" Supreme Court authority on this issue, Franklin v. Lynaugh, contradicts Hand's claim that he was constitutionally entitled to a residual doubt instruction at sentencing.  See also, Oregon v. Guzek, 546 U.S. 517, 525 (2006), rejecting the argument that the Eighth Amendment provides a capital defendant the right to introduce evidence of "residual doubt" of the crime of conviction at sentencing, and citing Franklin.  Hand has cited no contrary controlling authority.  The Court therefore denies this ground for relief.

**Ground Fourteen**

Hand alleges as his fourteenth ground for relief that Ohio's lethal injection procedure amounts to an unconstitutional imposition of cruel and unusual punishment. The Ohio Court of Appeals rejected this claim raised in his post-conviction petition, finding that it had no legal basis.  In his post-evidentiary hearing brief filed in this case,

Hand acknowledged recent cases upholding the lethal injection procedure, and indicated that he wished to preserve the claim for the record. (See Doc. 90 at 42, n.9) In view of the decisions in Baze v. Rees, 553 U.S. 35 (2008), and Cooey v. Strickland, 589 F.3d 210 (6th Cir. 2009), the Magistrate Judge concluded that the claim lacks merit.

However, Hand has objected to the Magistrate Judge's conclusion because Ohio's lethal injection protocol has changed from the three-drug regime reviewed in Baze, and from the single-drug protocol using sodium thiopental reviewed in Cooey. The current Ohio protocol uses pentobarbital, a drug commonly used to euthanize animals. Hand contends that the state's switch to pentobarbital was due solely to the increasing unavailability of sodium thiopental, and he argues that the effect of pentobarbital on humans has not been sufficiently studied. Hand does not identify any specific risks that are or may be encountered in using pentobarbital that were not presented by the prior single-drug protocol addressed in Cooey. In that case, the Sixth Circuit reviewed a challenge to Ohio's single-drug protocol that also specified two back-up drugs to be used in the event that an IV injection site for administration of the sodium thiopental could not be achieved or had to be abandoned. Cooey reviewed the "ground rules" articulated by the Supreme Court in Baze for analyzing a challenge to an execution protocol:

> Capital punishment is constitutional, ... death-row inmates cannot use method-of-execution challenges to prohibit what the Constitution allows, ... the Constitution does not demand a pain-free execution, ... and an inmate cannot question a state's execution protocol without providing feasible, readily implemented alternatives that significantly reduce a substantial risk of severe pain ... . Significantly, the Constitution does not allow the federal courts to act as a best-practices board empowered to demand that states

> adopt the least risky execution protocol possible. ... Within
> this framework, the Supreme Court has never held that an
> inmate met the heavy burden of demonstrating that a state's
> execution protocol is cruelly inhumane in violation of the
> Constitution.

Cooey, 589 F.3d at 220-221 (internal citations and quotations omitted).

Hand's general objection to the use of pentobarbital by the State of Ohio does not specifically address any of these "ground rules." He simply argues that "until more is known about the effects of pentobarbital on humans," the Court should find that its use is unconstitutional. (Doc. 117 at 62) Reaching that result based on Hand's argument would effectively put the Court in the position of the proverbial "best-practices board" that the Supreme Court specifically warned against in Baze. Hand's petition generally alleged that prior experience with lethal injection reveals that the procedure is "... at the very least more likely than not a torturous, painful, barbaric, and, hence, unconstitutional means of extinguishing life ...". (Doc. 11 at 53) In his reply to Respondent's traverse brief, Hand cited newspaper articles describing incidents of equipment malfunction, or difficulties in locating an inmate's veins. He also acknowledged that his challenge to Ohio's procedure was made for the purpose of preserving the record. (Doc. 32 at 159-160) He has not sought discovery or pursued the development of a factual record concerning this claim in this proceeding.

The Court therefore concludes that Hand has not demonstrated that the state court's rejection of this claim is contrary to or an unreasonable application of clearly established federal law on the overall constitutionality of the state's lethal injection

-143-

procedure.[14]  This habeas claim is therefore denied.

**Ground Fifteen**

For his final claim, Hand raises a claim of cumulative error based on all of the cited errors at his trial, sentencing, and on direct appeal.  The Magistrate Judge recommends that this claim be dismissed because there were no constitutional errors during the proceedings that, individually or cumulatively, warrant habeas relief.  The Magistrate Judge also cites several cases noting that the Supreme Court has never recognized a distinct constitutional claim premised upon cumulative error.

Hand objects, citing Brecht v. Abrahamson, 507 U.S. 619 (1993) for the proposition that the court must consider the entirety of the record in order to determine if the errors had a substantial injurious effect on the outcome.  If they did, considered together, the errors could not have been harmless.  This Court has rejected each of the alleged constitutional errors that Hand has raised and found that none of them entitle Hand to relief.  The Court also rejects his cumulative error claim.  Considering the entirety of the record, and aggregating all of the alleged errors discussed above, the Court concludes that Hand's constitutional rights were not violated and that he was not deprived of a fundamentally fair trial.  This ground for relief is denied.

**CONCLUSION**

As required by 28 U.S.C. § 636(b)(1)(C) and Federal Rule of Civil Procedure 72(b), the Court has conducted a de novo review of the record in this case.  Upon such

---

[14] The Court recognizes that Hand is a plaintiff in the case pending in this district before Judge Frost, In Re Ohio Execution Protocol Litigation, No. 2:11-cv-1016. Nothing in this Order is intended to affect or interfere with Hand's participation in that case.

-144-

review, the Court finds that Hand's omnibus objections to the Magistrate Judge's Report and to his Supplemental Report are not well taken, and are therefore overruled.  For all of the foregoing reasons, Hand's petition for a writ of habeas corpus, and each Ground for Relief contained therein, is denied.

This case is referred to Magistrate Judge Merz for a Supplemental Report and Recommendation concerning Hand's motion for a certificate of appealability, which has been stayed pending this Court's order addressing Hand's objections to the Magistrate Judge's recommendations on the merits of his petition.

SO ORDERED.

DATED: May 29, 2013                    s/Sandra S. Beckwith
                                       Sandra S. Beckwith
                                       Senior United States District Judge