# IN  THE  UNITED  STATES  DISTRICT  COURT
# FOR  THE  SOUTHERN  DISTRICT  OF  OHIO
# EASTERN  DIVISION  AT  COLUMBUS

GERALD HAND,                  :

                           Case No. 2:07-cv-846

       Petitioner,

       -vs-                    District Judge Sandra A. Beckwith
                           Magistrate Judge Michael R. Merz

MARC HOUK, Warden,

           Respondent.        :

# REPORT AND RECOMMENDATIONS

This capital habeas corpus case is before the Court on Petitioner's Motion to Alter or Amend Order Denying Habeas Relief (Doc. No. 121).  The Warden has opposed the Motion (Doc. No. 123) and Hand has filed a Reply in support (Doc. No. 124).

For the reasons given in the recent Scheduling Order (Doc. No. 125), the Court treats the instant Motion as a timely motion for reconsideration rather than an untimely motion to amend the judgment under Fed. R. Civ. P. 59(e).

Although the motion is made pre-judgment, it seeks changes in a District Judge's disposition of the case on the merits.  It is therefore appropriately classified as a "dispositive" motion, requiring a report and recommendations from the assigned Magistrate Judge.

"As a general principle, motions for reconsideration are looked upon with disfavor unless the moving party demonstrates:  (1) a manifest error of law; (2) newly discovered evidence

which was not available previously to the parties; or (3) intervening authority." *Meekison v. Ohio Dept. Rehab. & Corr.*, 181 F.R.D. 571 (S.D. Ohio 1998)(Marbley, J.), quoting *Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir. 1985). As reflected in the Motion, these are the same standards which apply to a Rule 59(e) motion, so Petitioner's briefing is pertinent. The Motion purports to establish clear or manifest error of law, the first branch of the test. Each claimed error will be considered *seriatim*.

**Claimed Error One, Branch One: Confrontation Clause Claim Regarding Statements of the Victim**

Hand asserts the Court clearly erred "in characterizing [Lonnie] Welch's hearsay statements, which were introduced by the prosecution to prove that Hand killed Welch to prevent him from testifying as to the murders of Hand's first two wives, as non-testimonial." (Motion, Doc. No. 121, PageID 2954.) Hand's argument is that the very fact that he was convicted of killing Welch to keep him from testifying "suggests that the statements were in fact testimonial in nature." *Id.*

For the convenience of the reader, the challenged portion of Judge Beckwith's Order is quoted here in its entirety:[1]

> In his Report, the Magistrate Judge considered whether Welch's statements attributed to him by the trial witnesses were "testimonial" for purposes of the Confrontation Clause analysis under *Crawford*. He cited the Sixth Circuit's lengthy analysis of the issue in *Miller v. Stovall*, 608 F.3d 913 (6th Cir. 2010), which reaffirmed the standard set forth in *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004): "The proper inquiry, then, is

---

[1] This Report includes lengthy quotations of those portions of Judge Beckwith's Order which are claimed to be manifest error. Although that adds to the length of this document, it will obviate the reader's paging back and forth to the docket.

whether the declarant intends to bear testimony against the accused. That intent, in turn, may be determined by querying whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime."

After reviewing the challenged trial testimony and these authorities, the Magistrate Judge concluded that the various statements attributed to Welch were not "testimonial" under *Crawford* and its progeny. Seven of the eight challenged witnesses were Welch's relatives, friends or acquaintances, and one was his cellmate (Jordan). Welch's statements were informal and they were not made within the context of any formal proceedings. For instance, Welch told his cousin, Pete Adams, that he killed Donna and Lori Hand; [and] he asked his brother, Shannon Welch, if Shannon knew how he made extra money, then volunteered that he killed Hand's first wife. He told his common law wife, Barbara McKinney, that he had been to Hand's home, and asked her to call Hand to get bail money for him when he was arrested before Jill's murder. Jordan testified that Welch told him he was "going to take somebody out" and that he was doing the work "for a guy named Bob...". Welch said he had known "Bob" for years, and "the money is good." And Welch offered Jordan money to drive him to this "job" which was going to happen in January. (Trial Trans. Vol. 16 at 2820-2821[.])

Nothing in any of the statements, or about the circumstances under which Welch made any of the challenged statements, reflects any intent by Welch to "bear testimony" against Hand. There is nothing in this testimony or in the record raising the possibility that any of these witnesses would cooperate or were cooperating with any investigation at the time Welch made any of the statements.

The Ohio Supreme Court did not expressly determine if Welch's statements were "testimonial" under Crawford, as the Court found that Hand forfeited his confrontation rights by his own misconduct in murdering Welch. But this Court agrees with the Magistrate Judge's conclusion that the challenged statements (as summarized by the Magistrate Judge in his Report at pp. 50-51) were not "testimonial" under Crawford. The Sixth Circuit has often noted that statements made to friends and family are more reliable, both for hearsay and Confrontation Clause analyses, than statements that are made to law enforcement personnel or officials. See, e.g., United States v. Gibson, 409 F.3d 325, 337-38 (6th Cir. 2005) (describing statements as non[-]testimonial where the "statements were not made to the police or in the course of an official

3

> investigation . . . [nor in an attempt] to curry favor or shift the blame . . . ."); United States v. Johnson, 581 F.3d 320, 326-327 (6th Cir. 2009)(statements made to a friend and confidant, someone the defendant saw every day for meals and at social activities, were not testimonial); United States v. Franklin, 415 F.3d 537, 545-548 (6th Cir. 2005) (statements by nontestifying co-defendant to a friend, implicating both defendant and the co-defendant in an armed robbery, were not testimonial and bore sufficient indicia of reliability under Crawford).

(Order, Doc. No. 118, PageID 2823-24.)

By Hand's logic, any hearsay statement a prosecutor wants to introduce becomes, by the prosecutor's proffering it, retroactively testimonial, regardless of the circumstances in which the statement was made. That approach turns Confrontation Clause analysis on its head. Adopting Hand's approach would be clear error, for he points to no case law adopting this approach.

The only case cited by Hand is *United States v. Johnson*, 581 F.3d 320 (6th Cir. 2009). There the court upheld admission of inculpatory statements of a co-defendant made to a fellow inmate because the co-defendant did not anticipate their being used in a proceeding against Johnson. *Id.* at 325. The court held:

> In determining whether statements are testimonial, we ask whether the declarant "intend[ed] to bear testimony against the accused." *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004). This, in turn, depends on "whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime." *Id.*

*Id.* Welch's statements admitted in evidence were not only inculpatory as to Hand, they also self-incriminated Welch for aggravated murder. No reasonable person in Welch's position – factually guilty of two murders for hire on which the statute of limitations would never run – would make the admitted statements with the expectation that any of his hearers would repeat them in court or to law enforcement, at least as long as Welch was alive.

4

Hand labels the Court's decision as "internally inconsistent":  if Hand murdered Welch to keep him from testifying,[2] how can Welch's statements be "non-testimonial"?  (Motion, Doc. No. 121, PageID 2955.)  This argument completely misses the point.  Hand killed Welch to prevent him from testifying at some point in the future from the date of Welch's murder, not to prevent him from saying the things he had already said – that would be nonsensical.  Welch was killed to keep him from repeating – on the witness stand or to law enforcement – the things he had said to those who testified.  Those statements, if given on the witness stand or to law enforcement, would have been testimonial, but they were not when initially made.

The first branch of Claimed Error One is without merit.


**Claimed Error One, Branch Two:   Fair Presentation of Due Process Claim to Ohio Supreme Court**


Hand's second claimed error of law is that the Court

> erred in concluding that Hand did not fairly present his due process claim to the Ohio Supreme Court and, further, that if Hand did in fact present a due process claim, the Ohio Supreme Court's discussion of the hearsay question under Ohio R. Evid. 804(B)(6) constituted an analysis of the constitutional due process issue as well.

(Motion, Doc. No. 121, PageID 2955.)

The objected-to portion of Judge Beckwith's Order is as follows:

> Hand also objects to the Magistrate Judge's conclusions that he failed to present a federal due process claim to the Ohio Supreme Court, and that the admission of Welch's statements did not violate Hand's due process rights under the Fourteenth Amendment. He argues that he did present a due process claim but the Ohio

---

[2] Hand was found guilty of the aggravating factor that his murder of Welch was done to escape detection.  The Court has upheld that finding.

Supreme Court did not address it, and confined its discussion to state evidentiary law. Hand's first proposition of law on direct appeal alleged: "When the State fails to prove by clear and convincing evidence that a witness is unavailable due to a criminal defendant's wrongdoing, and the proposed evidence does not meet standards of reliability, it is constitutional error to admit this evidence against the defendant." (Apx. Vol. 6 at 269). The last sentence of the introductory section for the arguments supporting this proposition states that the testimony violated his constitutional rights "under the Confrontation Clause of the Sixth Amendment to the United States Constitution as well as his rights to due process and a fair trial guaranteed by the Fourteenth Amendment." (Id. at 269-270) In the body of the brief, he argued that the admission of Welch's statements under Ohio Evid. R. 804(B)(6) was error, and in the concluding section argued that the statements violated his Confrontation Clause rights. (Id. at 277-278). The passing reference in the introductory section, with no mention of due process in the proposition itself and no substantive argument or citation of authorities on that subject, is not sufficient to "fairly present" a federal claim to the state court.

The Magistrate Judge also observed that in his brief on appeal, Hand referred to the "probable" due process requirement that hearsay statements are found to be reliable, and he argued that the trial court erred in finding that Welch's statements were reliable. (Id. at 273-277) The Ohio Supreme Court expressly addressed the reliability of the statements at some length, and held that the trial court acted well within its discretion in determining that each witness was credible. The court stated that "No evidence supports Hand's allegations that Welch's friends and family members were not telling the truth, and their bias could have been explored on cross-examination. ...

Moreover, the testimony of Welch's friends and family members was corroborated by Jordan, Welch's cellmate, and Grimes, who testified that Hand admitted hiring Welch to kill Jill." State v. Hand, 107 Ohio St.3d at 393. The Supreme Court did not use the words "due process" nor explicitly conduct its reliability analysis with reference to the Due Process Clause or the 14th Amendment. But in Harrington v. Richter, 131 S.Ct. 770, 784-785 (2011), the Supreme Court clearly held that a state court is not required to write a detailed opinion explaining the state court's reasoning on a claim in order for the decision to be entitled to deferential review under Section 2254(d). And as the Magistrate Judge further observed, Hand does not identify any substantive difference between a 14th Amendment Due Process reliability analysis, and

6

> the state court's reliability analysis in the context of Evid. Rule
> 804(B)(6). This Court also finds no meaningful distinction to be
> made.
>
> It is clear that the Ohio Supreme Court rejected the substance of
> Hand's due process challenge when it thoroughly reviewed the
> reliability of the challenged testimony and the veracity of the
> witnesses, in affirming the trial court's admission of the testimony.
> That decision is not contrary to clearly established federal law.
> Therefore, this Court agrees with the Magistrate Judge's analysis
> with respect to Hand's first ground for relief, and overrules Hand's
> objections.

(Order, Doc. No. 118, PageID 2828-30.)

Claimed Error One, Branch Two, directed at this portion of the Order, is supported by no

citations of law at all. Merely using talismanic constitutional phrases like "fair trial" or "due

process of law" does not constitute raising a federal constitutional issue. *Slaughter v. Parker,*

450 F.3d 224, 236 (6th Cir. 2006); *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987); *McMeans*

*v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *citing Petrucelli v. Coombe*, 735 F.2d 684, 688-89

(2d Cir. 1984). Mere use of the words "due process and a fair trial by an impartial jury" are

insufficient. *Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006); *Blackmon v. Booker*, 394

F.3d 399, 400 (6th Cir. 2004)(same). "A lawyer need not develop a constitutional argument at

length, but he must make one; the words 'due process' are not an argument." *Riggins v.*

*McGinnis*, 50 F.3d 492, 494 (7th Cir. 1995).

The second branch of Claimed Error One is without merit.


**Claimed Error Two: Fair Presentation of and Prejudice from Prior Acts Evidence**


Hand claims this Court committed clear error of law in holding (1) that his prior acts

evidence claim was not fairly presented to the Ohio courts as a constitutional claim, and (2) that

admission of that evidence did not prejudice the outcome of the trial (Motion, Doc. No. 121, PageID 2956-2957).

The objected-to portion of Judge Beckwith's Order relating to fair presentation reads:

> The Magistrate Judge recommended that this claim be denied because Hand did not fairly present a federal constitutional argument on these issues to the Ohio Supreme Court on direct appeal. He notes that Hand's brief made only cursory references to "due process" or to the constitution, and his arguments were framed by and presented under state law. The Magistrate Judge correctly described Hand's direct appeal brief. Proposition of Law No. 2 alleged: "The introduction and admission of prejudicial and improper character and other acts evidence and the failure of the trial court to properly limit the use of the other acts evidence denied Gerald Hand his rights to a fair trial, due process and a reliable determination of his guilt and sentence as guaranteed by the United States Constitution, Amends. V, VI, VII and XIV; Ohio Const. Art. I, §§ 10 and 16." (Apx. Vol. 6 at 279) Section 2 of the discussion contains Hand's arguments on admissibility of other acts evidence; it spans three paragraphs and cites Ohio case law, Ohio Evid. Rule 404(A) and (B), and R.C. 2945.59. In Section 5, Hand addressed the trial court's failure to give additional limiting instructions and cited only Ohio cases. Section 6 addressed harmless error and cited one federal case, Chapman v. California, 386 U.S. 18 (1967). The conclusion section generally asserted that he was denied a fair trial in violation of the Fourteenth Amendment's Due Process clause. (Apx. Vol. 6 at 285.)

> Hand objects, contending that his brief expressly argued that his fair trial and due process rights "as guaranteed by the United States Constitution" had been violated. He contends that the Ohio Supreme Court's failure to address the federal claims should not result in a default. Hand cites Carter v. Bell, 218 F.3d 581 (6th Cir. 2000), a habeas case (arising pre-AEDPA) in which the petitioner contended that Tennessee's statutory definition of aggravating circumstances was unconstitutionally vague and violated the Eighth Amendment. The district court found the federal claim was defaulted because it was not presented to the state court. The Sixth Circuit disagreed because Carter's post-conviction petition (which he filed pro se) argued that the

>> ... entire statute failed to genuinely narrow the class of death-eligible murders. Even if we agreed with the district court that such allegations were 'bald' or 'general,' we

> find that they are substantively the same claim as that made to us. We do not require word-for-word replication of the state claim in the habeas corpus petition in order to address the merits therein, only that the petitioner 'fairly present' the substance of each of his federal constitutional claims to the state courts. ... A petitioner 'fairly presents' his claim to the state courts by citing a provision of the Constitution, federal decisions using constitutional analysis, or state decisions employing constitutional analysis in similar fact patterns.

Id. at 606-607 (internal citations omitted).

In a later case, the Sixth Circuit reiterated these principles:

> Federal courts do not have jurisdiction to consider a claim in a habeas petition that was not 'fairly presented' to the state courts. A claim may only be considered 'fairly presented' if the petitioner asserted both a factual and legal basis for his claim in state court. ... Although general allegations of the denial of a 'fair trial' or 'due process' have been held insufficient to 'fairly present' federal constitutional claims, ... a petitioner need not recite 'book and verse on the federal constitution.' A petitioner can take four actions in his brief which are significant to the determination as to whether a claim has been fairly presented: (1) reliance upon federal cases employing constitutional analysis; (2) reliance upon state cases employing federal constitutional analysis; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law.

Newton v. Million, 349 F.3d 873, 877 (6th Cir. 2003)(internal citations omitted). There, the court rejected the state's argument that the petitioner failed to fairly present his federal due process claim to the state court. He had requested his trial court to instruct the jury about his right to defend himself against two aggressors, and not limit the instruction to the one individual of whose murder the petitioner was charged and convicted. He argued that the evidence at trial supported his claim that both individuals attacked him and he acted to defend himself from both of them. His state appeal brief had included a detailed recitation of the facts adduced at trial and argued that the failure to instruct the jury violated his right to due process of law under the Fifth and Fourteenth

Amendments. The Sixth Circuit found that this was sufficient to present his claim and avoid default.

In contrast, in <u>McMeans v. Brigano</u>, 228 F.3d 674 (6th Cir. 2000), the court found that the petitioner (charged and convicted of rape) did not fairly present his federal Confrontation Clause claim raised in his habeas petition to the state court in his direct appeal. The issue was the trial court's limitation on questioning his accuser about her subsequent rape accusations against other men. On direct appeal, he argued that the limitation violated his "... right to a fair trial, and to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the U.S. Constitution ...". <u>Id</u>. at 678. The Sixth Circuit affirmed the district court's conclusion that he failed to fairly present a Confrontation Clause claim:

> In his direct appeal, the petitioner focused entirely on the applicability of Ohio's rape shield law, Ohio Rev. Code Ann. §2907.02. He did not cite any federal precedent and his appellate brief only alleges that the trial judge's limitation on cross-examination denied him a "fair trial" and "due process." As this court recognized in *Franklin [v. Rose,* 811 F.2d 322 (6th Cir. 1987)], this is not sufficient to alert a state court that an appellant is asserting the violation of a specific constitutional right. While it is true that a few of the state cases cited by the petitioner on direct appeal contain references to the Confrontation Clause, the majority of those cases were concerned with Ohio evidence law. We do not think that a few brief references to the Confrontation Clause in isolated cases is enough to put state courts on notice that such a claim had been asserted. Thus, we hold that the petitioner failed to "fairly present" his Confrontation Clause claim to the Ohio courts.
> <u>Id</u>. at 682.

The Court reaches the same conclusion with respect to Hand's claim. Hand argued in state court that the admission of the challenged testimony created a reasonable probability that the jury convicted him because of his bad character, or that "he was the type of person who could have committed" the murders. (Apx Vol. 6 at 284[.])

While his Proposition of Law cited "fair trial" and "due process" rights, as well as the 5th, 6th, 7th and 14th Amendments, no constitutional analysis under any of these amendments was included in the brief. And in this Court's opinion, the five incidents

> of which Hand complains do not, individually or collectively, clearly fall within "the mainstream of constitutional law" regarding due process or fair trial rights. As the Magistrate Judge observed, the substance of this claim was presented, argued, and addressed by the Ohio Supreme Court under Ohio evidence law and not as a federal constitutional violation.

(Order, Doc. No. 118 at PageID 2834-37.)

In purporting to show that this ruling by Judge Beckwith was "manifest" or "clear" error, Hand argues only that *McMeans v. Brigano, supra,* "does not apply as broadly as the Court held. (Motion, Doc. No. 121, PageID 2956). In addition to *McMeans,* the Report and Recommendations which Judge Beckwith adopted on this point cited *Williams v. Anderson,* 460 F.3d 789, 806 (6th Cir. 2006); *Levine v. Torvik,* 986 F.2d 1506 (6th Cir. 1993); *Riggins v. McMackin,* 935 F.2d 790 (6th Cir. 1991); *Slaughter v. Parker,* 450 F.3d 224, 236 (6th Cir. 2006); and *Franklin v. Rose,* 811 F.2d 322, 326 (6th Cir. 1987). Hand fails to present or even cite those portions of the state court record where he claims he made the fair presentation. He has not shown clear error – indeed any error – in the Court's fair presentation decision.

Judge Beckwith decided this claim in the alternative. Assuming arguendo there was fair presentation, she found no due process violation.

> But even if the reference to the federal amendments in the Proposition itself was enough to present and preserve a due process or fair trial challenge, Hand has failed to show how these five instances actually deprived him of due process or the presumption of innocence. The five incidents about which Hand complains - the prosecutor's comment about the way he operates, Wolmendorf's description of Hand's demeanor, his own admission to police that he was a "horny old man," his childhood interest in "true crime" stories, and the description of his dispute with his father - were all brief statements or passing comments in a lengthy trial in which over 75 state witnesses appeared. Moreover, as the Magistrate Judge notes, Hand did not object to most of this testimony, resulting in plain error review by the Supreme Court, which is another basis upon which to find the claim defaulted. Where he did object (to Wolmendorf's description of his demeanor), the trial

> court properly admitted it as a lay opinion. This Court would
> conclude that no due process violation resulted from an
> experienced detective testifying to his firsthand observations of
> Hand's demeanor upon learning that his wife had been murdered.
> The Court would also conclude that none of the other incidents
> raised in this claim are the sort of evidence that, either individually
> or collectively, seriously impugned the fundamental fairness of the
> proceedings or denied Hand due process or a fair trial.

(Order, Doc. No. 118, PageID 2837-38.)

Hand makes no argument about why there was a due process violation in admitting this evidence.  He merely asserts that conclusion:  "the state's reliance on other alleged wrongdoing by Hand likely caused the jury to convict based on its distaste for Hand rather than on conclusive proof that Hand murdered his wife and Welch."  (Motion, Doc. No. 121, PageID 2957).  Hand also cites no law in this section of the Motion.  "There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence."  *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir. 2003), *accord*, *Bey v. Bagley*, 500 F.3d 514, 520 (6th Cir. 2007)

Claimed Error Two is completely without merit.


**Claimed Error Three:  Ineffective Assistance of Trial Counsel at the Guilt Phase**


In his Claimed Error Three, Hand claims clear error in the Court's rejection of two of his ineffective assistance of trial counsel claims.

**First Branch:  Failure to Protect Attorney-Client Privilege**

In his Fourth Ground for Relief, Hand asserted his trial attorney was ineffective for failing to object that testimony from Hand's bankruptcy attorney should have been excluded under the protection for attorney-client communications.

12

The objected-to portion of Judge Beckwith's Order reads:

(A) **Failure to object to testimony from Hand's bankruptcy attorney that was protected by attorney-client privilege.**

This issue was first raised in Hand's application to reopen his direct appeal filed in September 2007, where Hand was represented by his federal habeas counsel. The Ohio Supreme Court denied that application because it was not timely filed. The Magistrate Judge concluded this subclaim is procedurally defaulted because it should have been, and was not, raised on direct appeal. Ohio's *res judicata* doctrine requires a claim to be raised at the first opportunity or it is waived. This doctrine is clearly recognized as an adequate and independent state ground upon which to find a habeas claim defaulted. And there is little doubt that the Ohio courts would enforce this rule, as it did so with several other claims that Hand raised for the first time in his post-conviction petition.

The Magistrate Judge also rejected Hand's argument that he established cause for the default and actual prejudice resulting from a constitutional error. Procedural default may be excused by such a showing, or by a demonstration that the failure to review the claim will result in a fundamental miscarriage of justice. Coleman v. Thompson, 501 U.S. 722, 749 (1991). Hand contends that he was represented by the state public defender's office on direct appeal and for his post-conviction proceedings. But the public defender did not represent him at trial, and no conflict prevented his new appellate lawyers from raising any claim of ineffective assistance of trial counsel in his direct appeal. The fact that the public defender's office also represented him in postconviction proceedings does not affect that conclusion.

He also contends that he has shown cause for the default based on ineffective assistance of appellate counsel. Because his appellate lawyers were all from the public defender's office, Hand argues that his earliest opportunity to raise an appellate counsel claim was in his untimely petition to reopen his direct appeal. He suggests that his testimony about the advice he received from his bankruptcy lawyer, which was elicited by the state during Hand's cross-examination, was not only prejudicial, it was "devastating" because it strengthened the state's argument that Hand had a financial motive to kill Jill.

As discussed below with respect to sub-claim (B) of Hand's Eleventh Ground for relief, Hand's ineffective assistance of

appellate counsel sub-claim regarding this issue is procedurally defaulted. The Ohio Supreme Court summarily rejected Hand's 2007 motion to reopen his direct appeal which included this sub-claim because his motion was untimely. Hand's ineffective appellate counsel claim is therefore itself defaulted, and it cannot serve as good cause for his admittedly defaulted ineffective assistance of trial counsel sub-claim.

Moreover, even if the claim is not defaulted, the testimony at issue concerned State Exhibit 70, a letter from a local bankruptcy law firm addressed to Hand to confirm an appointment at the firm. Earlier in the trial, the judge read the parties' stipulation about that letter to the jury: "If called [as a witness], a records custodian of the law firm Semons and Semons would testify that the appointment book for their law firm would indicate an appointment for the defendant regarding bankruptcy issues for May 19th, 2001, and that the defendant did not keep this appointment, but re-scheduled it. The witness would further testify that the defendant never kept the appointment and did not consult with any attorney in the law firm." (Trial Trans. Vol. 11 at 1470-1471) Later on, during his direct testimony in his defense case, Hand explained that Jill Hand was upset when she learned about the fact that he had a very large credit card debt, and that they had worked out a plan to reduce his debt. He testified that "... some of [the plan] consisted of a bill consolidation, Chapter 13, or something, ... where they consolidate it, make an agreement, lower your payment, lower what you owe them, and then pay it off in a so many year program. We was going to file bankruptcy; I was going to file bankruptcy by myself on all these bills." (Trial Trans. Vol. 19 at 3471) He said that he was not concerned about filing for bankruptcy, because he did not have anything to protect, and Jill owned her own home and his creditors could not touch her assets. (Id. at 3472) Hand's lawyer questioned him how the idea of bankruptcy first came to him, asking "... was that something you talked to about with anybody?" Hand responded that he talked to several people about bill consolidation, to stop creditors from calling him at home; he also admitted that his name and phone number were "in the book" at the law firm. (Id. at 3475) Then on cross-examination, Hand was asked about the letter from the bankruptcy law firm. Hand remembered going to an appointment, and said he had talked to a lawyer on two occasions. The prosecutor asked if that lawyer told him that he could not eliminate his debt through bankruptcy, and Hand answered: "He did not say that; no, sir. He just told me what he wanted - that he wanted W-2 forms from me, since I wasn't including Jill in the bankruptcy."

14

(Id. at 3531) Hand also testified that he never actually filed a bankruptcy petition.

Hand voluntarily disclosed the fact that he had contemplated filing for bankruptcy protection, and the letter from the law firm was admitted by stipulation. Moreover, the Court doubts that his testimony describing what the lawyer told him about the kind of documents needed in order to prepare a bankruptcy petition revealed privileged information. This Court would conclude that this brief testimony did not prejudice Hand's defense or result in a fundamentally unfair trial, even if Hand could overcome his default of this sub-claim.

(Order, Doc. No. 118, PageID 2843-46.)

Hand has no quarrel with the first finding that this claim should have been raised on direct appeal because it is based on the appellate record, that it was not raised in that way, and that it would therefore be barred by the Ohio criminal doctrine of *res judicata*. He asserts, rather, that the default on direct appeal is excused by the ineffectiveness of his appellate counsel. Ordinarily when a habeas petitioner wants to rely on ineffective assistance of appellate counsel to show cause and prejudice, he must first present that ineffective assistance of appellate counsel claim to the state courts. *Edwards v. Carpenter,* 529 U.S. 446 (2000). Hand did eventually present this claim to the Ohio Supreme Court in a motion to reopen the direct appeal, but the court dismissed the motion as untimely.

Hand asserts that his procedural default in presenting the ineffective assistance of appellate counsel claim is excused by the fact that he had the same post-conviction counsel as direct appeal counsel and that, under Ohio law, attorneys are not expected to raise claims that they or other members of their firms were ineffective, (Motion, Doc. No. 121, PageID 2957, *citing State v. Cole*, 2 Ohio St. 3d 112 (1982).)

*Cole* does not hold what Hand cites it for.  Instead, in a footnote, the *Cole* court cites

15

*State v. Carter*, 36 Ohio Misc. 170, 304 N.E. 2d 415 (Mont. Cty. C.P. 1973)(Rice, J., later of this

Court).  Judge Rice distinguished *State v. Perry,* 10 Ohio St. 2d 175 (1967), then and now the

leading case on criminal *res judicata* in Ohio, on the grounds that to raise ineffective assistance

of trial counsel at the trial level, a criminal defendant would have to raise the issue *pro se*.

> Certainly, his retained counsel could not logically be expected to
> urge the argument of his own inadequacy or incompetency upon
> the trial court. One cannot realistically expect trial counsel to argue
> the issue and, likewise, one cannot logically expect the defendant,
> himself, to take over the proceedings from his attorney so as to
> argue the issue on his own.

Carter, 36 Ohio Misc. at 173, 304 N.E.2d at 417.  Certainly, by citing *Cole*, Hand has not shown

the Court committed manifest or clear error in finding this claim procedurally defaulted – and

*Cole* is the only case cited.

Assuming *arguendo* that *Cole* and its progeny overcome the default in timely presenting

the ineffective assistance of appellate counsel claim, Judge Beckwith alternatively found that

claim was without merit:

> The Court would also conclude that the sub-claim regarding the
> allegedly privileged testimony from Hand's bankruptcy attorney
> lacks merit. The underlying claim is procedurally defaulted, as the
> Court discussed previously with respect to sub-claim (A) of
> Ground Four. This sub-claim was not "clearly stronger" than the
> claims that were raised, given Hand's actual testimony and the
> likelihood that the information Hand voluntarily disclosed was not
> in fact privileged.

(Order, Doc. No. 118, PageID 2933.)  At most, the information from the attorney showed that

Hand had made an appointment to discuss a possible bankruptcy filing.  Hand argues the

prejudice comes from revealing that he was considering bankruptcy and thus bolstering the

State's asserted motive for killing his wife, to wit, to get the life insurance proceeds.  But Hand

himself disclosed on the witness stand that he was considering bankruptcy or at least a Chapter

13 proceeding.  In the face of that testimony, appellate counsel would readily have understood how weak a claim of ineffective assistance of trial counsel regarding this bare-bones appointment book information would have been.  It was not clear error to find no merit to the ineffective assistance of appellate counsel claim.


### Second Branch:  Failure to Adequately Voir Dire Jurors Ray and Finnamore


Hand also claims the Court committed clear error in not granting him habeas relief on his claim that he received ineffective assistance of trial counsel when his trial attorney failed to question Jurors Ray and Finnamore further about their answers to jury questionnaires regarding pretrial publicity.

The objected-to portion of Judge Beckwith's Order is as follows:

**(B) Failure to adequately question potential jurors about pretrial publicity.**

> Hand contends that his trial counsel failed to adequately question two jurors about their exposure to pre-trial publicity. This sub-claim was not raised on direct appeal, but was raised in Hand's post-conviction petition. The trial court found it was barred by res judicata, and the Ohio Court of Appeals affirmed because Hand did not offer "... any new evidence outside the record, precluding the application of res judicata. We note the record on direct appeal was supplemented with the jury questionnaires which [Hand] asserts merit review under post conviction relief herein." State v. Hand, 2006- Ohio- 2028 at ¶ 33 [footnote omitted].
>
> Hand contends he can establish cause for this default, based on his appellate counsel's failure to amend his direct appeal merit brief to specifically present this sub-claim.  This sub-claim is related to sub-parts (E) and (F) of Hand's ineffective assistance of appellate counsel claims (raised in his Eleventh Ground for Relief), and the Magistrate Judge concluded that those sub-claims were not defaulted. Because ineffective assistance of appellate counsel can serve as good cause to excuse a procedural default, the Magistrate Judge addressed whether Hand was prejudiced by appellate

counsel's failure to raise this issue on appeal. If not, then Hand has not shown that he can avoid the procedural bar of the state court's application of res judicata. In order to do so, Hand must establish that his trial counsel was deficient in failing to specifically question the two jurors about their responses to the juror questionnaires indicating that they had seen some pre-trial publicity, and that he was actually prejudiced by that failure (and thus by his appellate lawyer's failure to appeal the issue). After reviewing the record, the Magistrate Judge found that Hand has not satisfied that burden.

The juror questionnaires asked the prospective jurors if they had seen or heard anything about the case, and if so, "What impression did [the article] leave in your mind?" Ms. Ray responded that she had seen a local newspaper article in April 2003 that left her "wondering." (Apx. Vol. 10 at 213) She also stated that despite the article, she had no opinion on whether Hand was guilty, that she could put the article out of her mind, and could follow the court's instructions. She reported that she believed in the death penalty but thought it was not appropriate for most murder cases. *Id.* at 215. Hand's counsel did not directly question Ms. Ray about her questionnaire response in voir dire.

Juror Finamore stated in her questionnaire that she had seen articles and news reports about the case two or three times, which left her with the impression that Hand was probably involved in the murder, and was guilty. She also stated that she would be able to put that information out of her mind, and base a decision on the evidence and the court's instructions. She responded that she would have no trouble following the instruction to avoid news media during the trial. Answering a question about the death penalty, she stated that life in prison was a greater punishment than the death penalty in some cases, and that the death penalty was not appropriate for most murder cases. She was not directly questioned during voir dire about her responses concerning the articles and news reports. The trial court conducted voir dire by posing initial questions to small groups of potential jurors, excusing jurors who would face financial hardships or would not be available for the projected length of the trial, and then considering challenges for cause within the small group. In the initial questioning of the small group of seven that included Ray and Finamore, the trial court asked a few preliminary questions, and then asked if anyone in the group had any changes to their responses to the written questionnaires; all seven answered in the negative. (Trial Trans. Vol. 4 at 301-305) The judge reminded the group that any verdict must be based on evidence presented in the

courtroom, and "not on the basis of what you may have read, heard or seen in the news media. Is there anything that you may have read, heard or seen that caused you to form an opinion as to the defendant's guilt or innocence that you could not put aside?" (Id. at 306) All jurors responded negatively; and the court asked again, "Any of you?" and again there were no responses. The court asked, "So were you all able to put aside anything you saw, heard or read in the media and decide this case strictly on evidence that's presented within the walls of this courtroom?" (All answered in the affirmative.) "Does anybody have any concerns about that?" There were no responses. "No, all right. I'm sure none of you want to reach a significant and important decision in your lives based on something you might have seen in the news, is that fair?" All of the jurors answered yes. (Id. at 306-307)

Hand's counsel then asked Ms. Ray if she would be able to consider a verdict other than death; she replied "Yes, you know, if it leaned that way. It depends on the evidence, the law that is presented." She said that the state would have to prove that the sentence was appropriate. (Id. at 320) Defense counsel then asked the group about the "eye for an eye" adage, and Ms. Ray said she did not believe in that, explaining that "I believe in the New Testament and not the Old." Ms. Finamore responded that she agreed "to a certain extent, but again, you hear about turning the other cheek also. I don't necessarily think that if someone kills a person, their life should be taken. I don't think it's an automatic death penalty." (Id. at 322) Finamore felt the same way about someone who committed more than one murder. (Id. at 323) The prosecutor also asked Ms. Finamore about her feelings about the death penalty, noting that she wrote in her questionnaire, "I see more shades of gray rather than black and white." She explained: "I would want to be absolutely certain. I mean, I don't know the details of the situation, but I believe it was in Illinois that recently everybody was taken off death row because they have found that there were people on death row that were not guilty and that kind of thing bothers me some. I would not want to sentence someone to death and find out later that they were innocent." (Id. at 331) She said she understood the law and that the death penalty is appropriate in many situations, but she would want to be "firmly convinced." (Id. at 332) The prosecutor then asked the entire group of seven, "I take it nobody has any views on the pre-trial publicity questions from yesterday that cause you any trouble? You don't have any particular views that apply in this group of seven based on things you've heard?" All of the group, including Finamore and Ray, answered no. (Id. at 323-324)

The Magistrate Judge concluded that Hand has not shown actual prejudice resulting from his trial counsel's failure to further question Ray or Finamore about publicity. With regard to Ms. Ray, her exposure to publicity was minimal and she said that it left her "wondering" about the case. Her other responses to both the questionnaire and to the voir dire questions were clear: she believed she was able to put that article out of her mind and to follow the court's instructions. Moreover, she may have been a very favorable juror, given her responses to questions about the death penalty and her rather firm rejection of the "eye for an eye" adage. Ms. Finamore's questionnaire answers raised a greater concern than Ms. Ray's, especially her comment that the media stories she had seen led her to think that Hand was guilty.

Despite that statement, the Magistrate Judge concluded that she had been rehabilitated during voir dire. She repeatedly affirmed that she would be able to put all of her initial impressions and exposure to publicity out of her mind, and would follow the court's instructions. And like Ms. Ray, many of her responses, particularly regarding the death penalty, strongly suggested she would be a favorable juror. For example, she stated that even if a defendant killed more than one person, the death penalty would not be automatic in her mind, and that any sentence would depend upon the evidence presented.

Hand objects to the Magistrate Judge's conclusion, arguing that he did not understand the legal basis of this sub-claim, which Hand contends is ineffective assistance of counsel, not a "biased jury" claim: "Hand does not claim, as the Magistrate [Judge] implies, that his jury was not fair and impartial or comprised of a fair cross-section of his peers, but instead faults his attorneys for not adequately questioning Jurors Ray and Finamore to determine whether they should be the subject of peremptory challenges." (Doc. 108 at 11) Hand cites Quintero v. Bell, 256 F.3d 409, 414 (6th Cir. 2001), affirming the grant of habeas relief due to trial counsel's failure to adequately examine potential jurors. The petitioner in that case escaped from prison with a group of several other prisoners. He was eventually caught and tried on the charges. Seven of his trial jurors had served on the jury that two months earlier had convicted one of his fellow escapees. His trial counsel did not object to the presence of these jurors, and there were no questions asked during voir dire about the jurors' ability to serve due to their exposure to the prior trial. The state courts found that his claims of a biased jury and ineffective assistance of counsel were procedurally defaulted. The federal district court granted his habeas petition and the Sixth Circuit affirmed, noting that the case

raised two prejudice inquiries: prejudice resulting from the tainted jury, and prejudice caused by ineffective assistance of counsel. The court concluded that the tainted jury was itself a Sixth Amendment violation that rose to the level of structural error. And the court found good cause to excuse the procedural default of that claim, due to the ineffective assistance of petitioner's trial counsel in failing to question or challenge in any way the seating of those jurors. Despite the petitioner's admission at his trial that he had escaped from prison (which the state argued established that no prejudice resulted), the court concluded that including the jurors who participated in the previous case undermined the fundamental fairness of petitioner's entire trial.

The facts at issue here do not come close to structural error, much less a Sixth Amendment violation. Indeed, Hand admits that he is not claiming that his jury was biased or lacked impartiality; nevertheless, he contends that he has shown actual prejudice because his trial counsel should have questioned the two jurors more extensively. To be entitled to habeas relief on this claim, Hand must demonstrate that he was actually prejudiced by counsel's failure to ask more questions, not simply raise the possibility that additional questions might have elicited additional or different responses than those the jurors gave to the court's questions. Moreover, as the Magistrate Judge noted, these jurors gave very favorable responses to issues concerning the applicability of the death penalty.

Given the extent of the voir dire that was actually conducted of these two jurors and of the small group they were questioned with, the Court must conclude that Hand has not shown that he was actually prejudiced by trial counsel's failure to further question these jurors, or by appellate counsel's failure to amend his direct appeal brief to specifically raise this sub-claim. Therefore, as the Magistrate Judge concluded, Hand has not satisfied the cause-and-prejudice requirements that would excuse his procedural default of this ineffective assistance of trial counsel sub-claim.

(Order, Doc. No. 118, PageID 2846-53.)

Hand now argues that this portion of Judge Beckwith's Order committed clear error (1) in holding that "Jurors Ray and Finnamore were not prejudicial to the defense" and (2) in distinguishing *Quintero v. Bell*, 256 F.3d 409 (6th Cir. 2009) (Motion, Doc. No. 121, PageID 2958-59).

As to the first of these supposedly manifestly erroneous holdings, Judge Beckwith was quoting Hand's counsel who said "Hand does not claim, as the Magistrate [Judge] implies, that his jury was not fair and impartial or comprised of a fair cross-section of his peers, but instead faults his attorneys for not adequately questioning Jurors Ray and Finamore to determine whether they should be the subject of peremptory challenges." (Objections, Doc. 108, PageID 2453) If the Petitioner concedes that his jury was fair and impartial, how can it be clear error for the District Judge to find that the two jurors complained of "were not prejudicial to the defense"? Perhaps what Hand is arguing is that these two jurors could not have been excused for cause, but should have been the subject of peremptory challenges. (*See* Objections, Doc. No. 108, PageID 2453.) But what further information is there in the trial record to show that others in the jury pool would have been more favorable than these two? It must be recalled that this is a claim of ineffective assistance of trial counsel based on the trial record – nothing beyond the trial record was introduced to prove that hypothesis. The Ohio courts dismissed this ineffective assistance of trial counsel claim on *res judicata* grounds because nothing beyond the trial record was introduced to prove it. To excuse that procedural default, Hand proposed to show ineffective assistance of appellate counsel in failing to amend to add this claim. While the ineffective assistance of appellate counsel claim itself is properly preserved for decision on the merits, to be successful Hand must show that the argument that trial counsel was ineffective was a "clearly stronger" argument than others that were made on appeal and would have to prove the trial attorney ineffectiveness from the trial court record. He points to no evidence anywhere in the record that further questioning of these two jurors would have produced anything to tip the scale against them in the exercise of peremptory challenges. He does not even say what questions it was ineffective assistance to fail to ask, much less what the answers would have been. When we

ask Hand's current counsel what it is his trial counsel should have done, the answer is simply "more." That shows neither deficient performance nor prejudice under *Strickland* and *a fortiori* does not show this would have been a "clearly stronger" argument on appeal.

Hand argues next that *Quintero v. Bell,* 256 F.3d 409 (6th Cir. 2001[3]), has been applied in a clearly erroneous way. In that case, seven of the twelve jurors had served in the prior trial of Quintero's co-escapees. *Id.* at 411. He did not preserve his claim that he did not receive a fair and impartial jury on direct appeal and the Kentucky Supreme Court dismissed the claim on that basis. *Id.* The district court granted the writ on the impartial jury claim, finding the procedural default was excused by ineffective assistance of trial counsel. *Id.* The Sixth Circuit found the taint from prior service was so grave as to constitute a structural error, and the failure to object was so plainly deficient performance that Quintero did not have to show prejudice, either from the taint or from the ineffective assistance. *Id.* at 415.

Hand argues *Quintero* stands for the proposition "that a jury containing members who have prejudged the defendant's guilt satisfies the prejudice requirement." That is inaccurate. What the Sixth Circuit held was that a jury including seven people who have actually sat in judgment of co-defendants is presumptively prejudiced. Nothing like that occurred here. Jurors Ray and Finnamore had been exposed to some pretrial publicity about the case. That exposure was examined in voir dire and they revealed, as Judge Beckwith found, attitudes which would leave a reasonable observer to think they might be favorable to the defense. It is standard practice in cases which have received pretrial publicity to ask jurors if they have seen or heard it and if they have formed an opinion which they cannot put aside. The law has no presumption that a juror cannot put aside such opinions. Hand's position seems to be that these jurors had not put those opinions aside but that could not be shown sufficiently to excuse them for cause, so

---

[3] Miscited by counsel as 2009.

counsel should have continued to examine them until he heard answers which would have caused him to prefer some other unidentified potential juror to them.  *Quintero* requires nothing of the kind.

**Claimed Error Four:  Ineffective Assistance of Trial Counsel at the Sentencing Phase**

      **First Branch:  Omission of Psychologist Testimony**

In his Fifth Ground for Relief, Hand claims he suffered ineffective assistance of trial counsel when his attorneys did not elicit from the defense psychologist, Dr. Davis, testimony that Hand was "truthful, open, and cooperative [in psychological testing]; that his test results did not reveal characteristics similar to those of an antisocial personality disorder; and that Hand's psychiatric profile was not consistent with the typical traits of a 'cold calculating antisocial personality.'"  (Petition, Doc. No. 11, ¶ 86, PageID 73.)

This ineffective assistance of trial counsel claim was not raised on direct appeal.  When Hand presented it in post-conviction with the supporting affidavit of Dr. Davis and his MMPI test results, the state court rejected the claim as barred by *res judicata* on the theory that it could have been presented on direct appeal.  This Court affirmed the procedural default (Order, Doc. No. 118, PageID 2878).

Hand argues it was clear error to reach this conclusion without considering whether the default was excused "to the extent the claim could have been developed in the record, Hand's trial and appellate counsel were ineffective for failing to raise the issue."  (Motion, Doc. No. 121.)  However, Hand points to no place in the state court record where he attempted to show it was ineffective assistance of trial counsel to fail to present this evidence or ineffective assistance

of appellate counsel to fail to argue it was ineffective assistance of trial counsel to present this evidence.  Nor does he point in his Motion to any place in the federal court record where he previously claimed the default was excused by ineffective assistance of counsel.  The very authority Hand cites, *Edwards v. Carpenter*, 529 U.S. 446 (2000), holds that ineffective assistance of counsel claims available to show cause and prejudice can themselves be forfeited if they are not presented to the state courts.

Judge Beckwith assumed arguendo that the procedural default was excused and found there was no prejudice.  She wrote:

> But even assuming that res judicata does not apply and the claim is not defaulted, Hand argues that his situation falls "within the gambit" of Glenn v. Tate, 71 F.3d 1204 (6th Cir. 1995), a pre-AEDPA decision finding that counsel's complete failure to discover and present any relevant mitigation evidence amounted to ineffective assistance of counsel. Hand also cites Williams v. Taylor, 529 U.S. 362, 395 (2000), where the Supreme Court granted habeas relief based on defense counsel's failure to investigate the petitioner's truly nightmarish childhood. The fact that Hand's MMPI results were not discussed by Dr. Davis during his trial testimony does not come close to the magnitude and significance of the utter failure to investigate a defendant's background that was addressed in both Glenn and Williams. If Dr. Davis had testified that Hand does not suffer from a manifest anti-social personality disorder, an area of cross-examination might have been eliminated as Hand argued in his post-conviction petition. But Dr. Davis does not opine or even suggest that Hand was psychologically incapable of committing the murders, or of conspiring with Welch to commit them. The state's primary theory was that Hand killed Jill because he badly needed money, and he killed Welch to eliminate him as a witness to Jill's murder. The fact that the jury did not learn that Hand was not diagnosed with anti-social personality disorder is not the sort of powerful mitigating evidence, such as the type of evidence discussed in *Williams*, that supports a reasonable likelihood that the jury would not have imposed the death penalty if Dr. Davis had discussed those test results.
>
> . . .

> Even if Dr. Davis had testified that Hand did not have an antisocial personality disorder, or that he had depression and anxiety, that testimony would not establish a reasonable probability that Hand would have received a life sentence in lieu of the death penalty. Even if this claim is not barred by res judicata, as the Ohio Court of Appeals found, it would fail on its merits.

(Order, Doc. No. 118, PageID 2879-81.)  In other words, the testimony of one psychologist that Hand was not a sociopath (the other term for persons with anti-social personality disorder) would not likely have persuaded the jury that a man responsible for the murder of three wives for money who then murdered the hit man (conclusions the jury had already reached) was not deserving of the death penalty.

### Second Branch:  Evidence of Medication

Hand also argues it was clear error for the Court to reject his claim that his trial counsel were ineffective "in failing to present evidence [from his mental health expert] that he was highly medicated during trial and thus unable to express emotion or remorse on the grounds that Hand was not prejudiced by the exclusion of this testimony."  (Motion, Doc. No. 121, PageID 2960).

The objected-to portion of Judge Beckwith's Order reads:

> (B)  Failure to present testimony about Hand's demeanor at trial.
>
> Hand alleges that when he testified at his trial, he was taking prescribed medications which influenced his demeanor and hampered his ability to clearly present his testimony. He suggests that the lack of evidence about these medications must have affected the jury's evaluation of his credibility. This issue was first raised as his sixth claim in his post-conviction petition. The Ohio Court of Appeals found this claim (as well as his fourth and eighth claims) barred by res judicata, because Hand did not offer admissible evidence that was outside of the trial record: "Rather,

26

the record demonstrates the issues were cognizable and capable of review on direct appeal." State v. Hand, 2006-Ohio-2028 at ¶ 36. The Magistrate Judge concluded that this claim is defaulted, and that Hand did not show cause to excuse the default.

Hand objects, arguing that the essence of this claim is that his attorneys failed to introduce evidence about the medications and their alleged negative effect on his demeanor and his ability to testify. As this claim would necessarily rely on evidence outside the trial record (records concerning the medications), he contends that he properly presented it in his post-conviction petition. Hand submitted an affidavit with that petition from a mitigation specialist, describing her conversation with one of Hand's jurors, who reported that Hand's testimony was "awful," that Hand seemed very nervous, and that he kept changing his story. (Apx. Vol. 10 at 380) Aside from the obvious hearsay problem, a juror's subjective impression of testimony offered at trial is inadmissible under Ohio's Evid. Rule 606(B), as the Ohio Court of Appeals held. Hand also submitted medical records from the time he was held in the Delaware County Jail before his trial, documenting administration of Buspar (for anxiety) and Trazadone (an anti-depressant). (Id. at 388-431) He argued that if his friends had been called as witnesses, they would have testified that he always had trouble "expressing himself" and was a "poor speaker." (Apx. Vol. 10 at 101) But Hand does not dispute the fact that all of this evidence was available at the time of trial. As the Ohio Court of Appeals held, the issue was cognizable and capable of review on direct appeal.

In his Supplemental Report, the Magistrate Judge further concluded that even if the claim is not barred by res judicata, the claim should be rejected on the merits. Even if Dr. Davis had testified that Hand's medications, his anxiety, or his general "social ineptness" contributed to his difficulty in expressing himself, or if his friends had testified about that difficulty, it is sheer speculation to assume that any of that testimony would have altered the outcome. (Doc. 111 at 19-20) The Court agrees with this alternate conclusion. In order to demonstrate prejudice resulting from ineffective assistance, Hand must demonstrate a reasonable probability of a different result, not simply identify additional evidence that could have been presented, or testimony that other witnesses might have given. This sub-claim is therefore denied.

(Order, Doc. No. 118, PageID 2884-85.)

Hand's only argument about why this finding of no prejudice is clearly erroneous is that

the State "presented evidence that Hand failed to show emotion as evidence of his lack of remorse." (Motion, Doc. No. 121, PageID 2960, *citing State v. Hand*, 107 Ohio St. 3d 378, 388-89 (2006). Nothing on either of those pages has anything to do with Hand's demeanor at trial or any argument about it by the prosecutor. The only place where the word "remorse" appears in the Supreme Court opinion is in ¶ 126 where the court is discussing admission of testimony that Hand failed to show remorse about Jill's death two to three weeks after it happened; that testimony did not concern his demeanor at trial. Nor is there any discussion in the opinion about Hand's demeanor at trial.

Aside from this one unpersuasive argument, Hand makes no other arguments in support of his claim of clear error in finding no prejudice. The Court is not cited to any place in the record where Dr. Davis is shown to have been willing or competent to testify "that the medications [Hand] was taking prohibited him from outwardly expressing emotion." (Motion, Doc. No. 121, PageID 2960.)[4] In post-conviction Hand argued that his friends could have been called to testify he had trouble expressing himself and was a poor speaker. That testimony would hardly have explained any lack of emotion he showed at trial, but only, perhaps, why his testimony or unsworn statement were halting, if indeed they were. The only evidence Hand presented about the impact of his demeanor on the jury was a post-conviction affidavit from a mitigation specialist who found a juror who said that Hand's testimony was "awful," that he seemed nervous, and that he kept changing his story. If the Buspar was prescribed for anxiety, how explain that it did not appear to work? To this juror, Hand did not appear to be emotionless, but nervous. And no medication would explain why he kept changing his story, which would likely have had a negative impact on any juror's evaluation of Hand.

---

[4] Dr. Davis' Affidavit in post-conviction concerned the MMPI results. He was not the prescriber of Trazadone and Buspar because he was a psychologist, not licensed to prescribe controlled substances.

In sum, Hand has presented nothing to show the Court's finding of lack of prejudice from failure to present medication testimony was "clear error."

**Claim of Manifest Injustice**

In addition to the claimed "clear" or "manifest" errors of law dealt with above, Hand argues "it is manifestly unjust to impose a death sentence based solely on the thirty-year[-]old recollections of biased individuals and a discrete statement allegedly made by Hand to a jailhouse informant."  (Motion, Doc. No. 121, PageID 2960-61.)

As authority for the Court's power to act to correct manifest injustice, Hand cites *United States v. Moored*, 38 F.3d 1419,[5] 1421 (6th Cir. 1994).  In that case the Sixth Circuit was considering whether a district court could revisit loss calculation on remand for resentencing.  It held:

> The law of the case doctrine and the mandate rule generally preclude a lower court from reconsidering an issue expressly or impliedly decided by a superior court. However, these principles are not without exception. "Even where, as here, an appellate court's mandate does not contemplate resurrecting an issue on remand, the trial court may still possess some limited discretion to reopen the issue in very special situations." *Bell,* 988 F.2d at 250-51. In *Petition of United States Steel Corp.*, 479 F.2d 489, 494 (6th Cir.), *cert. denied*, 414 U.S. 859, 38 L. Ed. 2d 110, 94 S. Ct. 71 (1973), this circuit explained that the law of the case doctrine dictates that issues, once decided, should be reopened only in limited circumstances, e.g., where there is "substantially different evidence raised on subsequent trial; a subsequent contrary view of the law by the controlling authority; or a clearly erroneous decision which would work a manifest injustice." (*citing White v. Murtha*, 377 F.2d 428, 431-432 (5th Cir. 1967)). *Accord United States v. Rivera-Martinez*, 931 F.2d 148 (1st Cir.), *cert. denied*, 112 S. Ct. 184 (1991).

---

[5] Miscited by counsel as "1319" at Doc. No. 121, PageID 2960.

*Id.*.at 1421-22.  *Moored* does not speak to any authority of a federal court to set aside a state court criminal judgment because the federal court believes the sentence works a "manifest injustice."  Nor is the Magistrate Judge aware of any federal case law supporting such a decision. Presumably the core case of manifest injustice would be execution of someone who is actually innocent and the Supreme Court, although it has come close, has not yet held that habeas authority reaches to such a case.  *See Herrera v Collins,* 506 U.S. 390, 417 (1993); *House v. Bell*, 547 U.S. 518 (2006).

Hand assumes the Court has the requisite authority and appeals directly to the Court's sense of justice.  Given three dead wives and a dead hit man, Hand's claim of injustice is, to put it as mildly as possible, unpersuasive.

**Conclusion**

The Motion to Amend under Fed. R. Civ. P. 59(e), construed as a motion for reconsideration, should be denied in its entirety.

September 16, 2013.

s/ *Michael R. Merz*
United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report

30

and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.  Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).